**IN THE UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No.: 1:25-cv-00024-LMM |
| FULTON COUNTY AND SHERIFF PATRICK LABAT, IN HIS OFFICIAL CAPACITY, | ) ) ) ) | |
| Defendants. | ) ) | |

**CONSENT DECREE**

# TABLE OF CONTENTS

I.      INTRODUCTION AND BACKGROUND......................................................................... 1

II.     DEFINITIONS ....................................................................................................................... 3

III.    POLICIES, PROCEDURES, AND TRAINING ................................................................ 6

IV.     NOTIFICATION OF RIGHTS AND PROTECTIONS ................................................... 7

V.      PROTECTION FROM HARM............................................................................................ 9

        A.   Policies, Procedures, and Training ....................................................................... 9
        B.   Classification and Housing................................................................................... 10
        C.   Staffing and Supervision...................................................................................... 11
        D.   Contraband Prevention ........................................................................................ 13
        E.   Gang Violence ....................................................................................................... 14
        F.   Grievances, Incident and Maintenance Reporting........................................... 15
        G.   Investigations and Corrective Action Planning ............................................... 17
        H.   Sexual Abuse Reporting and Investigations ..................................................... 19
        I.   Information Management Systems and Resiliency Planning ........................... 21
        J.   Data Tracking and Reporting.............................................................................. 22

VI.     USE OF FORCE ................................................................................................................. 22

        A.   Policies, Procedures, and Training ..................................................................... 22
        B.   Tasers..................................................................................................................... 25
        C.   Use-of-Force Reviews .......................................................................................... 26
        D.   Data Tracking and Reporting.............................................................................. 29

VII.    ENVIRONMENTAL HEALTH AND NUTRITION ...................................................... 30

        A.   Policies, Procedures, and Training ..................................................................... 30
        B.   Sanitation and Environmental Safety ................................................................ 30
        C.   Physical Plant........................................................................................................ 31
        D.   Pest Control ........................................................................................................... 32
        E.   Chemical Control.................................................................................................. 33
        F.   Food and Nutrition............................................................................................... 34

VIII.   MEDICAL AND MENTAL HEALTH CARE ................................................................ 34

        A.   Policies, Procedures, and Training ..................................................................... 34
        B.   Intake and Records ............................................................................................... 35
        C.   Emergencies........................................................................................................... 35
        D.   Medical and Mental Health Assessments, Sick Calls, and Referrals ............ 36
        E.   Medical Care.......................................................................................................... 38

F. Supportive Environments for People with Medical and Mental Health Needs......... 39

G. Mental Health Care........................................................................................... 40

H. Suicide Prevention ............................................................................................ 43

I. Medication Administration................................................................................. 44

J. Oversight and Mortality Reviews ...................................................................... 45

IX. **RESTRICTIVE HOUSING** ................................................................................. **45**

A. Policies, Procedures, and Training .................................................................... 45

B. Mental Health Contraindication to Restrictive Housing ................................... 46

C. Conditions in Restrictive Housing..................................................................... 48

D. Discipline............................................................................................................ 48

E. 17-Year-Olds in Restrictive Housing ................................................................ 50

F. Data Tracking and Analysis............................................................................... 51

X. **SPECIAL EDUCATION AND RELATED SERVICES** ...................................... **52**

XI. **QUALITY ASSURANCE** .................................................................................... **53**

XII. **IMPLEMENTATION AND REPORTING** .......................................................... **53**

XIII. **RIGHT OF ACCESS**............................................................................................ **56**

XIV. **MONITORING** ...................................................................................................... **56**

A. Selection, Term, and Budget of the Monitor ..................................................... 56

B. Monitoring Activities.......................................................................................... 58

C. Reporting and Compliance Assessments and Other Monitoring Activities ............. 59

D. Limitations.......................................................................................................... 61

XV. **ACCOUNTABILITY AND TRANSPARENCY**.................................................. **63**

XVI. **JURISDICTION AND ENFORCEMENT** ........................................................... **64**

XVII. **CONSTRUCTION AND TERMINATION**........................................................... **64**

XVIII. **PRISON LITIGATION REFORM ACT STIPULATION** ..................................... **66**

## I.    INTRODUCTION AND BACKGROUND

1.  The United States of America ("United States"), Fulton County ("County"), and
    Sheriff Patrick Labat in his official capacity as the Sheriff of Fulton County
    ("Sheriff") (collectively, "the Parties") share a mutual interest in upholding the
    constitutional rights of incarcerated people, promoting safe and effective custodial
    care, and protecting public safety.  This Consent Decree pertains to the Fulton
    County Jail and has the following goals:  (1) provide reasonable protection from
    violence to the incarcerated population; (2) ensure that incarcerated people are not
    subject to excessive force; (3) provide safe and sanitary living conditions; (4) ensure
    appropriate medical and mental health care is provided to incarcerated people; (5)
    ensure that restrictive housing practices do not pose an unreasonable risk of harm, do
    not discriminate against people with mental health disabilities, do not harm 17-year-
    olds, and provide due process; and (6) provide eligible 17-year-olds access to special
    education services.

2.  The County owns and funds the operations of the Fulton County Jail.  The County
    and Fulton County Sheriff's Office ("FCSO") contract with a third party to provide
    medical and mental health care at the Jail.

3.  The Sheriff leads the FCSO and is responsible for providing care, custody, and
    control of incarcerated people at the Jail.  The Fulton County Sheriff is an elected
    official.

4.  The County and FCSO will work together to implement this Consent Decree.  The
    County will make reasonable and adequate provision of resources necessary to
    enable the Sheriff to perform his duties under this Consent Decree.

5.  In July 2023, the United States initiated an investigation pursuant to the Civil Rights
    of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Title II of the
    Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131.  The investigation
    focused on violence among incarcerated people in the Jail, excessive force against
    the incarcerated population, living conditions in the Jail, the provision of medical
    and mental health care, and the discriminatory treatment of people with mental
    health disabilities.  In April 2024, the United States expanded its investigation

pursuant to CRIPA and the Violent Crime Control and Law Enforcement Act, 34 U.S.C. § 12601, to examine the use of restrictive housing, its disciplinary practices, and access to special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482.

6. On November 14, 2024, the United States issued a CRIPA Findings Report to the County and FCSO concluding that certain conditions at the Jail violated incarcerated people's constitutional and federal rights. Specifically, the United States concluded that the County and FCSO violated the Eighth and Fourteenth Amendments of the United States Constitution by failing to protect incarcerated people from violence from other incarcerated people, having a pattern or practice of excessive force against incarcerated people, failing to provide adequate living conditions, and failing to provide adequate medical and mental health care to incarcerated people. The United States further concluded that the Jail uses restrictive housing in a manner that exposes incarcerated people to a substantial risk of serious harm and that discriminates against people with mental health disabilities in violation of the ADA, and that the Jail imposes disciplinary restrictive housing without due process protections. The United States also determined that the County and FCSO violated the IDEA by failing to provide eligible 17-year-olds in the Jail access to special education services.

7. Throughout the CRIPA investigation, the County and FCSO have cooperated with the United States. The County and FCSO assert that they have also taken steps to address the United States' concerns at the Jail including, but not limited to, the following:

   a. Reduced the jail population from 3,583 on August 30, 2023, to 2,494 on December 9, 2024, such that all individuals are assigned a bed and no one is sleeping on portable sleeping devices.

   b. Fully rehabilitated several of the housing units including floors, showers, lights, door locks, walls, windows with completion of rehabilitation of all units scheduled for January 2025.

   c. Purchased medical beds.

   d. Updated padded cells.

     e.  Added a padded cell at the South Annex.

     f.  Repaired kitchen equipment.

     g.  Contacted NIC to provide technical assistance in September 2022.

8. As indicated in Section XVIII of this Consent Decree, the Parties consent to a finding that this Decree complies in all respects with the provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).

## II.  DEFINITIONS

9. "Compliance" is discussed throughout this Consent Decree in the following terms: substantial compliance, partial compliance, and non-compliance.

     a.  "Substantial Compliance" with a provision of the Agreement means that the County and FCSO have met or achieved all components of the relevant provision of the Consent Decree and met the goals of the provision, and instances of non-compliance are unusual and infrequent.

     b.  "Partial Compliance" with a provision of the Agreement means that the County and FCSO have met or achieved some of the components of the relevant provision and are making tangible progress in achieving substantial compliance, but significant work remains.  The County and FCSO may comply with the requirements of the provision on some occasions, but it often fails to comply with the requirements.

     c.  "Non-compliance" with a provision of the Agreement means that the County and FCSO have not achieved either substantial compliance or partial compliance with the relevant provision of the Consent Decree.

10. "Custody Staff" include deputies and detention officers who are responsible for the safety and supervision of incarcerated individuals.

11. "Discharge Taser"/"Discharging a Taser" means using a Taser in drive stun mode, or firing Taser probes or darts, whether or not the Taser or Taser probes/darts make contact.

12. "Effective Date" refers to the date when this Decree is approved by the Court and entered in the Court's electronic docketing system.

13. "Fulton County Jail" or "Jail" refers to the existing jail facilities where people are detained or held in custody by the FCSO, specifically the Main Jail at 901 Rice Street in Atlanta, and the annex facilities:  the Union City Jail (South Annex) in Union City; the Alpharetta Jail (North Annex) in Alpharetta; and the Marietta Annex, a short distance from the Main Jail in Atlanta, as well as any other facility that is built, leased or otherwise used to the extent that FCSO retains control, to replace or supplement the current Jail facilities or any part of the Jail.  This does not include independent facilities where incarcerated people are outsourced.

14. "Implement" or "implementation" means putting a policy, procedure, or remedial measure into effect, including informing, instructing, or training impacted staff and ensuring that staff in fact follow the policy, procedure, or remedial measure. "Implement" or "implementation" includes educating or training incarcerated people about policies, procedures, or practices relevant to them, such as the grievance and sick call practices.

15. "Incarcerated person," "incarcerated people," or "incarcerated individuals" is construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at the Jail based on arrests, detainers, criminal charges, civil contempt charges, or convictions.

16. "In-service training" refers to training received while on duty, including but not limited to Power DMS training, roll call training, academy training.

17. "Jail Facility" or "Facility" refers to any of the detention facilities referenced in the definition of "Jail" where people are detained or held in custody by the FCSO.

18. "Monitor" means an individual, who is approved by the Court pursuant to the provisions of this Decree to oversee and facilitate its implementation, and his or her team of professionals, if any.

19. "Planned force" or "planned use of force" means a use of force in response to an incarcerated person's actions, where the incarcerated person's behavior does not pose an imminent threat to the incarcerated person's own safety or another individual's safety.  Examples include cell extractions to remove an incarcerated person who is failing to follow lawful directives and potentially is a threat to himself, herself, or others, force used to restrain an incarcerated person in order to

4

prevent continuing property damage, and medically-ordered physical restraints on an incarcerated person exhibiting escalating signs of mental illness.

20. "Policy" or "policies" means regulations, directives, procedures, protocols, unit orders or manuals, regardless of the designation, describing the duties, functions, and obligations of staff, and providing specific direction in how to fulfill those duties, functions, or obligations.

21. "Qualified Mental Health Professional" ("QMHP") refers to an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, social work, or psychiatric nursing, who is currently licensed by the State of Georgia to deliver those mental health services the individual has undertaken to provide.

22. "Restrictive Housing" means removal from the general jail population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another person; and inability to leave the room or cell for the vast majority of the day, typically 22 hours or more. Restrictive housing includes administrative segregation and disciplinary segregation.

23. "Sentinel Event" is a significant negative event that requires investigation into potential underlying system weaknesses.

24. "Serious Mental Illness" ("SMI") means a diagnosable mental, behavior, or emotional disorder that causes serious functional impairment that substantially interferes with or limits one or more major life activities. The Parties agree that not all people with a diagnosable mental, behavior, or emotional disorder will meet this definition.

25. "Staff" or "staff members" includes all persons who are assigned to work at the Jail or provide services to incarcerated people at the Jail, including Custody Staff, other security staff including security specialists, medical practitioners, mental health practitioners, other medical or mental health care staff, County employees, and contractors, as well as volunteers who provide services at the Jail without pay.

26. "Staffing plan" means a detailed document describing the number of staff and the classifications of staff that need to be assigned to each post and position within the facility for each shift.

27. "Sustained Substantial Compliance" means substantial compliance maintained for a period of one year (two consecutive monitoring periods).

28. "Taser" means a weapon designed primarily to discharge electrical charges into a person that cause involuntary muscle contractions and override the person's voluntary motor responses. A Taser is also known as a conducted electrical weapon ("CEW").

29. "Train" means to instruct in skills to a level that the trainee can demonstrate proficiency by testing to implement those skills when called for. "Trained" means proficient in the skills.

30. "Use of force" means the application of physical, chemical, or mechanical measures on an incarcerated person, including measures used to compel compliance with a staff directive to prevent the incarcerated person from harming another incarcerated person or staff, or for other legitimate or illegitimate purposes.

### III. POLICIES, PROCEDURES, AND TRAINING

31. Within 4 months of the Effective Date, or as otherwise agreed to in the Implementation Plan developed pursuant to Section XII, the County and FCSO will provide draft policies, procedures, and training curricula (including PowerPoint slides and handouts) regarding each Party's respective duties under this Consent Decree developed to meet the requirements of this Consent Decree to the United States and the Monitor for review and comment. The United States and the Monitor will provide any comments in response within 30 days of receipt of each policy, procedure, or training.

32. Within 30 days of receipt of comments from the United States and the Monitor, the County and FCSO will revise and finalize the policy, procedure, or training.

33. If the Monitor and United States must approve a policy, procedure, or training before it can be finalized, that requirement will be specified in this Decree. If approval is not specifically required, the County and FCSO will nevertheless consider the comments of the Monitor and United States in revising and finalizing the policy, procedure, or training.

34. The County and FCSO will review their policies, procedures, and training relevant to the Consent Decree annually, revising them as necessary. All substantive revisions to policies, procedures, and training relevant to this Consent Decree will be submitted to the United States and the Monitor for review following the procedure described in paragraphs 31–33, above.

