# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.: 1:25-cv-00024-LMM |
| | ) | |
| FULTON COUNTY AND | ) | |
| SHERIFF PATRICK LABAT, IN | ) | |
| HIS OFFICIAL CAPACITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MONITOR'S FIRST REPORT

Pursuant to Paragraph 330 of the Consent Decree, the Lead Monitor appointed by this Court, Kathleen Kenney, hereby submits the attached Monitor's First Report, which provides an overview of the baseline visit, the Monitoring Team's initial impressions of the subject matter areas contained in the Consent Decree, and recommendations for the Fulton County Sheriff's Office and Fulton County to focus on in the next six months. This Report takes into consideration the comments from the Parties in accordance with Paragraph 332 of the Consent

Decree.  The Lead Monitor is available to answer any questions the Court may

have regarding this Report at such times as are convenient for the Court and the

Parties.

      Respectfully submitted August 21, 2025.


  /s/ Kathleen M. Kenney
  Kathleen M. Kenney
  Lead Monitor
  343 Sweet Grass Way
  Richmond, KY 40475
  (301) 312-0220
  kkenney@federalcourtmonitor.com

# Monitor's First Report

## Table of Contents

I. Introduction and Background ...................................................................5

II. Baseline Visit ............................................................................................7

   Staffing Crisis ........................................................................................7

   Facility Tours .......................................................................................10

      North Annex – Alpharetta, Georgia ...............................................11

      Marietta Annex ...............................................................................12

      Main Jail – Rice Street....................................................................12

      South Annex – Union City, Georgia ..............................................16

      Atlanta City Detention Center ........................................................18

   Staff and Resident Focus Group Feedback...........................................19

   Monitoring Team's General Impressions ...............................................21

III. Subject Area Impressions ......................................................................24

   Policies, Procedures, and Training ........................................................24

   Notification of Rights and Protections ..................................................25

   Classification and Housing ...................................................................25

   Contraband Prevention .........................................................................26

   Gang Violence ......................................................................................27

   Grievances, Incident, and Maintenance Reporting................................27

   Investigations and Corrective Action Planning.....................................28

   Sexual Abuse Reporting and Investigations..........................................29

   Information Management Systems and Resiliency Planning...................29

   Protection From Harm Data Tracking and Reporting ...........................30

   Tasers ...................................................................................................30

   Use of Force Review.............................................................................31

   Use of Force Data Tracking and Reporting...........................................31

   Sanitation and Environmental Safety ...................................................31

Physical Plant.................................................................................................32

Pest Control....................................................................................................32

Chemical Control............................................................................................33

Food and Nutrition.........................................................................................33

Medical and Mental Health Staffing.............................................................33

Intake and Records.........................................................................................34

Emergencies....................................................................................................34

Medical and Mental Health Assessments, Sick Calls, and Referrals..................34

Medical Care...................................................................................................34

Supportive Environments for People with Medical and Mental Health Needs ...35

Mental Health Care........................................................................................35

Suicide Prevention..........................................................................................36

Medication Administration.............................................................................36

Oversight and Mortality Reviews...................................................................37

Restrictive Housing Policies, Procedures, and Training ...............................37

Mental Health Contraindication to Restrictive Housing ...............................38

Conditions in Restrictive Housing.................................................................38

Discipline........................................................................................................38

Special Education and Related Services.........................................................39

IV.  Recommendations for the Next Six Months.................................................40

# Monitor's First Report

## I. Introduction and Background

The Court entered the Consent Decree between the United States, Fulton County, and Sheriff Patrick Labat pertaining to the Fulton County Jail as an order of the Court on January 6, 2025. The goals of the Consent Decree are as follows: (1) provide reasonable protection from violence to the incarcerated population; (2) ensure that incarcerated people are not subject to excessive force; (3) provide safe and sanitary living conditions; (4) ensure appropriate medical and mental health care is provided to incarcerated people; (5) ensure restrictive housing practices do not pose an unreasonable risk of harm, do not discriminate against people with mental health disabilities, do not harm 17-year-olds; and (6) provide eligible 17-year-olds access to special education services.

The Consent Decree requires Fulton County and the Fulton County Sheriff to, among other things: improve supervision and staffing; implement plans and policies to keep incarcerated people safe from violence; keep doors locked and in working order; require staff to use force consistent with Constitutional standards; protect incarcerated people at risk of suicide and ensure incarcerated people receive adequate medical and mental health care; develop and implement a comprehensive housekeeping plan and pest control to keep jail facilities clean, sanitary, and free from of pests; and facilitate adequate special education services to children with disabilities in the jail. The comprehensive Consent Decree covers virtually every aspect of jail operations and is structured under the following nine areas: (1) Policies, Procedures, and Training; (2) Notification of Rights and Protections; (3) Protection from Harm; (4) Use of Force; (5) Environmental Health

and Nutrition; (6) Medical and Mental Health Care; (7) Restrictive Housing; (8) Special Education and Related Services; and (9) Quality Assurance.

On February 21, 2025, the Court appointed Kathleen Kenney as the Lead Monitor for this case. Following her appointment, Ms. Kenney worked with the Parties on selecting a Monitoring Team and developing a budget. The Consent Decree provides that the Monitor will issue a monitoring report six months after being appointed, and six months thereafter. This Report will describe some steps taken by the Fulton County Sheriff's Office (FCSO) and the County to implement the Consent Decree but it will not evaluate their compliance with each substantive provision. This Report provides an overview of the baseline visit and includes recommendations for the FCSO and the County to focus on in the next six months. The Monitoring Team's initial assessment is based on document and data review, interviews with staff and residents, and observations during our tours. The Monitor will evaluate each substantive provision of the Consent Decree in the subsequent monitoring reports.

Paragraph 354 of the Consent Decree requires the Monitor to host a public website that makes available the United States' Findings Report, all Monitoring Reports, and all public filings in this case. The Monitor's website can be found at www.fultonjailmonitor.com.

## II.  Baseline Visit

The Monitoring Team conducted its baseline visit from May 19 – 23, 2025.[1] The baseline visit included visually inspecting housing areas for residents with varying security classifications at the Main Jail and annex facilities, as well as intake, medical, and mental health areas of the jail.  It also included interviewing custody staff and supervisors, residents, and medical and mental health staff and supervisors.  The County and FCSO cooperated fully with the Monitoring Team during this visit, and the Monitor thanks staff of the County and FCSO and the residents for their professionalism, candor, and cooperation.