35. FCSO will request a National Institute of Corrections (NIC) and Bureau of Justice Assistance (BJA) assessment of its training program, capacity, and needs, which will be provided to the Monitor and United States. FCSO will obtain from NIC and BJA such assistance as can be provided to improve its training program.

36. All Jail staff will be trained on this Consent Decree, including how and why it came about and what it means, and will be provided with a written overview of the Consent Decree and an electronic copy of the Consent Decree.

37. FCSO will document all staff trainings and certify that each staff member has attended all required trainings and has demonstrated basic competency and understanding of the material presented.

38. FCSO will fully train all Custody Staff, pursuant to FCSO training requirements, before allowing any officer to work without direct supervision in a housing unit.

39. FCSO will train all personnel who hold supervisory and leadership positions in supervision requirements and leadership skills.

40. The United States and the Monitor will be permitted to observe trainings relevant to provisions of the Consent Decree in-person or by reviewing video of the trainings.

## IV. NOTIFICATION OF RIGHTS AND PROTECTIONS

41. FCSO will effectively and meaningfully communicate to all incarcerated people their right to reasonable safety within the Jail, including their right to be free from violence, extortion, sexual abuse, retaliation, and other misconduct; the protections in place to ensure that incarcerated people are safe; and if violence, abuse, or misconduct does occur, that incarcerated people can report it so that it can be responded to promptly, appropriately, and without retaliation.

42. FCSO will ensure that, during the intake process, all incarcerated people receive clear and accurate information regarding the following: (a) all Jail rules and

procedures for incarcerated people to follow; (b) the disciplinary process and potential punishment for rule infractions; (c) the right to be free from violence from other incarcerated people, extortion, sexual abuse, and other misconduct, and from retaliation for reporting such incidents; (d) information about how incarcerated people can protect themselves against a risk of extortion (e.g., not sharing family member contact information, avoiding drug debt); (e) how to report incidents or suspicions of violence, extortion, sexual abuse, or other misconduct; (f) how to seek protection from threatened violence or other harm; (g) procedures for requesting the use of interpreter services; (h) procedures for reporting physical plant issues and requesting repairs to cells and living areas; (i) procedures for requesting hygiene items and accessing laundry services; (j) the process for filing and appealing a grievance; (k) the process of accessing medical and mental health care; and (l) information regarding the FCSO's zero-tolerance policy regarding sexual abuse, including the definition of sexual abuse.

43. Within 14 days of intake, FCSO will provide comprehensive orientation education to incarcerated people, either in-person or through a video presented by an in-person facilitator, regarding their rights to be free from violence, extortion, sexual abuse, and other misconduct, and to be free from retaliation for reporting such incidents, and regarding the FCSO's policies and procedures for responding to such incidents. People currently incarcerated in the Jail will receive this information and education within four months of the Effective Date.

44. FCSO will ensure that the information outlined in this Section is conveyed and made available in formats accessible to all incarcerated people, including those who are limited English proficient, deaf, visually impaired, or otherwise disabled, as well as to incarcerated people who have limited reading skills, and is conveyed via appropriate secure means in facilities, as well as Jail handbooks.

45. The United States will review any materials or curriculum utilized to satisfy the requirements of this Section, in consultation with the Monitor, and provide recommendations.

## V.  PROTECTION FROM HARM

### A.      Policies, Procedures, and Training

46. By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Protection from Harm, and will submit those policies and procedures to the United States and the Monitor pursuant to the process described in Section III above.

47. Within three months of the date that any policy or procedure related to Protection from Harm is finalized or revised (following the period of review for the Monitor and United States), FCSO will train all relevant staff on that policy, through in-service training.

48. Staff training will include information about how to recognize signs of abuse, control, and extortion among the incarcerated population.

49. FCSO will develop and implement a training program to ensure that all Jail investigators have the requisite skills to conduct prompt, thorough, and objective investigations, including specialized training for investigators of sexual abuse allegations.

50. FCSO will train all staff who may have contact with incarcerated people on the following: (a) its zero-tolerance policy for sexual abuse; (b) how to fulfill staff's responsibilities under the FCSO's sexual abuse prevention, detection, reporting, and response policies and procedures; (c) incarcerated people's right to be free from sexual abuse and to be free from retaliation for reporting sexual abuse; (d) the dynamics of sexual abuse in confinement; (e) the common reactions of sexual abuse victims; (f) how to detect and respond to signs of threatened and actual sexual abuse; and (g) how to respond to sexual abuse, including: (i) how to respond effectively and professionally to victims of sexual abuse; (ii) how and to whom to report allegations or suspicions of sexual abuse, including how to comply with relevant laws related to mandatory reporting of sexual abuse to outside authorities; (iii) how to preserve physical evidence of sexual abuse (this provision does not apply to volunteers); and (iv) how to communicate effectively and professionally with incarcerated people, including incarcerated people who are gay or transgender.

### B.    Classification and Housing

51. By dates set in the Implementation Plan, Section XII, FCSO will, in consultation with the Monitor, draft and implement a plan for an objective classification system and housing plan specific to the Jail ("Classification and Housing Plan").  In drafting the Classification and Housing Plan, FCSO will consider custody classification, risk/need assessment, and screening for risk of vulnerability or perpetration of physical violence or sexual abuse.  FCSO will also examine its current housing units, including restrictive housing and protective custody, to determine the appropriateness of each housing unit as it relates to classification at the Jail.  The Classification and Housing Plan will provide for separation of incarcerated people by custody classification, as appropriate.  The Classification and Housing Plan will address adjustments to the classification system, adequate data collection and analysis, and appropriate ongoing testing for effectiveness.  FCSO will submit the Classification and Housing Plan to the United States and the Monitor for review and comment before finalizing.

52. FCSO will update the Jail's intake/classification database to ensure compliance and implementation of the substantive provisions of this Consent Decree.  It will capture important demographic, security, criminal history, vulnerabilities, medical, and mental health information.

53. Jail classification staff will review any incident reports referred to classification and include relevant data from any threatening or violent incidents in the intake/classification database.

54. Housing assignments, including cell and bunk assignments within units, will be assigned by classification staff and may not be changed by other Jail staff, except in the case of exigent circumstances, and then subject to review by classification staff within 24 hours.  Custody Staff will ensure that incarcerated people comply with housing unit, cell, and bunk assignments.

55. FCSO will conduct reclassification progress reviews of all incarcerated people at least once every 90 days to ensure that incarcerated people are assigned to the correct Facility and custody level, in accordance with the classification process.  The

reclassification will give more weight to institutional behavior and less weight to the charged offenses.

56. FCSO will hold a reclassification review of incarcerated people following any adverse disciplinary finding and restrictive housing sanction.

57. FCSO will prepare an annual classification report, based on data from the reclassification progress reviews, to assess whether incarcerated people are being classified correctly and housed appropriately according to their classification.

58. Fulton County and the FCSO will designate or create a sufficient number of housing units to enable the Jail to house people at high risk for victimization safely without relying on restrictive housing or similar punitive conditions. These housing units will be available, per request or assignment, to incarcerated people whose risk assessment screening(s) demonstrate(s) a high likelihood of being abused; who are deemed vulnerable following an incident of physical or sexual abuse, or a threat thereof; who are vulnerable due to renunciation or refusal of gang membership, or who seek to renounce gang membership; or who request protective custody, where an appropriate review by Jail staff deems such protection necessary.

59. When an incarcerated person communicates an imminent threat or risk of danger, Jail staff will immediately place the incarcerated person in a safe place, removed from the perceived or alleged threat of physical or sexual abuse, while determining an appropriate housing assignment.

60. No one will be denied protective custody or a housing unit designated pursuant to paragraph 58 based solely on a refusal to identify the person or persons who pose a threat.

## C.    Staffing and Supervision

61. By dates set in the Implementation Plan, Section XII, the County and FCSO will, in consultation with the Monitor, conduct a staffing analysis consistent with national standards of practice. The staffing analysis will consider the requirements of this Consent Decree in formulating minimum staffing levels for the Jail.

62. By dates set in the Implementation Plan, Section XII, the County and FCSO will provide to the United States and the Monitor a detailed "Recruiting and Retention Plan" that will allow the Jail to meet the minimum staffing levels identified in the

staffing analysis. The County and FCSO will implement the Plan with input from the United States and Monitor.

63. By dates set in the Implementation Plan, Section XII, the County and FCSO will, in consultation with the Monitor, develop and implement a detailed "Staffing Plan" for the Jail. The Staffing Plan will ensure that staffing and supervision levels for each shift are appropriate to adequately supervise people incarcerated at the Jail and ensure access to medical and mental health care, and it will identify mandatory posts that must be filled. The Staffing Plan will take into account the Consent Decree requirements and staffing analyses; potential overcrowding; outside trips (for instance, hospital runs); medical and mental health escorts; and relief for absences, training, holidays, and special assignments. The Staffing Plan will include the number of response or escort officers needed to supervise movement outside of the housing units and serve as a first response when an incident occurs. The County and FCSO will provide the Staffing Plan to the United States and Monitor for review and comment before finalizing.

64. FCSO will document on each shift report whether the minimum staffing requirements as set out in the staffing analysis and staffing plan were met for that shift.

65. FCSO is obligated to ensure that all mandatory posts at the Jail are filled on each shift. FCSO will take all reasonable steps to fulfill this obligation, including by closely tracking and reporting on unfilled posts and developing corrective action plans to address deficiencies.

66. FCSO is obligated to ensure that appropriate security supervisors are assigned to the Jail on all shifts, so as to provide staff supervision and guidance, and ensure safe and orderly operation of the Jail. FCSO will take all reasonable steps to fulfill this obligation, including by closely tracking and reporting on a lack of assigned supervisory staff and developing corrective action plans to address deficiencies. These supervisory positions will not be used to replace correctional officer staffing, absent exigent circumstances.

67. FCSO will ensure and document that there are unannounced, irregularly timed rounds conducted at least every hour inside each general population housing unit and

at least once every 30-minutes for special management units, or more often if required by policy or this Consent Decree. During rounds, Custody Staff will observe every incarcerated person in the unit for signs of life. Video surveillance and visual rounds from a control tower may be used to supplement, but must not be used to replace, rounds by Custody Staff.

68. FCSO will ensure that supervisors conduct and document unannounced rounds during all shifts to identify and deter staff misconduct or lapses in supervision. The Watch Commander, Captain of Security or equivalent, and Chief Jailer, will all conduct documented and unannounced rounds in housing and activity areas.

69. FCSO will ensure that all security rounds are documented electronically in NoteActive. In the event that NoteActive is unavailable, they will be documented in bound logs with pre-printed sequential page numbers that do not contain pre-printed rounding times, and that are maintained on each housing unit, then entered in NoteActive as a late entry. NoteActive logs will be reviewed by the Watch Commander on each shift, and a selection of NoteActive logs will be reviewed by the Chief Jailer monthly.

70. FCSO will identify all Jail doors that should be locked and interlocked (not open at the same time) and develop and implement policies to ensure proper door security.

71. FCSO will draft or revise and implement post orders for Custody Staff for each post in accordance with operational practices developed in compliance with this Consent Decree. The post orders will be prominently located in the control towers.

72. The County and FCSO will continue to perform a criminal background records check on all new hires, including contractors.

**D.    Contraband Prevention**

73. FCSO will appoint an individual of appropriate rank and authority at each Jail Facility with responsibility for the Facility's systems for interdiction of contraband. FCSO will notify the United States and the Monitor of these appointments.

74. By dates set in the Implementation Plan, Section XII, the County and FCSO will, in consultation with the Monitor, develop and implement a "Perimeter and Contraband Plan" for detecting and reducing the amount of contraband at each of the Facilities. The Perimeter and Contraband Plan will set forth procedures for screening and

searching incarcerated people, staff, and visitors, and otherwise detecting and preventing the introduction and flow of contraband around the Jail.  The County and FCSO will submit the Plan to the United States and Monitor for review and comment before finalizing and implementing the Plan.

75. The County and FCSO in consultation with the Monitor, will assess what is required to provide adequate substance use disorder treatment for all persons requiring it at the Jail, and will develop a plan to provide adequate substance use disorder treatment and programs.  The County and FCSO will submit the plan for providing adequate substance use disorder treatment and programming to the United States and the Monitor for approval.  The County and FCSO will implement the plan upon approval.

**E.    Gang Violence**

76. FCSO will assign a person with adequate time and resources to track, monitor, investigate, and implement measures reasonably designed to prevent gang activity in the Jail.

77. By dates set in the Implementation Plan, Section XII, FCSO will, in consultation with the Monitor, develop a "Gang Violence Prevention Plan" that addresses the following areas: (a) ensuring people with known gang affiliations are identified upon entry to the Jail and their affiliation is documented; (b) ensuring people who are later identified as having gang affiliations, including after disciplinary incidents, have their affiliation documented; (c) using housing assignments to ensure that gangs do not obtain control or influence over a particular housing zone; (d) using housing assignments to ensure that rival gangs prone to violence are separated; (e) using housing assignments, including protective custody, to protect people who are likely to be the victim of gang violence (e.g., people who were previously affiliated with a gang); and (f) coordinating with other law enforcement agencies to keep apprised of gang activity and violence that may affect the climate in the Jail.  FCSO will submit the Gang Violence Prevention Plan to the United States and the Monitor for approval.  FCSO will implement the plan upon approval.

F.    **Grievances, Incident and Maintenance Reporting**

78. To adequately identify and respond to all incidents posing a risk of harm to people incarcerated at the Jail, FCSO will provide incarcerated people and staff multiple methods to report incidents of violence, extortion, drug trafficking, other contraband, sexual abuse, and threats of any of the foregoing, free from retaliation.  The FCSO will also provide a designated avenue for receiving this information from third parties, including family members and attorneys.  FCSO will post this information on the FCSO website, in the Jail handbook, in the Jail visiting area, and inside Jail housing zones.

79. FCSO will include accurate information about how to file grievances in the Jail handbook and will make this information available within the housing units.