### Staffing Crisis

The single biggest takeaway from the Monitoring Team's visit was that FCSO Jail Operations is significantly understaffed, which creates serious safety risks for residents and staff and will obstruct compliance with virtually every provision of the Consent Decree.  For example, during our baseline visit, most floors in the Main Jail were staffed with only one deputy or detention officer.  This lone deputy was responsible for approximately 200 residents who were housed in six separate housing zones.  The security towers (enclosed and elevated area on the housing floor) in the Main Jail are often left vacant thereby further exacerbating safety risks to the staff and incarcerated population.

The Monitoring Team engaged the services of a technical expert to assist the FCSO with its staff rosters, post plan development, staff scheduling, and reporting. To assess staff deployment at the Main Jail and annex facilities, the expert

---

[1] The baseline visit was originally scheduled for April 2025, but due to ongoing discussions with the Parties regarding the Monitoring Team members and budget, the visit was postponed until May.

analyzed a seven-day sample of rosters for all shifts from July 7 – 13, 2025.[2]  The
FCSO mainly operates with 12-hour shifts.  For the 7:00 a.m. – 7:00 p.m. shift, the
seven-day average percentage of vacant posts for the Main Jail housing units was
50% and 55% for the annex facilities.  For support and operations (intake,
classification, food services, laundry, etc.), there was an average of 68% vacant
posts during this shift.  The seven-day average of vacant posts on the 7:00 p.m. –
7:00 a.m. shift was higher:  Main Jail – 58%, annex facilities – 59%, and support
and operations – 71%.  Due to inconsistencies in the rosters and reporting methods,
the Monitoring Team believes the actual vacancy rate may be higher than reported
above.  Standardized daily staffing rosters have been developed with the FCSO
command staff to better track staff deployment and post closures.

        The FCSO has experienced staffing shortages for decades.  In December
2005, Fulton County Sheriff Myron Freeman entered into a Consent Order with
Frederick Harper.[3]  Mr. Harper filed suit pursuant to 42 U.S.C. § 1983, alleging
that he, and all people at the jail, were confined in unconstitutional living
conditions due to an excessive number of residents in the jail, an inadequate
number of detention officers to ensure their safety, and a breakdown of the
ventilation, plumbing and laundry systems, and other circumstances.  The Sheriff
was required to assign at least three uniformed officers to supervise the residents in

------

[2] For the purposes of this analysis, the annex facilities encompass North, Marietta,
South, Atlanta City Detention Center, and Grady Hospital.
[3] Consent Order, Harper v. Bennett, et al., 1:04-CV-01416, ECF No. 89 (N.D. Ga.
December 21,2005).  In addition to Sheriff Freeman, the following individuals and
organizations were defendants in this matter:  Deputy Bennett, Fulton County
Board of Commissioners, Karen Handel, Chairperson, Rob Pitts, Emma Darnell,
William Edwards, Tom Lowe, Nancy Boxill, members, Jim Donald, Commissioner
Georgia Department of Corrections and the Georgia Department of Corrections.

the six cellblocks on each side of each floor at the Main Jail on all shifts seven days a week. One person was required to be stationed in the tower to observe the cellblocks on each side from the tower. Additionally, one supervisor was to be stationed on each floor. The Sheriff was also required to assign sufficient detention staff to provide transport, security, and other functions necessary for the provision of medical care. While the Sheriff was never able to meet the mandatory staffing requirement in the Consent Order, the conditions at the jail improved. On May 7, 2015, United States District Judge Thomas W. Thrash, Jr. terminated the Consent Order.[4] Judge Thrash was satisfied that the fundamental purpose behind the Consent Order, to provide a constitutional jail, had been met.

Prisons and jails across the country are facing significant staffing shortages. The FCSO expressed to the Monitoring Team that its salary and benefits package is not competitive with other law enforcement entities in the surrounding area. For example, local police departments and sheriff's offices are offering the following incentives: hiring bonuses, retention bonuses, pensions, overtime incentives, education incentives, shift differential payments, housing stipends, childcare stipends, and take-home vehicles. A comprehensive evaluation of the FCSO's pay and benefit structure, using internal and external data, would help identify whether improvements are needed to assist with recruitment and retention. As noted below, the FCSO is in the process of securing a company to assist with this evaluation.

To address this staffing crisis, the County and FCSO, in collaboration with the Monitoring Team, have taken a number of immediate steps to improve staffing. First, Fulton County has contracted with CGL Management Group, a jail/prison

---

[4] Harper, et al., v. Fulton County, et al.,1:04-CV-01416-TWT, ECF 368, (N.D. Ga. May 7, 2015).

staffing consultancy, to update and expand its 2015 staffing analysis. The final report from CGL Management Group is expected in October 2025. Second, as mentioned above, the County and FCSO have agreed to engage technical assistance services, through the Monitoring Team, for assistance with post plan development, scheduling, and reporting. Third, the County and FCSO are negotiating with a company that specializes in recruitment for corrections, detention, and law enforcement to provide assistance with recruitment and salary/benefits assessments. Fourth, the County and FCSO contract with NaphCare, the medical and mental health provider, to fund seven full-time equivalent (FTE) custody staff to supervise and enhance access to medical and mental health care.[5] Fifth, the County and FCSO are seeking a contract to provide staff to work the jail towers. Sixth, the FCSO is in the process of deactivating one satellite jail facility to redirect the staff to other critical vacancies. Finally, Sheriff Labat issued a directive on June 13, 2025, to direct staff currently assigned to Law Enforcement Operations to work two days a week in support of Jail Operations. As of July 23, 2025, of the seven identified posts to be filled by staff assigned to Law Enforcement Operations, only two were being filled on a regular basis. The Monitoring Team will continue to work with the FCSO on these initiatives, and report to the Court on their effectiveness at addressing the staffing emergency.

## Facility Tours

The Fulton County Jail consists of four separate facilities: the Main Jail at 901 Rice Street in Atlanta; the Marietta Annex, located a short distance from the Main Jail; the South Annex in Union City; and the North Annex in Alpharetta.

---

[5] The Monitoring Team has concerns about whether seven FTE are sufficient and will review additional information and further report on this issue in the future.

Noted below are the Monitoring Team's observations gleaned during its tours of these facilities. The Monitoring Team visited the Main Jail and South Annex during the day and evening shifts. The Atlanta City Detention Center (ACDC), owned and operated by the City of Atlanta, is an important part of the FCSO's population management, and a brief overview of that facility will be noted below.