80. FCSO will keep all kiosks or other electronic devices in housing zones in good, working condition so that all incarcerated people in the Jail can submit grievances via kiosks or other electronic devices.  FCSO will also provide blank grievance forms to all floor officers and will provide paper grievance forms upon request.  In the event that a kiosk or other electronic device is not operable, FCSO will provide a supply of paper grievance forms to the housing zone, unless a supervisor determines that it is not safe to do so.

81. FCSO will assist incarcerated people who are limited English proficient, who have a physical, developmental, or mental impairment that substantially limits one or more major life activities, or who have limited reading or writing skills in accessing the grievance system.

82. FCSO will provide written acknowledgement of any grievance received via kiosk or other electronic device, paper form, or otherwise, within 24 hours.

83. FCSO will issue a final decision on the merits of any grievance within 7 days of the initial filing of the grievance.  FCSO may extend the response period up to an additional 10 days for good cause, with written notice of status update provided to the incarcerated person.

84. After receiving an emergency oral or written grievance alleging an incarcerated person is subject to a substantial risk of imminent sexual abuse or violence, FCSO will immediately forward the grievance (or any portion that alleges the substantial

risk of imminent sexual abuse or violence) to a level of review at which immediate corrective action may be taken, will provide an initial response within 48 hours, and issue a final decision within seven calendar days. The initial response and final agency decision will document FCSO's determination whether the incarcerated person is in substantial risk of imminent sexual abuse or violence and the action taken in response to the emergency grievance. FCSO will not fail to respond to information alleging a substantial risk of imminent sexual abuse or violence due to mere technical flaws in the form of the grievance.

85. When grievance officers refer a grievance to other Jail staff (e.g., Jail investigators, the Prison Rape Elimination Act ("PREA") Coordinator, kitchen administrators, or Health Services Administrator), they will (a) share information explaining the referral that was made when responding to the grievance, and (b) receive confirmation from other Jail staff that they have acted in response to the referred grievance.

86. FCSO will use incident reports to document all incidents related to physical assaults and fights between incarcerated people, sexual abuse and sexual harassment between incarcerated people, threats of force or violence against incarcerated people, extortion of incarcerated people or their families, rule violations, injuries to incarcerated people, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts.

87. Incident reports will specify if a weapon was used; whether a search of the housing unit occurred after the incident; whether housing changes were initiated; whether a referral for further investigation was made and to whom; whether protective custody was requested; and whether maintenance orders were submitted in connection with the incident.

88. FCSO will enter all incident reports into the electronic incident reporting system (currently Odyssey) within 24 hours of the incident.

89. Jail supervisors will review all incident reports to ensure that the applicable data points, including incident type, time, location, involved parties, staff, witnesses, narrative summary, and the information required in paragraph 87, are reported in the document.

90. FCSO will use maintenance reports to document all maintenance issues related to the facility including fires and utility failures. Maintenance reports will specify time, location, impacted parties, staff, witnesses, nature and extent of the damage, and whether work orders requesting maintenance were submitted in connection with the issue(s).

91. FCSO will enter all maintenance reports and work orders into the electronic incident reporting system within 48 hours of the maintenance issue. The County and FCSO will review all maintenance reports and work orders weekly to address concerns.

### G.    Investigations and Corrective Action Planning

92. FCSO will implement a brief and documented daily Incident Review briefing, Monday through Friday, with the Chief Jailer and other appropriate administrative staff to review all major incidents and maintenance issues that occurred in the Jail on the previous day or days and discuss responsive action.

93. FCSO will examine incident report data for patterns and trends (including violence reported on particular floors, among particular groups, or on particular shifts), and will identify remedial measures to correct any identified issues.

94. FCSO will implement a Critical Incident Review process, by which Jail leadership, investigatory staff, and other relevant staff review incidents resulting in serious harm or disruption (such as homicides, suicides, injuries requiring outside transport, escapes, and large scale disturbances), within 30 days of the incident's occurrence, to discuss the cause of the incident and any immediate remedial measures, and ensure that all relevant information has been provided for investigation.

95. FCSO will screen all incident reports, third-party reports, anonymous reports, and grievances, and will refer them for investigation as appropriate.

96. FCSO will conduct timely thorough, and objective investigations of all threats of or incidents of violence resulting in serious injury, sexual abuse, drug trafficking, dangerous contraband, extortion, suicides, serious suicide attempts, injuries requiring treatment by an outside hospital, injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), fires, escapes, escape attempts, allegations of staff misconduct, and deaths.

97. FCSO will develop and implement a process for monitoring the timeliness and completeness of all investigations.

98. All Jail investigations will include creation and maintenance of an investigative file documenting investigative steps taken/to be taken, evidence and statements collected, and findings and referrals made.

99. All Jail investigations will be referenced in electronic systems by an investigation number that can be cross-referenced with the incident identification number.

100. FCSO will complete its internal investigation regardless of whether the victim wishes to pursue criminal or administrative charges, or whether an external agency pursues criminal prosecution.

101. FCSO will refer all incidents that appear appropriate for criminal prosecution to the appropriate law enforcement agency for investigation, even when a victim does not wish to cooperate.

102. The FCSO Jail investigator will issue a written investigative report to the Chief Jailer within 30 days after the date of the incident, unless there is documented good cause for an extension. The investigative report will indicate whether the allegation is substantiated, unsubstantiated, or unfounded. The investigative report will include an effort to determine whether staff actions or failures to act contributed to the abuse, a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings, including a determination of why the incident occurred.

103. The departure of the alleged perpetrator or victim from Jail custody or County/FCSO employment will not provide a basis for terminating an investigation.

104. When outside agencies investigate alleged incidents, the FCSO will request that the outside agency notify a designated point of contact at FCSO when the investigation concludes. In such cases, FCSO will conduct its own investigation, with the goal of identifying and remedying conditions or misconduct that affects the safety of people incarcerated in the Jail, and will cooperate with and defer to an outside agency's ongoing investigation as appropriate.

105. Within 60 days of an incarcerated person's death, serious suicide attempt, or other sentinel events resulting in serious security breaches or life-threatening injuries to

staff or incarcerated people, the Chief Jailer and other relevant staff will review the investigative file to identify and recommend any corrective action, including changes to policy, or other systemic remedial measures, to attempt to prevent similar incidents in the future. These reviews and any recommendations will be memorialized in writing.

106. At least semi-annually, FCSO will assess for patterns and trends in deaths, serious suicide attempts, and other sentinel events, will memorialize these assessments and recommended remedial measures in written reports, and will implement systemic remedial measures to correct any identified issues.

**H.    Sexual Abuse Reporting and Investigations**

107. Fulton County and FCSO will make available a no-cost telephone hotline for reporting sexual abuse in the Jail, consistent with PREA regulations (National Standards to Prevent, Detect and Respond to Prison Rape, 28 C.F.R. § 115 *et seq.*). FCSO will ensure that all Jail staff accept reports of sexual abuse, including third-party reports of sexual abuse, and will make appropriate notifications.

108. FCSO will send notifications regarding all sexual abuse allegations to a centralized PREA unit in a timely and prompt manner, and the status of each such investigation will be centrally tracked and documented at least monthly.

109. FCSO will employ a full time, dedicated PREA Coordinator, and any additional support staff such as investigators as needed to reasonably manage volume, to direct PREA compliance activities, and have responsibility to implement the sexual abuse provisions of this Consent Decree.

110. FCSO will send all incarcerated people who allege sexual abuse for an examination at a hospital facility when recommended by Jail medical staff.

111. FCSO will investigate all allegations of sexual abuse in the Jail in a timely, thorough, and complete manner. At a minimum, investigations into sexual abuse in the Jail will include and document interviews of the complainant and the alleged perpetrator, attempts to identify and interview potential witnesses, and reviews of camera footage (including camera footage which may corroborate but not confirm an allegation), relevant documents, and other physical evidence. Where relevant medical records are reviewed by the investigator but not included in the file for

privacy reasons or legal restrictions on access to medical information, a summary of relevant information from the records will be included.  All investigations will document consideration of all such evidence, and, where any such evidence is unavailable or not considered, include an explanation.

112.   Sexual abuse investigations will be conducted by investigators who have received special training in institutional sexual abuse.  Specialized training will include techniques for interviewing sexual abuse victims, proper use of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Garrity v. New Jersey*, 385 U.S. 493 (1967), warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral.

113.   Administrative investigations into sexual abuse allegations will be completed regardless of the results of any criminal investigations and regardless of the subject's continued confinement in the Jail.  Alleged victims will be advised of the outcome of their allegations when possible.

114.   Within 30 days after an allegation of sexual abuse is referred for investigation, FCSO will issue a written investigative report that indicates whether the allegation is substantiated, unsubstantiated, or unfounded.  In making that determination, FCSO will apply a preponderance-of-the-evidence standard, with the sole exception of criminal charges.  The investigative report will include an effort to determine whether staff actions or failures to act contributed to the abuse, a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings.  If warranted, supervisors may grant a time-limited extension for completion of an investigation.

115.   FCSO investigations into sexual abuse allegations will examine whether policy violations or violations of PREA regulations have occurred in addition to assessing whether potential criminal conduct has occurred.

116.   Jail investigations into sexual abuse allegations will consider potential administrative or other remedies including personnel actions and trainings for staff, and counseling referrals, and housing or classification changes for incarcerated people.

117.   A multi-disciplinary review team, including upper-level management officials at the Jail, with input from line supervisors, investigators, and medical and mental health practitioners, will conduct monthly incident review meetings for substantiated allegations of sexual abuse and for unsubstantiated allegations of sexual abuse committed by staff.  The review team will: (a) consider whether the allegation or investigation indicates a need to change policy or practice to better prevent, detect, or respond to sexual abuse; (b) examine the area where the incident allegedly occurred to assess whether physical barriers in the area may prevent detection of sexual abuse; (c) assess the adequacy of staffing levels in that area during different shifts; (d) assess whether monitoring technology should be deployed or augmented to supplement supervision by staff; and (e) prepare a report of its findings and any recommendations for improvement and submit such report to the PREA Coordinator.  FCSO will timely consider the review team's recommendations for improvement and will implement them or document their reasons for not doing so.

118.   Supervisory sexual assault investigators will review and sign off on all investigations and will order additional investigation as needed.

119.   FCSO will take appropriate corrective administrative action—including personnel action, trainings and counseling referrals for staff, and housing or classification changes for incarcerated people—based on the findings of sexual abuse investigations.

## I.    Information Management Systems and Resiliency Planning

120.   The County and FCSO will, in consultation with the Monitor, review and modify its information management systems to ensure that those systems provide accurate, reliable, and up-to-date information about people in the Jail, including locations and custody levels.

121.   The County and FCSO will upgrade its systems to ensure that, in the event of power outages, emergency power is immediately available and critical services in the Jail continue.

122.   By dates set in the Implementation Plan, Section XII, the County and FCSO will develop and implement a resiliency plan for major events like power outages so that

these events do not put people incarcerated in the Jail at substantial risk of serious harm.

### J.    Data Tracking and Reporting

123.    FCSO will provide the Monitor and United States a Quarterly Staffing Update every January 15, April 15, July 15, and October 15, which will include information on FCSO's recruitment efforts, hiring, attrition, vacant posts, and use of overtime. The Quarterly Staffing Update will report separately on staffing for the FCSO overall and staffing at the Jail specifically.  When the 15th day of a month in which the Quarterly Staffing Update is due falls on a weekend or holiday, the report will be due on the following County business day.

124.    FCSO will track all grievances filed and their subject matter, including grievance responses and appeals, analyzing them for patterns and trends so as to prevent violence.

125.    FCSO will track and report the following events occurring in the Jail: (a) homicides, (b) physical assaults between incarcerated people, (c) stabbings, (d) hospital transports following assaults between incarcerated people, and (e) contraband discovered.  FCSO will report these events by Jail facility, will separately identify violence against 17-year-olds, people with Serious Mental Illness, and people who identify as gay or transgender.

126.    FCSO will collect and track data regarding sexual abuse allegations and investigations at the Jail, and will analyze the data for trends and patterns.

127.    FCSO will report data regarding the population in the Jail to the United States and Monitor monthly.  FCSO will notify the United States and the Monitor if the size of the population in the Jail makes compliance with any provision in this Consent Decree unfeasible.

### VI.  USE OF FORCE

### A.    Policies, Procedures, and Training

128.    By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Use of Force as set forth in paragraphs 129–151 below and will submit those policies and

procedures to the Monitor and United States for approval pursuant to the process described in Section III above.

129.   FCSO will ensure that its use-of-force policies provide sufficient guidance on use of force and what constitutes excessive force in compliance with constitutional standards and generally accepted practices and will ensure compliance with all such policies.  FCSO's use-of-force policies will describe the level of force authorized for each threat level.

130.   FCSO will require in policy and ensure in practice that Jail staff:

    a.  Use de-escalation and crisis intervention methods when safe and resort to force only after all other reasonable efforts to resolve a situation have failed;

    b.  Not use force on a person who is already under officer control and does not pose a threat to the safety or security of the institution, incarcerated people, staff, or visitors;

    c.  Use only the amount of force needed to gain control of the person and immediately reduce the level of force as the threat diminishes;

    d.  Not use force as a response to verbal insults, taunts, or swearing, and only in response to verbal threats where there is an immediate threat to the safety or security of the institution, incarcerated people, staff, or visitors;

    e.  Not use force as punishment or retaliation;

    f.  Not use force until the following conditions have been met: (i) a warning or command has been given and repeated, if practical; (ii) the incarcerated person has had time to comply with the warning or command; and (iii) it appears that the incarcerated person is going to continue to resist the order or the staff's effort to control the situation;

    g.  Activate body-worn camera in advance of a force incident, whenever possible;

    h.  Make timely, documented notifications to medical and mental health staff prior to planned uses of force, if feasible, and after any use of force;

    i.  Adequately and promptly report all uses of force, including each separate use of force that occurs in an incident, and do so independently and not in

consultation with anyone else. Each staff member who used or observed a use of force must prepare a written report by the end of that person's shift or as soon as possible thereafter;

j.  In reporting a use of force, provide an accurate and detailed account of events that describes what precipitated the use of force, the level of resistance encountered, and any attempts at de-escalation;

k.  Treat any failure to report a use of force as required under these policies as a disciplinary infraction subject to re-training and staff discipline, including possible termination;

l.  Subject any supervisor who fails to comply with their use-of-force review obligations to re-training and discipline for this failure; and

m.  Prohibit the use of conclusory statements, boilerplate, or canned language (e.g. "fighting stance") without supporting incident-specific details in reports describing uses of force.