### North Annex – Alpharetta, Georgia

This facility is located 25 miles north of the Main Jail. The facility includes intake holding areas, individual cells, and dormitories. During the week of the Monitoring Team's visit, there were 36 residents housed at this facility. There were four 17-year-olds female residents housed in a dorm across from the officer's station. They were not receiving educational services at this time, but all reported to being interested in having access to those services. Due to the malfunction of the video visiting tablet, there were no visits taking place. The residents had access to a small yard equipped with a ping pong table; however, the yard was inadequate in size to accommodate the approximately 24 residents housed in the largest dormitory. The residents reported they did not receive clean laundry weekly and the food was delivered cold due to insufficient staffing to deliver warm meals from the Main Jail kitchen and insufficient equipment to keep meals warm. The laundry and food are delivered to this facility from the Main Jail. Due to the heavy traffic on the north side of the city, it often takes staff tasked with delivering these items over an hour to get to the facility from the Main Jail.

The residents reported that they are generally seen timely for medical care. They reported having daily access to the small yard, availability of cleaning supplies, and chaplain services provided at the facility. Residents reported they lacked access to tablet or paper grievances, and no paper grievances were available

11

when the Monitoring Team requested a copy.  There were no kiosks noted in the unit.

The Sheriff announced a plan to close the facility.  FCSO staff and residents will be redirected to other facilities by September 1, 2025.  This allows for the redirect of approximately 8 staff.  This plan conserves staff resources by eliminating the need to provide meals and laundry services to this facility from the Main Jail.

## Marietta Annex

This is a dormed facility next to the Main Jail.  The purpose of the Marietta Annex is twofold – one to house two dorms of trustees and secondarily there are offices and classroom space which serve as the training location for the FCSO. There were 70 residents housed at this facility during the week of our visit.  The dorms are numbered 100 and 200 with one deputy sheriff and one security technician (tower officer) who oversee the unit.

The trustees had no major complaints from Dorm 100, but Dorm 200 reported unresolved maintenance issues with the video visiting system, a telephone, the television, and the bathroom showers and sinks.  The residents also reported inability for outside recreation on a daily or consistent basis due to lack of staffing.  The units were tidy and well-organized.  Overall, residents were positive about having the opportunity to work as trustees to support the operations of the Main Jail because it gave them something to do and a sense of purpose.

## Main Jail – Rice Street

The Main Jail was built in 1989 and has seven floors, with North and South sides on each floor.  Each floor has eight zones, numbered 100 to 800.  Zones 100 through 600 are 32 to 36 bed housing units with an upper and lower floor. The 700

12

zone is used for medical purposes with the upper tier used for non-contact attorney visits.  The 800 zone is a recreation yard.

During the week of our visit, there were a total of 1,838 residents.  There were 731 beds that were inoperable during our tour, principally due to environmental or maintenance issues.  Some of the off-line beds were in areas that were being "blitzed" or are scheduled to be blitzed.  The blitz is an effort to surge maintenance resources by the County zone-by-zone and repair the units all at one time while they are empty.  While the concept of the blitz project is good, staff and residents report that its execution has not been sustainable.  Specifically, after a zone has been repaired, the residents are returned to it.  As soon as they return, they destroy the items that have just been repaired.  Staffing deficits are inextricably linked to profound and unaddressed maintenance problems.  Unsupervised, idle residents will continue destroying the facilities until staff are able to adequately supervise them.[6]

This facility's compact design with a variety of zones allows for separation of populations by unique classifiers.  This design also offers the opportunity to contain a disturbance in a limited area.   However, the design of the facility creates sight line problems and blind spots as there is no ability for housing staff to stand in a central location and observe all zones.

The Monitoring Team was impressed with the Mental Health Competency Restoration Unit, which is a collaboration between the FCSO and Emory University School of Medicine.  It was developed to address the insufficient

---

[6] To be clear, not all the maintenance issues are related to staffing levels and resident behavior.  The Monitoring Team observed other issues, such as corroded pipes, that are likely related to the original construction and age of the building.

13

number of inpatient hospital beds to restore defendants to competency outside the jail.

While the Competency Restoration Unit only treats a small percentage of the total number inmates with serious mental illness in the FCSO jails, it is promising and appears to be functioning according to standard correctional practices. There were two officers working in the unit and two clinicians providing group therapy to the resident who were sitting in the day room and were engaged in the programming. The unit was clean and appeared well-maintained. Deputies who have been trained in Crisis Intervention Techniques worked in the unit Monday through Friday, eight hours a day. There appeared to be effective collaboration between custody and clinical staff. They offered residents in the unit behavior-based incentives. This unit can serve as a model for units with 17-year-olds and other specialized units.

The Main Jail serves as the central booking site for the FCSO. The intake area is large and houses both clinical staff and classification personnel, facilitating standard intake procedures. During our tour of this area, the Monitoring Team observed more than 100 residents being held in three separate holding tanks. There were approximately 30 – 40 residents per holding tank in areas not able to adequately accommodate that many persons. The residents were packed into these holding tanks so tightly that they could not sit or lie down (with the exception of a few residents who were able to sit on benches or lie on the floor). Each holding tank contained one toilet. The residents were brought out of the tanks for 15 minutes a few times a day to be counted, make phone calls, and use a restroom. Many of the residents had been held in these inhumane conditions for five to seven days. The FCSO did not identify beds to send them to nor did it allocate sufficient

staff to allow the residents to remain out of the holding tanks and sit in the chairs in the center of the intake unit.

To reiterate, these residents would have been standing in a holding tank for upwards of 120 – 168 hours (with the limited exception of their 15-minute breaks), many of them unable to even sit down. While the FCSO recognized the conditions were problematic, it failed to take appropriate action and treat the situation with the urgency required. Following our tour of the unit, the Sheriff personally stepped in and worked through the night to deploy additional staff, mobilize his management team, and develop a plan to open an additional housing unit. This required a maintenance crew to come into the facility in the middle of the night to get the unit ready for habitation. The unit that was activated, 1 North, is prone to flooding and pervasive plumbing issues, which is one of the reasons it had remained offline. One of the law enforcement divisions took ownership of 1 North to accommodate for the lack of custody staff for that floor. That team has continued to provide custody services for the floor since its activation. The Monitoring Team toured the area where the residents had been moved to and noticed that due to a recent rainstorm, the recreation area (not the living units) had standing water on the ground in some locations.

FCSO staff explained to the Monitoring Team, that due to lack of adequate supervision and compromised security systems, such as doors that do not secure and windows that have been and continue to be breeched, the residents routinely have access to weapon stocks and create weapons. Some of the weapons are used to burn holes in the windows to allow drones to drop drugs, weapons, and other contraband into the jail virtually unabated and undetected. The doors do not lock, phones do not work, showers are unsanitary, plumbing fixtures and lights remain unrepaired, and video tablets are broken.