131.  Within three months after the date that any policy or procedure related to use of force is finalized or revised (following the period of review for the Monitor and United States), FCSO will train all relevant staff on that policy, through in-service training.

132.  FCSO will ensure that all staff are properly and regularly trained on policies and procedures on uses of force. All staff members who interact with incarcerated people will be required to receive adequate in-service use-of-force training and annual use-of-force refresher training. Training must include scenario-based training where staff can practice applying force techniques in scenarios encountered in the Jail. Topics covered by the training will include: (a) constitutionally permissible and impermissible uses of force, including what constitutes excessive force; (b) appropriate use of chemical agents and Tasers; (c) de-escalation techniques; (d) use of force on incarcerated people with mental health disabilities or in crisis; (e) methods of managing incarcerated people with mental illness to avoid the use of force; (f) defensive tactics; (g) use-of-force reporting requirements; and (h) all Jail use-of-force policies and procedures.

133.   FCSO will ensure that supervisors, as part of their initial and annual in-service supervisory training, receive training in conducting use-of-force reviews or investigations appropriate to their rank; strategies for effectively directing staff to minimize uses of force and to intervene effectively to prevent or stop objectively unreasonable force; and supporting staff who report objectively unreasonable or unreported force, or who are retaliated against for attempting to prevent objectively unreasonable force.

**B.     Tasers**

134.   FCSO will reduce reliance on electronic control devices to gain control of incarcerated people while still ensuring incarcerated person, staff, and visitor safety.

135.   FCSO will ensure that no Jail staff use the Taser unless they have been adequately trained to do so.

136.   FCSO will require that staff discharge Tasers only in circumstances to be outlined in a Taser policy developed in consultation with the Monitor to comply with constitutional standards.

137.   FCSO will ensure that staff warn incarcerated people and other staff prior to discharging a Taser, when feasible.

138.   Each application (in probe, darts, or drive stun mode) or standard cycle (five seconds) of a Taser is a separate use of force, and FCSO will require that each application or cycle is (i) objectively reasonable, (ii) is the minimum force necessary to protect the staff member or another person, (iii) avoids unnecessary injury or risk of injury to officers and others, and (iv) is proportional to the threat.  FCSO will require that staff members give the incarcerated person a reasonable opportunity to comply prior to applying another cycle.

139.   FCSO will require that staff do not deploy more than three cycles or 15 total seconds of a Taser against a person during a single incident unless Lethal Force is justified.  FCSO will require that staff report the justification for each application or cycle in use-of-force force reports.  FCSO will require officers to consider alternatives, including de-escalation, if the Taser is ineffective.

140.   FCSO will require that staff do not discharge or activate Tasers:

a. In drive-stun mode solely for pain compliance. Officers may discharge Tasers in drive-stun mode only to supplement the probe deployment to complete the incapacitation circuit, or to gain separation between the officer and the person so that officers can consider another force option;

b. To target the face, head, neck, breasts, chest, or groin; instead, staff should target the lower center mass (except in deadly force situations);

c. Intentionally, when doing so would mean more than one Taser is used at a time against a person;

d. When it is reasonably evident that a discharge may cause serious physical injury or death, including if the person may fall from a significant height onto a hard or sharp object, if the person is known or reasonably appears to be pregnant, elderly, infirm, or frail, or if the person has been exposed to a flammable substance, except where Lethal Force is justified;

e. On a person who is known or reasonably appears to be exhibiting signs of a mental or behavioral health crisis and who otherwise does not pose an immediate threat of serious injury.

**C.    Use-of-Force Reviews**

141.   FCSO will amend its use-of-force policies and procedures to reflect, and ensure compliance in practice with, the following requirements related to use-of-force reviews.

142.   FCSO will ensure that all uses of force and allegations of force are promptly reviewed by appropriate supervisors to identify unlawful conduct, policy violations, and tactical needs. This review will consist of the following, all of which will be documented in a report:

a. Names and statements of all staff members, incarcerated people, and other participants or witnesses interviewed by the supervisor;

b. A detailed description and review of the incident, including a discussion and resolution of any material inconsistencies in the evidence;

c. The supervisor's preliminary findings and conclusions regarding the appropriateness of the force, including whether the force used was

necessary, proportional, and objectively reasonable, and otherwise within policy;

d.  Any recommended corrective action plans, re-training, and discipline if appropriate;

e.  A determination of whether anyone was injured and whether necessary medical care was provided;

f.  Photos of all visible injuries sustained;

g.  A description of whether an individual's mental health condition may have or likely contributed to the force event;

h.  A description of injuries observed, including by medical staff;

i.  Separate, confidential interviews of all Custody Staff and witnesses who observed or participated in the use of force;

j.  Documentation about whether the use of force was recorded on video and if not, why not;

k.  All supporting documentation such as incident reports and classification records; and

l.  All video and audio recordings of the incident and of interviews conducted.

143.  The watch commander and the lieutenant colonel will review the use of force report to ensure that it is complete, that the report was thorough, and corrective action was initiated, if necessary.

144.  FCSO will ensure that investigations comply with, and develop a manual on use-of-force investigations setting forth, the following:

a.  All investigative findings are based on application of a preponderance-of-the-evidence standard;

b.  Investigators obtain and review all supporting evidence, including witness and participant statements, physical evidence, body charts, photographs, and video or audio recordings;

c.  Investigators conduct timely, thorough, and documented interviews of all relevant staff and incarcerated people who were involved in and witnessed the incident in question, to the extent practicable;

d.  All investigations occur promptly after the incident and include thorough documentation of the basis for the investigator's finding, including discussion of all evidence available and unavailable;

e.  All investigations must clearly indicate whether there was compliance with Jail policies and procedures related to uses of force; and

f.  All uses of force will be timely reviewed by supervisors who were neither involved in nor approved the use of force.

145.  Higher-level reviewers of appropriate rank will make determinations of whether findings by supervisors regarding the use of force are consistent with policy and supported by a preponderance of the evidence; whether the reviews are thorough and complete; whether there are tactical, equipment, training, or policy considerations that need to be addressed; and whether to initiate an administrative personnel complaint.

146.  FCSO will create a use-of-force review committee that will oversee use-of-force events.  The use-of-force committee will consist of middle- and upper-level management staff. The committee will conduct systemic reviews of uses of force and investigations into uses of force at least every six months to identify patterns or trends and to determine if there were violations of policy or opportunities to improve training or practices at the organizational and individual level.  The committee will also determine if uses of force are being properly classified, investigated, and resolved.  FCSO will take appropriate corrective action based on the trends and patterns observed in its systemic reviews. Supervisor-level staff will be re-trained on conducting use-of-force investigations if these reviews or audits demonstrate that FCSO's policies and procedures are not being followed.

147.  If staff are found to have engaged in misconduct related to inappropriate or unnecessary force against incarcerated individuals, including use of excessive force or failure to report or inaccurately reporting a use of force, FCSO will initiate appropriate personnel actions and systemic remedies, including reporting to an appropriate law enforcement agency for consideration of criminal prosecution as appropriate.

**D.    Data Tracking and Reporting**

148.    FCSO will develop and implement a system that accurately tracks all uses of force by Jail staff and any complaints or grievances related to the alleged use of excessive force to alert FCSO administration to any potential need for retraining, problematic policies, or supervision lapses.

149.    The tracking system discussed in paragraph 148 above will include the categories of information required for individual use-of-force reviews under paragraph 142 above, as well as the following: (a) name and rank of the supervisor(s) responsible for investigating the force; (b) the length of time between the use of force and the completion of the use-of-force investigation and review; (c) the type of any disciplinary action (including corrective action) taken; and (d) whether the matter was referred to the Office of Professional Standards or another agency for further investigation.

150.    Every six months, FCSO will analyze the prior six months' force data, including the data described above, to determine if underreporting is happening, assess any staff member-specific, unit-specific, and Jail-wide trends, and identify and correct deficiencies revealed by this analysis.  The analysis will include reviews of all of the following: incident reports regarding force; use-of-force reviews and investigations; investigations into allegations of excessive force; use-of-force determinations and recommendations; force reporting; and incidents in which medical assistance was requested or provided following a use of force.  FCSO will submit this data and analysis to the Monitor and United States every six months.

151.    FCSO will develop and implement an effective early warning system that screens incident reports, use-of-force reviews, allegations of excessive force, and grievances to identify staff members who may be using excessive force, regardless of whether individual use-of-force reviews concluded that specific uses of force were within policy.  The system will examine and address potential behavior patterns by staff members that may indicate training deficiencies, persistent policy violations, misconduct, or potential criminal activity related to uses of force. Screening staff will refer to supervisors for investigation any misconduct, criminal activity, or other behaviors that may require corrective action including re-training.  FCSO will

29

maintain a list of staff members identified by the early warning system as possibly needing additional training or discipline and will provide an updated list to the United States and the Monitor every six months and upon request.

## VII.  ENVIRONMENTAL HEALTH AND NUTRITION

### A.    Policies, Procedures, and Training

152.   By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Environmental Health and Nutrition as set forth in paragraphs 153–180 below and will submit those policies and procedures to the United States and the Monitor for approval pursuant to the process described in Section III above.

153.   Within six months of the date that any policy or procedure related to Environmental Health and Nutrition is finalized or revised (following the period of review for the Monitor and the United States), FCSO will train all relevant staff on that policy, through in-service training.

### B.    Sanitation and Environmental Safety

154.   The County and the FCSO will develop and ensure compliance with a comprehensive, written housekeeping plan that assigns responsibility for carrying out the requirements from paragraphs 155–156 below.  The housekeeping plan will describe cleaning procedures and instructions on which chemicals and cleaning supplies to use.  In addition, it will include checklists and other measures to ensure accountability for completion of sanitation tasks.  The County and FCSO will provide the Monitor and the United States a draft of this housekeeping plan for review and comment.

155.   FCSO will ensure documented cleaning and sanitization on a set schedule, at least weekly, of all Jail areas, including: (a) housing units and individual cells, including floors, walls, sinks, toilets, bunks, and showers; (b) medical areas, including exam and procedure rooms, sinks, toilets, and exam tables; (c) laundry areas, and ensuring that soiled clothes are laundered separately from unsoiled clothes; and (d) food preparation and distribution areas.  Ceilings, air vents, air returns will be cleaned monthly.

156.   The County and FCSO will ensure that sanitation inspections are conducted at least weekly by designated staff, that the inspections and their findings, including deficiencies, are documented, and that all deficiencies identified are promptly addressed through documented corrective action and follow-up.

157.   The County will repair or replace all broken or damaged equipment in the medical areas, laundry, and kitchens immediately after it discovers or is notified that they are inoperable; will inspect all equipment in these areas at least weekly to ensure that it is in good working condition; and will provide prompt servicing and preventative maintenance of all such equipment.  For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

C.    **Physical Plant**

158.   The County will ensure that all doors and locks in the housing areas of the Jail are kept in good working order, and that the housing areas are free of dangerous features including holes in walls and windows, and accessible metal.

159.   The County will ensure that all plumbing fixtures, including sinks, toilets, and showers, operate with adequate running water at appropriate temperatures.

160.   The County will ensure that lights and light fixtures provide adequate lighting (with light intensity measuring at least 20-foot candles) in all housing units, cells, dayrooms, and personal hygiene areas, and that all lighting and electrical fixtures are free of exposed wiring.

161.   The County will ensure that mold on ceilings and walls is promptly remediated.

162.   The County will ensure that there is adequate air quality and ventilation throughout the facilities, including by: (a) changing all air filters throughout the Jail on a regular schedule; (b) cleaning all air vents and air returns throughout the Jail on a regular schedule; (c) cleaning or replacing all dirty ceiling tiles throughout the Jail; (d) cleaning dust and dirt from overhead pipes throughout the Jail; and (e) ensuring that all air conditioning and heating facilities are in good repair.

163.   The County will ensure that pipe chases are in good working condition free from leaks, flooding, and other damage, and that incarcerated people do not have access to pipe chases at any time.

164.   The County will ensure that there are adequate fire suppression and alert systems throughout the Jail and that they are tested at regular intervals to ensure they are kept in working condition.

165.   For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

166.   The County will develop and promptly implement a comprehensive plan to inspect and fix all existing physical plant deficiencies in the Jail in accordance with paragraphs 158–164 above, and to maintain such plant elements in good condition going forward.  The County will provide the United States and Monitor a draft of this plan, and it will consider comments from the United States and Monitor in revising and finalizing the plan.

167.   The County and FCSO will conduct documented inspections at least weekly to ensure that the items described in paragraphs 158–164 are in good working condition going forward.  For all deficiencies identified in these inspections, the County will ensure that corrective actions are promptly taken, including by inspecting, cleaning, maintaining, and if necessary repairing or replacing the defective items.

168.   Pursuant to the terms of the Staffing Plan, FCSO will provide supervision that is reasonably designed to avoid damage beyond normal wear and tear.

**D.     Pest Control**

169.   The County and FCSO will develop and implement a comprehensive Integrated Pest Management system for all parts of the Jail that uses prevention measures to keep pests from entering the Jail and control measures to reduce and eliminate pests.

170.   The County and FCSO will ensure that its pest control system is adequately responsive to reports of pest activity by incarcerated people, including by implementing adequate contact tracing, promptly evaluating all reports of pest

activity, and promptly taking appropriate corrective actions where reports are confirmed.

171.   The County and FCSO will ensure that pest control measures employed in the kitchen, such as use of chemical sprays, do not contaminate food or food preparation areas.