During our visit, the temperatures in several of the housing units were high – upwards of 85 degrees – due to the air conditioning unit not working.  Staff did allow the residents to leave their cell doors open so air could circulate, and they provided access to water and to ice (provided the ice machine was operable).  The maintenance company was waiting on a part to repair the air conditioning unit.  The FCSO does not currently have a heat alert plan to address support for residents who are at higher risk during heat waves but was open to developing one.

Overall, this facility is in an unacceptable condition and inadequately staffed.  Many of the staff we spoke with focused on the need for a new jail facility.  There is a pervasive attitude among staff that the conditions at the current facility cannot improve and the only solution is a new facility, but with the current staffing crisis, unsupervised residents would quickly destroy even a newly designed facility.

### South Annex – Union City, Georgia

This facility is located approximately 20 miles south of the Main Jail.  It has approximately 285 beds and was shuttered between December 2022 and July 2023 to rehabilitate the facility.  It was reopened to relieve population pressures at the Main Jail due to the blitz projects.  This facility is currently being operated as a high security unit.  During the week of our visit, there were 173 males housed there.  In addition to the adult residents in segregation (administrative, disciplinary and protective custody), the facility houses 17-year-old males in general population and segregation.  The unit has a gymnasium and a well-equipped recreation yard.  Each unit has zones where a tower officer oversees another officer, though not all towers are staffed and officers are not assigned to each housing unit but rather roam about the facility in pairs when entering housing units.  There are classrooms, a satellite kitchen, and office spaces on site.  The South Annex is next to other

buildings with minimal perimeter security. Staff reported, and the Monitoring Team observed, portions of the fences that have been cut through and breached to allow for the passing of contraband through broken and compromised cell windows. To combat this, the FCSO has placed metal plates over first floor cell windows, eliminating ambient lighting in the housing units and creating dark environments for the residents to reside in.

The jail's primary mission is segregation. Staff acknowledged they are not able to meet the requirements of their restrictive housing policy due to staffing shortages. Residents in both administrative and disciplinary segregation reported they had not received written notices as to why they were being held or how long they would remain in that confinement. There are no secure shower doors, and residents reported avoiding showers due to being left in restraints. The facility lacks tablets, handbooks, and sheets.[7] Several units have malfunctioning doors; poor maintenance; limited lighting; and broken video monitors, phones, toilets, and showers. There is no visiting when the video system fails. The food delivered from the Main Jail is processed in the kitchen under unsanitary conditions. The residents expressed dissatisfaction with the cold and unpalatable meals, including being served bologna three times a day. One resident reported attending a General Education Development (GED) class via tablet, and others took coping skill classes, but most were idle. The juvenile residents resided in a dark unit where the overhead lighting was inoperable. They had no access to educational programming, adequate out-of-cell time, or outdoor recreation for large muscle

---

[7] The FCSO explained that it provides residents two blankets instead of sheets to reduce the likelihood that residents will hang themselves with the bedding material and one of the blankets is be used as a mattress covering. This is not a practice utilized at all of its facilities nor is it congruent with normal correctional practices.

activity.  The staff at this facility are proud of their work and committed to each other, despite challenging circumstances.

### Atlanta City Detention Center[8]

In August 2022, the County and FCSO entered into an Intergovernmental Agreement (IGA) with the City of Atlanta for the temporary housing of detainees. The Agreement allows the FCSO to temporarily house up to 700 individuals at ACDC when the Fulton County Jail exceeds its capacity.  As of July 22, 2025, there were 141 male detainees and 312 female FCSO detainees housed at ACDC. The current operational capacity at ACDC for FCSO detainees is 500.  The FCSO explained that, because of current staffing limitations and classification restrictions imposed by ACDC, it cannot use all available beds.  While ACDC accepts all adult female residents, only adult male detainees who are classified as low to medium custody level are eligible for housing at ACDC.  The FCSO provides all the resources to maintain the detainees during their housing at ACDC, to include the staff to supervise them, food, medical care, laundry, etc.

This facility is an important part of FCSO population management.  As of July 22, 2025, the total FCSO population was 2,896.  The Main Jail's population was 1,902 and there were 553 beds that are off-line due to extensive repairs and the blitz project.  There were 262 residents housed at the 3 FCSO Annexes noted above.  Members of the Monitoring Team toured ACDC on July 21, 2025.  The facility is clean, bright, and well-maintained.  It is operated under the direct supervision model, meaning the custody staff are stationed in the unit directly supervising the residents.  The IGA is slated to expire in December 2026, and should it be extended beyond the original four-year term, the County and FCSO

---

[8] ACDC is not covered by the Consent Decree.

would have to pay triple the per diem they are currently paying per detainee ($50/day – increased to $150/day). In light of the state of the Main Jail, however, the FCSO would be unable to absorb an additional 450 residents. The FCSO has a need to continue housing detainees at ACDC or find alternative solutions to address the loss of those critically needed beds.[9]

## Staff and Resident Focus Group Feedback

Members of the Monitoring Team conducted three focus groups with staff who were randomly selected by the Monitoring Team. The following ideas were expressed by staff during the focus groups.

- Staff do not feel safe working in the jail.
- They raised concerns with the environmental conditions they work in – no proper ventilation and a leak in the pipe chase caused one deputy to have an asthma attack.
- Staff did not feel supported and were afraid of being fired or publicly humiliated if they made a mistake due to the current practice of the FCSO publicly reporting serious staff misconduct.
- Staff report they are working alone in housing units that should have four to six staff assigned. Response to critical incidents is delayed and insufficient and oftentimes doors are not easily or quickly opened to allow a staff response to assist.
- They noted issues with the doors not locking properly.

---

[9] The Monitoring Team is aware that community groups do not support the FCSO's continued use of ACDC for housing residents beyond the term of the current lease. As noted above, this facility is an important part of FCSO's population management and alternative, suitable solutions would need to be identified to address the loss of those critically needed beds.

- They strongly believe they need a new jail facility.

- They have to pick up their oleoresin capsicum (OC) spray at the Training Center (which is a 20 – 30 minute drive) on their own time.[10]  One staff member was carrying an empty OC spray canister and others were in possession of OC spray canisters that appeared to have limited supply remaining after prior deployment.

- Paying staff double time for overtime shifts would increase the number of staff working in the jails.

- They recommended having all outside units (not assigned to Jail Operations) be put on the schedule to work at the jail on a regular basis.

The following were themes identified during the focus groups with residents:

- Residents do not feel safe in the jail.  Several mentioned issues with weapons and gang issues creating safety problems.

- They described staff conducting rounds very infrequently due to understaffing.