172.   For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

173.   FCSO will take adequate steps to reduce the introduction and spread of ectoparasites and lice throughout the Jail, including by:

    a.   Ensuring that every incarcerated person receives a physical skin check conducted by qualified medical staff within a reasonable time after entering the Jail and before transfer to any housing area;

    b.   Taking prompt action to control any known infestation or infection;

    c.   Ensuring that incarcerated people receive adequate opportunities to shower and that their clothes are adequately laundered and replaced as needed; and

    d.   Ensuring that haircutting equipment is adequately cleaned and disinfected between uses to prevent the spread of skin infections or parasites, and that scalps are examined for parasites or infections before haircuts commence.

**E.    Chemical Control**

174.   FCSO will ensure that all chemicals are stored, labelled, distributed, and used following OSHA Standards.

175.   FCSO will ensure that all chemical containers, including spray bottles, are secured and kept inaccessible to anyone other than authorized staff except under appropriate conditions and with appropriate supervision.

176.   FCSO will develop and implement a perpetual chemical inventory system to track receiving, issuing, and current quantity of chemicals on hand in all areas where chemicals are stored.  FCSO will ensure that all receiving and issuing out of

chemicals is recorded in this inventory system, and that it is updated daily to always reflect the amount of chemicals on hand in each storage area.

177.   FCSO will ensure that all janitorial closets and storage areas are kept clean and organized, and that those cleanings are documented and performed on a regular schedule.

178.   FCSO will ensure that all staff and incarcerated people who utilize chemicals receive adequate, documented training in the proper use and storage of chemicals.

**F.     Food and Nutrition**

179.   FCSO will ensure all food items are stored, prepared, and delivered to incarcerated people at the appropriate temperatures for food safety.

180.   FCSO will ensure that meals for incarcerated people meet requisite nutritional and caloric requirements, including the specific requirements for special and medically necessary diets, such as diabetic diets.

## VIII.   MEDICAL AND MENTAL HEALTH CARE

**A.     Policies, Procedures, and Training**

181.   By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Medical and Mental Health Care, and will submit those policies and procedures to the United States and the Monitor pursuant to the process described in Section III above.

182.   Within three months of the date that any policy or procedure related to Medical or Mental Health Care is finalized or revised (following the period of review for the Monitor and United States), FCSO will ensure all relevant staff are trained on that policy, through in-service training.

183.   The County and FCSO currently contract with a vendor to provide medical and mental health staffing for the Jail and expect to continue to do so.  The County and/or FCSO will ensure that the vendor's policies and conduct conform to the requirements of this Consent Decree.   Where the Consent Decree places an obligation on the County and/or FCSO to provide certain services or undertake certain actions, the Parties recognize that the vendor's satisfaction of the requirements of the provision suffices.

184.   All Custody Staff will receive training that emphasizes the importance of providing medical and mental health services in the Jail, and the role that Custody Staff have in ensuring these services are provided, with the understanding that Custody Staff is not medically trained and is not responsible for making medical decisions and does not get to override medical decisions.

185.   All Custody Staff who work in mental health units will be trained in de-escalation and crisis response techniques, and will be trained to recognize signs of decompensation (e.g., significant worsening of symptoms, or significant decline in self-care and/or communication).

**B.     Intake and Records**

186.   FCSO will conduct medical and mental health intake screenings upon admission to the Jail in a confidential setting that encourages the sharing of accurate and complete information.

187.   FCSO will ensure that the Jail's data management system accurately and timely communicates information to the electronic medical records system, including changes in custody status, location, and medical conditions.

**C.     Emergencies**

188.   FCSO will develop and implement protocols identifying potentially life-threatening medical emergencies that require immediate consultation with a physician or immediate transfer to a hospital emergency room.  FCSO will ensure that incarcerated people deemed to fall within these protocols are immediately assessed by a medical professional who will document the risk presented and the level of supervision required or immediately transferred to a hospital emergency room.  In the event of any delays in assessment or transfer, FCSO will ensure that incarcerated people are under constant unobstructed visual observation.

189.   FCSO will develop protocols identifying potentially life-threatening mental health emergencies (e.g., imminent danger to self or others) that require immediate consultation with a QMHP or immediate transfer to a hospital emergency room or psychiatric hospital.  FCSO will ensure that incarcerated people deemed to fall within these protocols are immediately assessed by a QMHP who will document the

risk presented and the level of supervision required, or, if transfer is warranted, FCSO will take all reasonable steps to immediately transfer to a hospital emergency room or psychiatric hospital.  In the event of any delays in assessment, FCSO will ensure that incarcerated people are under constant unobstructed visual observation while awaiting assessment.

190.   FCSO will ensure that life-saving medical aid is promptly delivered during medical emergencies.

191.   FCSO will ensure that all medical, and mental health staff receive adequate pre-service and annual in-service training on first-responder medical care, mental health care, de-escalation and suicide prevention.  FCSO will ensure that all Custody Staff receive adequate pre-service and annual in-service training on first-responder medical care, and the appropriate level of mental health care, de-escalation and suicide prevention training.  FCSO will conduct joint man-down drills with medical and custodial staff and address problems identified.

192.   FCSO will regularly review medical emergency responses to identify opportunities for improvement and implement any needed changes.

**D.    Medical and Mental Health Assessments, Sick Calls, and Referrals**

193.   All incarcerated people will receive a comprehensive health assessment following their intake screening, including people who had a comprehensive health assessment in a prior incarceration within the past year.  The timing of the assessment will be based on whether the screening identifies factors necessitating an urgent follow-up due to active, uncontrolled, or otherwise unstable physical health symptoms.  These factors, and the associated timelines, will be described in a policy that FCSO will implement after approval from the United States and the Monitor.  The purpose of the medical assessment is to create a full and comprehensive record of the individual's medical history, diagnoses, symptoms, and current needs.  The information gathered during the medical assessment will be used to create treatment plans and will guide follow-up care.  Diagnoses will be listed clearly and will be updated as needed.

194.   Individuals whose mental health screening instrument indicates a need for a full mental health assessment will receive one on a timely basis.  The timing of the

assessment will be based on whether the screening identifies factors necessitating an urgent follow-up due to active, uncontrolled or otherwise unstable mental health symptoms.  These factors, and the associated timelines, will be described in a policy that FCSO will develop and implement after approval from the United States and the Monitor.  The purpose of the mental health assessment is to create a full and comprehensive record of the individual's medical history, diagnoses, symptoms, and current needs.  The information gathered during the mental health assessment will be used to create treatment plans and will guide follow-up care.  Diagnoses will be listed clearly and will be updated as needed.

195.   A QMHP will indicate if an incarcerated person has SMI by adding this to the problem code and flags sections of the person's medical record.  They will also add an SMI designation whenever it becomes apparent, at any point in the course of their incarceration, that such a designation is appropriate.

196.   FCSO will indicate in the medical record if any incarcerated person has a Substance Use Disorder (SUD).  FCSO will ensure that any incarcerated person who reports at intake or otherwise the use of medications or substances that may trigger withdrawal receive immediate initiation of withdrawal monitoring and obtain treatment consistent with the BJA *Guidelines for Managing Substance Withdrawal in Jails: A Tool for Local Government Officials, Jail Administrators, Correctional Officers, and Health Care Professional*s (June 2023), including, where appropriate, medication for opioid use disorder.  In the event that BJA publishes new guidelines or updates the guidelines, FCSO will provide treatment consistent with the new guidelines or updates, or will meet and confer with the United States and the Monitor about the appropriate treatment.

197.   FCSO will ensure that the sick call process provides incarcerated people with adequate access to medical and mental health care.  FCSO will implement a system for sick calls that includes: (a) ready availability of sick call requests and daily collection in a confidential manner; (b) sick call requests will be triaged appropriately and in a timely manner; (c) sick calls will be logged and tracked through a tracking system that notes the date of the sick call and the date of the

examination and any treatment; and (d) FCSO will implement a sick call oversight system that will allow audits to assess timeliness and appropriateness of responses.

198.   Individuals whose sick call request reveals an emergency will be treated on an emergency basis.  Individuals whose sick call request reveals factors necessitating an urgent follow-up due to uncontrolled or otherwise unstable symptoms will receive a medical assessment or mental health assessment, as appropriate, within an urgent timeframe.  These factors and timelines will be described in a policy that FCSO will develop and implement after approval from the United States and the Monitor.  All other individuals whose sick call requests require a medical assessment or behavioral health assessment will receive that assessment within 72 hours.

**E.    Medical Care**

199.   FCSO will provide appropriate security to ensure that healthcare services are available to the incarcerated population.  In the event that healthcare services are significantly delayed or denied due to a lack of staffing, FCSO will document the disruption, escalate the issue to supervisory staff at the Jail, and implement corrective actions.

200.   FCSO will hire sufficient staff with appropriate credentials to offer all necessary medical care.

201.   FCSO will ensure that incarcerated people can adequately communicate with medical and mental health staff, and will use available interpretation services to ensure language access.

202.   FCSO will ensure that incarcerated people with chronic conditions, including, but not limited to, HIV, other autoimmune diseases or conditions, hypertension, diabetes, congestive heart failure, asthma, and elevated blood lipids, hepatitis C, or cancer, receive ongoing care for their conditions as needed.  FCSO will ensure that a Medical Provider develops and implements a chronic care plan for each individual with a chronic condition.

203.   FCSO will maintain a chronic care registry that identifies all incarcerated people receiving chronic care, the diagnosis, the date of their last visit with a Medical Provider, and the date of their next visit.

204.   FCSO will take all reasonable steps to ensure that incarcerated people are able to receive timely medical specialist appointments, including those scheduled outside of the Jail.

205.   FCSO will maintain a specialty appointment registry that identifies all incarcerated people recommended for a specialist, the specialty to which they are being referred, the date of referral, whether the referral was approved or denied by the medical contractor, the date the appointment is scheduled to occur, and the date the appointment was completed.

206.   FCSO will ensure that incarcerated people who receive specialty, emergency room, or hospital care are examined and evaluated by a Registered Nurse upon their return to the Jail, and that the Registered Nurse reviews all accompanying documentation available from the visit before the incarcerated person is returned to his/her housing unit.  This review and the outside provider's documentation will be recorded in the medical record, and appropriate follow-up, including referrals to a Medical Provider, will be scheduled.  FCSO will ensure compliance with hospital discharge plans as appropriate.

207.   FCSO will ensure that incarcerated people receive adequate testing and treatment that addresses their serious medical needs in a timely and appropriate manner.

208.   FCSO will ensure that individuals needing rehabilitative therapy services receive them in a timely manner.  FCSO will examine the feasibility of having physical and occupational therapists provide services in the Jail to facilitate these services.

209.   FCSO will develop and implement a policy or protocol to provide supports and accommodations to meet the physical health needs of individuals in their housing units.  The policy will include a minimum timeframe within which FCSO must deliver accommodations for disability, mobility, and physical impairment needs. FCSO will ensure that individuals needing equipment, assistive care devices or support items receive them in a timely manner.

## F.    Supportive Environments for People with Medical and Mental Health Needs

210.   The County and FCSO will maintain a Medical Observation Unit (MOU) and Female Observation Unit (FOU) that is safe for incarcerated people with medical conditions, disabilities, or other serious medical injuries to reside.  FCSO will

39

provide adequate supportive staffing to the MOU and FOU to assist patients with mobility needs and who need assistance with activities of daily living.

211.   The County and FCSO will make every effort to have an adequate number of hospital beds for people in the MOU.  FCSO will make every effort ensure that no person residing in the MOU due to a medical condition, disability, or other serious medical injury is provided with a temporary bed or floor bed.

212.   The County and the FCSO will maintain a working call bell system in the MOU and FOU that rings to a staffed area across all shifts.

213.   The County and FCSO will add grab bars to cells and bathrooms in the MOU and FOU.  All such features will be suicide resistant.

214.   The County and the FCSO will rehabilitate and maintain adequate suicide-resistant cells in all buildings where incarcerated people are held and ensure that they are always usable.

215.   The County and FCSO will repair and rehabilitate housing units to remove physical risks for suicide and self-harm, to include but not be limited to removing objects and fixtures that could be used for self-harm or as a tie-off point for a ligature.

216.   For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

### G.    Mental Health Care

217.   FCSO will hire sufficient staff with appropriate credentials to offer all necessary mental health care.

218.   FCSO will ensure that appropriate, detailed, individualized treatment plans are developed and implemented for incarcerated people with mental health needs.  If Custody Staff deny any recommendations by medical or mental health staff regarding housing, privileges, transfers to outside specialists, emergency room visits or hospitalizations, FCSO will document consultation between custody and mental health leadership discussing the decision and the reasons behind it.

219.  FCSO will develop and implement a policy regarding mental health and SUD treatment planning.  Individualized mental health and SUD treatment plans will be developed for each incarcerated person on the mental health caseload in a timely manner.  Each plan will include treatment goals and objectives.  FCSO is responsible for implementing each mental health and SUD treatment plan.

220.  FCSO will ensure that incarcerated people with SMI receive treatment that adequately addresses their mental health needs in a timely and appropriate manner, in a clinically appropriate setting, with clinically appropriate personnel and with clinically appropriate medications, therapy, and programming.  FCSO will ensure that all incarcerated people with SMI receive regular, consistent therapy, counseling, skill-building, and rehabilitation services, including group therapy, as clinically appropriate.

221.  FCSO will provide adequate SUD treatment, including monitoring and appropriate medications, to all individuals who need it.  This includes, where appropriate, medication for opioid use disorder.

222.  FCSO will ensure an inpatient level of care is available to all incarcerated people who need it, including regular, consistent therapy and counseling, as clinically appropriate.

223.  FCSO will ensure that clinical conversations between QMHPs and incarcerated people are conducted in a confidential setting to allow for effective information sharing and treatment.

224.  FCSO will ensure that incarcerated people who are a danger to themselves or others due to symptoms of mental illness receive timely and adequate treatment.

225.  FCSO will develop and implement an incentive-based behavior management program or mental health achievement award program.