- Many residents believed staff do not care.

- They do not view the grievance system as a viable tool to address their concerns.

- The food is generally bad and the portions too small.

- Sinks, toilets, and showers often do not work.

---

[10] Following these focus groups, the FCSO explained that staff could pick up new OC spray at the Main Jail and that communication of this fact with staff had improved. The Monitoring Team will verify the availability of OC spray at the Main Jail and South Annex during the first Monitoring Visit.

- Some residents indicated that a lack of a paper inmate handbook was a problem because the tablets never work.

## Monitoring Team's General Impressions

The Monitoring Team highlights the following positive aspects of the Fulton County Jail system:

- The Jail Operations staff continue to report to work despite the incredible challenges they are faced with every day.
- There are several experienced and dedicated senior managers who are motivated to improve the conditions in the jails.  They welcome any technical assistance offered by the Monitoring Team and experts identified by the Monitoring Team.
- The FCSO has updated policies to reflect a commitment to American Correctional Association (ACA) standards.
- There are existing cameras throughout the system and staff wear body-worn cameras.
- The FCSO offers a three-month academy with job shadowing for Jail Operations staff.
- The FCSO has equipment for addressing serious violence, including Tasers and OC spray.
- The FCSO has a system for personal issuance of tablets to residents, albeit not all units issue tablets.
- Law Enforcement Operations and Court Operations staff can be redirected or required to work overtime in Jail Operations to address critical vacancies.

- The FCSO recently updated the employee dining rooms, with support from the resident food vendor, and was conducting employee wellness checks, but these were discontinued due to funding issues.
- The interviewed watch commanders and line staff offered insightful ideas for system improvement.

The Monitoring Team highlights the following challenges within the Fulton County Jail system:

- The jails are extremely dangerous, making recruitment and retention challenging.
- Entities involved in administering the jails operate within separate silos, and there is insufficient coordination, cooperation, and information sharing among them. This includes the County and FCSO, as well as the multiple contractors involved in maintaining the physical plant and environmental conditions in the jails. Improved coordination and a whole-of-government approach will be necessary to bring the Consent Decree into compliance.
- Many units are in unacceptable conditions with unsecurable doors, non-functional lights, phones, tablets, and visiting kiosks. Heavy smoke and mold odors permeate most units.
- Staff equipment, such as broken Tasers, radios that do not work in certain areas of the jail, and empty OC canisters were noted by the Monitoring Team without awareness by FCSO.
- The residents are demoralized and do not trust staff or the grievance system to make things better.
- At times, the communications between staff and residents is unprofessional.

- Contraband appears to be available unabated in the jails despite routine searching. To combat daily contraband issues, the County needs additional security equipment like drone interdiction solutions, walk-through metal detectors, and cell phone detection systems.

- Rear cell windows need addressing as the residents are compromising the windows and contraband is coming in through that breach undetected. The South Annex has plated the windows, which prevents ambient lighting in cells, while the Main Jail has not. The security captain suggests drone netting, but other solutions may exist.

- Classification, restricted housing, and population management strategies lack alignment with common correctional practices.

- Video visiting is inconsistent across jails, with some systems nonfunctional and little priority given to connecting residents with families.

- The FCSO lacks an emergency housing policy; as evidenced by over 100 residents held in areas designed for far fewer in untenable circumstances for days.

- Emergency medical response procedures are unclear, deputies lacked cutdown tools, and control towers were often unmanned.[11] There are not a sufficient number of AED devices and transportation modes, like wheelchairs or gurneys. The FCSO is not conducting critical emergency response drills.

---

[11] The Monitoring Team recommended the FCSO provide cutdown tools to all custody staff. The FCSO procured cutdown tools, but they were deemed insufficient by FCSO management and returned for replacement with a more industrial grade tool.

- There is a lack of group programming and out-of-cell time for residents with serious mental illness in the mental health units.
- General population residents also do not have meaningful programming occurring due to lack of staffing, resulting in idleness which contributes to problematic behaviors.
- The limited number of mental health staff make it difficult to see residents with serious mental illness with sufficient frequency given the severity of their illnesses.
- Residents placed on suicide watch are not consistently placed in safe cells in which ligature risks have been addressed, nor are they monitored with sufficient frequency to ensure their safety.
- In-service training is insufficient.  Because of staffing issues, FCSO in-service training has been reduced to 16 hours for detention officers and 32 hours for deputies, and much of the training is individual reading. Staff feel poorly trained in all aspects of the job.

## III.  Subject Area Impressions

This section summarizes key points from information gathered over the last several months, including from the Monitoring Team's baseline visit and analysis of records provided by the County and FCSO.  The subject areas noted below align with the sections noted in the Consent Decree.

### Policies, Procedures, and Training

The FCSO held in-service training sessions about the Consent Decree.  The Monitoring Team will review the curricula for this training as well as the attendance records.

The FCSO provided the Monitoring Team access to current policies and procedures through PowerDMS, a platform that contains all of its policies. A preliminary review of relevant policies suggests that they are generally updated though will require edits and additions to ensure compliance with the Consent Decree. It is noted that several policies have been refined to meet ACA standards, but given the current staffing crisis, the FCSO will struggle to pull all staff from their regular duties to be trained on those new policies. The Monitoring Team intends to collaborate with the County and United States to develop a strategy and timeline for policy revisions that is realistic and achievable. The Monitor expects the pace of policy updates and training to substantially increase once the staffing crisis has been ameliorated.

## Notification of Rights and Protections

The FCSO communicates most safety-related information to the residents through the tablets. However, tablets are not universally available to residents, and the Monitoring Team had difficulty finding the relevant material when given a chance to work with an example tablet. As an example, during focus groups conducted during the baseline visit, the Monitoring Team heard that information related to the Prison Rape Elimination Act (PREA) was not generally communicated to residents during the orientation process. Further, the Education Monitor assessed the reading level associated with the inmate handbook section about grievances and found that it was written beyond the reading comprehension level of average incarcerated individuals.

## Classification and Housing

The FCSO operates a classification unit within intake that uses the NorthPointe classification system. The unit is understaffed, creating a bottleneck at intake, and there is currently an insufficient reclassification process in place.

Housing the population consistent with their classification risk has not been established, placing lower-level residents at risk when housed with higher custody residents. Housing unit staff are able to move residents without ensuring the moves are safe, and residents actually move without permission due to lack of supervision. The County and FCSO have agreed to engage Dr. James Austin to provide technical assistance regarding the implementation of an objective classification and housing plan. On July 23, 2025, Dr. Austin began his on-site visit to observe the current classification process, conduct statistical analysis of the current jail population and how it is classified, and submit a classification system assessment report. Going forward, he will support the FCSO as it implements recommendations to modify the current classification system, provide recommendations on housing unit classification designations, and evaluate the modified classification system as it evolves.