226.  FCSO will provide documented release planning and related services for incarcerated people with a mental illness diagnosis or who receive and continue to require psychotropic medications, including the following:

   a.  Arranging an appointment with community mental health providers for all incarcerated people with mental health needs and ensuring, to the extent possible, that incarcerated people meet with that community mental health

provider prior to or at the time of discharge to facilitate a warm hand off;

b.  Providing referrals for incarcerated people with mental health needs that require ongoing treatment post-release;

c.  Providing sufficient supply of critical medications on discharge to carry over until the medication can be obtained in the community;

d.  Arranging with local pharmacies to have incarcerated people's prescriptions renewed to ensure that they have an adequate supply to last through their next scheduled appointment;

e.  Assisting people with serious mental health needs with transportation from the Jail; and

f.  Ensuring that, where appropriate, family members are aware of an impending release so that they can assist with transportation and safety.

227.   FCSO will ensure that incarcerated people with mental illness are placed in housing that is the most integrated setting possible based on their required level of care and will not unnecessarily segregate incarcerated people based on their mental health needs.

228.   FCSO will develop and implement policies that will establish the criteria for admission into the mental health unit (3 North or any successor unit) and the POU and the levels of care provided to incarcerated people in those units.  The policies and procedures will require that FCSO house incarcerated people with mental illness in the most integrated and least restrictive setting possible, provide individuals with the most out-of-cell time appropriate to their needs, and will not assign them a classification that requires segregating them from the rest of the Jail population unless a QMHP has determined this is appropriate.  The policies will further create a system whereby individuals will be released gradually from more restrictive levels of supervision to less restrictive levels over an appropriate period of time.  The policies will specify the minimum amount of out-of-cell time per week for each level of care.  FCSO will submit policies developed pursuant to this paragraph to the United States and the Monitor for review, comment, and approval, consistent with the procedures in Section III, and will implement these policies in phases taking into

consideration physical space constraints according to a timeline that will be determined as part of the Parties' Implementation Plan, Section XII.

229.    Individuals housed on 3 North (or any successor unit) and the POU will have adequate access to large-muscle exercise, programming, therapeutic services, educational services, and recreation.

## H.    Suicide Prevention

230.    FCSO will ensure that it identifies suicidal incarcerated people and intervenes appropriately.  Jail staff will immediately interrupt, and provide appropriate aid to, any incarcerated person who threatens or exhibits suicidal or self-injurious behavior.

231.    Custody staff will immediately notify medical/ mental health staff of all suicide attempts, gestures, and threats.  Upon request from medical/ mental health staff, FCSO will transport people from annex facilities to the Main Jail for suicide observation.

232.    FCSO will provide thorough, quality suicide risk assessments by a QMHP of incarcerated people who are at risk of suicide.  Absent documented clinical contraindications or documented individualized assessment of security needs, these suicide risk assessments will be conducted in a confidential setting.  In addition, FCSO will ensure that incarcerated people identified as being at risk of suicide are immediately searched and monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

233.    FCSO will provide direct staff supervision of actively suicidal incarcerated people when necessary and close supervision of incarcerated people with lower levels of risk.  Officers will document their checks.  Actively suicidal people will be monitored at all times, and individuals under close supervision will be monitored no less frequently than every 15 minutes.

234.    FCSO will ensure that incarcerated people expressing suicidality are placed in suicide resistant housing with sight lines that permit the appropriate level of staff supervision.  If no suicide resistant cell is available, a suicidal incarcerated person will be placed on constant observation until such housing is available.  Incarcerated

people expressing suicidality will not be placed in other forms of Restrictive Housing.

235.   The County and FCSO will maintain the padded cells in the Jail in a clean, sanitary, and operational condition, and will use them solely for documented mental health purposes.

236.   For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

237.   FCSO will ensure that suicidal incarcerated people receive adequate mental health treatment and follow-up care, including out-of-cell counseling.

**I.    Medication Administration**

238.   FCSO will ensure that incarcerated people receive appropriate medications in a timely manner and that incarcerated people have proper diagnoses and/or indications documented for each medication they receive.

239.   FCSO will ensure that prescribed medications are administered in a clinically appropriate manner as to prevent deviation from the medication regimen, including misuse, hoarding, overdose, theft, or violence related to the medication.

240.   FCSO will ensure that incarcerated people receive psychotropic medications in a timely manner, that incarcerated people have proper diagnoses and/or indications for each psychotropic medication they receive, and that medications are administered to incarcerated people in clinically appropriate dosages and without errors.

241.   FCSO will ensure that psychotropic medication administration records are audited by appropriate health care staff every 90 days for completeness and accuracy.

242.   FCSO will develop and implement a policy requiring accurate documentation of psychotropic medication refusals and psychiatric follow-up after repeat refusals.

243.   FCSO will ensure that a qualified individual is available to administer emergency medications at all times.

244.   FCSO will ensure that laboratory studies are ordered per the standard of care as clinically appropriate for incarcerated people who receive psychotropic medications to screen for potentially adverse side effects or otherwise as needed to monitor the

incarcerated person's health status and the effectiveness of the medication and treatment.

**J.     Oversight and Mortality Reviews**

245.   FCSO is responsible for overseeing all medical and mental health care provided by vendors or contractors and ensuring that adequate care is provided.  When oversight efforts reveal areas for improvement, FCSO is responsible for working with vendors and contractors to institute improvements.

246.   Medical and mental health staff will participate in all mortality and serious suicide attempts reviews pursuant to paragraph 105, alongside FCSO, to ensure comprehensive and well-documented evaluation of quality of care related to all deaths and serious suicide attempts.  This includes detailed psychological autopsies to assess gaps in mental health treatment that may have been relevant to the death. All reviews should be documented and contain analysis of care, conclusions regarding any gaps or areas for improvement, corrective action plans to make needed improvements, and a plan to assess the effectiveness of any corrective actions after they are implemented.

247.   Medical and mental health staff will work with Custody Staff to implement appropriately detailed and specific corrective action plans in response to any deficiencies in care found through the mortality review process.

## IX.  RESTRICTIVE HOUSING

**A.     Policies, Procedures, and Training**

248.   By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Restrictive Housing as set forth in paragraphs 249–282 below and will submit those policies and procedures to the United States and the Monitor for approval pursuant to the process described in Section III above.

249.   Within six months of the date that any policy or procedure related to Restrictive Housing is finalized or revised (following the period of review for the Monitor and the United States), FCSO will train all relevant staff on that policy, through in-service training.

250.   FCSO will ensure that all staff working in restrictive housing units are trained about the risks associated with long terms in restrictive housing, the particular risks associated with confining people with serious mental illness and young people in restrictive housing, and to recognize signs of decompensation in restrictive housing.

**B.**    **Mental Health Contraindication to Restrictive Housing**

251.   Restrictive housing will be contraindicated when it leads to decompensation, mental health deterioration, self-harm, or suicidality.  Restrictive housing is also contraindicated if it causes new signs or symptoms of SMI where such signs or symptoms had not previously been identified or if there is a significant medical contraindication to restrictive housing.

252.   Custody Staff will notify and consult mental health staff before placing incarcerated people in restrictive housing to determine whether it is contraindicated based on the incarcerated person's mental health.  Both Custody Staff and mental health staff will document this consultation.  If it is not feasible to consult with mental health staff before the placement, then the consultation will occur within 24 hours of placement, or within 48 hours if on a weekend or holiday, to determine the appropriateness of the placement.

253.   Mental health staff will make a determination as to whether restrictive housing is contraindicated due to SMI or other acute mental health condition based on a review of pertinent records, and mental health staff will notify Custody Staff of the determination.  If mental health staff determines that restrictive housing is contraindicated, they will recommend alternative, less restrictive housing.

254.   In addition, all incarcerated people placed in restrictive housing will be screened by a Qualified Mental Health Professional in a face-to-face clinical encounter within the first week of placement.  The purpose of this screening is to determine whether restrictive housing is contraindicated.  If mental health staff determines that restrictive housing is contraindicated, they will notify Custody Staff of the determination and recommend alternative, less restrictive housing.

255.   If an incarcerated person in restrictive housing shows signs of decompensation, suffers a deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, or if an incarcerated person in restrictive housing

develops signs or symptoms of SMI where such signs or symptoms had not previously been identified, Custody Staff will immediately refer the incarcerated person for assessment and treatment by a QMHP. The QMHP will determine if restrictive housing is contraindicated and, if so, recommend less restrictive housing.

256.   FCSO will not place or retain a person in restrictive housing if they have SMI, unless:

     a.   The incarcerated person presents such an immediate and serious danger that there is no reasonable alternative, or

     b.   a QMHP determines (i) that restrictive housing is not contraindicated; (ii) that the incarcerated person is not a suicide risk; (iii) that the incarcerated person does not have active psychotic symptoms; and (iv) in disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation.

257.   If a QMHP determines that restrictive housing is contraindicated, FCSO will not place a person in restrictive housing unless the incarcerated person presents such an immediate and serious danger that there is no reasonable alternative.

258.   Whenever an incarcerated person is placed or kept in restrictive housing despite SMI or contraindication, this decision must be approved with documented reasons by the Chief Jailer or designee, and will be reviewed weekly with the goal of moving the person into less restrictive housing as soon as feasible.

259.   Incarcerated people with SMI in restrictive housing will receive clinically appropriate mental health treatment for the entirety of the placement in restrictive housing. These treatment sessions will occur outside the cell in a confidential clinical setting, unless there are overriding, particularized security concerns.

260.   At least once per week, a QMHP assigned to supervise mental health treatment in the restrictive housing unit will conduct face-to-face clinical contact with all people with SMI in restrictive housing, to monitor their mental health status and identify signs of deterioration.

261.   After 30 days, incarcerated people with SMI or contraindications to restrictive housing will be removed from restrictive housing, unless the Chief Jailer certifies

that transferring them to less restrictive housing is clearly inappropriate. Incarcerated people with SMI or other contraindication to restrictive housing who are housed in restrictive housing for more than 30 days will have their cases reviewed by the Chief Jailer, the director of mental health services, and a psychiatrist or psychiatric nurse practitioner.

**C.    Conditions in Restrictive Housing**

262.   Incarcerated people in restrictive housing will have daily access to out-of-cell time, absent exceptional circumstances.

263.   Incarcerated people in restrictive housing will have opportunities to exercise in areas of the Jail allowing for large muscle movement twice weekly.

264.   Incarcerated people in restrictive housing will retain the ability to submit grievances, contact the PREA hotline and PREA Coordinator, and access the Jail handbook.

265.   Incarcerated people in restrictive housing for non-disciplinary purposes will have generally the same ability to retain personal property, including reading/writing materials, as people in general population, and to make phone and video calls during out-of-cell time.

266.   Incarcerated people in disciplinary restrictive housing will retain at minimum some reading/writing materials and religious articles.  These items may not be removed except upon a particularized security concern.

**D.    Discipline**

267.   All discipline of incarcerated people will be imposed consistent with Jail policies and this Consent Decree.

268.   In consultation with the Monitor, FCSO will review its schedule of disciplinary sanctions and ensure they are proportional to misconduct, progressive in severity, and purposeful in encouraging compliance with Jail rules.

269.   All disciplinary investigations will be completed, and all disciplinary hearings will occur, within 14 days.  A supervisor may approve a request for an extension of a disciplinary investigation with documented good cause.

270.   All people accused of any disciplinary offense with a potential restrictive housing sanction will have an opportunity to participate in a live disciplinary hearing.  No one will be denied a live hearing except for particularized safety concerns, which will be documented and detailed, and in which case they will be provided an alternative means to make a statement (e.g., in writing) for consideration at the hearing.

271.   Any findings of guilt will be explained in writing, will explain the factual basis for the finding and the specific violations found, and will be provided to the incarcerated person being disciplined.

272.   Disciplinary officers will issue restrictive housing sanctions only as necessary, and only after concluding that other reasonable sanctions (e.g., commissary restriction, loss of phone privileges) are insufficient to serve the purposes of punishment.

273.   Disciplinary sentences for offenses that arise out of the same episode will be served concurrently.

274.   Incarcerated people who demonstrate good behavior during disciplinary restrictive housing should be given consideration for early release from restrictive housing, as appropriate.

275.   Custody Staff will consult with mental health staff to determine whether initiating disciplinary procedures is appropriate for incarcerated people with mental health disabilities, in accordance with the following:

   a.   The disciplinary review panel or individual will consult with a QMHP prior to the hearing;

   b.   If, following a review of the incarcerated person's medical and mental health record, a QMHP determines the incarcerated person's actions were the result of mental illness (i.e. unable to appreciate the nature and quality or the wrongfulness of their acts), the incarcerated person will not be disciplined because of mental illness;

   c.   Even when an incarcerated person with mental illness is determined to be culpable for a disciplinary violation, Custody Staff will consult with a QMHP to determine whether the proposed sanction is likely to cause

psychological harm or interfere with mental health treatment.  In such cases, custody and mental health staff will confer to consider alternative sanctions that do not pose such harm and document such consultation; and

d.  If Custody Staff decide not to follow those recommendations, Custody Staff will document a reasonable rationale why they decided not to follow the alternative sanction recommendations, how the harm identified by the QMHP will be safely addressed, and what sanctions if any they decided to put in place.

**E.    17-Year-Olds in Restrictive Housing**

276.   Until completion of the process described in Paragraph 277 below, and subject to the limitations set above in paragraphs 251-275 and below in paragraphs 278-280, FSCO will approach restrictive housing for 17-year-olds as follows:  FCSO will not use restrictive housing for 17-year-olds in response to minor offenses or major offenses, as defined in the schedule of disciplinary sanctions described in section D above, that do not involve violence, significant property damage, or serious security risks.  FCSO may use restrictive housing for 17-year-olds in response to major offenses involving violence, significant property damage, or serious security risks, or in response to serious and extreme offenses, as defined in the schedule of disciplinary sanctions, but will consider youth as a mitigating factor when selecting a reasonable and proportionate sanction.  FCSO may also use restrictive housing for 17-year-olds in response to an ongoing safety threat, and FCSO will review the ongoing need for such placement as appropriate.