## Contraband Prevention

The FCSO attempted to reduce the introduction of contraband by restricting entrance and exit location and subjecting staff and visitors to increased searching on intake. However, serious and dangerous contraband continues to exist in the jails. FCSO staff identified the use of drones as the most significant contraband-related issue they currently face. They described a pilot project with Axon's Dedrone system to track drone flights near the facilities and plans to purchase netting to create a barrier around facilities. While the solutions present other challenges associated with restricted ambient lighting, the FCSO placed metal plates over cell windows at the South Annex facility and some units at the Main Jail as the residents have been able to compromise the cell windows to grab contraband delivered via drone.

In June 2025, the FCSO began redirecting K-9 staff to provide perimeter security to assist with drone and contraband detection but is challenged as there are insufficient staff to respond to housing units when the K-9 officer reports a drone or perpetrator is noted near the perimeter or a cell window. The FCSO began using RaySecur contraband screening services in 2023 to scan incoming mail and deliver it digitally to residents to reduce drug related contraband that can be soaked into paper and delivered into the jail via the mail. Teams of staff continue to attempt to eradicate contraband through investigations and searches, and information about searches and any contraband found is saved in incident reports in Odyssey. There is no specific form or data entry to easily identify trends, so staff need to read the reports to identify and document contraband-related activities. This review is conducted weekly, and summary information is emailed to command staff.

## Gang Violence

The FCSO provided the Monitoring Team with a list of 89 residents with active gang-related charges and a list of 143 residents who admitted to gang-affiliation during intake. Of those 143, only 46 had been validated due to staffing issues and the 143 self-identified gang members likely significantly unrepresented the number of gang members in the jail. The available gang-related information is not being utilized appropriately in housing decisions as evidenced by the fact during the baseline visit, the Monitoring Team learned that both gang members and protective custody residents were housed in the same administrative segregation units, and resident housing moves are not consistently controlled by the classification unit.

## Grievances, Incident, and Maintenance Reporting

The FCSO has two systems for accepting and handling grievances. The tablet system is through ICSolutions, and it allows for automatic notifications and

electronic responses.  The paper system is tracked with a spreadsheet and scans of grievances saved on a shared drive.  FCSO staff copy information from the electronic ICSolutions system into the spreadsheet to have a single source to document how grievances are handled.  Between January 1 and July 9, 2025, the FCSO received 1,337 paper grievances and 922 electronic grievances.  FCSO staff indicated that the timeliness of grievance responses is a key performance indicator but this was not assessed on the baseline visit.  During the baseline visit, the Monitoring Team learned that many residents may not have access to tablets and that paper grievances were not always available.  Focus group responses suggested that residents do not use the grievance system because they do not think the FCSO will address the issue and may instead retaliate against them.  One focus group member described language access issues with the grievance process, with Spanish-speaking individuals struggling to get translation support.

As of May 14, 2025, the County and FCSO had between 1,167 outstanding maintenance work orders with Johnson Controls (JCI).   The FCSO contracted with a third-party contractor, EMSI, to track maintenance issues and JCI progress on work orders.  EMSI staff described a recent physical plant inspection of the jail that resulted in 149 new work orders and reported that many work orders generated from prior inspections have not been completed.  In June 2025, the Monitoring Team learned that the FCSO ended its contract with EMSI.  The County has since agreed to extend the contract with EMSI for six months.

## Investigations and Corrective Action Planning

FCSO staff read the narrative sections of incident reports regarding contraband, security breaches, and uses of force.  It is not clear how the incident reports are used or any process for referring incidents for follow-up investigations

or evaluating trends requiring management support.  Timely and meaningful investigation will be difficult to complete until the staffing crisis is resolved.

## Sexual Abuse Reporting and Investigations

Fulton County has provided a no-cost telephone hotline for reporting sexual abuse in the jails.  During the baseline visit, the Monitoring Team called the hotline and did not receive a timely response, suggesting that it may not be staffed appropriately.  FCSO staff are in the process of contracting with an outside vendor to manage the PREA telephone hotline.  During focus groups, residents indicated that they learned about PREA from other facilities and that no information was shared with them during the intake process and that they would not feel comfortable reporting any PREA-related issues to FCSO staff.  Most housing units had at least one PREA-related poster visible, and several residents noted that the tablets had a section for PREA resources.  FCSO classification staff indicated, and the Monitoring Team confirmed, that there were several PREA-screening questions asked at intake.  The FCSO reported affirmative answers led to mandatory referral to the PREA Coordinator.  FCSO's PREA Coordinator is experienced and knowledgeable.  There are no PREA Compliance Managers and only two trained PREA investigators.  FCSO will need to dedicate additional PREA resources to achieve compliance with the Consent Decree.

## Information Management Systems and Resiliency Planning

The County and FCSO provided the Monitoring Team with access to Odyssey, its jail management system.   However, it does not appear to be fully utilized.  For example, in an initial virtual tour, FCSO staff indicated that movement is documented at the beginning of each shift through paper change reports from each housing unit.  The paper forms are shared with the classification unit and housing assignments are updated in Odyssey.  Dr. Austin has met with

classification staff and Tyler Technologies and is assisting the FCSO in maximizing the use of the Odyssey system for resident movement and classification documentation as an aspect of his technical assistance.

## Protection From Harm Data Tracking and Reporting

During the baseline visit and in subsequent meetings, the Monitoring Team has heard about serious reliability issues related to staffing, grievance, violence, PREA, and population data. The FCSO does not appear to have established the type of routine analysis and reporting required by these provisions or data-based decision making by the management team. The FCSO had a grant-funded data analyst provided by the Department of Justice. The grant funding for the position was lost and the data analyst in that position has left the FCSO. The Monitoring Team is in the process of obtaining access to the relevant data systems and will be able to form its own assessment in preparation for the next report.

## Tasers

In response to the initial records request, the FCSO provided force incident logs, example videos and reports, and some counts of the type of force used. The records indicated that there were 489 uses of force between January 2024 and mid-May 2025. Tasers were used in 201 of those incidents and displayed in an additional 17. During the baseline visit, the Monitoring Team identified examples of broken tasers going unfixed.[12] There was one taser incident provided in the sample use of force reviews and the Monitoring Team found the manner in which the taser was deployed was not objectively reasonable.

---

[12] The FCSO explained that some of the broken tasers are old and cannot be repaired because the necessary parts are no longer being manufactured and distributed.