277.   By a date to be set in the Implementation Plan, Section XII, FCSO will have a multi-disciplinary committee, which will include appropriate FCSO leadership and the FCSO Medical Director, and will review restrictive housing practices for 17-year-olds in the Jail and make recommendations with the goal of minimizing to the extent possible FCSO's use of restrictive housing for this population.  The committee will consult with the Monitor and will review and consider national standards on the use of restrictive housing for this population.  The committee will communicate its findings to the Monitor, who, by a date set in the Implementation Plan, Section XII, will produce a written report documenting the work and any

recommendations.   By a date to be determined, the FCSO will revise its policies and practices to implement these recommendations.  The Parties will meet and confer about any recommendations FCSO has not implemented.

278.   FCSO will provide 17-year-olds placed in restrictive housing with continuing and adequate access to: medical, mental health, and education services; hygiene supplies; opportunity for large muscle exercise and telephone calls to their attorney; writing and reading materials; religious materials; and access to the grievance system.

279.   FCSO will provide sight and sound separation of 17-year-olds and adults in restrictive housing, and it will not house 17-year-olds in adult restrictive housing units.

280.   All 17-year-olds in the Jail will have adequate access to out-of-cell time, opportunities for large muscle exercise, programming (except that programming may be limited for the time a 17-year-old is serving a disciplinary sanction in restrictive housing or as otherwise needed for safety reasons), medical and mental health treatment, and educational services, as appropriate, and will not be subject to restrictive housing conditions solely because of their age.

**F.    Data Tracking and Analysis**

281.   FCSO will document using an incident report or by some other agreed-upon means the placement, reasoning for placement, and removal of all incarcerated people to and from restrictive housing by the end of the shift in which such placement or removal occurs.  FCSO will have a centralized tracker for restrictive housing that records the date and time of placement; reason for placement; status of any disciplinary charges; projected restrictive housing release date; actual restrictive housing release date; and consultations with mental health staff regarding the use of restrictive housing.

282.   FCSO will collect and report system-wide data on its use of restrictive housing. This data will describe the incidence and prevalence of restrictive housing, including the total number of incarcerated people in each restrictive housing, restrictive housing recidivism rates, and the average length of stay.  This data will include demographic information, including race, gender, gender identity, sexual orientation, disability status, and age.

## X. SPECIAL EDUCATION AND RELATED SERVICES

283.  FCSO will comply with the requirements of the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. §§ 1400–1482; 34 C.F.R. Part 300.

284.  FCSO will employ a dedicated IDEA Coordinator, and any additional support staff as needed to reasonably manage volume, to direct IDEA compliance activities, and have responsibility to implement provisions of this Consent Decree related to special education and related services.

285.  By dates set in the Implementation Plan, Section XII, the County and FCSO will create special education and related services policies and procedures to be consistent with the principles set forth herein and in accordance with the IDEA.

286.  Within six months of the date that any policy or procedure related to Special Education and Related Services is finalized or revised (following the period of review for the Monitor and United States), FCSO will train all relevant staff on that policy, through in-service training.

287.  FCSO will create a comprehensive intake process to include assessments, interviews/questionnaires, and records review to help identify students who may currently receive special education services, previously received special education services, or may require special education services and will ensure the Atlanta Public School (APS) and/or the Fulton County Schools (FCS) has access to this information on a timely basis.  FCSO will ensure that APS and/or FCS has access to any incarcerated people who are identified so that it can conduct evaluations as appropriate.

288.  FCSO will facilitate APS's and/or FCS's provision of specially designed instruction and related services to students with disabilities based on their individualized academic, social, emotional, and behavioral needs.

289.  FCSO will, under the leadership of APS and/or FCS, facilitate the development and implementation of Individualized Education Programs ("IEPs").  FCSO will facilitate the meaningful participation in the IEP decision-making process of students and their parents or guardians where appropriate.

290.  FCSO will ensure that APS and/or FCS has necessary access to Jail Facilities so that it can provide services in an educational setting as appropriate.

291.   FCSO will facilitate APS's and/or FCS's tracking and sharing of all removals from the educational setting based on behavior to determine when a manifestation determination review must be held, and will facilitate APS's and/or FCS's conducting of all required manifestation determinations as required by the IDEA.

292.   FCSO will coordinate with APS and/or FCS and take all reasonable steps within its control to ensure that there are a sufficient number of education professionals to offer educational services consistent with this Consent Decree.

## XI. QUALITY ASSURANCE

293.   Beginning one year after the effective date, for the metrics required by this Consent Decree, the County and FCSO will, with input from the Monitor, establish an adequate Quality Assurance Program with the expectation that this Program will continue after the termination of this Consent Decree to ensure the durability of these improvements.  The County and FCSO will ensure that the Quality Assurance Program is sufficiently maintained and identifies and corrects deficiencies relevant to the areas covered in this Consent Decree in the Jail.

294.   On an ongoing basis, the Quality Assurance Program will collect and analyze reliable data for patterns and trends relevant to the Consent Decree, and will develop and implement adequate corrective action plans when data analysis or program reviews indicate the need to address a system deficiency and ensure compliance with the terms of this Consent Decree.  The corrective action plans will include the time frame for implementation of corrective action, the person or persons responsible for implementing the action, and how the outcomes will be objectively measured.

## XII. IMPLEMENTATION AND REPORTING

295.   The County and FCSO will create an Implementation Plan, supplemented semi-annually, that describes the actions they will take to fulfill their obligations under this Consent Decree.  Implementation of this Consent Decree will be completed in phases as outlined in the Consent Decree and the Implementation Plan.

296.   Within 30 days of the Effective Date, and every six months thereafter, the County and FCSO will create and implement an Implementation Plan.  In each

Implementation Plan, the County and FCSO will develop a specific schedule and deadlines for each action step required to implement the Consent Decree over the course of the next year, with a general schedule for successive years.

297.    In the first Implementation Plan (Implementation Plan #1), the County and FCSO will develop a specific schedule and deadlines for the first twelve months, to include when the County and FCSO will: (a) draft or revise policies and procedures; (b) complete a staffing analysis and all plans required by this Consent Decree; and (c) develop and deliver training to Jail custody, medical, and mental health staff and providers concerning the provisions of this Consent Decree and the County's and FCSO's commitment to fulfilling their obligations under the Constitution and federal law.

298.    Implementation Plans after Implementation Plan #1 will focus on and provide additional detail regarding implementation activities.  The County and FCSO will address in their further Implementation Plans any areas of non-compliance or other recommendations identified by the Monitor in its reports.

299.    The United States and the Monitor will provide comments regarding all Implementation Plans within 30 days of receipt.  The County and FCSO will timely revise their Implementation Plans to address comments from the United States and the Monitor; the Parties and the Monitor will meet and consult as necessary.  The United States and Monitor must approve the final Implementation Plans.

300.    FCSO will maintain and submit upon request records or other documents to verify that it has taken actions described in its reporting to the Monitor and United States (e.g., policies, procedures, protocols, training materials, investigations, and incident reports), and will provide all documents reasonably requested by the Monitor or United States.

301.    Within 30 days of the Effective Date, the County and FCSO will develop a job description and initiate recruitment of a full-time Compliance Coordinator.  This person will have the requisite skills, knowledge, abilities, and time to perform the job functions that are substantially related to coordinating the successful implementation of every requirement of this Consent Decree.  Two years after the Effective Date of this Consent Decree, the Parties may consult with each other and

the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours.

302. The Compliance Coordinator will report to the Attorneys for the County and the FCSO who will serve as a primary point of contact for the Monitor and United States. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out its duties.

303. At a minimum, the Compliance Coordinator will: (a) coordinate compliance and implementation activities; (b) facilitate the provision of data, documents, materials, and access to County and FCSO personnel to the Monitor, United States, and the public, as needed; (c) ensure that all documents and records are maintained as provided in this Consent Decree; and (d) assist in assigning compliance tasks to County or FCSO personnel.

304. FCSO will notify the United States and the Monitor upon the death of any incarcerated person, within 24 hours. FCSO will forward to the Monitor and United States incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of incarcerated people, as well as all final investigative reports that involve deaths and mortality reviews within seven days of completion.

305. Monthly, FCSO will notify the Monitor and United States of any of the following occurring at the Jail during the preceding month:

    a. deaths and cause of deaths if known;

    b. overdoses requiring medical intervention;

    c. serious injuries to incarcerated people or staff requiring hospitalization or emergency hospital transfer;

    d. substantiated findings of violence, extortion, or sexual abuse; and

    e. substantiated findings of staff misconduct related to drug trafficking, other contraband, or retaliation against an incarcerated person or staff member for reporting misconduct.

306. Upon request, FCSO will forward to the United States any related incident reports, and medical and/or mental health reports, and investigation reports as they become available, for the events reported monthly.

## XIII.   RIGHT OF ACCESS

307.   The Monitor and United States (and its attorneys, consultants, and agents) will have full access to persons (including employees, contractors, and incarcerated people), facilities, buildings, programs, services, overhead surveillance and body-worn camera video footage, documents, data, records, electronic databases, materials, and things that are necessary to assess the County's and FCSO's progress and implementation efforts with this Consent Decree.  Access will include medical, mental health, educational, and other records.

308.   The Monitor and United States will provide at least three (3) days notice of any visit or inspection.  Advance notice will not be required if the Monitor or United States has a reasonable belief that incarcerated people face a risk of immediate and serious harm.

309.   The Monitor and United States will keep confidential all non-public information provided pursuant to this Consent Decree.  Other than as expressly provided in this Consent Decree, the Consent Decree will not be deemed a waiver of any privilege or right the County or FCSO may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document or information.  The Parties and Monitor will treat all personally identifiable information obtained pursuant to this Consent Decree as confidential.

## XIV.   MONITORING

### A.    Selection, Term, and Budget of the Monitor

310.   The Parties agree to jointly select a lead Monitor, who will be retained to assess and report whether the provisions of this Consent Decree have been implemented and to provide technical assistance to help FCSO comply with its obligations under the Consent Decree.  The Parties will file a joint motion asking the Court to appoint the Monitor within 45 days of the Effective Date.

311.   In selecting the Monitor, the Parties will prioritize a person with demonstrated project management experience.

312.   If the Parties are unable to agree on a Monitor, each Party will submit the names of up to two candidates, along with the resumes and cost proposals, to the Court, and the Court will select and appoint from among the qualified candidates.

313.   The Monitor will be appointed for an initial period of two years from the appointment date, subject to an evaluation by the Court to determine whether to renew the Monitor's appointment until the Termination of this Consent Decree or periodically for each two-year period until the Termination of the Consent Decree, whichever happens first.  In evaluating the Monitor, the Court will consider the Monitor's performance under this Consent Decree, including whether the Monitor is completing its work in a cost-effective manner and on budget,  and is working effectively with the Parties to facilitate the County's and FCSO's efforts to comply with the Consent Decree's terms, including by providing technical assistance to the County and the FCSO.

314.   The cost of the Monitor's fees and expenses will be borne by the County.  The County will contract with the Monitor to provide these monitoring services.  The Parties recognize the importance of ensuring that the fees and costs of monitoring the Consent Decree are reasonable.  The Monitor will submit a proposed budget annually to the Parties for comment, and to the Court for approval.  The Court has the discretion to increase the Monitor's cap by a specific amount for a specific year at the Monitor's request.  To grant the request, the Court must find that the increase is necessary for the Monitor to fulfill its duties under the Consent Decree and is not due to a failure in planning, budgeting, or performance by the Monitor.  The Court retains the authority to resolve any dispute that may arise regarding the reasonableness of fees and costs charged by the Monitor.

315.   The lead Monitor will have expertise in correctional operations.  The Monitor will select a team of several sub-monitors to assist in monitoring responsibilities (Monitoring Team).  The Monitoring Team will include a Force Monitor, a Sanitation Monitor, a Nutrition Monitor, a Medical Monitor, a Mental Health Monitor, and an Education Monitor.  One person may fill the role of both Sanitation and Nutrition Monitor.  In addition, the Monitor may contract or consult with other persons or entities to assist in the evaluation of compliance.  The Monitor will

consult with the Parties on selection of members of the Monitoring Team.  The Parties may conduct interviews of proposed members, and may object to proposed members of the Monitoring Team for good cause.  The Monitor will pay for the Monitoring Team or consulting services out of the Monitor's budget.  The Monitor is ultimately responsible for any compliance assessments made under this Consent Decree.  Any person or entity hired or otherwise retained by the Monitor to assist in furthering any provision of this Consent Decree will be subject to the provisions of this Decree.

316.    In the event the Monitor is no longer able to perform its functions, is removed, or is not extended, within 60 days thereof, the Parties will together select and advise the Court of the selection of a replacement Monitor, acceptable to both.  If the Parties are unable to agree on a Monitor, each Party will submit the names of up to two candidates, along with the resumes and cost proposals, to the Court, and the Court will select and appoint from among the qualified candidates.

**B.    Monitoring Activities**

317.    The County and FCSO will maintain sufficient records to document that the requirements of this Consent Decree are being properly implemented and will make such records available to the Monitor and United States within 14 days of a request.

318.    The County and FCSO will provide written answers within 30 days of receipt of written questions from the Monitor or United States concerning implementation of this Decree.

319.    The County and FCSO will direct all staff to cooperate fully with the Monitor and the United States.

320.    The Monitor may convene regular conference calls with the Parties to discuss implementation of the terms of the Consent Decree, updates, and any other items that the Monitor and/or the Parties wish to discuss.

321.    The County and FCSO's representatives and staff will not retaliate against any person because that person has provided information or assistance to the Monitor or United States relating to this Consent Decree.

322.    The County and FCSO will distribute to the United States all documents, forms, assessments, and reports submitted by the County and FCSO to the Monitor/ Monitoring Team.

323.    The Parties will have the opportunity to participate in all monitoring site visits.

324.    The Monitor will be permitted to engage in *ex parte* communications with the County and FCSO, the United States, and the Court regarding this Consent Decree. Communications between the Monitor and the Parties are neither discoverable nor the property of the United States, the County, or FCSO.  The Monitoring Team shall not be required to disclose outside the Monitoring Team any *ex parte* communications, draft work product, or communications within the Monitoring Team, unless there is a substantial need as determined by the Court.