## Use of Force Review

The FCSO has a force review system that can be developed/enhanced but the historical tracking and early warning systems related to the use of force are inadequate. Since January 2025, FCSO's senior leaders convened regularly recurring meetings to review force incidents. On July 21, 2025, members of the Monitoring Team met with FCSO's Force Review Committee to discuss their processes, review a sample of force incidents, and establish expectations around force reviews. While there is a system to build upon, the review process will require enhancements.

## Use of Force Data Tracking and Reporting

The FCSO uses IAPro and Blueteam software to record information about uses of force. Reportedly, staff complete standard forms and upload other relevant evidence, such as body-worn camera video into the system. The Monitoring Team heard that staff have introduced some checks and balances in the last 4-5 months to ensure that all uses of force are entered into Blueteam, including having staff review incident reports and connect those that mention force to records in Blueteam. The Monitoring Team has received access to IAPro/Blueteam and will be able to form a more detailed assessment in preparation for the next report.

## Sanitation and Environmental Safety

The Monitoring Team found the Main Jail and South Annex generally in unacceptable condition. The FCSO provided monthly sanitation inspection records that appear to document compliance with sanitation requirements, but the report only addresses the laundry area. Information in a work order log provided to the Monitoring Team suggests that essential sanitation equipment was inoperable and may not be immediately fixed. The FCSO could have more sanitation tasks completed by residents. In focus groups, residents described mildew/mold issues,

that were evident to the Monitoring Team during the baseline tour, and the residents reported regularly requesting cleaning supplies but that those requests are denied.

## Physical Plant

Throughout the baseline visit, the Monitoring Team identified serious ongoing maintenance issues, including inoperable doors and locks, compromised cell windows, broken video monitors, phones, toilets, and showers.  The biggest issues were linked to a broken fire alarm system, non-operational padded cells, nonfunctioning doors, exposed live electrical wires, and a lack of sufficient lighting.  A log of active work orders provided to the Monitoring Team indicates that issues with doors, locks, plumbing, etc. go unaddressed for long periods of time.  FCSO staff identified the fact that the FCSO does not own the building and is dependent on the Fulton County Department of Real Estate and Asset Management and JCI to maintain the building as a major issue.  Maintenance staff identified issues with a lack of custody staff available to provide security and supervision to engage in repairs or to keep residents from destroying the building once repairs are complete.  The current system with multiple contractors and a lack of coordination and communication are also an issue.

## Pest Control

During the baseline visit, the Monitoring Team learned that pest problems have gotten better with improvements to trash handling.  When pests are reported to the FCSO, staff call JCI, which then calls Orkin (pest control company).  Staff and residents reported continuing concerns about ectoparasites, particularly in the mental health housing units.  All individuals take a shower with water treated for ectoparasite control during the intake process.  In focus groups, residents in

recently blitzed areas described few pest-related issues. Those in other housing units described constant problems and little experience seeing exterminators.

## Chemical Control

The FCSO chemical inventory system is insufficient. The Monitoring Team observed blank chemical inventory logs and safety data sheets that were outdated. When the Monitoring Team identified the issue with the safety data sheets, FCSO staff began immediately working to update the relevant binders.

## Food and Nutrition

Food is prepared in the Main Jail and moved to the annexes. The kitchen is understaffed, and essential equipment appeared inoperable during the visit. The Monitoring Team observed food sitting out at room temperature without date and time labels. In focus groups, residents indicated that the food is generally bad, that portion size varies across trays, and that breakfast in most housing units is served between 1-3 am, which is not a best practice. Several described issues with dietary restrictions and getting the appropriate meals. This included not eating bologna because it was a pork product, though the Monitoring Team later learned that the bologna served was actually turkey, and residents were not aware or did not trust that this was the case.

## Medical and Mental Health Staffing

The Fulton County Board of Commissioners approved an amendment to the contract with NaphCare, effective July 1, 2025, that increased staffing levels and compensation.

## Intake and Records

Initial medical intake occurs in a room with four bays separated by curtains and/or plastic or plexiglass barriers.  This creates a potential issue with providing a confidential setting.

## Emergencies

Custody staff carry Narcan for emergencies and have access to locked AEDs in tower stairwells.  Staff do not conduct emergency drills, and residents mentioned that safety buttons in their cells do not work.  Staff are not equipped with either personal alarm devices or cutdown tools.  The Monitoring Team's immediate recommendations following the visit included a recommendation to purchase both. The FCSO reported they purchased the cutdown tools, which remove ligatures during suicide attempts, but the tools were not sturdy enough and were returned for replacement.  One set of replacement cutdown tools are now being carried and tested by staff at the rank of Lieutenant and above.

## Medical and Mental Health Assessments, Sick Calls, and Referrals

Staff reported that nurses handle many sick call requests a day.  Requests for medical care back up over the weekend and it can take 14 days for residents to be seen by a practitioner in response to a sick call request.  Similarly, in the focus groups, the Monitoring Team heard that it could take weeks to get a response to sick call request.

## Medical Care

NaphCare staff consistently reported that the delivery of medical care in the Main Jail is hindered by a lack of custody staff to provide security.   As mentioned, NaphCare does hire seven FTE custody staff per day to assist with access to care. Reported rates for refusals for care are too high but there may be room to improve

the process for handling refusals, as they are now generally reported by custody staff and there is no formal process to reschedule or follow up with the incarcerated individual.  When possible, refusals for care should be made to a clinical staff member and signed by the resident.

## Supportive Environments for People with Medical and Mental Health Needs

The capacity of the medical observation unit (MOU) and the female observation unit (FOU), which are located in the Main Jail, are insufficient for the jail's population, poorly lit, and not as clean as desirable.  Residents may wait for days in intake for an MOU bed.  In July 2025, plumbing issues in the FOU forced the relocation of the incarcerated patients who had been housed there in a unit separated from clinical staff for several days.  Padded safety cells used for suicide watch are not consistently operational, and the backup cells have not been rehabilitated to remove ligature risks.

## Mental Health Care

It is estimated that 40% to 70% of all inmates in the jail have a diagnosed mental illness.  The inmates with the most acute mental illness are housed in a dedicated mental health unit, which has approximately 100 beds, is staffed by a nurse 12 hours a day, and receives mental health wellness rounds Tuesday through Thursday.  There is also a separate psychiatric observation unit.  Wait time for transfer to the state hospital has led to a backlog of individuals with serious mental illness in the jails.  Mental health staff also described challenges associated with attempting to provide mental health care when there are an insufficient number of custody staff to provide security.  Residents determined by clinicians who require hospitalization while at Grady Hospital are returned to the Main Jail before transfer to the Georgia Regional Hospital, and the FCSO indicated that the transfer can take

months.  There are no private rooms available for mental health staff to meet with residents in general housing units.  Treatment planning is minimal, at best, due to staffing constraints.  Clinical contact is often limited to cell-side wellness checks rather than more detailed therapeutic interventions to treat specific mental health symptoms.  Release planning for residents with mental illness is largely handled by a single employee, which is insufficient given the size of the population and the severity of their need.