**C.    Reporting and Compliance Assessments and Other Monitoring Activities**

325.    Within 30 days of the Court's appointment of a Monitor, the Monitor and the Parties will develop a Monitoring Plan that will include: (a) a timetable for semi-annual visits to each Facility; (b) a division of responsibility between members of the Monitoring Team, based on specific subject areas of the Consent Decree; and (c) a budget.

326.    Within 60 days of the Monitor's appointment, the Monitor will develop a draft Monitoring Tool, to include outcome measures by which the Monitor and Monitoring Team will measure compliance.  The Parties will have 30 days to offer comments on the Monitoring Plan and Monitoring Tool.  The Monitor will consider all comments and issue a final Monitoring Plan and Monitoring Tool within 30 days of receiving the Parties' comments.

327.    As necessary, the Parties and the Monitor may agree to amend and revise the Monitoring Plan and Monitoring Tool throughout the period of this Consent Decree. All amendments and revisions that occur pursuant to this provision will be in writing.

328.    The Monitor will make the Monitoring Plan, Monitoring Tool, and all amendments and revisions readily available to the Parties via SharePoint or a similar service.

329.   The Monitor will assess compliance with the requirements of this Consent Decree.  Compliance assessments will be conducted in a reliable manner.  The Monitor will provide the parties with the underlying analysis, data, methods, and sources of information relied upon in the reviews, maintaining sources as anonymous where appropriate.

330.   Within 60 days of the Monitor's appointment, the Monitor and members of the Monitoring Team will conduct a baseline site visit at each Facility, and thereafter will conduct on-site inspections of the Jail every six months.  The Monitor will issue a Monitoring Report six months after the Monitor's appointment, and then every six months thereafter.

331.   One year after the Effective Date, the Parties and the Monitor may confer to determine if the schedule of on-site inspections and Monitoring Reports should be decreased or adjusted.

332.   A draft Monitoring Report will be provided to the Parties for comment.  The Parties will provide comments, if any, to the Monitor within 15 days of receipt of the draft Monitoring Report.  The Monitor will consider the Parties' comments and make appropriate changes, if any, before issuing the final Monitoring Report.

333.   The Monitoring Reports will describe the steps taken by the County and FCSO to implement this Consent Decree and evaluate the extent to which the County and FCSO have complied with each substantive provision of the Consent Decree.

334.   The Monitor will review a sufficient number of pertinent documents and interview a sufficient number of staff and incarcerated people to accurately assess current conditions.  The Monitor may also communicate with formerly incarcerated people, and family members, and relevant community members to assist the Monitor's assessment of current conditions.

335.   Each Monitoring Report will:

   a.   Evaluate the status of compliance for each relevant provision of the Consent Decree using the compliance standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance;

   b.   Describe the steps taken by each member of the Monitoring Team to analyze conditions and assess compliance, including documents reviewed

and individuals interviewed, and the factual basis for each finding;

    c.  Contain the Monitor's independent verification of representations from the County and FCSO regarding progress toward compliance, and examination of supporting documentation;

    d.  Highlight the County's and FCSO's successes towards achieving compliance while also being forthright about the work left to do; and

    e.  Provide recommendations and outline proposed actions for at least the next six months to assist the County and FCSO in achieving compliance.

336.   These Monitoring Reports will be filed with the Court and will be written with due regard for the privacy interests of individuals and will not include any information likely to jeopardize the security of the Jail, or safety of Jail staff or incarcerated people.

337.   The Monitoring Reports are evidence of compliance. The Parties agree that the Monitoring Reports will be admissible as evidence for any proceedings related to the County's and FCSO's compliance with this Consent Decree. The Court determines the facts regarding compliance and the status of compliance pursuant to the Consent Decree.

338.   Nothing in this Section prohibits the Monitor from issuing interim letters or reports to the parties or the Court via the public record in this case should they deem it necessary.

339.   The Monitor and members of the Monitoring Team will provide the County and FCSO with technical assistance as requested. Technical assistance should be reasonable and should not interfere with the Monitor's ability to assess compliance.

340.   The Monitor will mediate concerns between the County and FCSO as needed to facilitate compliance with this Consent Decree.

**D.    Limitations**

341.   The Monitor will only have the duties, responsibilities, and authority conferred by this Consent Decree. The Monitor will be subject to the supervision and orders of the Court.

342.   Neither the County, FCSO, United States, nor any of their staff or agents will have any supervisory authority over the Monitor's activities, reports, findings, or recommendations.

343.   Except as required by the terms of this Consent Decree, or as directed by the Court, or as authorized by the Parties acting together, the Monitor and members of the Monitoring Team will not make any public statements (at a press conference or otherwise) with regard to any act or omission of the County, FCSO or their agents, representatives or employees, or disclose information provided to the Monitor or members of the Monitoring Team pursuant to this Consent Decree.

344.   The Monitor and members of the Monitoring Team will not testify in any other litigation or proceeding with regard to any act or omission of the County or FCSO or any of their agents, representatives, or employees related to this Consent Decree, nor testify regarding any matter or subject that they may have learned as a result of their performance under this Consent Decree, nor serve as a non-testifying expert regarding any matter or subject that they may have learned as a result of their performance under this Consent Decree.  In addition, the Monitor and members of the Monitoring Team shall not be subject to formal discovery in any litigation involving the subjects of this Consent Decree, including deposition(s), request(s) for documents, and request(s) for admissions, interrogatories, or other disclosure.

345.   Unless such conflict is waived by all Parties, the Monitor and members of the Monitoring Team will not accept employment or provide consulting services that would present a conflict of interest with their monitoring responsibilities under this Consent Decree, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the County, FCSO, its departments, officers, agents or employees.  If the Monitor or a Monitoring Team member resigns from their position, that person may not enter any contract with the County, FCSO, or the United States on a matter encompassed by this Consent Decree without the written consent of the other Parties while this Consent Decree remains in effect.

346.   The Monitor and members of the Monitoring Team are agents of the Court and not employed by the County, FCSO, or agents thereof, and accordingly the records

maintained by the Monitor and members of the Monitoring Team will not be deemed public records subject to public inspection.

347.    The Monitor and members of the Monitoring Team will not be liable for any claim, lawsuit, or demand arising out of and substantively related to the Monitor's performance pursuant to this Consent Decree brought by non-parties to this Consent Decree.

## XV.  ACCOUNTABILITY AND TRANSPARENCY

348.    FCSO will make all new policies and procedures adopted under this Consent Decree readily available to the public and the incarcerated population, unless a specific policy or procedure creates a legitimate security risk, as described below.

349.    FCSO will notify all incarcerated people that they can review available policies and procedures upon request.

350.    Electronic copies of policies and procedures adopted under this Consent Decree will be available in the multipurpose area of the Main Jail and in the Annex Facilities.

351.    Policies and procedures will also be posted on the FCSO website and accessible on electronic platforms (e.g., tablets and kiosks) accessible to incarcerated people.

352.    If FCSO determines that allowing the public to access a policy or procedure creates a legitimate security risk, it will notify the Monitor and United States of this determination.  FCSO will provide a written explanation of the security risk upon request.

353.    FCSO will provide ways for incarcerated people to report information related to the Consent Decree directly to the Monitor at no cost to the incarcerated person, including via the Jail kiosks and in writing.

354.    The Monitor will host a public website with information about how family members and advocates can contact the Monitor to raise concerns about implementation of the Consent Decree.  The website will also host and make available to the public the United States' Findings Report, all Monitoring Reports, and all material, public filings in the above-captioned case.  No information that may compromise the security of the Jail will be provided to the public.

## XVI.   JURISDICTION AND ENFORCEMENT

355.    The United States District Court for the Northern District of Georgia will retain jurisdiction over this matter for the purposes of enforcing this Consent Decree.

356.    The Court's jurisdiction and the terms of this Consent Decree extend to any facilities built, contracted, modified, or used by the County and FCSO to house incarcerated people during the life of this Consent Decree.

357.    During the period that the Consent Decree is in force, if the United States determines that the County and FCSO have not made material progress toward substantial compliance with a significant obligation under the Consent Decree, the United States may initiate enforcement proceedings in Court against the County and FCSO for an alleged failure to fulfill their obligations under this Consent Decree, subject to the requirements below.

358.    Prior to taking judicial action to initiate enforcement proceedings, the United States will give the County and FCSO written notice of its intent to initiate such proceedings, and the Parties will engage in good-faith discussions to resolve the dispute.  Fulton County and FCSO will have 60 days from the date of such notice to cure the failure (or such additional time as is reasonable due to the nature of the issue and agreed upon by the Parties) and provide the United States with sufficient proof of its cure.  At the end of the 60-day period (or such additional time as is reasonable due to the nature of the issue and agreed upon by the United States), if the United States determines that the failure has not been cured or that adequate remedial measures have not occurred, it may initiate enforcement proceedings without further notice.  The United States commits to work in good faith with the County and FCSO to avoid enforcement actions.

359.    In case of an emergency posing an immediate threat to the health or safety of any incarcerated person or staff member at the Jail, the United States may omit the notice and cure requirements herein and seek enforcement of the Consent Decree.

## XVII.  CONSTRUCTION AND TERMINATION

360.    If any unforeseen circumstance occurs that causes a failure to timely carry out any requirements of this Consent Decree, the County and FCSO will notify the United

States in writing within 30 days (or as soon as reasonably practicable) after it
becomes aware of the unforeseen circumstance and its impact on the County's
and/or FCSO's ability to perform under the Consent Decree. The notice will
describe the cause of the failure to perform and the measures taken to prevent or
minimize the failure. The County and FCSO will implement all reasonable
measures to avoid or minimize any such failure.

361.   Where a provision of this Consent Decree requires United States approval,
approval will not be unreasonably withheld.

362.   The Consent Decree will terminate when the Court determines that the County
and FCSO have attained Sustained Substantial Compliance with all substantive
provisions of this Consent Decree, as demonstrated by two consecutive Monitoring
Reports reporting substantial compliance on each provision. The County and FCSO
may then file with the Court a motion to terminate this Consent Decree.

363.   Should an individual Jail Facility achieve Sustained Substantial Compliance with
all substantive provisions of this Consent Decree, as demonstrated by two
consecutive Monitoring Reports reporting substantial compliance on each provision,
the County and FCSO may then file with the Court a motion to terminate the
Consent Decree as to the individual Jail Facility.

364.   Should the County and FCSO achieve Sustained Substantial Compliance with a
full substantive section or subsection (designated by a roman numeral or capital
letter heading) of this Consent Decree, as demonstrated by two consecutive
Monitoring Reports reporting substantial compliance on each provision, the County
and FCSO may then file with the Court a motion to terminate that section or
subsection of the Consent Decree.

365.   Should an individual Jail Facility achieve Sustained Substantial Compliance with
a full substantive section or subsection (designated by a roman numeral or capital
letter heading) of this Consent Decree, as demonstrated by two consecutive
Monitoring Reports reporting substantial compliance on each provision, the Parties
may agree to modify the Monitoring Plan to confirm that the individual Jail Facility
has achieved Sustained Substantial Compliance with that full substantive section or

subsection, and, as such, monitoring of that full substantive section or subsection at that Jail Facility may cease.

366.    The burden will be on the County and FCSO to demonstrate that they have maintained Sustained Substantial Compliance with each provision of this Consent Decree, or with a full substantive section or subsection of this Consent Decree.

367.    Should any provision of this Consent Decree be declared or determined by any court to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions will not be affected.  The Parties will not, individually or in combination with another, seek to have any court declare or determine that any provision of this Consent Decree is invalid.

## XVIII.  PRISON LITIGATION REFORM ACT STIPULATION

368.    The United States, Fulton County, and FCSO stipulate and agree, and the Court finds, that this Consent Decree complies in all respects with the requirements for prospective relief under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a).

369.    The United States, Fulton County, and FCSO stipulate and agree, and the Court finds, that all of the prospective relief in this Consent Decree is narrowly tailored, extends no further than is necessary to correct the violations of federal rights as set forth by the United States in its Complaint and Findings Report, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of a criminal justice system.

Entered as an Order of the Court, the 6th day January, 2025.

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE

66

CONSENTED TO BY:


FOR FULTON COUNTY, GEORGIA:



Robert L. Pitts
Chairman, Fulton County Board of Commissioners


_Y. Soo Jo_                                _Miller_
Y. Soo Jo                                  Shalanda M. J. Miller
Fulton County Attorney                     Deputy County Counsel
Georgia Bar Number 385817                  Georgia Bar Number 122544
Fulton County Attorney's Office            Fulton County Attorney's Office
141 Pryor Street SW, Suite 4038            141 Pryor Street SW, Suite 4038
Atlanta, Georgia 30303                     Atlanta, Georgia 30303
(404) 612-0246                             (404) 612-0246
soo.jo@fultoncountyga.gov                  shalanda.miller@fultoncountyga.gov




FOR SHERIFF PATRICK LABAT, IN HIS OFFICIAL CAPACITY:


Sheriff Patrick "Pat" Labat
Fulton County Sheriff's Office


Amelia Joiner
Chief Legal Counsel for the Fulton County Sheriff
Georgia Bar Number 362825
Fulton County Sheriff's Office
185 Central Avenue SW, 9th Floor
Atlanta, Georgia 30303
(404) 613-8362
amelia.joiner@fultoncountyga.gov




[United States Department of Justice signatures on next page]

FOR THE UNITED STATES:

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

AILEEN BELL HUGHES
GA Bar No. 375505
Deputy Chief, Public Integrity & Civil
Rights Section

REBECA M. OJEDA
GA Bar No. 713997
RAHUL GARABADU
GA Bar No. 553777
Assistant United States Attorneys
600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
Tel: 404-581-6000
rebeca.ojeda@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REGAN RUSH
Chief, Special Litigation Section

MAURA M. KLUGMAN
DC Bar No. 1500461
Deputy Chief, Special Litigation Section

MAGGIE FILLER
CA Bar No. 287836
BETH KURTZ
DC Bar No. 1022970
MATTHEW NICKELL
CA Bar No. 304828
Trial Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section—4CON
950 Pennsylvania Avenue NW
Washington, DC 20530
Tel: 202-598-0957
maggie.filler@usdoj.gov