## Suicide Prevention

At any given time, approximately 5-15 inmates are on suicide precautions. Suicide rounds are not regularly conducted according to the required 15-minute intervals.  There are no mental health staff working overnight to respond to crisis calls.  Two suicide watch cells with padded walls and equipped with cameras were not functional at the time of the baseline visit and the holding cells used as a substitute have obstructed sight lines, posed ligature risks, and were not well monitored.  The padding in the suicide cells is frequently destroyed and takes a long time to replace through the current vendor.

## Medication Administration

Medications are administered exclusively by nursing staff.  Involuntary medication is permitted under policy but it is rarely implemented. NaphCare has policies and procedures that guide their nursing staff on medication administration. The Monitoring Team observed medication administration in two dorms at the South Annex.  The nurse and the deputy were working collaboratively to ensure the prescribed medications were provided to the right resident and ingested in view of staff, including by checking residents' mouths to ensure consumption.

## Oversight and Mortality Reviews

FCSO staff responsible for managing the NaphCare contract conduct quarterly performance assessments of NaphCare. These assessments appear to be cursory and do not include the evaluation of performance metrics necessary to meaningfully evaluate NaphCare's performance under the contract.

Mortality reviews occur through the general NaphCare Morbidity and Mortality Committee. FCSO staff attend these meetings along with NaphCare staff.

## Restrictive Housing Policies, Procedures, and Training

A recent update to the restrictive housing policy is a good example of the FCSO updating the policy to conform to ACA standards but not following the updated policy. During the facility tours, the Monitoring Team asked staff about the newly developed restrictive housing policy, noting the supervisors and manager responsible for the facility were not aware of the requirements contained therein and the staffing resources to comply with the policy are insufficient.

The FCSO does not have a clear policy or practice on designated restricted housing units. Restricted housing populations were identified at the Main Jail, South, and Marietta Annex facilities, but the FCSO lack clear policies, practices, training, and specialized staffing to operate restricted housing units consistent with ACA standards. Incompatible residents were housed in the same segregation unit, a practice that is not necessary as FCSO operates more than one restricted housing unit. Custody staff are not adequately trained on restricted housing security and operating practices.

While the updated FCSO policies do incorporate requirements on due process placements into restricted housing and routine reclassification practices

through a committee action, the FCSO does not provide the residence notice on placement, track needed classification actions to ensure timely review, or document reasons for on-going retention in restricted housing.

## Mental Health Contraindication to Restrictive Housing

NaphCare staff conduct weekly rounds in the restrictive housing units. Their ability to meet with patients privately, as needed, is hampered by custody staff vacancies. They described mental health services as primarily focused on "crisis management" rather than regular therapy. Staff rarely see patients in private mental health interview space. Psychiatric visits occur virtually though patients express a desire for in-person meetings.

## Conditions in Restrictive Housing

Residents in restrictive housing are not always afforded daily out-of-cell time due to staff vacancies. The maintenance of the restricted housing units for adults and 17-year-olds at the South Annex was unacceptable with lack of lighting, difficult to open tray slots, broken kiosks and unit phones, unsanitary cells, etc. The Monitoring Team spoke with two 17-year-olds in restrictive housing. Neither had tablets. One reported that the lights in his cell were not working and they did not appear to be oriented to the facility's rules or his rights. These issues were confirmed by the onsite FCSO managers.

## Discipline

At the time of the baseline visit, the two FCSO staff assigned to resident discipline received no formal training and had only two years' experience. Staffing vacancies require that the discipline hearing officers are regularly pulled from disciplinary hearing duties to cover posts. While the staff appeared committed, due to the pressure of the work, the hearings observed lasted no longer than 5 minutes

and inconsistent documentation and informal guidelines meant that no final dispositions were issued.  The disciplinary officers were observed not ensuring adequate translation services were made available to a resident during one of the hearings.

## Special Education and Related Services

During the baseline visit, the Monitoring Team identified caring and enthusiastic staff and two large classrooms as positive attributes on which to build. The FCSO explained that Atlanta Public Schools provides special education services for residents as requested and pursuant to their Individualized Education Programs (IEPs).  Interestingly, all of the 17-year-olds interviewed by the Monitoring Team (males and females) reported there was no school and they would like to go to school.  Additional information is needed to assess the education and special education services provided to 17-year-olds in FCSO's custody.

Following the baseline visit, the Education Monitor met with personnel from Atlanta Public Schools, and they expressed their commitment to providing education and special education to all students who qualify.  In preparation for the next report, the Education Monitor will need an opportunity to observe the provision of education and special education services and review records beyond attendance logs, including information about which 17-year-old students are classified as special education, what courses students are taking, the qualifications of the teachers, and the instructional materials used.

# IV.  Recommendations for the Next Six Months

In consultation with the Parties, the Monitoring Team has identified the following Consent Decree provisions for the FCSO and County to focus on for the next six months.

- Protection from Harm – Classification and Housing – Provisions 51-60
- Protection from Harm – Staffing and Supervision – Provisions 61-71
- Environmental Health and Nutrition – Physical Plant – Provisions 162(e) and 164
- Medical and Mental Health Care – Suicide Prevention – Provisions 199, 214, 224, 230-237

Finally, in addition to addressing the staffing crisis, there are two foundational areas that are imperative to put the FCSO and County on the path to achieving compliance.  First, the FCSO and County will require a well-resourced, dedicated, and experienced team to lead implementation of the provisions and engage in internal monitoring.  The County reports the establishment of one contract position to serve as the Compliance Coordinator, and FCSO redirected the former Assistant Chief Jailer to serve as its Compliance Coordinator.  NaphCare has also identified a Compliance Coordinator.  However, it is believed a team of at least five full-time staff, including staff capable of project management, data management, and legal analysis is required to focus on implementation and compliance.  Absent that, the FCSO team does not have the bandwidth to focus on daily operations and project management.  Second, it is critical for the FCSO and County officials to work collaboratively to implement the requirements of the Consent Decree.  It is the Monitoring Team's collective experience that achieving compliance requires a whole-of-government approach.