# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.: 1:25-cv-00024-LMM |
| | ) | |
| FULTON COUNTY AND | ) | |
| SHERIFF PATRICK LABAT, IN | ) | |
| HIS OFFICIAL CAPACITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MONITOR'S SECOND REPORT

Pursuant to Paragraph 330 of the Consent Decree, the Lead Monitor appointed by this Court, Kathleen Kenney, hereby submits the attached Monitor's Second Report, which describes the steps taken by Fulton County and the Fulton County Sheriff's Office to implement the Consent Decree, evaluates the extent to which they have complied with substantive provisions of the Consent Decree, and shares recommendations for them to focus on in the next six months. This Report takes into consideration the comments from the Parties in accordance with

Paragraph 332 of the Consent Decree.  The Lead Monitor is available to answer any questions the Court may have regarding this Report at such times as are convenient for the Court and the Parties.

Respectfully submitted February 20, 2026.

/s/ Kathleen M. Kenney
Kathleen M. Kenney
Lead Monitor
343 Sweet Grass Way
Richmond, KY 40475
(301) 312-0220
kkenney@federalcourtmonitor.com

# Monitor's Second Report

## Table of Contents

I.  Introduction and Background ................................................................5

II.  Monitoring Visit .............................................................................6

III. Executive Summary ........................................................................8

    Classification and Housing .................................................................8

    Staffing and Supervision....................................................................9

    Contraband Prevention ...................................................................13

    Gang Violence ..............................................................................14

    Investigations and Corrective Action Planning ...................................15

    Sexual Abuse Reporting and Investigations........................................17

    Protection from Harm Data Tracking and Reporting .............................17

    Tasers ........................................................................................19

    Use-of-Force Reviews ....................................................................20

    Use of Force Data Tracking and Reporting.........................................22

    Sanitation and Environmental Safety ................................................23

    Physical Plant...............................................................................24

    Pest Control.................................................................................27

    Chemical Control...........................................................................29

    Food and Nutrition .......................................................................30

    Intake and Records........................................................................32

    Emergencies ................................................................................33

    Assessments, Sick Calls, and Referrals ..............................................33

    Medical Care ...............................................................................34

    Supportive Environments for People with Medical and Mental Health Needs ...35

    Mental Health Care .......................................................................36

    Suicide Prevention ........................................................................38

    Medication Administration ..............................................................39

Oversight and Mortality Reviews...........................................................................39

Mental Health Contraindication to Restrictive Housing .......................................40

Conditions in Restrictive Housing.........................................................................42

Discipline ...............................................................................................................42

17-Year-Olds in Restrictive Housing ....................................................................43

Special Education and Related Services.................................................................43

Quality Assurance..................................................................................................44

Implementation and Reporting ..............................................................................45

IV.  Recommendations for the Next Six Months....................................................47

# Monitor's Second Report

## I. Introduction and Background

The Court entered the Consent Decree between the United States, Fulton County, and Sheriff Patrick Labat pertaining to the Fulton County Jail as an order of the Court on January 6, 2025. The goals of the Consent Decree are as follows: (1) provide reasonable protection from violence to the incarcerated population; (2) ensure that incarcerated people are not subject to excessive force; (3) provide safe and sanitary living conditions; (4) ensure appropriate medical and mental health care is provided to incarcerated people; (5) ensure restrictive housing practices do not pose an unreasonable risk of harm, do not discriminate against people with mental health disabilities, do not harm 17-year-olds; and (6) provide eligible 17-year-olds access to special education services.

The Consent Decree requires Fulton County and the Fulton County Sheriff to, among other things:  improve supervision and staffing; implement plans and policies to keep incarcerated people safe from violence; keep doors locked and in working order; require staff to use force consistent with Constitutional standards; protect incarcerated people at risk of suicide and ensure incarcerated people receive adequate medical and mental health care; develop and implement a comprehensive housekeeping plan and pest control to keep the jail facilities clean, sanitary, and free of pests; and facilitate adequate special education services to children with disabilities in the jail.  The comprehensive Consent Decree covers virtually every aspect of jail operations and is structured under the following nine areas: (1) Policies, Procedures, and Training; (2) Notification of Rights and Protections; (3) Protection from Harm; (4) Use of Force; (5) Environmental Health

and Nutrition; (6) Medical and Mental Health Care; (7) Restrictive Housing (8) Special Education and Related Services; and (9) Quality Assurance.

This Report evaluates the status of compliance for each relevant provision of the Consent Decree using the compliance standards: (1) Substantial Compliance (2) Partial Compliance; and (3) Non Compliance.  Given the current staffing crisis, the FCSO will have a difficult time revising policies and pulling all staff from their regular duties to be trained on those new policies.  Therefore, the Monitoring Team has assessed many of the provisions related to developing policies, procedures, and training as "Not Rated."  The Monitoring Team continues to collaborate with Fulton County, the FCSO, and United States to identify a timeline for policy revisions and related training that is realistic and achievable.  Due to the length of that portion of the Report, the Monitoring Team has placed those evaluations in the Attachment to the Report.  Noted in those evaluations is the County's and FCSO's successes towards achieving compliance while also being forthright about the work left to do. We have included an Executive Summary of those evaluations below. We have also provided recommendations for what areas FCSO and the County should focus on in the next six months.

Paragraph 354 of the Consent Decree requires the Monitor to host a public website that makes available the United States' Findings Report, all Monitoring Reports, and all public filings in this case. The Monitor's website can be found at www.fultonjailmonitor.com.

## II.  Monitoring Visit

The Monitoring Team conducted its first monitoring visit from October 6 – 10, 2025.  The visit included visually inspecting housing areas for residents with varying security classifications at the Main Jail and annex facilities, as well as

intake, medical and mental health areas of the jail. Members of the Monitoring Team visited the Main Jail and South Annex during both shifts. They interviewed custody staff and supervisors, executive leaders, residents, and medical and mental health staff and supervisors. FCSO executive leaders provided the Monitoring Team updates regarding staffing, jail population, maintenance issues, fires, contraband interdiction and documents being revised or developed. Details regarding those updates are noted below in the specific subject matter sections. On October 7, 2025, a FCSO detention officer was stabbed by a resident resulting in the lockdown of the Main Jail. While this impacted the Monitoring Team's ability to conduct focus groups with staff and residents, FCSO staff worked to provide opportunities to conduct some monitoring activities.

There were two noted areas of improvement since the baseline visit. First, the overall sanitation in the facilities was most improved at the South Annex. While there is room for improvement in sanitation throughout the jails, the Monitoring Team noted conditions had improved. The other area of noticeable improvement was the intake area. During the baseline visit, the Monitoring Team observed more than 100 residents being held in three separate holding tanks. The residents remained in these tanks for upwards of 120 – 168 hours. During the October visit, the Monitoring Team observed 13 inmates in the holding tanks in the intake area. The Monitoring Team recommended, and FCSO agreed, to have a technical expert assist with revising its intake policies and procedures to include the following: establishing a maximum time an individual can be in the intake area prior to housing; defining the process for tracking time in intake; monitoring intake cell capacity and maximum time spent in the area; and developing an internal audit process.

The County and FCSO continued to cooperate fully with the Monitoring Team during this reporting period. They engaged in constructive conversations with the Monitoring Team regarding their efforts to implement the Consent Decree. They sought technical assistance in a variety of areas, described in more detail below. During this monitoring period, the Monitoring Team focused much of its efforts on the areas where technical assistance was provided. Those sections of the report, such as classification and staffing, contain more detail than others. The Monitoring Team expects to focus its review and analysis on other areas of the Consent Decree in the next reporting period. The Monitoring Team appreciates FCSO's and the County's responsiveness, transparency, professionalism, and courtesy in handling its requests.

# III. Executive Summary

The Attachment to this Report contains the Monitoring Team's evaluation of the status of compliance for each relevant provision. This Executive Summary provides an overview of the subject areas of the Consent Decree.

## Classification and Housing

During this review period, the FCSO and County made significant progress in fulfilling the requirements of the Classification and Housing provisions. This advancement has been supported by technical assistance from a nationally recognized classification expert, whose guidance has been instrumental in evaluating the classification scoring system, intake procedures, and the Jail Management System (JMS). The expert has also provided input into necessary system updates to enhance the overall classification process.

Before the Monitoring Team's involvement, the County and FCSO proactively dedicated resources to improve the JMS in preparation for upcoming changes. Key

updates implemented during this period include the revision of the intake questionnaire and the classification scoring tool, as well as the integration of management reports designed to identify overdue intake and ninety-day reclassification reviews. While these developments represent important progress, additional modifications are anticipated, especially regarding the integration of non-confidential health record information into the JMS. This integration is intended to equip classification staff with the information necessary to make informed housing decisions that address residents' medical, mental health, or disability-related needs.

Overall, the FCSO has demonstrated a strong commitment to improving its classification system and is well positioned to achieve substantial compliance with many provisions. However, certain areas may not reach substantial compliance in the next review period due to ongoing challenges such as staffing shortages, time needed to implement JMS updates, and limitations in bed availability, which impact the accommodation of the dynamic resident population.

## Staffing and Supervision

The FCSO faces a significant barrier to achieving compliance with the Consent Decree: a persistent and severe staffing crisis within the jails. As previously documented in the First Monitoring Report, vacancy rates for critical security posts remain alarmingly high. This shortage contributes to extreme violence and security violations, posing substantial risks to both residents and staff, as well as impacting the broader community.

Due to insufficient staffing levels, essential correctional practices, such as timely security checks and contraband control, are not being adequately carried out. The lack of regular supervision has allowed disruptive residents to ignite fires, assault

other residents, damage cell windows, doors, lights, and other crucial security devices.  Staff are often compelled to manage force incidents without adequate support, resulting in critical errors and exposing both staff and residents to unnecessary danger.  The staff shortage crisis is therefore extremely serious and requires immediate remedial action.

The County and FCSO have acknowledged the urgency of addressing this staffing crisis, which is not unique to Fulton County or Georgia.  Several immediate and foundational steps have been launched, but these measures have yet to reverse the decline in custody staffing levels.  In fact, the custody staffing level reduced 10% between the period of December 2024 to December 2025, from 416 filled positions to 373.[1]  To strengthen recruitment and onboarding, the County partnered with the Whalls Group recruitment firm.  However, it is currently too early to assess whether this partnership will yield improvements in recruitment outcomes and the overall hiring process.

In addition to partnering with a recruitment firm, the County has commissioned a comprehensive salary survey (Segal Group).  The Monitoring Team has specifically requested the final salary study report include ancillary benefits, recognizing their importance in attracting and retaining qualified candidates and the County reports that this is an important aspect of the analysis.

To address immediate staffing shortages in critical security roles, the County contracted with a private security firm (Allied Universal) to fill vacant security specialist positions, staff who operate unit control towers, and provide support to deputies and detention officers assigned to housing units.  As of January 20, 2026,

---

[1] Comparison Monthly AMS Reports – December 23, 2024 and December 1, 2025.

71 contract employees were working in the unit control towers and 33 additional contract employees were in training.

The FCSO has also sought technical assistance to develop a shift scheduling system aimed at more accurately quantifying daily staffing levels and vacancies. This initiative began in October 2025, with pilot testing of a daily scheduling report commencing in November 2025. As a result, the FCSO managers and the Monitoring Team can now better evaluate post vacancies and confirm whether mandatory posts are being filled according to requirements. Additionally, the County intends to transition to a software system, Telestaff, that will integrate daily scheduling and payroll to further improve tracking.

Furthermore, the County engaged an outside firm (the CGL Group) to conduct a staffing analysis. The initial report by CGL focused on the immediate staffing crisis and provided recommendations for establishing minimum custodial jail staffing levels. A follow-up assessment is anticipated to ensure a comprehensive evaluation of all jail personnel needs. In the interim, using the minimum staffing levels established by the CGL report, as of early December 2025, the FCSO was able to fill less than 50% of the CGL identified mandatory minimum posts.[2]

To meet urgent staffing needs, the Sheriff continues to reassign some personnel from non-custody divisions to jail duties. However, in reviewing documented overtime and redirection of non-custody staff working inside the jails for the week of November 26 through December 2, 2025, less than 1% of the posts were filled by court and outside law enforcement staff on redirect from their regular post.[3] The FCSO reports that not all redirects and overtime were listed on the daily

---

[2] Weekly Roster Analysis November 26 through December 2, 2025
[3] Weekly Roster Analysis November 26 through December 2, 2025

schedules, which would have resulted in underreporting the support provided to the jails through redirection and overtime, which is likely accurate. However, the redirection of non-custody staff does not match the dire needs in the jail. While it is difficult to require staff to work in the jails either through redirect or involuntary overtime, the staff shortages require greater utilization of all available resources to help fill vacant posts.

As we recognize this reality, we are cognizant of the FCSO's reasonable concerns that the redirection of non-custody staff into jail posts or retention incentives paid only to custody personnel may have contributed to increasing resignations among non-custody law enforcement and civilian staff, who may seek employment with agencies offering better compensation, benefits, and less demanding work environments. Working in the jail facilities is inherently challenging and has become increasingly stressful and dangerous due to current conditions in Fulton County. The FCSO reports that its Law Enforcement Division realized a 20% reduction in staff from 2024 to 2025, from 120 filled positions to 96. Notwithstanding these concerns, all available resources must be brought to bear to mitigate the staffing emergency. And we anticipate that other initiatives, including taking action to address concerns identified through the benefits and compensation study discussed above, may help the FCSO mitigate its retention challenges.

Current staffing levels are insufficient to safely and effectively manage the jail population. Should the County and FCSO fail to resolve this crisis, the next reasonable course of action may be to reduce the jail population. A population reduction would ease pressure on existing staff and could allow for the closure of certain housing units. While such a measure is extreme, the severity of the situation may necessitate decisive and significant intervention. A coordinated effort among State Courts, District Attorney, Public Defender, FCSO, and other

county and municipal partners is essential to address current operational constraints.  A focused and daily review of specific populations may yield meaningful court efficiencies and viable alternatives to custody, including felony pretrial cases, which are currently averaging more than 700 days in custody; competency restoration cases that may remain pending for a year or longer; technical probation violations; failures to appear; individuals held on low bond amounts; and those awaiting placement in alternative programs.  Absent sustained and measurable progress , a court-ordered population cap aligned with available staffing levels may become necessary to ensure safe operations.

In addition, the County and FCSO must plan for the potential loss of approximately 500 beds provided by the City of Atlanta.  The Intergovernmental Agreement with the City of Atlanta for the temporary housing of detainees is slated to expire in December 2026.  The facility is an important part of FCSO's population management.  The current facilities cannot absorb 500 residents as the system is already utilizing non-traditional, overcrowding floor beds (boats), which is not a sustainable housing solution.

## Contraband Prevention

The FCSO continues to face profound and evolving challenges related to contraband, making it one of the most serious security risks impacting the safety of residents, staff, the broader jail environment and the community.  Weapons are frequently used in assaults, and incarcerated people have discovered ways to cut through perimeter windows, enabling airborne drones to hover outside and deliver narcotics, cell phones, and weapon components directly into areas that should be secured, directly into resident cells.  Community members have also breached the perimeter fence to drop contraband through compromised windows, further complicating safety efforts.  Unfortunately, employees have also been detected

introducing contraband, leading to termination and referral for criminal prosecution where warranted.

While the FCSO has implemented staff-screening measures at entry points, aging equipment has the potential to limit the ability to deter staff or contractors from introducing narcotics or other dangerous items. The FCSO previously utilized drone detection technology, but more solutions are needed to address this growing threat. Reportedly, a new vendor contract (Axon) may restore a level of drone detection in the future, but specifics are not yet confirmed due to ongoing implementation planning.

Against this backdrop, the FCSO has designated managers responsible for contraband interdiction at each facility and submitted a draft Perimeter and Contraband Control Plan, though additional work is needed to formalize responsibilities in Post Orders, strengthen resource allocation, and ensure that new or alternative screening technologies are incorporated. A comprehensive, coordinated, and well-resourced approach, paired with improved collaboration between the County and the FCSO, is required to meet the scale of the threat and support sustainable implementation of the Perimeter and Contraband Plan.

## Gang Violence

Gang activity within the jails is pervasive and continues to shape daily operations in profound and dangerous ways. Violent gang-related assaults, including stabbings and group attacks involving weapons, occur with troubling regularity. In urban jails, such as those operated by the FCSO, sophisticated gang members often prey on less sophisticated or more vulnerable individuals. The criminal dynamics occurring in the community routinely spill into the jail. The FCSO currently lacks the tools, staffing, and coordinated investigative structure needed to effectively

combat gang influence. While the FCSO is committed to addressing and abating gang activity, severe staffing shortages and fragmented investigative responsibilities shared between custody and non-custody investigative units undermine the development and implementation of a cohesive gang management strategy.

Similarly, efforts to develop a comprehensive Gang Violence Prevention Plan remain hindered by insufficient staffing, gaps in communication between investigative units, and limitations within the current Jail Management System that prevent the secure and coordinated handling of gang intelligence. These structural and resource challenges prevent the FCSO from implementing housing, classification, and investigative practices that effectively mitigate gang influence or protect vulnerable individuals.

Substantial progress toward compliance will require dedicated personnel, better internal coordination, improved data systems, and focused investment in a unified gang management strategy capable of addressing the significant gang presence that continues to destabilize the jail environment.

## Investigations and Corrective Action Planning

The FCSO has a variety of systems in place to address investigations (post incident, use of force reviews, internal affairs, etc.) and corrective action planning but will require substantial effort and resources to fully comply with the Consent Decree. During this monitoring period, the FCSO demonstrated willingness and effort to improve its investigative and review processes, but the system as a whole continues to face significant structural barriers that prevent sustained progress. While the daily incident briefing process remains a stable and effective component of operations, most of the investigative and corrective action provisions remain in

partial or non compliance. These provisions collectively require well-functioning data systems, consistent investigative practices, and coordinated oversight across multiple divisions, conditions that are not yet present within the agency.

A central theme across the provisions is the absence of a unified, reliable, and accessible data infrastructure. The FCSO currently relies on a patchwork of systems and processes that do not communicate with one another. Incident reports, grievances, internal investigations, criminal investigations, anonymous complaints, and video evidence are all captured in different systems or repositories, many of which lack standardization or basic categorization. This fragmentation makes it extremely difficult to track the status of investigations, identify patterns or trends, or ensure that serious incidents receive appropriate follow-up. It also places a substantial burden on already limited investigative and supervisory staff, who must navigate these disconnected systems while also managing high workloads.

Staffing shortages, particularly in investigative and supervisory positions, further complicate compliance efforts. These shortages limit the agency's ability not only to complete investigations in a timely and thorough manner, but also to participate in necessary training, strengthen documentation practices, and build internal capacity. As the agency continues to manage high levels of violence, contraband, and other critical safety concerns, investigative systems remain reactive rather than preventive.

Despite these challenges, FCSO leadership has shown a consistent willingness to engage in technical assistance and to prioritize foundational improvements. Planned enhancements to the Jail Management System (JMS) are particularly important, as improved incident categorization and reporting capabilities are necessary for nearly every provision in this section. Early exploration of a centralized investigative file system and the request for leadership development

16

assistance also reflect a commitment to long-term reform. These steps, while incremental, are essential for establishing the organizational stability and infrastructure needed to support more complex improvements in investigative quality, trend analysis, and corrective action planning.

Given the scope of work needed and the systemic nature of the deficiencies identified, substantial compliance with most provisions is not anticipated before 2027. However, the Monitoring Team will continue collaborating with the FCSO to support incremental progress, strengthen core investigative functions, and build the foundation for sustainable compliance over time.

## Sexual Abuse Reporting and Investigations

The FCSO has demonstrated its commitment to achieving compliance with the PREA-related provisions of the Consent Decree in two areas this reporting period. First, it has added two PREA Compliance Managers to assist the PREA Coordinator. Second, the FCSO has entered a Memorandum of Understanding with LiveSafe Resources to provide several resources pertaining to sexual abuse, including a no-cost telephone hotline, victim advocacy and support services and coordination of sexual assault examinations conducted by Sexual Assault Forensic Examiners (SAFEs) or Sexual Assault Nurse Examiners. The FCSO PREA Coordinator is a dedicated professional who is working collaboratively with the Monitoring Team and LiveSafe to meet the requirements of the Consent Decree.

## Protection from Harm Data Tracking and Reporting

The provisions in this section require the FCSO to track and report on information related to staffing and recruitment efforts, grievances, incidents, allegations of sexual abuse, and the resident population.

The FCSO provided the Monitoring Team with Quarterly Staffing Updates for the second and third quarters of 2025. The third quarter report included information about its recruitment efforts, describing participation in 37 career fairs and community events that led to invitations to 1,080 individuals to take the FCSO Physical Abilities Test. The third quarter report also addressed hiring and attrition, with information about the FCSO overall and specific to its Jail Operations. For example, in the third quarter of 2025, the FCSO hired 16 deputies, 14 of whom were hired to work in the jails. During that same time period, the FCSO lost 29 deputies, 15 of whom were assigned to the jails. Information about the use of overtime was also included in the third quarter report. Specifically, in the third quarter of 2025, FCSO staff worked a total of 67,276 overtime hours, 46,283 of which were worked by Jail Operations staff.

The FCSO has also shared with the Monitoring Team reports that list the average daily population for July through November 2025, which fluctuated between 1,958 and 2,079 residents at the Main Jail. In August 2025, the FCSO provided the Monitoring Team a specific update regarding the size of the resident population, the strain it placed on its resources, and the practices necessary to address the issue:

> As of today, the total population in the Fulton County jail system is 2,972 and the Main Jail population is 2,016. At the same time, the Main Jail has 515 beds out of service due to various maintenance issues. Because we are limited in bedspace, we are forced to resort to the use of portable sleeping devices ("boats"). Currently, we have deployed the use of 18 portable sleeping devices. The number of devices fluctuates depending on arrests, releases, and outsourcing.

As of January 19, 2026, the number of residents using a portable sleeping device was 61.

## Tasers

The FCSO has established foundational policies and training protocols governing the use of electronic control devices (Tasers) within the Custody Division. Staff receive structured initial and refresher training, and existing lesson plans reflect core principles related to proportionality, officer safety, and risk awareness.  These efforts provide a solid framework upon which further refinement can occur.

During this monitoring period, the Monitoring Team reviewed available information regarding Taser utilization and individual use-of-force incidents. While policies are in place and Taser issuance has been limited, the review identified utilization patterns and specific deployments that raise concern and require closer attention.  These findings highlight the need for more consistent analysis of Taser use, clearer guidance on when deployment is appropriate, and stronger mechanisms to address misuse through supervision and accountability.

Several compliance gaps relate not to the absence of policy or training, but to the need for greater clarity and integration across systems. The current Conducted Energy Weapon Policy (200-09) has not yet been revised in consultation with the Monitoring Team to fully incorporate Consent Decree requirements, including expectations related to warnings, cycle limitations, prohibited uses, and considerations for individuals experiencing mental or behavioral health crises. While some of these elements are addressed in training materials, they are not yet consistently reinforced through policy language or the use-of-force review process.

The FCSO has begun working with technical assistance experts to develop a broader implementation plan addressing use of force policies, training, and

oversight across the Custody Division. While this work has not yet focused specifically on Taser-related policy, Taser use is expected to be incorporated into this comprehensive framework beginning in the next review period. Continued monitoring will focus on whether these efforts result in clearer guidance, improved analysis of utilization trends, and sustained, constitutionally compliant practice.

The County also approved replacement Tasers through a countywide approach that is reported to also improve force tracking, force reviews, and information storage related to force incidents. The procurement is not yet complete, so the actual implementation date for the new program is not yet established.

## Use-of-Force Reviews

The FCSO currently operates a use of force review process, which is partially addressed within the Custody Use of Force Policy (200-05). In addition to this core policy, there are more than thirty other policies that govern force or force review practices within the Custody Division. A dedicated group of command staff members assigned to the FCSO is responsible for conducting reviews of known use of force incidents and for documenting the outcomes of these reviews.

Despite this established commitment, the procedures for conducting these reviews are often overly complex. This complexity has led to delays in completing reviews, insufficient documentation of findings, and inconsistent follow-up actions. Nonetheless, the FCSO has shown a clear commitment to conducting thorough reviews and has demonstrated a willingness to update policies, seek external support, and recognize existing structural challenges. This openness provides a solid foundation for future improvements in force practices.

An analysis of approximately twenty randomly selected use of force incidents from 2025 revealed significant concerns regarding staff training and response practices.

Staff members were found to be inadequately trained in de-escalation techniques, and their responses frequently did not align with the FCSO policies or accepted principles for the use of force. In many cases, inappropriate responses appeared to stem from insufficient training and limited support, as staff often lacked adequate supervision or backup when managing resident misconduct or refusals to comply with direct orders.

This lack of support frequently resulted in staff acting independently in response to resident noncompliance, leading to unprofessional communication and the use of unauthorized or improper force techniques. None of the incidents reviewed reflected responses that were consistent with industry standards for correctional force. These initial findings highlight recurring systemic issues, including insufficient staffing, uneven supervisory review, inconsistent documentation, unclear separation of roles, lack of follow-up, and the absence of a well-resourced, standardized, and consistent force review structure.

Based on the force incident reviews and discussions with the FCSO staff regarding force-related policies, it became evident early in the analysis that substantial improvements are needed in force training, review procedures, custody force policies, tracking mechanisms, and documentation forms. In response to these findings, the Monitoring Team began providing technical assistance in November 2025 by engaging two experienced correctional executives with expertise in updating force policies, training, and review practices in large correctional systems.

These experts are collaborating directly with the FCSO to develop an actionable implementation plan that addresses all relevant force provisions and will support every aspect of the implementation process. This technical assistance is considered critical, as other sections of this report identify persistent gaps in policy

21

consistency, the absence of a formal investigative manual and force tracking systems, inconsistent supervisory practices, and significant staffing shortages that impede timely and effective review of force incidents.  Coordinating these improvements into a unified plan is essential for achieving sustainable compliance. The primary goal for the next review period is to establish a robust implementation plan that will guide the FCSO's strategy for complying with use of force review provisions.

## Use of Force Data Tracking and Reporting

The FCSO currently faces significant challenges in developing a reliable and coordinated system for tracking, reviewing, and analyzing use-of-force incidents. Although some structures are in place, underreporting of lower-level force, fragmented databases, and inconsistent documentation practices limit the FCSO's ability to identify trends, training needs, or supervisory gaps.  These limitations also prevent the FCSO from producing the comprehensive six-month analyses required under the Consent Decree.

Efforts to modernize the system are underway, including exploring replacement databases and refining review processes, but meaningful progress cannot occur until a single, integrated platform is established and supervisors receive consistent training.  Similarly, while an early warning system exists, it is not yet fully functional because it does not pull information from all necessary sources, including grievances and external complaints.

Overall, the County and FCSO are working toward improvement, but substantial updates to technology, staffing, and review practices will be required before FCSO can accurately track use-of-force activity, evaluate patterns, and respond effectively to emerging risks.

## Sanitation and Environmental Safety

The jail must be maintained in a clean and sanitary condition to promote personal hygiene and prevent and minimize disease transmission. To achieve substantial compliance, the FCSO and County will need to both have adequate policies and procedures in place governing sanitation and environmental safety, and demonstrate, through appropriate documentation, that those policies are being followed. Moreover, on site observations of the Monitoring Team, and its discussions with staff and the incarcerated population, should verify that those policies are being consistently adhered to. While the Monitoring Team found the general level of cleanliness to be improved in October 2025 (when compared to the observations of the baseline visit in May 2025), the provisions related to sanitation and environmental safety are either in partial compliance or non compliance.

An undated document titled, "Housekeeping Plan: Daily Cleaning & Maintenance" (Housekeeping Plan), was provided by the FCSO that addresses the cleaning of areas other than resident housing areas, such as various elevators, staff restrooms, employee offices, visitation booths, court rooms, and the front lobby. The Housekeeping Plan includes refilling the cleaning chemicals in the sanitation closets as well as the hand soap and hand sanitizer dispensers on the resident housing floors. However, the cleaning of the resident housing units, including the cells, dorms, dayrooms, showers, and toilets, is not included in the Housekeeping Plan. Therefore, to attain substantial compliance, a housekeeping plan that addresses the resident living areas including cleaning procedures and instructions on which cleaning supplies and chemicals to use, checklists, and measures to ensure accountability must be developed and implemented.

In a positive sign of progress, the Monitoring Team found the South Annex to be cleaner than was observed in May 2025. Additionally, 5-South in the Main Jail

and the Marietta Annex housing units were found to be reasonably clean. However, significant, serious sanitation deficiencies were found, including accumulations of soils, soap film, and mold in numerous showers; a large area of mold on the ceiling in the intake area; dusty air vents; soiled walls and floors; and accumulations of dust, trash, and debris in various cells and pipe chases. Additionally, the weekly Main Jail inspection and the MOLD reports provided by the FCSO document frequent findings of mold and mildew in the showers.

In general, the floor, walls, and cooking equipment in the Main Jail kitchen were found to be cleaner than was observed during the May 2025 baseline inspection. However, one of the walk-in coolers was not functioning properly, leading to unsafe food temperatures. The ground around the kitchen's trash compactor was soiled with food residue, debris, and trash, attracting numerous flies. Deficiencies that hinder proper kitchen sanitation were observed, including severely peeling wall paint, missing grout, and missing and broken ceiling tiles. These issues must be corrected and reliable processes for promptly identifying and correcting other sanitation issues must be developed, for substantial compliance to be achieved.

## Physical Plant

The poor condition of the physical plant and lack of maintenance create a hazardous environment for residents, officers, support staff, contractors, and visitors in a variety of ways. Given the manifest safety risks, these issues must be addressed as soon as possible.

Locks remain a significant problem in the Main Jail in that residents continue to break and damage the locks, and the slider and swing doors, creating an unsecure, unsafe environment where resident movement is not contained by locking doors. Numerous door hinges and frames were observed to be severely damaged

24

rendering it impossible to close and secure the cell and pipe-chase doors. These findings are supported by the weekly facility inspection reports. For example, the September 24, 2025 "Weekly Inspection Rice Street" report cites approximately 51 cell doors that were unable to be closed and secured due to damaged door hinges in 2-South, Zones 100 through 500.

Properly functioning toilets, sinks, and showers are essential to maintaining personal hygiene and good health. Plumbing fixtures that do not work, have low water pressure, leak, run constantly, or are clogged or backed up were observed and are consistently noted in the facility's inspection reports. During the inspection of 4-North, a resident stated that water leaked from the bottom of his toilet and he had "caulked" around it using a combination of toothpaste and toilet tissue. The Monitoring Team consistently observed resident attempts to address plumbing problems, such as sopping up leaking fixtures with clothing and blankets, in place of actual fixes of the problems themselves.

During the October monitoring visit, exposed live wires were found throughout many of the housing units, creating critical safety and fire concerns. Residents are removing the light switch plate covers, exposing the wiring in the walls. They are using those wires to light wicks made of tissue or paper and, in some cases, starting significant fires, which is extremely hazardous for both residents and staff. The FCSO reported that as of October 2025, the facility had 24 fires in 2025, including a fire that caused significant smoke and extensive damage to a shower stall, which was evident during the monitoring visit. In addition, a fire was set on December 12, 2025, seriously injuring both residents and staff and triggering a major emergency response.

The FCSO's fire protection and safety practices are not adequate to protect life and prevent injury. A State Fire Marshall's Safety Fire Inspection Report, dated April

25

29, 2024, states that the following are noncompliant: means of egress of approved type; exit signs; detection, alarm, communication systems; extinguishment systems; compartmentation requirements; and electrical system.  Further compounding the danger, the fire alarm and suppression systems in the Main Jail are not fully operational.  *See* First Monitoring Report at pp. 32.  A project commenced on September 29, 2025, to replace the systems in two phases and as of October 2025, completion was not expected for at least a full year.  To obtain substantial compliance, all facilities must have a fully functional fire alert and suppression system that is inspected and tested at regular intervals to ensure that it is compliant with fire safety codes.  While the County is working with a contractor to bring those systems fully back online, the fire danger in the units is self-evident, and the timetable for full restoration of those systems must be escalated.

Additionally, residents are using the long screws removed from the light plate covers to craft weapons, and an officer was attacked with one such instrument during the October 2025 site visit.  Residents are also using the metal switch plates to burn holes in the windows to allow for the entry of contraband into the facility.  The extent of the problem and the number of exposed, live wires observed during the October 2025 site visit is shocking and must be immediately addressed.

Mold in the Main Jail is not promptly remediated.  The facility provided a "MOLD" report for the dates of March 5, 2024, through September 24, 2025, listing approximately 474 instances where mold or mildew was found, also indicating that most of them are repeat findings.  During the October 2025 site visit, mold was observed in numerous showers.

Heavy accumulations of dust were found on the ductwork and vents in the Marietta Annex housing units.  During the October 2025 site visit, facilities management reported that due to blocked vents in cells and vandalism to the return air ducts in

the pipe chases, air is not being satisfactorily exchanged in the facility. The facility provided air temperature reports, which noted that the acceptable range for air temperatures is 68-78°F. While most of the temperatures recorded on the reports and those measured during the onsite inspections fell within this range, documented temperatures in the mid to upper 50s were also noted on the reports.

The custody staffing crisis discussed above is also inextricably intertwined with the persistent maintenance problems in the Main Jail. Custody staffing shortages continue to hinder the maintenance contractor (and its subcontractors) from having adequate access to housing units to perform repairs and renovations. JCI, the County's jail maintenance contractor, prepares a Maintenance Access onto Floor Denial Log 2025, which substantiates numerous occasions wherein contractors were unable to gain access to the facility to perform essential repair work due to the lack of available security escorts.

## Pest Control

While the presence of significant numbers of pests or common signs of infestation, such as numerous droppings, were not observed by the Monitoring Team, the presence of pests was found during the October site visit. Kitchen staff reported seeing no rodents, and very few cockroaches since the one-time treatment of the kitchen with an EPA Registered, botanical cleaning agent last summer. The ground around the kitchen trash compactor was untidy, attracting house flies. Small numbers of drain flies were observed in some of the shower and toilet areas, indicating that improved cleaning practices are needed to eliminate breeding and harborage. No evidence of rodent infestation, including droppings was observed. The interviewed staff and residents reported that they had not recently seen roaches or rodents in the resident housing units; however, random cockroaches were observed in several of the pipe chases.

27

Service reports were provided indicating weekly visits by the contracted pest control company. The service reports include observations made by the technician and recommended corrective actions, such as loading dock doors left open when not in use and a recommendation to keep the doors closed. The materials or products used during the service, such as insecticides, should be listed on the service report to ensure regulatory compliance and adhere to safety standards; however, they were not listed on the reports that were provided. Rodent bait stations, refillable containers that are strategically placed around buildings and baited with rodenticide for the control of rodents, should be serviced at least monthly and more often if an infestation is present. A review of the contracted pest control company's service reports for the Main Jail state that the rodent bait stations were sometimes "skipped" and the most common stated reason was "not due this visit" for the six-month period of April through September 2025, despite the fact that bait stations should be serviced on at least a monthly basis, which is an important aspect of a comprehensive integrated pest management system.

Clean laundry is fundamental to maintaining personal hygiene and good health. Resident clothing appeared to be in generally good condition, without obvious rips, tears, and stains. However, most of the interviewed residents in the Main Jail reported that their laundry is not exchanged as scheduled or returned in a timely manner. Many of the residents reported that they prefer to hand wash their own laundry, and evidence of this practice was observed, including laundry soaking in a mop bucket. Residents housed at the Marietta Complex reported that the laundry that they send out is returned the same day.

Haircutting equipment was observed and hair trimmings were found in the storage box on the small brushes used to clean the equipment, and on hair clippers that

should have been cleaned after use.  Failure to properly clean and disinfect barber tools places residents at risk of skin and scalp diseases.

## Chemical Control

It is essential that cleaning chemicals are properly labeled and stored, and available to the residents at appropriate intervals to maintain clean cells and living areas. To reach substantial compliance with the Chemical Control provisions, the County and FCSO will need to both have adequate policies and procedures in place governing chemical use and storage, and demonstrate, through logs and records, that those policies are being followed.  Moreover, on site observations of the Monitoring Team, and its discussions with staff and the incarcerated population, should verify that those policies are being consistently adhered to.

Records reviewed by the Monitoring Team reflected that the completed Inventory of Chemicals Issued forms are check marked to indicate that specific chemicals were issued, while also including possibly contradictory handwritten notes such as "out of chemicals." It is recommended that these forms be reviewed and revised to ensure clear documentation of the distribution of chemicals.  The chemical inventory logs at the Marietta Annex were not up to date, the log for the Zep brand DZ-7 disinfectant was blank despite the fact that there was a partial 55-gallon drum of the chemical in the storage area.  In response to a request for inspection logs related to chemical use and control, the FCSO reported that no responsive records exist, which must be addressed.

During interviews, residents stated that they routinely self-wash their laundry, and evidence of this practice was observed, including a mop bucket containing resident laundry soaking in a milky white liquid that had a strong bleach odor in the medical unit.

29

The distribution of cleaning supplies and chemicals in the resident housing areas is deficient to achieve and maintain general sanitation in the facilities. With the exception of one interviewed resident who stated that he can obtain the necessary cleaning supplies from the "right" officers, the residents stated that they need access to more cleaning supplies, including chemicals, to maintain a clean environment, and none reported that they had received instruction or training on the use of chemicals. Copies of Inmate Work Detail Equipment Training Forms were provided indicating that residents who assist the sanitation officers receive training related to the use of equipment and chemicals. Forms were also provided indicating that residents assigned to the kitchen received training on topics including hand washing and washing dishes.

## Food and Nutrition

Maintaining safe food temperatures is critical for preventing foodborne illnesses. The FCSO has ongoing problems with the refrigeration system and has leased a refrigerated trailer unit to supplement the kitchen's refrigeration. During the inspection of the kitchen on October 6, 2025, walk-in cooler C-1 was not properly working and not adequately cold to maintain safe food storage temperatures. The Monitoring Team also observed and measured various foods that were not held at appropriate temperatures. This is a dangerous practice and could lead to foodborne illness if the food were to be consumed. To achieve substantial compliance, the FCSO needs to ensure that foods are maintained at safe temperatures in accordance with food code regulations at all times.

The food service program has a significant influence on the climate and morale of the facility. Therefore, it is important that the food service department provides nutritious, appetizing meals within budgetary and operational constraints. During both the May and October 2025 site visits, numerous residents reported that the

30

facility serves the same sliced bologna lunchmeat at breakfast, lunch, and dinner. Observation of the dinner meal on October 8, 2025, was consistent with this reporting and revealed sliced luncheon meat that looked the same as that served in the sandwiches at lunch, even though the dinner entree was listed as turkey ham on the menu.  Likewise, the breakfast served on May 20, 2025, included sliced luncheon meat that was listed on the menu as "baked turkey ham" and looked the same as the meat served for the lunch sandwiches.

While this meat may be calculated in the dietitian's menu plan, it is not a best practice to routinely serve the same food item.  Such an approach quickly leads to menu fatigue and complaints.  The FCSO outsources food service to a vendor that is contractually required to "ensure that all meals will be served in a manner that makes them nutritious, wholesome, palatable and visibly pleasing" and therefore, the FCSO should reevaluate the frequent service of bologna type lunchmeats to ensure that the meals meet their contractual as well as requisite nutrition requirements, including sodium recommendations, because deli meats are a significant source of sodium.  The dietitian's menu analyses reveals that the general diet contains almost 5 grams of sodium and the Cardiac menu contains an average of 3.4 grams of sodium and also includes frequent servings of turkey bologna and salami, which exceeds the United States Department of Agriculture Dietary Guidelines for Americans recommendation of less than 2.3 grams of sodium per day.

Additionally, a review of the diabetic menus reveals that it generally aligns with the regular diet menu except that some menu items, such as grits, are not buttered and a serving of 100% fruit juice or canned fruit is provided instead of cookies or cake.  However, the diet is high in carbohydrates and lacks servings of fresh fruits and vegetables.

31

The dietitian's analysis of the regular diet that was provided by the facility indicates that it meets or exceeds the recommendations for Iron, Vitamin A, Vitamin C, Vitamin D, and Calcium for adults between the ages of 19 to 50; however, the Calcium is below the recommendation for adults over the age of 50. Moreover, it is sufficient, on paper, to meet the caloric requirements of the resident population, including the 17-year-olds.

Both the medical department and interviewed residents report that the provision of medical diets is inconsistent. To obtain substantial compliance, all menus should be reviewed to ensure that the diets promote good health and meet the nutritional needs of all incarcerated persons, and the process for medically therapeutic diets is reviewed and improved to ensure that meals that comply with the medical diet order are consistently provided.

## Intake and Records

FCSO relies on a contracted provider, NaphCare, for medical and mental healthcare. All new arrivals to the jail flow through its intake area where they are evaluated by NaphCare staff before moving on to their housing assignments. Intake is an especially important healthcare process in jails, as two essential health care obligations are met at intake: identifying patients with urgent and emergent medical or mental health needs, and ensuring continuity of care for patients receiving medical or mental health care prior to coming to jail. All of these patients need to be identified at intake, and their medications and treatments need to be continued uninterrupted. At present, while NaphCare has appropriate policy frameworks in place related to patient intake, the lack of privacy in the Intake setting is a significant impediment that must be remedied for the FCSO to achieve substantial compliance.

## Emergencies

Across both medical and mental health emergencies, FCSO staff demonstrated responsiveness and appeared to take emergent presentations seriously during the October site visit. The goal of an emergency response system is to deliver life-saving emergency care to patients as soon as possible. Life-saving emergency medical interventions include Automated External Defibrillators (AEDs), Cardiopulmonary Resuscitation (CPR), Naloxone, and cut down kits. An effective emergency response system includes relevant policies and procedures, training, properly located equipment, effective communication protocols, regularly scheduled practice drills, appropriate documentation, and routine oversight, including continuous quality improvement.

Similarly, in mental health emergencies, the facility requires an integrated policy or procedure that defines and operationalizes mental health emergency protocols. The lack of a unified document with expectations and operational guidance leaves the system vulnerable to inconsistent practices in high-risk situations. In addition to generating clear guidance, cross-departmental training, and reliable systems for tracking timeliness and compliance are needed.

## Assessments, Sick Calls, and Referrals

All patients must be appropriately assessed for medical and/or mental health problems and have unimpeded access to health care while incarcerated. The Monitoring Team's discussions with and observations of medical and mental health staff reflect that they are committed to providing quality patient care, which is encouraging. Yet, significant obstacles must be overcome to achieve compliance with these provisions.

Health care assessments consist of the receiving screening and the health assessment (called the "Physical Assessment" in TechCare, the electronic health records system used by NaphCare).  If these assessments are not done within accepted time frames, patients with serious health problems can be missed and suffer harm. Likewise, if patients do not have access to sick call clinics in a timely manner, all will have increased risk, and some will suffer medical harm.

The Monitoring Team identified gaps and areas for improvement in the FCSO's systems for mental health assessments, sick call triage, and referral processes. While the facility conducts mental health screening at intake and has multiple guidance documents outlining referral pathways, these documents are fragmented and lack unified operational standards.  Mental health and psychiatric evaluations demonstrate variable quality, limiting their reliability for diagnosis, treatment planning, and risk assessment.  Additionally, the absence of a standardized and consistently implemented Serious Mental Illness (SMI) classification system undermines the facility's ability to ensure appropriate clinical follow-up, housing decisions, diversion from restrictive settings, and population-level risk management.  Together, these vulnerabilities reflect the need for consolidated policies, clearer referral criteria, improved documentation standards, and stronger quality assurance to support a coherent and clinically sound assessment and referral framework.  The Monitoring Team has provided guidance on some of these necessary site-specific policies, and will continue to work with NaphCare on implementation.

## Medical Care

The overall goal for the provision of health care to patients incarcerated at the FCSO jails is that all necessary medical tasks, including intake screening, tuberculosis screening, health assessments, chronic care clinics and sick call, will

be completed, in a clinically appropriate fashion, every day without carry-over to the next day. Thereafter, the emphasis will be on ensuring the quality of health care administered, which is Continuous Quality Improvement.

Currently, not all medical and mental health tasks are completed every day. Estimates from medical practitioners interviewed by the Medical Monitor in October ranged from being able to complete half to two thirds of each day's tasks. This indicates an unacceptable degree of systemic health care dysfunction at the jail. Some of the root causes of this dysfunction are readily apparent in that security staffing remains insufficient to handle the flow of patients to clinic appointments and providers into the housing units to see patients. NaphCare and its FCSO and County partners should work with the Monitoring Team to identify, and rectify, other root causes of this dysfunction. Moreover, records within the medical records database indicate a persistent backlog of between 280-400 appointments for residents with chronic medical conditions. This, too, must be corrected.

## Supportive Environments for People with Medical and Mental Health Needs

Incarcerated patients have a wide range of medical needs. Some only need their medications. Others, with more serious medical disabilities, need help ambulating, communicating, or even need assistance with their activities of daily living (ADLs), such as bathing, dressing and eating. Such patients must be housed in an environment where needed assistance is available.

A key obstacle to the FCSO's compliance with the Consent Decree requirements for supportive environments is the Main Jail facility itself. The Medical Observation Unit/Female Observation Unit (MOU/FOU) is too small for a facility

the size of the FCSO. There are problems related to the age of the physical plant. While some specialized mental health units, such as 5-South, were recently renovated, other units remain characterized by inconsistent access to essential clinical spaces, limited therapeutic environments, inadequate suicide-resistant infrastructure, and insufficient accommodations for individuals with serious medical or psychiatric impairments.  Several observation areas contain ligature points, obstructed sightlines, or non-functional safety features, and available suicide-resistant cells are insufficient to meet demand.  The County is attempting to upgrade the physical spaces devoted to patients with special needs by, for example, installing Americans with Disabilities Act compliant grab bars.  However, much work still needs to be done.

Although some units benefit from dedicated staff and structured workflows, physical plant limitations, inconsistent access to equipped clinical spaces, and gaps in staffing and supervision undermine the facility's ability to reliably provide supportive environments for individuals with significant medical and mental health needs.  Many of these deficits require coordinated action between the County, which maintains the buildings, the FCSO and NaphCare, highlighting the need for clearer shared processes and sustained collaboration across agencies.

## Mental Health Care

Mental health services at FCSO are operational across multiple housing settings and acuity levels, including general population clinics, specialty mental health units (5-South), the Psychiatric Observation Unit (POU), restrictive housing and youthful offender units. The mental health clinical staff we encountered were consistently thoughtful and committed to providing care to residents with psychiatric needs, and during unannounced observations, they were respectful and attentive in their interactions with patients.  Our interactions with NaphCare mental

36

health leadership were transparent and constructive, and they seemed open, reflective, and expressed a clear interest in identifying opportunities to improve care for individuals incarcerated in the FCSO jails.

Despite the dedication observed among staff, the overall mental health care delivery system appears dictated by jail operational challenges and consequently more focused on identifying and responding to acute crises rather than on providing a fully developed, integrated, and individualized continuum of care. Across settings, limited security staffing and insufficient private clinical space restrict the ability to consistently provide confidential assessments and treatment. As a result, core therapeutic activities are frequently delivered through brief cell-side encounters, often prioritizing efficiency and brief access over thorough clinical assessment or engagement. The above likely impacts diagnostic accuracy, treatment planning quality, risk monitoring, and integration of behavioral therapies. It also leads to an underestimate of the staff required to provide high-intensity and integrated mental health care.

Documentation practices vary in quality and consistency, particularly regarding initial evaluations and follow-up notes. Mechanisms to ensure systematic supervisory review would help ensure consistent delivery of quality of care.

Regarding discharge planning, there does not seem to be a systemwide discharge-planning program for individuals with mental illness, and workflows remain informal, inconsistently applied, and heavily dependent on court-driven coordination and a single discharge planner. The creation of a dedicated mental health discharge planner line is a positive step in addressing this.

## Suicide Prevention

Suicide prevention at the FCSO reflects a system in which frontline recognition of risk often occurs but formalized procedures and accountability mechanisms are underdeveloped.  Custody and clinical staff seem to generally demonstrate awareness of suicide risk and frequently initiate referrals to mental health services when detainees express suicidal ideation or display concerning behavior.  However, the practice appears vulnerable to variation by housing unit, shift, and facility location, with inconsistent adherence to required monitoring and safety standards.  As noted in the Supportive Environments section of this report, at the Main Jail, the number of individuals placed on suicide watch frequently exceeded the availability of suicide-resistant cells, leading to the placement of detainees in cells not designed for suicide prevention, including cells with ligature risks and obstructed sightlines.  These capacity constraints combined environmental hazards, create an ongoing risk that individuals identified as suicidal are not housed in safe conditions.

Supervision and monitoring practices for at-risk individuals were also inconsistent.  While observation log sheets were present in many areas, the completion of monitoring documentation varied, and staff acknowledged existing gaps.  Despite being informed that individuals at the highest level of suicide observation (SOS Level-1) were being monitored at fifteen-minute intervals (Q15), these checks were not reliably completed or documented for these individuals.  This is especially concerning as FSCO and NaphCare policy both indicate that individuals who are at acute risk of suicide be monitored through constant observation, which was not implemented.  Additionally, suicide risk assessments by Qualified Mental Health Professionals were not consistently conducted in private settings, and treatment interventions for suicidal individuals were frequently limited to brief

cell-side contacts rather than structured therapeutic encounters.  These operational inconsistencies limit the jail's ability to ensure continuous protection, timely clinical reassessment, and effective therapeutic engagement for detainees during periods of elevated suicide risk.

## Medication Administration

Policy and training materials addressing medication administration are largely in place and reflect many elements of accepted correctional health care standards. However, the Monitoring Team identified variability in how these policies are implemented in practice, particularly with respect to follow-up after missed or refused medications, documentation and tracking of non-adherence, and systematic monitoring of laboratory testing for individuals receiving psychotropic medications.

Moreover, medication is sometimes administered in the middle of the night on certain housing units in the Main Jail, resulting in a substantial number of medication refusals that result from residents simply refusing to wake up.  Further, in most housing units, medication rounds were limited to a single general announcement, with no documented or observed effort by custody or health care staff to personally locate individuals who did not present for pill call.  In some instances, follow-up was reportedly performed informally by other residents rather than by staff.  These issues must be addressed for the FCSO to work towards compliance with these provisions.

## Oversight and Mortality Reviews

Mortality investigations are an essential component of all medical systems, including jails. Some jail deaths are expected, such as terminal cancer patients on hospice.  However, most jail deaths are unexpected and the health care provided to

patients who died unexpectedly must be closely evaluated to determine whether the death was, in any way, preventable. The goal of the mortality reviews is to improve health care overall by identifying any weaknesses in the healthcare system and creating a plan to fix them.

## Mental Health Contraindication to Restrictive Housing

The restrictive housing provisions are intended to ensure that individuals with SMI or acute psychiatric vulnerability are protected from placement in conditions that pose a heightened risk of psychological deterioration, self-harm, or suicide, and that housing decisions are consistently informed by timely, clinically grounded mental health input. Collectively, these provisions establish an integrated decision-making framework in which qualified mental health professionals (QMHPs) assess contraindications to restrictive housing, recommend less restrictive alternatives, provide ongoing clinical monitoring and treatment, and collaborate with custody leadership to minimize both the use and duration of restrictive housing for individuals with mental health needs.

Current practice at the FCSO reflects inconsistent implementation of this framework. There does not seem to be a standardized, facility-wide process to ensure that mental health consultation reliably occurs prior to restrictive housing placement, is consistently documented, or results in timely diversion to less restrictive housing when clinically indicated. As noted elsewhere in this report, the historical absence of a standardized SMI designation within the medical record makes it more difficult for NaphCare and the FSCO to systematically identify individuals who should be presumptively contraindicated for restrictive housing or subject to heightened clinical review prior to placement. In practice, this has resulted in reliance on ad hoc communication rather than a structured, enforceable clinical-custody workflow.

40

In addition, the lack of clearly defined care pathways for individuals with SMI or acute mental illness who remain in restrictive housing leaves the system and patient vulnerable to variable monitoring and clinical follow-up. The Monitoring Team was not provided with evidence of a uniform process for weekly QMHP reviews or multidisciplinary review of extended restrictive housing placements when continued restrictive housing was clinically questionable. This indicates that several core safeguards envisioned by the Consent Decree, including real-time clinical oversight, progressive reduction of restrictions, and routine provision of treatment outside the cell, have not yet been operationalized.

Data provided by NaphCare indicate that, in November 2025, five SMI individuals were housed in restrictive housing in the Main Jail and none in the South Annex. However, NaphCare also reported that seven individuals in the restrictive housing areas in the Main Jail, and four in the South Annex, were diagnosed with a schizophrenia-spectrum disorder, a diagnostic category that should be considered SMI. During the October site visit, the Monitoring Team observed at least four individuals exhibiting acute psychotic symptoms in the 7-North Zones 100 and 600 (administrative and disciplinary segregation, respectively), as well as three individuals with apparent psychotic symptoms across the B and C pods in the South Annex (punitive and administrative segregation, respectively). These observations, as well as the discrepancy between SMI and schizophrenia diagnostic reporting above, raises concerns about potential under-identification of individuals with serious mental illness in restrictive housing, particularly in the context of inconsistencies in SMI definition and identification.

Although existing FCSO and NaphCare policies reference periodic medical and mental health rounds in restrictive or segregated settings, they do not establish explicit workflows for consultation, clinical exclusion criteria, alternative housing

41

placement when restrictive housing is contraindicated, or associated observation and treatment requirements.  Implementation of the SOP guidance previously provided regarding SMI identification, specialty mental health housing admissions, and treatment planning would provide essential infrastructure to advance compliance with these provisions.  A standardized classification process, defined consultation and documentation requirements, clear escalation pathways, and multidisciplinary oversight mechanisms are necessary to ensure that restrictive housing decisions consistently include clinical input when appropriate.

## Conditions in Restrictive Housing

The FCSO's staffing crisis is an impediment for the FCSO reaching substantial compliance with many of the Consent Decree provisions related to restrictive housing.   The sanitation at the South Annex had greatly improved since our visit in May.  The hallway floors had been painted and lighting in the housing areas had improved.  At both the South Annex and Main Jail, residents reported they ordinarily were not given the opportunity to get out of their cells on weekends and they were not always afforded the opportunity for outdoor recreation on a weekly basis.  They also noted they did not have access to books and reading material. The FCSO needs sufficient staff in the housing units to be able to escort residents to recreation.  Finally, the staffing shortages also make it a challenge to keep appropriate records of each resident's daily activities.

## Discipline

The FCSO now has three staff dedicated to the resident discipline process: a captain, a lieutenant, and a hearing officer.  The captain is experienced and is providing guidance and oversight to the team.  The team is reviewing the entire disciplinary process and identifying gaps and solutions.  The Monitoring Team

acknowledges the disciplinary team is committed to ensuring residents are held accountable for misconduct while ensuring their due process rights are met. Due to the ongoing staffing crisis, the disciplinary team often handles duties adjacent to the process such as conducting the investigation of the incident. The staffing crisis has been an impediment to conducting a disciplinary hearing within 14 days of the incident report. The disciplinary team reports that cases have been dismissed as a result of it not being able to hold the hearing within the requisite time frame. An objective mental health consultation and review process needs to be established to achieve compliance with the Consent Decree. The Monitoring Team anticipates that with focused effort, the FCSO will be able to make good progress with this area during the next monitoring period.

## 17-Year-Olds in Restrictive Housing

The FCSO must develop a policy regarding 17-year-olds in restrictive housing that incorporates the requirements in the Consent Decree. During the Monitoring Team's October visit, 17-year-olds in restrictive housing had minimal complaints, except for the food. Several of the residents reported not knowing why they were in the restrictive housing unit. The lighting in a number of the cells was not working, but the residents had a small dome light.

## Special Education and Related Services

In assessing their implementation priorities for the Consent Decree, the County and FCSO have determined they will focus on the Special Education and Related Services provisions in 2027. While FCSO staff will continue working on providing appropriate special education services before 2027, they are prioritizing the implementation of the life safety provisions contained in the Consent Decree.

FCSO staff expressed a commitment to identifying and addressing the educational needs of the 17- to 21-year-olds in their custody.

During the Monitoring Team's October visit, a Monitoring Team member spoke with five 17-year-olds who reported "going to school," which was described as one to two times per week for one to two hours at a time, usually with one resident present with the instructor. There were a few other 17-year-olds who indicated they were not receiving educational services but would be interested in participating in some type of "school." The Monitoring Team will continue to speak with 17-year-olds regarding educational services and will work with the FCSO to ensure that adequate education services are implemented for these residents.

## Quality Assurance

Quality Assurance, also known as Continuous Quality Improvement (CQI), is the process of ensuring that all health care processes are happening as they should and that patients are receiving appropriate medical care. CQI review of processes are "process studies," whereas CQI review of the quality of patient care are "outcome studies." The CQI process should include routine and ad-hoc process studies and outcome studies to ensure that all health care processes are reviewed over a period of time and appropriate outcomes are achieved; review of all such studies by a formal CQI committee, which typically meets monthly; and corrective action plans generated and tracked by the CQI committee in response to identified deficiencies.

NaphCare policies establish a comprehensive quality assessment/CQI framework that aligns with the requirements related to corrective action planning and performance oversight. The policy mandates formation of an institutional CQI committee with participation from medical leadership, mental health staff, nursing,

custody/security representatives, and administrative leadership. The committee is responsible for identifying quality issues, establishing performance thresholds, conducting monitoring activities, analyzing findings, developing and implementing corrective action plans, and determining follow-up timeframes to assess the effectiveness of interventions. Policies further require routine chart reviews conducted at least quarterly, documentation of CQI meeting minutes, and preparation of monthly CQI reports summarizing identified issues and actions taken or planned. Mortality reviews are explicitly included as a core component of the CQI program, ensuring linkage between death reviews and systematic quality improvement efforts.

The policy also requires that all health staff participate in CQI activities, that the Medical Director remain actively involved, and that quality improvement initiatives be tracked through process and outcome studies, with at least one formal study completed annually. Annual effectiveness reviews are required to assess CQI performance, including focused review of deaths and serious incidents involving individuals with mental illness or substance use disorders.

Despite the presence of this policy framework, the Monitoring Team has not received sufficient evidence demonstrating that an operational, sustainable Quality Assurance Program has been implemented. FCSO will need to bolster its compliance team capacity to move towards substantial compliance with the Quality Assurance provisions. The Medical and Mental Health Monitors will provide technical assistance on what is expected from the CQI process.

## Implementation and Reporting

Provisions 295 through 298 outline requirements concerning initial and subsequent implementation plans to describe the steps Fulton County and the FCSO will take

45

to fulfill their obligations under the Consent Decree. The initial implementation plan should include a specific schedule and deadlines to address required policy and procedure changes, analyses and plans, such as those related to staffing and housing, and training about the Consent Decree. Subsequent implementation plans, updated every six months, are required to set specific schedules and deadlines for the next year, provide details about implementation activities, and address areas of noncompliance and recommendations from the Monitoring Team.

Fulton County and the FCSO submitted the initial implementation plan within the requisite time frame required by the Consent Decree and received comments from the United States. Once the Monitoring Team began its work, it collaborated with FCSO regarding the implementation plan. During this review period, the Monitoring Team provided Fulton County and the FSCO technical assistance as it developed detailed implementation plans for certain provisions, including those identified by the Monitoring Team as having a particularly high priority. In June 2025 and December 2025, Fulton County and the FCSO submitted subsequent implementation plans within the requisite time frame required by the Consent Decree. In December 2025, the Parties agreed to an initial implementation plan that identifies high-level due dates, prioritizing each subsection of the Consent Decree containing substantive provisions. A draft of that initial implementation plan is currently under review, and the Monitoring Team expects that it should be finalized soon.

As required by Provision 301, Fulton County established a Compliance Coordinator position and filled it during this review period. The FCSO and NaphCare also identified staff to coordinate their compliance efforts. These personnel are critical in drafting and updating implementation plans and other work to coordinate and document efforts to achieve compliance with individual

46

provisions. The Monitoring Team does not think this is a sufficient number of staff to fulfill the compliance functions of the Consent Decree.

Provisions 304 and 305 require the FCSO to, among other things, notify the Monitoring Team and the United States of in-custody deaths withing 24 hours and to provide a monthly notification of deaths, overdoses requiring medical intervention, serious injuries, and substantiated findings of certain types of staff misconduct. During this review period, the Monitoring Team was notified of several in-custody deaths and the process for notification has evolved. We also received memoranda documenting that the FCSO Internal Affairs Unit had investigated no in-custody deaths classified as a homicides during the months of August, September, and October. The Monitoring Team recommends that the FCSO revise its Sheriff's Monthly Report Policy (700-28) or another relevant policy to require staff to generate and share a report notifying the Monitoring Team and the United States of incidents described in Provision 305 that occurred in the prior month.

## IV.  Recommendations for the Next Six Months

In consultation with the Parties, the Monitoring Team had identified the following Consent Decree Provisions for the FCSO and County to focus on for the next six months. The action steps should include, finalizing the implementation plan, revising policies, procedures, and training, and developing an internal audit process. The Monitoring Team remains available to support reform efforts.

- Protection from Harm – Staffing and Supervision – Provisions 61-71
- Medical and Mental Health Care – Suicide Prevention – Provisions 199, 214, 224, 230-237
- Medical and Mental Health Care – Emergencies – Provisions 188-192

47

- Environmental Health and Nutrition – Physical Plant – Provision 164
- Use of Force – Tasers – Provisions 134-140
- Use of Force – Use of Force Reviews – Provisions 141- 147
- Restrictive Housing – Discipline – Provisions 267- 275

Finally, unless and until FCSO's staffing levels increase or the population substantially decreases, it will be virtually impossible for FCSO and the County to obtain substantial compliance with the Consent Decree. The Monitoring Team reiterates the need noted in its First Monitoring Report (p. 40) for FCSO and the County to have a well-resourced, dedicated and experienced compliance team to lead implementation of the provisions and engage in internal monitoring. The Team believes that the FCSO should begin with at least five full-time staff, including staff capable of project management, data management, and legal analysis, focused on implementation and compliance. Future staffing analysis should engage in a meaningful workload assessment for the compliance team, as the true need may be much higher. The County and FCSO must also engage in a more meaningful collaboration with a whole-of-government approach, improving communication and collaboration as the required improvements are complex and cannot be facilitated without a unified, thoughtful, and well planned approach. It is critical that the Board of Commissioners, County Manager, and FCSO improve collaborative problem solving, engage in solution focused approaches and boldly address the profound challenges ahead with a renewed commitment to communication, information sharing and cross divisional transparency.

# Attachment to the Monitor's Second Report

## Table of Contents

Policies, Procedures, and Training.............................................................................3

Notification of Rights and Protections....................................................................12

Protection from Harm ..............................................................................................16

    Policies, Procedures, and Training........................................................................16

    Classification and Housing ....................................................................................19

    Staffing and Supervision.......................................................................................33

    Contraband Prevention .........................................................................................55

    Gang Violence .......................................................................................................60

    Grievance, Incident, and Maintenance Reporting ................................................65

    Investigations and Corrective Action Planning ....................................................74

    Sexual Abuse Reporting and Investigations.........................................................93

    Information Management Systems and Resiliency Planning...............................101

    Data Tracking and Reporting...............................................................................105

Use of Force ...........................................................................................................112

    Policies, Procedures and Training ......................................................................112

    Tasers ...................................................................................................................122

    Use-of-Force Reviews .........................................................................................131

    Data Tracking and Reporting...............................................................................143

Environmental Health and Nutrition .....................................................................150

    Policies, Procedures and Training ......................................................................150

    Sanitation and Environmental Safety .................................................................151

    Physical Plant.......................................................................................................155

    Pest Control..........................................................................................................166

    Chemical Control.................................................................................................170

    Food and Nutrition ..............................................................................................174

Medical and Mental Health Care ...........................................................................178

Policies, Procedures and Training ..................................................................178

Intake and Records.........................................................................................183

Emergencies...................................................................................................186

Assessments, Sick Calls, and Referrals ..........................................................191

Medical Care..................................................................................................202

Supportive Environments for People with Medical and Mental Health Needs .211

Mental Health Care.........................................................................................218

Suicide Prevention .........................................................................................234

Medication Administration .............................................................................241

Oversight and Mortality Reviews....................................................................248

Restrictive Housing...........................................................................................252

Policies, Procedures and Training ...................................................................252

Mental Health Contraindication to Restrictive Housing ....................................254

Conditions in Restrictive Housing...................................................................265

Discipline .......................................................................................................268

17-Year-Olds in Restrictive Housing ...............................................................273

Data Tracking and Analysis.............................................................................276

Special Education and Related Services................................................................279

Quality Assurance .............................................................................................283

Implementation and Reporting ...........................................................................286

Accountability and Transparency .......................................................................294

Compliance Status of Substantive Provisions ......................................................297

# Policies, Procedures, and Training

The provisions in this section establish requirements of Fulton County (the County) and the Fulton County Sheriff's Office (FCSO) related to policies and training.  As discussed in the First Monitoring Report, a preliminary review of relevant policies suggests that they will require revisions to ensure compliance with the Consent Decree.  Given the current staffing crisis, the FCSO will have a difficult time revising policies and pulling all staff from their regular duties to be trained on those new policies.  Therefore, the Monitoring Team has assessed many of the provisions related to developing policies, procedures, and training as "Not Rated" in this report.  Fulton County and the FCSO have shared limited draft policies, procedures, and training curricula with the Monitoring Team for review.

The Monitoring Team continues to collaborate with Fulton County, the FCSO, and United States to identify a timeline for policy revisions and related training that is realistic and achievable.  As part of that work, the Monitoring Team connected the FCSO with experts in the fields of resident classification and use of force to provide technical assistance as staff revise policies and procedures associated with those sections of the Consent Decree.

The FCSO made significant progress on Provision 36 in 2025 by holding in-service training sessions about the Consent Decree.  While the Monitoring Team has not received the curricula for this training, the training records we received indicate that between January 1, 2025 and August 29, 2025, 483 current employees attended the legal update addressing the Consent Decree.

In the sections below, the Monitoring Team provides more details and addresses specific recommendations about individual provisions.

**Provision 31**

Within 4 months of the Effective Date, or as otherwise agreed to in the Implementation Plan developed pursuant to Section XII, the County and FCSO will provide draft policies, procedures, and training curricula (including PowerPoint slides and handouts) regarding each Party's respective duties under this Consent Decree developed to meet the requirements of this Consent Decree to the United States and the Monitor for review and comment. The United States and the Monitor will provide any comments in response within 30 days of receipt of each policy, procedure, or training.

**Compliance Status:** Not Rated

**Additional Discussion/Recommendations:**

Fulton County and the FCSO have not yet shared any draft policies, procedures, or training curricula with the Monitoring Team to review.[1] The deadlines included in recent implementation plans target 2026 and 2027 for the completion of policies, procedures, and training. To meet these deadlines, the Monitoring Team expects to begin seeing drafts for review in the first half of 2026. As deadlines approach, the Monitoring Team recommends that the FCSO identify internal deadlines that account for the 30 days necessary for the Monitoring Team to review drafts and provide comments.

---

[1] The FCSO has shared a draft script for an orientation video for new residents, and the Monitoring Team provided comments.

**Provision 32**

Within 30 days of receipt of comments from the United States and the Monitor, the County and FCSO will revise and finalize the policy, procedure, or training.

**Compliance Status:** Not Rated

**Additional Discussion/Recommendations:**

Fulton County and the FCSO have not yet shared any draft policies, procedures, or training curricula with the Monitoring Team to review. As such, they have not had any comments from the Monitoring Team or United States to address. As deadlines for the completion of policies, procedures, and training approach, the Monitoring Team recommends that the FCSO stagger the provision of drafts to the Monitoring Team to ensure that FCSO staff have the time necessary to respond to comments and finalize each draft with 30 days of receiving comments.

**Provision 33**

If the Monitor and United States must approve a policy, procedure, or training before it can be finalized, that requirement will be specified in this Decree. If approval is not specifically required, the County and FCSO will nevertheless consider the comments of the Monitor and United States in revising and finalizing the policy, procedure, or training.

**Compliance Status:** Not Rated

**Additional Discussion/Recommendations:**

As discussed above, Fulton County and the FCSO have not yet shared policies, procedures, and training with the Monitoring Team to review. This will become more common in 2026, and the Monitoring Team recommends that the FCSO set the foundation for compliance with Provision 33 by first identifying those policies, procedures, and training curricula that require approval from the Monitoring Team

5

and the United States.  The FCSO may also benefit from revising its Personnel Policy Review Policy (700-12) and Training and Career Development Directive (8.01) to require staff to produce written documentation explaining the reasons for not accepting comments from the Monitoring Team and United States about policies, procedures, and training curricula that do not require approval.

## Provision 34

The County and FCSO will review their policies, procedures, and training relevant to the Consent Decree annually, revising them as necessary.  All substantive revisions to policies, procedures, and training relevant to this Consent Decree will be submitted to the United States and the Monitor for review following the procedure described in paragraphs 31–33, above.

*Compliance Status:* Not Rated

*Additional Discussion/Recommendations:*

In response to a records request for documentation associated with any review and analysis of existing policies, procedures, and training curricula as required by Provision 34, the FCSO provided, among other items, a list of policies with handwritten notes about whether an update was required and if a draft had been completed.  The Monitoring Team recommends that the FCSO begin to address this provision by formalizing the review process in the Personnel Policy Review Policy (700-12) and Training and Career Development Directive (8.01).  These revisions should specify the process associated with the annual review and require staff to formally document the outcome for all relevant policies, procedures, and training curricula in a manner that can be shared with the Monitoring Team.

**Provision 35**

FCSO will request a National Institute of Corrections (NIC) and Bureau of Justice Assistance (BJA) assessment of its training program, capacity, and needs, which will be provided to the Monitor and United States. FCSO will obtain from NIC and BJA such assistance as can be provided to improve its training program.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

In April 2025, the FCSO submitted a request for technical assistance through the National Institute of Corrections website. Specifically, the FCSO requested:

> assistance in the following areas related to our consent decree: (1) protection from harm; (2) use of force; (3) environmental health and nutrition; (4) medical and mental health care; (5) restrictive housing practices; (6) special education and related services; and (7) quality assurance efforts. At the outset, we request your technical assistance as we revise our policies and procedures, training opportunities and technological advances to support our custodial efforts.

While this initial request included training, the Monitoring Team recommends that the FCSO submit a new request that focuses only on the elements described in Provision 35 (i.e., its training program, capacity, and needs).[2]

---

[2] On February 9, 2026, the FCSO submitted a second request focused specifically on a comprehensive assessment of its current training program, including but not limited to training governance, organization, and oversight; core academy, in-service, and specialized training curricula; training delivery methods, frequency, and documentation; and staffing, instructor capacity, and training resources.

**Provision 36**

All Jail staff will be trained on this Consent Decree, including how and why it came about and what it means, and will be provided with a written overview of the Consent Decree and an electronic copy of the Consent Decree.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO made significant progress on Provision 36 in 2025 by holding in-service training sessions about the Consent Decree. Between January 1, 2025 and August 29, 2025, 483 current employees attended the legal update addressing the Consent Decree. The Monitoring Team recommends that the FCSO update this in-service training curricula and embed it in the orientation training provided to all new staff going forward. Before finalizing this training, the FCSO should provide the curricula to the Monitoring Team and United States for review.

The Monitoring Team also recommends that the FCSO develop a written overview of the Consent Decree, share it with the Monitoring Team and United States for review, and once finalized, upload it and a copy of the Consent Decree to PowerDMS to track staff receipt and review.

**Provision 37**

FCSO will document all staff trainings and certify that each staff member has attended all required trainings and has demonstrated basic competency and understanding of the material presented.

***Compliance Status:*** Partial Compliance

*Additional Discussion/Recommendations:*

The FCSO reports that training is documented using a manual process with handwritten forms and kept in employee training files at the Training Academy. The Monitoring Team has reviewed some of these training records, including those related to 2025 in-service training.

In response to a Monitoring Team request for the results of any internal audits or other efforts conducted in 2025 to review training and assignment records to ensure that staff working in a housing unit without direct supervision have completed all required training, the FCSO responded that "no responsive records exist." The Monitoring Team recommends that the FCSO develop an electronic method for tracking staff training that allows it to more easily document attendance, identify and correct training issues, and provide such documentation to the Monitoring Team for review. In future reporting periods, the Monitoring Team will then focus its review on the accuracy and reliability of the training information maintained.

## Provision 38

FCSO will fully train all Custody Staff, pursuant to FCSO training requirements, before allowing any officer to work without direct supervision in a housing unit.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

As indicated above, the FCSO reported that it did not have records responsive to a request related to Provision 38. When updating its method for tracking staff training, the FCSO should ensure that it can link training data to assignment data in a manner that determines if staff have completed all necessary training before working without direct supervision in a housing unit. The Monitoring Team observed aspects of the new custody staff training during monitoring tours and

interviewed newly hired staff and those attending the Training Academy concerning their training. The FCSO also provided an overview of custody staff training but the related policies, training and tracking require updates to comply with the Consent decree.

## Provision 39

FCSO will train all personnel who hold supervisory and leadership positions in supervision requirements and leadership skills.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

In response to a Monitoring Team request for the results of any internal audits or other efforts conducted in 2025 to review training and assignment records to ensure that supervisory staff have completed training required in the Training Requirements and Specialized Training Policy (700-05) and Training and Career Development Directive (8.01), the FCSO responded that "no responsive records exist." As indicated above, the Monitoring Team recommends that the FCSO update its method for tracking staff training that allows it to easily document attendance, identify and correct training issues, and provide such documentation to the Monitoring Team for review. The FCSO did provide information regarding aspects of new supervisor training, but a comprehensive update to the training, associated policies, and tracking will be necessary to comply with the Consent Decree.

## Provision 40

The United States and the Monitor will be permitted to observe trainings relevant to provisions of the Consent Decree in-person or by reviewing video of the trainings.

10

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***

The FCSO has not yet developed training relevant to the provisions of the Consent Decree, other than training on the Consent Decree itself.  Therefore, the Monitoring Team has not yet requested that the FCSO allow team members to observe training sessions. The Monitoring Team did informally observe aspects of the custody academy during the October 2025 tour.  Monitoring Team requests to observe newly developed training will likely grow more common in 2026.

11

# Notification of Rights and Protections

The provisions in this section address requirements that the FCSO provide certain information related to jail procedures and the residents' reasonable right to safety. The FCSO has drafted a script to be used for a Resident Orientation video that addresses these topics.  In the sections below, the Monitoring Team provides more details about specific provisions.

## Provision 41

FCSO will effectively and meaningfully communicate to all incarcerated people their right to reasonable safety within the Jail, including their right to be free from violence, extortion, sexual abuse, retaliation, and other misconduct; the protections in place to ensure that incarcerated people are safe; and if violence, abuse, or misconduct does occur, that incarcerated people can report it so that it can be responded to promptly, appropriately, and without retaliation.

***Compliance Status:*** Partial Compliance

***Additional discussion/Recommendations:***

As mentioned above, the FCSO has drafted a script to be used for the Resident Orientation video.  The Monitoring Team and the United States had the opportunity to review the script and provide feedback.  The topics covered by this provision are in the script.  Once the video is produced, the FCSO should also train staff to serve as facilitators for the orientation.  The facilitators should be available for clarification and to answer any questions.

## Provision 42

FCSO will ensure that, during the intake process, all incarcerated people receive clear and accurate information regarding the following: (a) all Jail rules and

procedures for incarcerated people to follow; (b) the disciplinary process and potential punishment for rule infractions; (c) the right to be free from violence from other incarcerated people, extortion, sexual abuse, and other misconduct, and from retaliation for reporting such incidents; (d) information about how incarcerated people can protect themselves against a risk of extortion (e.g., not sharing family member contact information, avoiding drug debt); (e) how to report incidents or suspicions of violence, extortion, sexual abuse, or other misconduct; (f) how to seek protection from threatened violence or other harm; (g) procedures for requesting the use of interpreter services; (h) procedures for reporting physical plant issues and requesting repairs to cells and living areas; (i) procedures for requesting hygiene items and accessing laundry services; (j) the process for filing and appealing a grievance; (k) the process of accessing medical and mental health care; and (l) information regarding the FCSO's zero-tolerance policy regarding sexual abuse, including the definition of sexual abuse.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As noted above, the draft orientation script covers topics listed in the provision. Implementation needs to include measurement of effectiveness and ensure that information is clear and understood.

## Provision 43

Within 14 days of intake, FCSO will provide comprehensive orientation education to incarcerated people, either in-person or through a video presented by an in-person facilitator, regarding their rights to be free from violence, extortion, sexual abuse, and other misconduct, and to be free from retaliation for reporting such incidents, and regarding the FCSO's policies and procedures for responding to

such incidents.  People currently incarcerated in the Jail will receive this information and education within four months of the Effective Date.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As noted above, the FCSO has drafted the script for the orientation video.  The FCSO needs to develop a tracking mechanism to show the residents received the orientation education within 14 days of intake and when the rest of the population received the education.

## **Provision 44**

FCSO will ensure that the information outlined in this Section is conveyed and made available in formats accessible to all incarcerated people, including those who are limited English proficient, deaf, visually impaired, or otherwise disabled, as well as to incarcerated people who have limited reading skills, and is conveyed via appropriate secure means in facilities, as well as Jail handbooks.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO does not currently have a mechanism to identify the incarcerated persons who need the orientation materials, including the jail handbooks, in an accessible format.  Once the FCSO has identified a comprehensive mechanism to identify the residents impacted by this provision, it will be able to track when and how the FCSO provided the necessary information.

**<u>Provision 45</u>**

The United States will review any materials or curriculum utilized to satisfy the requirements of this Section, in consultation with the Monitor, and provide recommendations.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The United States and the Monitoring Team had the opportunity to review and provide feedback on the FCSO's draft orientation script. When the FCSO develops the procedures to comply with Provision 44, it will provide them to the Monitoring Team and United States for review and comment.

# Protection from Harm

## Policies, Procedures, and Training

The FCSO has a solid foundation of policies that address many of the areas covered by the Protection from Harm section of the Consent Decree. These policies generally align with correctional standards and constitutional principles. These policies and related training programs have not yet been fully updated to incorporate all of the requirements of the Consent Decree. Revising the policies and training is staff intensive, and the Monitoring Team has identified technical experts to assist with this process in certain areas (i.e., classification). The FCSO's staffing crisis is an impediment for allowing staff to be relieved from their posts to attend the updated training. The Monitoring Team will continue to work with the FCSO on prioritizing the policies and trainings to be revised and implemented.

## Provision 46

By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Protection from Harm, and will submit those policies and procedures to the United States and the Monitor pursuant to the process described in Section III above.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***
The FCSO has not yet had the opportunity to formally submit a revised policy related to Protection from Harm to the United States and the Monitor.

**Provision 47**

Within three months of the date that any policy or procedure related to Protection from Harm is finalized or revised (following the period of review for the Monitor and United States), FCSO will train all relevant staff on that policy, through in-service training.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***
The FCSO has not yet finalized a revised policy warranting the need to train staff on the revised policy.

**Provision 48**

Staff training will include information about how to recognize signs of abuse, control, and extortion among the incarcerated population.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***
The FCSO provides staff training regarding the Prison Rape Elimination Act (PREA). The training can be enhanced and will be revised to incorporate changes to the relevant policies. The Monitoring Team recommends the FCSO consider consulting with LiveSafe regarding the content and delivery of this training.

**Provision 49**

FCSO will develop and implement a training program to ensure that all Jail investigators have the requisite skills to conduct prompt, thorough, and objective investigations, including specialized training for investigators of sexual abuse allegations.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team recommends obtaining outside assistance to provide the following: training for all investigators; train the trainer certification for the FCSO staff to provide training for new investigators; and refresher training for existing staff.

## **Provision 50**

FCSO will train all staff who may have contact with incarcerated people on the following: (a) its zero-tolerance policy for sexual abuse; (b) how to fulfill staff's responsibilities under the FCSO's sexual abuse prevention, detection, reporting, and response policies and procedures; (c) incarcerated people's right to be free from sexual abuse and to be free from retaliation for reporting sexual abuse; (d) the dynamics of sexual abuse in confinement; (e) the common reactions of sexual abuse victims; (f) how to detect and respond to signs of threatened and actual sexual abuse; and (g) how to respond to sexual abuse, including: (i) how to respond effectively and professionally to victims of sexual abuse; (ii) how and to whom to report allegations or suspicions of sexual abuse, including how to comply with relevant laws related to mandatory reporting of sexual abuse to outside authorities; (iii) how to preserve physical evidence of sexual abuse (this provision does not apply to volunteers); and (iv) how to communicate effectively and professionally with incarcerated people, including incarcerated people who are gay or transgender.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO does provide staff training regarding the Prison Rape Elimination Act. Once the related policies are updated, the training will need to be revised.

## Classification and Housing

During this review period, the FCSO and County have made significant progress in fulfilling the requirements of the Classification and Housing provisions. This advancement has been supported by technical assistance from a nationally recognized classification expert, whose guidance has been instrumental in evaluating the classification scoring system, intake procedures, and the Jail Management System (JMS). The expert has also provided input into necessary system updates to enhance the overall classification process.

Before the Monitoring Team's involvement, the County and FCSO proactively dedicated resources to improve the JMS in preparation for upcoming changes. Key updates implemented during this period include the revision of the intake questionnaire and the classification scoring tool, as well as the integration of management reports designed to identify overdue intake and ninety-day reclassification reviews. While these developments represent important progress, additional modifications are anticipated, especially regarding the integration of non-confidential health record information into the JMS. This integration is intended to equip classification staff with the information necessary to make informed housing decisions that address residents' medical, mental health, or disability-related needs.

Currently, the FCSO is updating several policies to align with the revised classification provisions. The process began with revisions to the Classification Policy (200-13). Additional affected policies will also be updated, with ongoing

19

consultation from the technical assistance expert in the next review period.  In addition, the expert has provided training to classification staff on conducting intake interviews and assessing criminal history for classification scoring.  The expert will also play a role in the development of ongoing training plans and internal quality assurance protocols.

Overall, the FCSO has demonstrated a strong commitment to improving its classification system and is well positioned to achieve substantial compliance with many provisions.  However, certain areas may not reach substantial compliance in the next review period due to ongoing challenges such as staffing shortages, time needed to implement JMS updates, and limitations in bed availability, which impact the accommodation of the dynamic resident population.

## **Provision 51**

By dates set in the Implementation Plan, Section XII, FCSO will, in consultation with the Monitor, draft and implement a plan for an objective classification system and housing plan specific to the Jail ("Classification and Housing Plan").  In drafting the Classification and Housing Plan, FCSO will consider custody classification, risk/need assessment, and screening for risk of vulnerability or perpetration of physical violence or sexual abuse.  FCSO will also examine its current housing units, including restrictive housing and protective custody, to determine the appropriateness of each housing unit as it relates to classification at the Jail.  The Classification and Housing Plan will provide for separation of incarcerated people by custody classification, as appropriate.  The Classification and Housing Plan will address adjustments to the classification system, adequate data collection and analysis, and appropriate ongoing testing for effectiveness.  FCSO will submit the Classification and Housing Plan to the United States and the Monitor for review and comment before finalizing.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

On November 5, 2025, the FCSO introduced a new intake and reclassification scoring system in collaboration with the classification expert. This initiative addressed a significant backlog, resulting in the classification of over 600 previously unclassified residents identified during the monitoring period. Additionally, the FCSO began implementing 90-day reclassification procedures for the current resident population to ensure ongoing accuracy and responsiveness in resident management. Upon completion of the process, the FCSO will collaborate with the classification expert to initiate the relocation of populations according to a newly developed classification system, aimed at minimizing the potential for mixing incompatible groups. The FCSO reports they will be able to more effectively evaluate the progress of reclassification, or identify necessary resources to ensure compliance, by April 2026.

The classification expert has actively assessed and evaluated the effectiveness of the new system. These evaluations have received positive feedback, and the expert will continue to support further assessments in future review periods to guide ongoing system improvements.

Current policies require that residents be assessed at intake for potential victimization and gang affiliation. In support of this mandate, enhancements have been made to the JMS, including the addition of alerts for enemy concerns, risk of victimization, protective custody requirements, and gang status. These improvements are designed to optimize the use of the JMS system, minimizing housing errors and strengthening reporting capabilities. The FCSO has already implemented several critical updates, demonstrating its commitment to advancing these goals.

21

Another key improvement is the integration of an alert system to notify the Prison Rape Elimination Act (PREA) Coordinator when the response to an intake PREA question indicates the need for a follow-up interview. This addition underscores ongoing efforts to enhance resident safety and compliance with PREA requirements.

Although implementation is still underway, the full impact of these changes cannot yet be evaluated. Assessment of these outcomes will be a primary focus in the upcoming reporting period. The foundational principles of an effective classification scoring system have been established, all new intakes are now classified, and the reclassification initiative is progressing as planned but it is too soon to assess the timeliness and quality of those classification actions.

By April 2026, the FCSO expects to have sufficient classification data within the JMS system to enable the classification expert to assist with the development of a comprehensive housing plan. This plan will address resident classification levels, such as low, medium, and maximum security, as well as specific factors such as protective custody and clinical needs. Upon completion, with support of technical assistance, the FCSO intends to provide a "Classification and Housing Plan" in accordance with the requirements of this provision. This plan may be incorporated through updates to existing policies, including the Classification Policy (200-13) and Resident Housing Policy (200-12). The most effective approach to achieving compliance will be decided in collaboration with the United States and the Monitoring Team in the next review period.

## **Provision 52**

FCSO will update the Jail's intake/classification database to ensure compliance and implementation of the substantive provisions of this Consent Decree. It will

capture important demographic, security, criminal history, vulnerabilities, medical, and mental health information.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The County and FCSO have implemented significant improvements in the JMS to better support the classification and housing of residents.  One key advancement is the enhanced access to the criminal history database, which now prioritizes criminal convictions over arrest charges in the classification scoring process.  This shift ensures that the intake classification system is more accurate and reflective of residents' actual criminal backgrounds.

Although the JMS system is currently effective in capturing essential information needed for resident management, additional steps are necessary to facilitate the transfer of non-HIPAA protected data from residents' electronic health records into the JMS.  Providing custody staff with access to critical health details, such as disabilities, mental health status, lower bunk or tier requirements, detoxification housing needs, and suicide observation status, is vital for making informed housing assignments and ensuring resident safety.

The County and FCSO, in partnership with their health care provider, are actively assessing the feasibility of integrating these health data into the JMS.  An update on this integration effort will be shared during the next monitoring period.

## Provision 53

Jail classification staff will review any incident reports referred to classification and include relevant data from any threatening or violent incidents in the intake/classification database.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO has undertaken several initiatives to enhance compliance with the provision requiring classification staff to review incident reports as part of a reclassification process. Classification staff have received instructions to review incident reports both during the scheduled reclassification of residents and when informed of a serious incident involving a resident. Despite these efforts, the FCSO acknowledges that there have been inconsistencies in communicating serious incidents to the Classification Unit, resulting in lapses in timely review.

To address these challenges, the FCSO has collaborated with the JMS vendor to introduce a feature that allows incident reports to be coded in a way that identifies incidents requiring reclassification review. Once implemented, this system enhancement is expected to generate notifications to classification staff whenever such incidents occur, thereby prompting a review. The FCSO anticipates that this modification to the JMS can be completed in the upcoming reporting period.

In the interim, the JMS system has already been updated to include a hyperlink to the incident report tab, making it easily accessible for classification staff when a resident is being reclassified. This immediate improvement supports staff in efficiently reviewing relevant incident information during the reclassification process.

While these JMS upgrades represent meaningful progress, the FCSO recognizes the need for further guidance and oversight. The classification expert will play a pivotal role in advising FCSO on policy development and staff training. This guidance will help establish clear procedures for how incident information should influence classification scores and housing decisions. Additionally, the expert will

24

assist in creating compliance review systems that use the JMS to identify whether incident reports that warranted reclassification were properly acted upon and to evaluate the effectiveness of these processes.

## Provision 54

Housing assignments, including cell and bunk assignments within units, will be assigned by classification staff and may not be changed by other Jail staff, except in the case of exigent circumstances, and then subject to review by classification staff within 24 hours.  Custody Staff will ensure that incarcerated people comply with housing unit, cell, and bunk assignments.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

FCSO policy designates classification staff as the responsible authority for making housing decisions for residents.  While the policy allows for emergency bed moves under certain circumstances, there have been recent instances where unauthorized moves have become frequent.  These unauthorized moves stem from both ongoing physical facility issues and the actions of inexperienced staff members.  Such moves have occurred without the required approval or notification of the classification staff, resulting in considerable security risks and representing a deviation from standard correctional procedures.

Specific challenges contributing to these problems include the presence of unsecured doors in some housing units, enabling residents to move about freely without staff awareness or permission.  Additionally, inexperienced staff have sometimes permitted residents to request transfers between units without consulting classification staff or completing the necessary paperwork.  There have also been failures in adequately monitoring resident movements.  For example, in a

recent incident, an incapacitated resident remained unobserved under a bunk for several hours because staff did not realize the resident was assigned to that cell. Such incidents highlight the need for robust movement and count protocols to prevent similar breakdowns in the future as staff response to residents being out of their assigned living areas has been dulled due to widely known lack of internal resident movement controls.

To address these ongoing concerns, the FCSO has undertaken repairs to cell doors and locks and has placed renewed emphasis on correct resident movement and counting procedures during staff briefings. During the Monitoring team's site visit in October 2025, improvements were observed, including updated briefings focusing on resident movement and more effective count procedures to ensure residents are housed in their assigned cells. The revised draft Classification Policy (200-13) further strengthens these efforts by mandating that classification staff must either authorize any housing changes or be notified of emergency moves within 24 hours of their occurrence.

Continued implementation and adherence to these improved practices, along with proper rollout of the revised Classification Policy, may enable the FCSO to achieve substantial compliance in 2026.

## **Provision 55**

FCSO will conduct reclassification progress reviews of all incarcerated people at least once every 90 days to ensure that incarcerated people are assigned to the correct Facility and custody level, in accordance with the classification process. The reclassification will give more weight to institutional behavior and less weight to the charged offenses.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Classification Policy, while still in draft form, has undergone revisions to incorporate factors to be utilized during reclassification reviews, prioritizing institutional behavior over the charging offense when determining classification changes within the 90-day review period.  Since the Classification Unit only began the reclassification project in November 2025, it remains premature to provide statistical analyses regarding the impact of reclassification scoring on overall population trends.

The reclassification process also requires a face-to-face interview with the incarcerated person.  This is not feasible given the number of staff currently assigned to the Classification Unit.  It has been estimated by the corrections expert that an additional five classification staff (either civilian or uniformed) are needed to meet this need.  In the meantime, FCSO will attempt to achieve reclassifications every 90 days via a remote paper review.

In the upcoming review period, the classification expert will collaborate with the FCSO to develop reporting metrics for the Monitoring Team, detailing completed monthly reclassifications, backlogs from overdue 90-day reviews, and scoring effects associated with those reviews.  Compliance can be achieved when the majority of 90-day reviews are current and conducted face-to-face, the Classification Policy has been reviewed, approved, and formally issued and the reclassification project is not leading to unintended outcomes.  The classification team is expected to report outcomes from these reviews, but the barrier to substantial compliance in the next review period will be the ability for the FCSO to conduct face-to-face 90-day reviews, which appears unlikely due to the staffing crisis.

27

**Provision 56**

FCSO will hold a reclassification review of incarcerated people following any adverse disciplinary finding and restrictive housing sanction.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO has initiated the process of reviewing classification levels after disciplinary hearings; however, substantial compliance with this provision has not yet been achieved. The primary challenges include necessary upgrades to the JMS and the need for additional training for both classification staff and disciplinary hearing officers. Currently, the documentation of disciplinary hearing outcomes within the JMS system remains inconsistent, which impedes comprehensive tracking and evaluation.

During this review period, the FCSO developed and implemented a Quick Reference Guide aimed at training staff on the proper entry of disciplinary hearing information into the JMS system and clarifying how this information should inform subsequent classification reviews. This training session was conducted in late November 2025. Despite these initial efforts, the FCSO acknowledges that ongoing training and diligent monitoring are essential for improving both consistency and proficiency among staff.

The JMS system is equipped to notify classification staff when a serious disciplinary hearing takes place. However, consistent and timely updates to the system after each hearing are critical for accurately assessing compliance with classification decisions stemming from disciplinary outcomes. Furthermore, the current policy and training materials, as well as the classification scoring system, require further review. Adjustments may be necessary to ensure that disciplinary

findings, especially those reflecting the severity and frequency of behaviors, are correctly factored into classification scores. Given the link between restrictive housing sanctions and disciplinary hearings, it is important that both the notification and scoring systems address post-disciplinary hearing reviews as well as subsequent evaluations that follow restrictive housing sanctions.

To comply fully with Provision 56, the FCSO must revise its classification and disciplinary policies, continue to train staff, and implement robust monitoring practices to ensure adherence to these policies. The classification expert is tasked with determining the appropriate impact of disciplinary incidents on overall classification scores, which will require detailed statistical analysis once sufficient data is available. In addition, it is recommended that the JMS system be enhanced to include a management tool that allows the FCSO to conduct self-audits of reclassifications, thereby ensuring that reclassifications occur promptly after the adjudication of serious disciplinary events or after a resident's release from restrictive housing.

While these measures are attainable, it is anticipated that other classification provisions may achieve full compliance ahead of this one in the upcoming review cycle. In the meantime, the classification expert and the Monitoring team will continue to provide guidance and support in developing effective strategies to advance compliance with Provision 56.

## **Provision 57**

FCSO will prepare an annual classification report, based on data from the reclassification progress reviews, to assess whether incarcerated people are being classified correctly and housed appropriately according to their classification.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***

While it is premature for the Monitoring Team to assess this provision, the FCSO is actively undertaking steps to achieve compliance and will receive technical assistance in developing an annual report. The requirement to prepare an annual classification report has been incorporated into the updated Classification Policy, which is presently pending approval. In support of these efforts, the classification expert has been engaged to review classification actions and assist the FCSO with its internal quality assurance processes.

Additionally, the FCSO and the classification expert will utilize the JMS to facilitate the preparation of the annual report. At this stage, however, the new classification scoring system has not yet been fully implemented, making it premature to generate a comprehensive report. As a result, it is anticipated that the inaugural annual classification report will cover the period from January to December 2026, with publication expected in early 2027.

## Provision 58

Fulton County and the FCSO will designate or create a sufficient number of housing units to enable the Jail to house people at high risk for victimization safely without relying on restrictive housing or similar punitive conditions. These housing units will be available, per request or assignment, to incarcerated people whose risk assessment screening(s) demonstrate(s) a high likelihood of being abused; who are deemed vulnerable following an incident of physical or sexual abuse, or a threat thereof; who are vulnerable due to renunciation or refusal of gang membership, or who seek to renounce gang membership; or who request protective custody, where an appropriate review by Jail staff deems such protection necessary.

30

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently provides protective custody housing and utilizes restricted placements for residents who seek protective custody but do not qualify for an existing unit, as determined by the FCSO.  At present, it is not possible to determine the precise number of protective custody beds required for each classification level and within other specialized groups.  This limitation will persist until the completion of the ongoing classification update project.  It is also recognized that the County has not been able to ensure the FCSO has maximum flexibility of available capacity, with reportedly over 500 beds being unavailable due to unresolved maintenance issues during this review period.

The FCSO recognizes the need to further develop expertise in managing its jail population.  The population within the jail is subject to frequent changes, and resident classifications can shift in unpredictable ways.  Enhancing internal knowledge and expertise will enable the FCSO to rapidly adjust and repurpose housing units in response to fluctuations in demand for protective custody or other specialized housing.

To support these goals, the classification expert will assist the FCSO in creating metrics that notify staff when preparation for housing unit conversions should begin.  These metrics will help facilitate timely responses to changing housing needs within the facility.

While the FCSO's current efforts remain focused on the accurate classification of its entire incarcerated population, it is not anticipated that substantial compliance with these protective custody requirements will be achieved during the next review

period.  Nevertheless, there is potential for the FCSO to meet these provisions by late 2026 as ongoing improvements and knowledge-building efforts continue.

## **Provision 59**

When an incarcerated person communicates an imminent threat or risk of danger, Jail staff will immediately place the incarcerated person in a safe place, removed from the perceived or alleged threat of physical or sexual abuse, while determining an appropriate housing assignment.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO asserts that it is informally complying with the requirement to immediately place incarcerated individuals in a safe location upon communication of an imminent threat or risk of danger.  However, there is presently no evidence from updated policies, staff training, documentation, or internal monitoring to confirm that this procedure is consistently followed in all incidents.  There are, however, residents in protective custody and reports that reflect a resident reporting feeling unsafe with the result being the resident was moved from the location.

Protective custody units are available, and staff interviewed reported that when a request for protective custody is made, the individual is either secured in their cell or removed from the area until a supervisor is able to assist.  This demonstrates an operational response to protective custody requests but lacks formal documentation.

The FCSO has announced plans to update policies in the near future, which will require documentation of protective custody requests and related staff training. These updates are scheduled for implementation in the next review cycle.

At this time, the FCSO maintains that it is meeting the provisions related to protective custody.  Nevertheless, a thorough assessment of compliance is not currently possible, as supporting documentation and proof of staff training to verify these practices is not yet available.

### Provision 60

No one will be denied protective custody or a housing unit designated pursuant to paragraph 58 based solely on a refusal to identify the person or persons who pose a threat.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

See response to Provision 59.

## Staffing and Supervision

The FCSO faces a significant barrier to achieving compliance with the Consent Decree: a persistent and severe staffing crisis within the jails.  As previously documented in the First Monitoring Report, vacancy rates for critical security posts remain alarmingly high.  This shortage contributes to extreme violence and security violations, posing substantial risks to both residents and staff, as well as impacting the broader community.

Due to insufficient staffing levels, essential correctional practices, such as timely security checks and contraband control, are not being adequately carried out.  The lack of regular supervision has allowed disruptive residents to ignite fires, assault other residents, damage cell windows, doors, lights, and other crucial security devices.  Staff are often compelled to manage force incidents without adequate support, resulting in critical errors and exposing both staff and residents to

unnecessary danger.  The staff shortage crisis is therefore extremely serious and requires immediate remedial action.

The County and FCSO have acknowledged the urgency of addressing this staffing crisis, which is not unique to Fulton County or Georgia.  Several immediate and foundational steps have been launched, but these measures have yet to reverse the decline in custody staffing levels.  In fact, the custody staffing level reduced 10% between the period of December 2024 to December 2025, from 416 filled positions to 373.[3]  To strengthen recruitment and onboarding, the County partnered with the Whalls Group recruitment firm.  However, it is currently too early to assess whether this partnership will yield improvements in recruitment outcomes and the overall hiring process.

In addition to partnering with a recruitment firm, the County has commissioned a comprehensive salary survey (Segal Group).  The Monitoring Team has specifically requested the final salary study report include ancillary benefits, recognizing their importance in attracting and retaining qualified candidates and the County reports that this is an important aspect of the analysis.

To address immediate staffing shortages in critical security roles, the County contracted with a private security firm (Allied Universal) to fill vacant security specialist positions, staff who operate unit control towers, and provide support to deputies and detention officers assigned to housing units.  As of January 20, 2026, 71 contract employees were working in the unit control towers and 33 additional contract employees were in training.

---

[3] Comparison Monthly AMS Reports – December 23, 2024 and December 1, 2025.

The FCSO has also sought technical assistance to develop a shift scheduling system aimed at more accurately quantifying daily staffing levels and vacancies. This initiative began in October 2025, with pilot testing of a daily scheduling report commencing in November 2025. As a result, the FCSO managers and the Monitoring Team can now better evaluate post vacancies and confirm whether mandatory posts are being filled according to requirements. Additionally, the County intends to transition to a software system, Telestaff, that will integrate daily scheduling and payroll to further improve tracking.

Furthermore, the County engaged an outside firm (the CGL Group) to conduct a staffing analysis. The initial report by CGL focused on the immediate staffing crisis and provided recommendations for establishing minimum custodial jail staffing levels. A follow-up assessment is anticipated to ensure a comprehensive evaluation of all jail personnel needs. In the interim, using the minimum staffing levels established by the CGL report, as of early December 2025, the FCSO was able to fill less than 50% of the CGL identified mandatory minimum posts.[4]

To meet urgent staffing needs, the Sheriff continues to reassign some personnel from non-custody divisions to jail duties. However, in reviewing documented overtime and redirection of non-custody staff working inside the jails for the week of November 26 through December 2, 2025, less than 1% of the posts were filled by court and outside law enforcement staff on redirect from their regular post.[5] The FCSO reports that not all redirects and overtime were listed on the daily schedules, which would have resulted in underreporting the support provided to the jails through redirection and overtime, which is likely accurate. However, the

---

[4] Weekly Roster Analysis November 26 through December 2, 2025
[5] Weekly Roster Analysis November 26 through December 2, 2025

redirection of non-custody staff does not match the dire needs in the jail and does not reach the potential of the agency. While it is difficult to require staff to work in the jails either through redirect or involuntary overtime, the staff shortages require greater utilization of all available resources to help fill vacant posts.

As we recognize this reality, we are cognizant of the FCSO's reasonable concerns that the redirection of non-custody staff into jail posts or retention incentives paid only to custody personnel may have contributed to increasing resignations among non-custody law enforcement and civilian staff, who may seek employment with agencies offering better compensation, benefits, and less demanding work environments. Working in the jail facilities is inherently challenging and has become increasingly stressful and dangerous due to current conditions in Fulton County. The FCSO reports that the Law Enforcement Division realized a 20% reduction in staff from 2024 to 2025, reducing from 120 filled positions to 96. Notwithstanding these concerns, all available resources must be brought to bear to mitigate the staffing emergency. And we anticipate that other initiatives, including taking action to address concerns identified through the benefits and compensation study discussed above, may help the FCSO mitigate its retention challenges.

Current staffing levels are insufficient to safely and effectively manage the jail population. Should the County and FCSO fail to resolve this crisis, the next reasonable course of action may be to reduce the jail population. A population reduction would ease pressure on existing staff and could allow for the closure of certain housing units. While such a measure is extreme, the severity of the situation may necessitate decisive and significant intervention. A coordinated effort among State Courts, District Attorney, Public Defender, FCSO, and other county and municipal partners is essential to address current operational constraints. A focused and daily review of specific populations may yield

meaningful court efficiencies and viable alternatives to custody, including felony pretrial cases, which are currently averaging more than 700 days in custody; competency restoration cases that may remain pending for a year or longer; technical probation violations; failures to appear; individuals held on low bond amounts; and those awaiting placement in alternative programs.  Absent sustained and measurable progress, a court-ordered population cap aligned with available staffing levels may become necessary to ensure safe operations.

In addition, the County and FCSO must plan for the potential loss of approximately 500 beds provided by the City of Atlanta.  The facility is an important part of FCSO's population management.  The current facilities cannot absorb 500 residents as the system is already utilizing non-traditional, overcrowding floor beds (boats), which is not a sustainable housing solution.

## **Provision 61**

By dates set in the Implementation Plan, Section XII, the County and FCSO will, in consultation with the Monitor, conduct a staffing analysis consistent with national standards of practice.  The staffing analysis will consider the requirements of this Consent Decree in formulating minimum staffing levels for the Jail.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

During the monitoring period, the County engaged a contracted firm (the CGL Group) to conduct an initial staffing analysis focused on addressing the immediate staffing crisis.  The primary objective of this assessment was to identify and fill mandatory posts within the facility, ensuring that the most critical coverage needs were met promptly.  This targeted approach was essential in the context of urgent shortages and the requirement to maintain minimum safety and security standards.

37

The 2025 draft CGL report reflected that the jail division requires 1,044 staff to operate at the minimal level.[6]  As of December 1, 2025, the jail had 373 staff assigned,[7] representing only 36% of the employee job positions in custody were filled.  The Monitoring Team recognizes that the FCSO has prioritized ensuring that at least one staff member is working in every housing unit.  The housing unit officer is often working alone when the unit should have more than one staff working directly with residents to ensure orderly and safe operations.  There are also circumstances in which no staff are on the housing unit floors, due either to lack of staffing, staff response to other areas of the jail, or meal breaks.

While the initial assessment served as an important step toward compliance, achieving full compliance with the relevant provision requires a more expansive and detailed evaluation.  Future staffing analyses must move beyond the immediate focus on housing units and incorporate a comprehensive review of support units.  These support units are vital for fulfilling the broader operational and supervisory requirements set forth in the Consent Decree.

At present, the County has not provided a timeline for initiating the subsequent phase of the staffing assessment.  However, given the significant staffing shortages currently faced, it is both practical and reasonable to prioritize immediate coverage of housing unit posts.  This prioritization ensures that the facility's most pressing safety and security needs are addressed, laying a necessary foundation for stability.  As staffing conditions improve and resources allow, future evaluations will incorporate the staffing needs of essential support positions, enabling the County

---

[6] *CGL Fulton County Staffing Analysis Update and Validation – October 2025, p. 130.*
[7] AMS Report – December 1, 2025

and FCSO to meet all requirements outlined in the Consent Decree in a systematic manner.

## Provision 62

By dates set in the Implementation Plan, Section XII, the County and FCSO will provide to the United States and the Monitor a detailed "Recruiting and Retention Plan" that will allow the Jail to meet the minimum staffing levels identified in the staffing analysis. The County and FCSO will implement the Plan with input from the United States and Monitor.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO submitted a proposed recruitment and retention plan designed to address ongoing staffing challenges within the Jail. However, the County has not taken full action on the plan. Despite not receiving formal endorsement, the proposed FCSO strategies encompassed a range of solutions targeting both the recruitment of new staff and the retention of existing personnel. Specifically, the plan included a mix of economic incentives, such as competitive compensation packages, alongside wellness-oriented initiatives aimed at improving staff morale and job satisfaction.

Currently, the County is engaged in a salary and benefit comparison study. The purpose of this study is twofold: first, to determine how the FCSO's salaries compare with those offered by neighboring agencies, and second, to identify non-salary incentives that have proven effective in attracting and retaining staff at other local organizations. This comprehensive approach is intended to ensure that the FCSO can remain competitive in both monetary and non-monetary terms.

In addition to the salary study, the County has contracted a recruitment firm (Whalls Group) to develop new strategies for staff recruitment. The firm's focus will be on identifying and implementing non-economic factors that can help draw qualified candidates and encourage current employees to remain with the organization. These strategies may include improvements to the work environment, professional development opportunities, and other benefits that contribute to long-term retention.

As these initiatives are still in progress, it would be premature for the County and FCSO to submit a finalized recruitment and retention plan during the current reporting period. The completion and submission of the official plan should occur only after the County and FCSO have received comprehensive feedback and recommendations from the contracted firms. This approach will ensure that the final strategies are both effective and informed by the most current data and best practices available. It is expected the salary study will be completed in March 2026, with a proposed strategy being developed in response. It is critical that the County and FCSO work together to implement a recruitment and retention strategy to address the staffing crisis.

**Provision 63**

By dates set in the Implementation Plan, Section XII, the County and FCSO will, in consultation with the Monitor, develop and implement a detailed "Staffing Plan" for the Jail. The Staffing Plan will ensure that staffing and supervision levels for each shift are appropriate to adequately supervise people incarcerated at the Jail and ensure access to medical and mental health care, and it will identify mandatory posts that must be filled. The Staffing Plan will take into account the Consent Decree requirements and staffing analyses; potential overcrowding; outside trips (for instance, hospital runs); medical and mental health escorts; and relief for

absences, training, holidays, and special assignments. The Staffing Plan will include the number of response or escort officers needed to supervise movement outside of the housing units and serve as a first response when an incident occurs. The County and FCSO will provide the Staffing Plan to the United States and Monitor for review and comment before finalizing.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**
The County has initiated measures to fulfill the requirements outlined in this provision by undertaking a comprehensive baseline staffing analysis. As part of this analysis, relief patterns were reevaluated to ensure that adequate backfill is available for staff absences due to training, sick leave, vacation, and holidays. This review also considered the needs for medical guarding and transportation, to the extent permitted by existing data, although limitations in data quality and completeness hamper the analysis.

In order to gain a clearer understanding of emergent staffing needs, particularly those related to medical transports and hospital coverage, the technical assistant staffing expert has worked collaboratively with the FCSO. Together, they have begun quantifying instances where staff are reassigned for transportation or hospital coverage using daily reports. While these efforts are ongoing and it is still too early to provide complete quantification, the anticipated implementation of a new staff scheduling system is expected to enhance the ability of both the FCSO and the staffing analysis contractor (the CGL Group) to refine their recommendations for specialized assignments and coverage.

Despite these efforts, significant work remains in establishing minimum staffing levels, especially in identifying disturbance or alarm response personnel for critical

41

incidents.  The severity of the current staffing crisis has resulted in the jail operating in an "all hands on deck" mode, where any available employee is required to respond to incidents.  Often, only one staff member is present in a housing unit, making it impossible to designate specific individuals to respond to off-unit incidents.  This situation is not expected to be resolved before 2027 and will need to be addressed in conjunction with provisions related to the use of force.

## Provision 64

FCSO will document on each shift report whether the minimum staffing requirements as set out in the staffing analysis and staffing plan were met for that shift.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

Early in the monitoring period, it became apparent that the FCSO lacked sufficient data to effectively evaluate daily scheduling across all jail facilities.  To address this deficiency, technical assistance was provided by assigning a staffing expert to collaborate with the FCSO.  The primary focus of this collaboration was to standardize daily scheduling reports and develop a tracking system capable of generating weekly staffing reports.  That collaboration began in earnest in October 2025 and resulted in a legitimate tracking system by late November 2025.

The staffing expert has continued working with the FCSO to refine the reporting mechanisms, ensuring greater accuracy in documenting which staff members worked in specific posts and tracking each employee's current assignment.  By early December 2025, it is believed that the weekly tracking reports had reached a level of accuracy sufficient to reliably monitor both the percentage of vacant posts

and the manner in which vacancies were filled, whether by regular custody staff, overtime personnel, or staff redirected from outside the jail division.

Although there is not sufficient data to determine the exact vacancy rates for mandatory posts for the entire monitoring period, data from weekly rosters spanning November 26 through December 2, 2025 indicate that 55% of the FCSO identified mandatory posts remained vacant during that week. Therefore, only 45% of the mandatory posts were filled that week, which is consistent with what the Monitoring Team has observed and the FCSO report. While the initial FCSO data may not be 100% accurate, documented redirected staff and contract tower officers managed to fill 14% of the posts, while overtime personnel accounted for coverage in only 3% of vacant posts. These figures underscore the need for improvement in hiring practices and a more assertive approach to redirecting existing staff and requiring overtime assignments, even on an involuntary basis, to address the significant gaps in mandatory post coverage. The next reporting period will have sufficient data to more accurately report on hiring trends.

The FCSO exhibited a proactive approach by collaborating with the staffing expert to implement a comprehensive daily tracking report within a short period, underscoring its commitment to transparency and internal oversight. Given the significant staffing shortages within the jail, assertive measures are required, and the improved tracking report now provides greater clarity regarding vacancy coverage, reasons for staff absences from posts, and the deployment of redirected staff and overtime personnel to address vacant positions. Assuming the staff continue to utilize the system in place and policies and/or desk procedures are developed to anchor the new system in training, this provision can reach substantial compliance in the next review period.

**Provision 65**

FCSO is obligated to ensure that all mandatory posts at the Jail are filled on each shift.  FCSO will take all reasonable steps to fulfill this obligation, including by closely tracking and reporting on unfilled posts and developing corrective action plans to address deficiencies.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The ongoing staffing crisis remains the primary obstacle preventing the FCSO from filling all mandatory posts within the jail.  Based on the findings of the draft CGL 2025 staffing analysis, approximately 409 posts were identified as essential for the safe operation of the facility and did not include all necessary ancillary positions that are critical to jail operations.[8]  However, the FCSO has not been able to increase its current staffing levels to meet this target, resulting in its inability to fill every designated mandatory post.

**CGL 2025 Mandatory Post Recommendations**

| Facility | Mandatory Posts |
|----------|-----------------|
| Main | 303 |
| South | 41 |
| Annex | 8 |
| ACDC | 36 |
| Grady | 21 |
| **Total** | **409** |

---

[8] Does not include all recommended units, such as the jail investigations unit. It is reported this analysis will occur in a future CGL assessment.

In response to the staffing challenges, the FCSO has taken steps to address staffing shortages by prioritizing mandatory posts that are deemed absolutely critical. These posts, referred to as Category 3, are highlighted on the daily staffing roster. Watch Commanders have been directed to ensure that staff assignments prioritize these critical posts each day and to ensure that at least one staff member is working directly in the housing units with residents.

It is important to note that the number of critical posts marked on the daily roster is distinct from both the total number of posts identified in the CGL staffing analysis and those classified as mandatory. The FCSO has designated 308 posts as critical, representing 75% of the 409 mandatory posts outlined in the CGL staffing analysis. This approach reflects an effort to maintain essential operations despite limited staffing resources and a recognition that the CGL recommendations are not currently achievable.

Unless staffing levels rapidly increase or there is a significant reduction in the jail population, the FCSO will be unable to comply with the requirements of this provision even partially. While the FCSO is able to track and report on unfilled posts, achieving compliance will only occur when the FCSO and County retain staff at sufficient levels.

**Provision 66**

FCSO is obligated to ensure that appropriate security supervisors are assigned to the Jail on all shifts, so as to provide staff supervision and guidance, and ensure safe and orderly operation of the Jail. FCSO will take all reasonable steps to fulfill this obligation, including by closely tracking and reporting on a lack of assigned supervisory staff and developing corrective action plans to address deficiencies.

45

These supervisory positions will not be used to replace correctional officer staffing, absent exigent circumstances.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

According to the draft 2025 CGL report, the FCSO should maintain a minimum combined total of 74 posts in the jail staffed by sergeants, lieutenants, and captains, as reflected in the table below. However, the daily FCSO staffing rosters indicate that the jails currently have only 56 posts of sergeants, lieutenants, and captains assigned to the jails and the hospital guardian unit (Grady Hospital); this represents that the FCSO only had 76% of the mandatory posts identified by CGL as critical on the daily assignment rosters.

**CGL 2025 Mandatory Supervisor Post Recommendations**

| Facility | Mandatory Posts |
|---|---|
| Main | 45 |
| South | 9 |
| Annex | 2 |
| ACDC | 11 |
| Grady | 7 |
| **Total** | **74** |

The ability of the FCSO to ensure minimum supervisor levels in the jails has been further eroded below the CGL recommended mandatory minimum. Based on the weekly staffing report for the period of November 26 through December 2, 2025, only 59% of sergeant posts were filled, 47% of lieutenant posts were filled, and 48% of captain posts were filled. It is also common to find that a sergeant or

lieutenant has been redirected to cover a housing unit due to insufficient detention officers or deputy sheriffs available for those units.

The FCSO has shown a commitment to closely tracking and transparently reporting on the lack of supervisory staff. Nevertheless, the severity of the staffing crisis means that, aside from redirecting non-custody staff and mandating overtime, there is little that can be done at this time in terms of a corrective action plan to resolve this issue other than a massive hiring effort. A more effective solution at this juncture would require a county-wide approach to hiring, aiming to reduce line-level staff vacancies and facilitate the promotion of supervisors.

The current staffing shortages make it difficult to promote supervisors. One significant factor contributing to staff shortages and retention problems is that newly hired staff members do not feel supported, as they rarely see supervisors and do not receive adequate training after leaving the Training Academy. Sergeants and lieutenants do not have sufficient time to dedicate to training and mentoring new staff, which exacerbates the staff shortages as newly hired staff leave and the vacancies continue to grow.

**<u>Provision 67</u>**

FCSO will ensure and document that there are unannounced, irregularly timed rounds conducted at least every hour inside each general population housing unit and at least once every 30-minutes for special management units, or more often if required by policy or this Consent Decree. During rounds, Custody Staff will observe every incarcerated person in the unit for signs of life. Video surveillance and visual rounds from a control tower may be used to supplement, but must not be used to replace, rounds by Custody Staff.

47

**Compliance Status:** Non Compliance

**Additional Discussion/Recommendations:**

Currently, the FCSO is not in compliance with this provision due to ongoing staffing shortages. Moreover, for the limited number of staff that are present, there are many conflicting tasks occurring at once, such as medication distribution, count, searches, response off of units, escorts, staff meal breaks, etc. Although efforts have been made to prioritize timely security checks, these efforts have been most focused in mental health units, where residents require suicide observation or specialized monitoring. Despite support from health care staff, the Monitoring Team continues to observe missed security checks even in these specialized units.

In non-mental health housing units, custody staff have reported substantial difficulties in fulfilling security check guidelines. The main challenge stems from staff being assigned to oversee multiple housing units at once, in addition to managing various competing duties. FCSO management recognizes these obstacles, but their ability to address them is limited by the persistent and high number of staffing vacancies.

Another major impediment to compliance is the documentation of security checks. The FCSO has attempted to enhance recordkeeping by implementing two different technology systems for tracking the timeliness of security checks. The initial system (Guard One) was discontinued and replaced with the NoteActive system; however, staff are not currently using the NoteActive system for recording security checks. One contributing factor is the physical limitation of the device: the tablet-sized equipment is neither practical nor safe for correctional officers to carry into housing units under current circumstances. The FCSO has responded to this and intends to operationalize a smaller handheld device that will assist with

48

documenting security checks during the next review period.  In the interim, tower officers, when filled, document security checks in the NoteActive system.

In summary, the FCSO is confronted with dual challenges in meeting the requirements of this provision: there is insufficient staffing to complete security checks as mandated, and there are significant practical barriers to floor-level custody effectively documenting those checks using existing technology but the FCSO does require the tower officers to document when they observe the floor-level staff conducting a security check.  It is positive that it appears the FCSO is addressing the technology challenge, which will help quantify compliance in the next reporting period.

## Provision 68

FCSO will ensure that supervisors conduct and document unannounced rounds during all shifts to identify and deter staff misconduct or lapses in supervision. The Watch Commander, Captain of Security or equivalent, and Chief Jailer, will all conduct documented and unannounced rounds in housing and activity areas.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Supervisors are actively conducting rounds in the housing units, but these rounds are primarily in response to emergencies.  As the main responders, supervisors provide critical support to housing unit staff, especially given the ongoing shortage of line-level employees available to assist with entering the housing units. Through staff interviews, it has been made evident that the management team maintains a presence in the units and is well known among the staff.  Additionally, command staff are familiar with jail employees, further demonstrating their visibility within the housing areas.

49

Despite this visibility, there are significant challenges related to documenting supervisor rounds. The lack of sufficient tower officers has resulted in inadequate recordkeeping, making it difficult to verify when supervisors are present on the housing unit floors. There has not been consistent tracking of supervisor activity, which hampers the ability to demonstrate compliance with applicable provisions or for internal monitoring.

The FCSO has reported that, with the anticipated addition of contract staff assigned to control towers, improvements in the documentation of supervisor rounds are expected during the next review period. However, moving toward substantial compliance with this provision will require not only better documentation but also ensuring that there are enough supervisors available to conduct meaningful rounds in the housing units. It is essential that these rounds address routine supervision needs and are not limited to responding to crises before quickly moving on to the next emergency. Emergency response to units does not represent meaningful rounds which should incorporate cleanliness inspections, one-on-one mentoring, document reviews and conversations with residents. The current staffing allocations simply do not permit supervisors the time to comply with this provision.

**<u>Provision 69</u>**

FCSO will ensure that all security rounds are documented electronically in NoteActive. In the event that NoteActive is unavailable, they will be documented in bound logs with pre-printed sequential page numbers that do not contain pre-printed rounding times, and that are maintained on each housing unit, then entered in NoteActive as a late entry. NoteActive logs will be reviewed by the Watch Commander on each shift, and a selection of NoteActive logs will be reviewed by the Chief Jailer monthly.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

FCSO staff are currently using the NoteActive security check tracking system to document the floor officers conducting security checks until appropriate handheld devices can be issued to the floor staff.  However, no alternative pre-printed paper logs have been established to make up for the absence of electronic documentation. However, the lack of filling the tower officer posts during this monitoring period has resulted in inconsistent recordkeeping and gaps in compliance with documentation requirements.

In response to these challenges, the FCSO is actively assessing upgrading the NoteActive tablet to a handheld device that would allow real-time documentation of security rounds.  During the review period, security rounds were recorded only sporadically in control towers that are staffed, leading to incomplete records.

To address these issues, the FCSO is in the final stages of implementing a handheld NoteActive device system.  This system enables staff to document security rounds by scanning tags located on doors and other designated areas throughout the jail. The handheld device is independent of the facility's main power source, as long as the handheld device remains charged, it can retain data even if the computer system becomes temporarily unavailable.  Once power or system operations are restored, the data from the handheld devices can be downloaded to ensure continuity in documentation.

The Monitoring Team plans to discuss the logbook requirements outlined in this provision with the United States.  The aim of these discussions is to evaluate alternative methods that are equally effective, such as the use of tower logbooks in

combination with video confirmation of security checks if the technology system becomes inoperable.

## **Provision 70**

FCSO will identify all Jail doors that should be locked and interlocked (not open at the same time) and develop and implement policies to ensure proper door security.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO has clearly identified specific jail doors that must remain locked and interlocked in order to maintain security within the facility. These designations are intended to ensure that doors are not open simultaneously when security protocols require them to be closed.

The County and FCSO have made consistent efforts to repair and maintain these doors and their associated locking mechanisms. Despite these initiatives, persistent problems remain. Some cell doors that should be secure have suffered damage to the extent that they can no longer be locked. Additionally, certain unit doors, which are designed to slide open smoothly, have deteriorated so much that staff must exert significant physical effort to operate them. Facility tours have revealed that, in some instances, staff permit residents to assist in opening damaged doors. This practice is indicative of broader maintenance challenges faced within the facility, lack of staffing and profound deviations from correctional norms.

As previously discussed in related provisions, maintaining door and lock security remains a continuous challenge for the County and FCSO. Although repairs have been completed, aging infrastructure, poor maintenance, and inadequate supervision or lack of experience among officers often leads to doors and locking mechanisms being damaged again shortly after being fixed. This recurring damage

has resulted in situations where residents in maximum security units reside in cells with doors that cannot be secured and security doors that cannot be easily opened.

The effectiveness of any policies or procedures for door security is limited until the FCSO can provide sufficient staffing to oversee housing units and prevent residents from causing further damage to cell doors and locking mechanisms. Addressing this issue requires either increasing staffing levels or reducing the resident population to help prevent ongoing destruction of critical security features within the housing units.

## **Provision 71**

FCSO will draft or revise and implement post orders for Custody Staff for each post in accordance with operational practices developed in compliance with this Consent Decree. The post orders will be prominently located in the control towers.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently maintains post orders and has established a procedure for their annual review and update. Staff are aware of their requirement to read and understand their post orders. Despite these existing processes, there are legitimate challenges in coordinating updates to designated post orders in accordance with all requirements outlined in the consent decree. The necessary revisions to post orders are expected to take place gradually, as new policies and procedures are developed and implemented in response to the consent decree. Many updates may not be completed within the next three to four reporting periods as compliance with various provisions are implemented.

During a recent monitoring tour of two control towers, it was observed that post orders were not prominently located, and there were no staff present in the tower to

indicate where the post orders had been placed. In response, the FCSO has committed to ensuring that the appropriate post orders are placed in all control towers in a visible location before the next review.

Given the current pace of policy development and implementation, this provision is anticipated to remain at partial compliance through 2027.

## **Provision 72**

The County and FCSO will continue to perform a criminal background records check on all new hires, including contractors.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***

The County and FCSO have maintained a consistent approach to conducting criminal background checks on all new employees and contractors as a fundamental component of their hiring process. This practice applies to all newly hired personnel, including contract employees such as maintenance and health care providers. The background requirements are also codified in the FCSO's Recruitment and Selection Policy (4.11).

The Monitoring Team reviewed a representative background investigation file and requested a random sample of a total of eleven (11) employee and contractor background clearance files. FCSO produced nine (9) of the eleven (11) randomly requested files. The two files not produced were contractor files that were reportedly water-damaged as a result of recent flooding at the main jail facility.

The review reflects that FCSO utilizes distinct processes for employee and contractor background clearances. Background investigators conduct comprehensive investigations for prospective employees, while jail staff conduct

criminal history checks for prospective contractors. As a result, employee and contractor background files are maintained in separate locations and contain different levels of documentation.

The employee background investigation process is thorough and includes verification of employment history, educational credentials, marital status, military service, credit status, and criminal history. The process also requires completion of physical and mental health examinations and physical fitness testing. While the exact process should remain confidential, the FCSO also conducts a truthfulness assessment (i.e. polygraph).  The files reviewed reflect that approvals or disqualifications are subject to multiple levels of executive review prior to a final determination, and both approvals and disqualifications were included in the random sample.  Contractor background files primarily consist of criminal history checks, which is generally consistent with industry practice for non-employee personnel. In the ten (10) files reviewed, the Monitoring Team identified no significant concerns regarding clearance determinations.

The issue of the water-damaged files was discussed with FCSO. The agency reported that it is exploring more secure and resilient records-retention solutions for background investigation materials, as these records are currently maintained primarily in paper format.

## Contraband Prevention

The FCSO continues to face profound and evolving challenges related to contraband, making it one of the most serious security risks impacting the safety of residents, staff, the broader jail environment and the community.  Weapons are frequently used in assaults, and incarcerated people have discovered ways to cut through perimeter windows, enabling airborne drones to hover outside and deliver

narcotics, cell phones, and weapon components directly into areas that should be secured, including directly into resident cells.  Community members have also breached the perimeter fence to drop contraband through compromised windows, further complicating safety efforts.  Unfortunately, employees have also been detected introducing contraband, leading to termination and referral for criminal prosecution where warranted.

While the FCSO has implemented staff-screening measures at entry points, aging equipment has the potential to limit the ability to deter staff or contractors from introducing narcotics or other dangerous items.  The FCSO previously utilized drone detection technology, but more solutions are needed to address this growing threat.  Reportedly, a new vendor contract (Axon) may restore a level of drone detection in the future, but specifics are not yet confirmed due to ongoing implementation planning.

Against this backdrop, the FCSO has designated managers responsible for contraband interdiction at each facility and submitted a draft Perimeter and Contraband Control Plan (Fulton County Jail Security Plan), though additional work is needed to formalize responsibilities in Post Orders, strengthen resource allocation, and ensure that new or alternative screening technologies are incorporated.  A comprehensive, coordinated, and well-resourced approach, paired with improved collaboration between the County and the FCSO, is required to meet the scale of the threat and support sustainable implementation of the Perimeter and Contraband Plan.

## Provision 73

FCSO will appoint an individual of appropriate rank and authority at each Jail Facility with responsibility for the Facility's systems for interdiction of contraband. FCSO will notify the United States and the Monitor of these appointments.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO has issued a directive that clearly identifies the management staff responsible for the interdiction of contraband at each facility. Documentation of these appointments was provided to the Monitoring Team as proof of compliance. Interviews conducted with staff at the facilities confirmed that they are aware of their responsibilities regarding contraband prevention. Furthermore, staff members interviewed could specifically identify which managers are responsible for overseeing this provision.

To achieve substantial compliance with this requirement, the FCSO must ensure that the responsibilities for contraband interdiction are formally incorporated into the appropriate post orders of the identified managers. The FCSO acknowledges the importance of this step and has indicated an intention to update the relevant post orders during the next monitoring period.

## Provision 74

By dates set in the Implementation Plan, Section XII, the County and FCSO will, in consultation with the Monitor, develop and implement a "Perimeter and Contraband Plan" for detecting and reducing the amount of contraband at each of the Facilities. The Perimeter and Contraband Plan will set forth procedures for screening and searching incarcerated people, staff, and visitors, and otherwise detecting and preventing the introduction and flow of contraband around the Jail.

The County and FCSO will submit the Plan to the United States and Monitor for review and comment before finalizing and implementing the Plan.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

The County and FCSO acknowledge the significant security risks posed by breaches of facility perimeters and the introduction of contraband into jail environments. In response to these challenges, the FCSO and County have invested in various technology solutions and made physical plant modifications to address serious vulnerabilities related to perimeter security and contraband interdiction.

To further strengthen these efforts, the FCSO has recently submitted a draft Perimeter and Contraband Control Plan (incorporated into the Fulton County Jail Security Plan) to the Monitoring Team for review. A comprehensive review and a robust discussion with the Monitoring Team is expected in the next cycle. It is anticipated that the finalized plan will be ready for submission to the United States and the Monitoring Team in the upcoming monitoring period.

Recognizing the need for additional resources, the FCSO has made several fiscal requests to the Board of Commissioners to obtain equipment and other supports necessary to enhance perimeter security and prevent contraband from entering through entrance and exit points. The approved solutions should be incorporated into the plan and if not approved, alternative approaches must be explored.

Despite these steps, there remains uncertainty regarding the most effective approach to resource allocation that will address the jail system's needs within available funding. Ensuring that FCSO staff can implement these improvements depends on additional prioritization efforts by both the County and FCSO. Such

prioritization effort is needed to develop and support the Perimeter and Contraband Plan in a manner that is both realistic and sustainable.

Finally, improved collaboration and communication between the County and FCSO are essential. Projects undertaken either by the County or FCSO involving the jails should be done in transparent collaboration.

**Provision 75**

The County and FCSO in consultation with the Monitor, will assess what is required to provide adequate substance use disorder treatment for all persons requiring it at the Jail, and will develop a plan to provide adequate substance use disorder treatment and programs. The County and FCSO will submit the plan for providing adequate substance use disorder treatment and programming to the United States and the Monitor for approval. The County and FCSO will implement the plan upon approval.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The treatment of Substance Use Disorder has multiple components:

- Treatment of Withdrawal. Provision 196 requires monitoring and treatment of withdrawal conform to the BJA Guidelines for Managing Substance Withdrawal in Jails: A Tool for Local Government Officials, Jail Administrators, Correctional Officers, and Health Care Professionals (June 2023). The monitoring and treatment of alcohol withdrawal, opioid withdrawal and sedative withdrawal that the FCSO provides incarcerated patients does conform to this guideline.
- Treatment of Opioid Use Disorder (OUD), which requires long term therapy with methadone or Suboxone plus appropriate monitoring and counselling.

59

- The FCSO continues OUD treatment if patients were already receiving treatment for OUD prior to incarceration in a community methadone clinic or buprenorphine clinic. This complies with Provision 75.
- However, the FCSO does not initiate long term OUD treatment in patients who were not already receiving it in the community. Such patients are only treated for withdrawal. This is not compliant with Provision 75.

The Medical Monitor and the Jail Medical Director have discussed the need for the FCSO to develop an OUD program that would initiate OUD treatment for appropriate patients. Such a program would require a significant increase in medical and security staffing as well as developing a housing area for OUD patients and so will take a great deal of planning.

Provision 196 requires the FCSO to "meet and confer with the United States and the Monitor about the appropriate treatment" for OUD patients. This meeting will be scheduled during the next monitoring period as the starting point to developing a program, including Policies and Procedures. The Monitoring Team recognizes that due to the current staffing crisis, the FCSO will likely not be able to implement a new program for at least twelve months.

## Gang Violence

Gang activity within the jails is pervasive and continues to shape daily operations in profound and dangerous ways. Violent gang-related assaults, including stabbings and group attacks involving weapons, occur with troubling regularity. In urban jails, such as those operated by the FCSO, sophisticated gang members often prey on less sophisticated or more vulnerable individuals. The criminal dynamics

60

occurring in the community routinely spill into the jail. The FCSO currently lacks the tools, staffing, and coordinated investigative structure needed to effectively combat gang influence. While the FCSO is committed to addressing and abating gang activity, severe staffing shortages and fragmented investigative responsibilities shared between custody and non-custody investigative units undermine the development and implementation of a cohesive gang management strategy. As outlined further below, jail-based investigations may be conducted by custody staff, gang investigators, the Criminal Intelligence Division, internal affairs personnel, and external strike teams, without each party necessarily being informed of the actions or findings of the others.

In reviewing the requirements related to gang violence prevention, the Monitoring Team finds that ongoing staffing shortages and competing operational demands prevent the agency from dedicating the time and resources needed for effective gang tracking, monitoring, and investigation. Although a supervisor has been designated for this work, the individual cannot meaningfully carry out the duties due to operational reassignment and lack of support staff, limiting the agency's ability to manage gang activity in a consistent or strategic manner.

Similarly, efforts to develop a comprehensive Gang Violence Prevention Plan remain hindered by insufficient staffing, gaps in communication between investigative units, and limitations within the current Jail Management System that prevent the secure and coordinated handling of gang intelligence. These structural and resource challenges prevent the FCSO from implementing housing, classification, and investigative practices that effectively mitigate gang influence or protect vulnerable individuals.

Substantial progress toward compliance will require dedicated personnel, better internal coordination, improved data systems, and focused investment in a unified gang management strategy capable of addressing the significant gang presence that continues to destabilize the jail environment.

### Provision 76

FCSO will assign a person with adequate time and resources to track, monitor, investigate, and implement measures reasonably designed to prevent gang activity in the Jail.

**Compliance Status:** Non Compliance

**Additional Discussion/Recommendations:**

Currently, the FCSO has assigned a lieutenant to be responsible for tracking, monitoring, and investigating gang activity within the jail. However, due to critical staffing shortages, this lieutenant serves a dual role in the intake area, where they oversee intake processing and classification activities. As a consequence, the lieutenant is unable to dedicate sufficient time and attention to gang management, which is necessary for addressing the security needs of a facility as large and complex as the FCSO system.

Because of these staffing constraints, it is not anticipated that even partial compliance with this provision can be reached until additional personnel resources are allocated. Assigning a supervisor on paper, without providing adequate time, resources, training, and staff to thoroughly investigate gang activity, is insufficient. Therefore, compliance with this provision cannot be achieved under the current circumstances.

**Provision 77**

By dates set in the Implementation Plan, Section XII, FCSO will, in consultation with the Monitor, develop a "Gang Violence Prevention Plan" that addresses the following areas: (a) ensuring people with known gang affiliations are identified upon entry to the Jail and their affiliation is documented; (b) ensuring people who are later identified as having gang affiliations, including after disciplinary incidents, have their affiliation documented; (c) using housing assignments to ensure that gangs do not obtain control or influence over a particular housing zone; (d) using housing assignments to ensure that rival gangs prone to violence are separated; (e) using housing assignments, including protective custody, to protect people who are likely to be the victim of gang violence (e.g., people who were previously affiliated with a gang); and (f) coordinating with other law enforcement agencies to keep apprised of gang activity and violence that may affect the climate in the Jail. FCSO will submit the Gang Violence Prevention Plan to the United States and the Monitor for approval. FCSO will implement the plan upon approval.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently utilizes classification protocols during intake to identify individuals with gang affiliations. The JMS also tracks known gang members. However, the effectiveness of these measures is significantly hindered by staffing shortages, which limit the FCSO's capacity to develop and implement a comprehensive gang violence prevention plan. Despite the limitations, the FCSO did submit a draft Jail Security Plan that contained aspects of gang management in the overall strategy. Feedback was provided during this review period to the FCSO on the overall plan.

Additionally, the existing JMS is inadequate for gang management purposes. Specifically, it lacks a secure database for confidential gang-related information, and its structure allows access to sensitive information by all JMS users, which is problematic for maintaining security and confidentiality.

Organizational challenges further complicate gang management within the FCSO. There is risk associated with the current structure due to multiple entities conducting jail-related investigations. For instance, as noted in Provision 76, a lieutenant with dual functions is tasked with gang validation responsibilities. However, the Strategic Enforcement Unit (SEU), which operates outside of the Custody Division, also engages in gang validation activities. This fragmentation results in poor sharing and documentation of gang validation status, whether information is obtained at intake, from confidential sources, or through investigations within housing units.

To address these challenges, comprehensive investigative, classification, and housing policies are needed to ensure the safety of vulnerable individuals against more predatory gang members. The provision also requires coordination with external law enforcement agencies, many of which possess integrated databases that could be valuable to FCSO. Leveraging these resources, however, would necessitate formal interagency agreements on data sharing.

This is a critically important provision that calls for a thorough reassessment of current FCSO practices and the allocation of sufficient resources to counter the significant influence of gang members in the jail's housing units. FCSO staff submitted a draft jail security plan that incorporated important aspects of gang management, but it is unlikely that a comprehensive plan will be completed in the next review cycle. Initial steps towards this will likely commence in late 2026 and will include finalizing a new policy. The FCSO will likely not reach substantial

compliance until 2027 or possibly 2028, given the complexity of gang management in the facility.

## Grievance, Incident, and Maintenance Reporting

The provisions contained in this section of the Consent Decree address the reporting and tracking of complaints, maintenance issues, and incidents in the jails. The FCSO is required to provide residents, staff, and third parties avenues to report safety and contraband issues and to be able to do so free from retaliation.

The procedures for residents to file a grievance are set forth in the FCSO's Resident Grievance Procedures Policy (600-02). The FCSO will revise this policy to align with requirements in the Consent Decree. The FCSO has two systems for accepting and handling grievances. The tablet system is through ICSolutions, and it allows for automatic notifications and electronic responses. The paper system is tracked with a spreadsheet and scans of grievances saved on a shared drive. In order to have a single source to document how grievances are handled, FCSO staff copy information from the ICSolutions system into a spreadsheet. Between 1/1/25 and 12/31/25, the FCSO received 5,242 grievances, 2,575 submitted on paper and 2,667 submitted electronically through tablets. During the Monitoring Team's October visit, residents reported several concerns with the grievance system. Specifically, they said staff would not bring them paper grievances, they did not get a response to grievances they filed and they did not view the grievance system as a mechanism to raise issues about their confinement.

This section also addresses the requirement for FCSO staff to complete an incident report to document specific matters within the jail, such as fights, sexual abuse, extortion, suicide attempts, etc. The FCSO Incident Report Policy (200-25) will need to be revised to align with the requirements of the Consent Decree.

Finally, as noted in the Executive Summary, the jails have significant, long-standing maintenance issues.  Ensuring those issues are reported and tracked through the appropriate mechanisms is required in this section of the Consent Decree.

## Provision 78

To adequately identify and respond to all incidents posing a risk of harm to people incarcerated at the Jail, FCSO will provide incarcerated people and staff multiple methods to report incidents of violence, extortion, drug trafficking, other contraband, sexual abuse, and threats of any of the foregoing, free from retaliation. The FCSO will also provide a designated avenue for receiving this information from third parties, including family members and attorneys.  FCSO will post this information on the FCSO website, in the Jail handbook, in the Jail visiting area, and inside Jail housing zones.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

The FCSO has not yet developed the policies and procedures for receiving information related to violence and contraband from third parties nor have they posted the information on their website or inside the jails.

## Provision 79

FCSO will include accurate information about how to file grievances in the Jail handbook and will make this information available within the housing units.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The FCSO's Grievance Policy requires a laminated copy of the written summary of the grievance procedures to be posted in the housing units. The Monitoring Team did not find these procedures posted in the housing during our tours. Additionally, while the Jail handbook contains information about how to file a grievance, residents are not given a paper copy of the handbook. If the resident has a tablet, they could access the handbook there. During the Monitoring Team's October visit, many residents did not have access to a tablet.

## Provision 80

FCSO will keep all kiosks or other electronic devices in housing zones in good, working condition so that all incarcerated people in the Jail can submit grievances via kiosks or other electronic devices. FCSO will also provide blank grievance forms to all floor officers and will provide paper grievance forms upon request. In the event that a kiosk or other electronic device is not operable, FCSO will provide a supply of paper grievance forms to the housing zone, unless a supervisor determines that it is not safe to do so.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The Monitoring Team observed many kiosks that were inoperable during the October visit. As noted above, many residents also did not have access to a tablet. While some residents reported they were unable to get a paper grievance form from staff, the data indicates there were 2,575 paper grievances submitted in 2025.

## Provision 81

FCSO will assist incarcerated people who are limited English proficient, who have a physical, developmental, or mental impairment that substantially limits one or

more major life activities, or who have limited reading or writing skills in accessing the grievance system.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***
The FCSO has not yet developed procedures for identifying residents who may need assistance accessing the grievance system.

### **Provision 82**

FCSO will provide written acknowledgement of any grievance received via kiosk or other electronic device, paper form, or otherwise, within 24 hours.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

If a resident files an electronic grievance, they receive an electronic acknowledgment within 24 hours. FCSO staff have begun providing residents written acknowledgment of their paper grievances. Policy and practice will need to be revised to achieve substantial compliance with this provision.

### **Provision 83**

FCSO will issue a final decision on the merits of any grievance within 7 days of the initial filing of the grievance. FCSO may extend the response period up to an additional 10 days for good cause, with written notice of status update provided to the incarcerated person.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team reviewed data regarding the timeliness of grievances in 2025. Of the 5,235 grievances recorded, 276 did not have a date closed listed. Setting the 276 aside, the majority of grievances (79%) were closed within 10 weekdays though some took more than 60 days to process. The FCSO Grievance Policy requires grievance to be processed within 10 working days. Excluding the 276 "open" grievances, the median number of weekdays to close grievances was 5. The Monitoring Team will further assess the timeliness of grievance responses during the next monitoring period.

## Provision 84

After receiving an emergency oral or written grievance alleging an incarcerated person is subject to a substantial risk of imminent sexual abuse or violence, FCSO will immediately forward the grievance (or any portion that alleges the substantial risk of imminent sexual abuse or violence) to a level of review at which immediate corrective action may be taken, will provide an initial response within 48 hours, and issue a final decision within seven calendar days. The initial response and final agency decision will document FCSO's determination whether the incarcerated person is in substantial risk of imminent sexual abuse or violence and the action taken in response to the emergency grievance. FCSO will not fail to respond to information alleging a substantial risk of imminent sexual abuse or violence due to mere technical flaws in the form of the grievance.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO Grievance Policy sets forth emergency grievance procedures. Staff handling grievances forward grievances alleging sexual abuse to the PREA

Coordinator.  The emergency grievance section of the policy should be revised to align with this provision.  The Monitoring Team will further assess the FCSO's handling of emergency grievance in the next reporting period.

## Provision 85

When grievance officers refer a grievance to other Jail staff (e.g., Jail investigators, the Prison Rape Elimination Act ("PREA") Coordinator, kitchen administrators, or Health Services Administrator), they will (a) share information explaining the referral that was made when responding to the grievance, and (b) receive confirmation from other Jail staff that they have acted in response to the referred grievance.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*
FCSO staff track referrals to other jail staff (and NaphCare for medical complaints) to investigate and draft responses for the grievances regarding their respective areas.  They also track the responses they receive from the  subject matter experts.  FCSO staff are working on refining this referral/response.

## Provision 86

FCSO will use incident reports to document all incidents related to physical assaults and fights between incarcerated people, sexual abuse and sexual harassment between incarcerated people, threats of force or violence against incarcerated people, extortion of incarcerated people or their families, rule violations, injuries to incarcerated people, suicides and suicide attempts, cell extractions, medical emergencies, contraband, vandalism, escapes and escape attempts.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The FCSO should revise the Incident Report Policy (200-25) to include all of the types of incidents noted in this provision. The Monitoring Team has reviewed several incident reports and discussed the process with staff. Staff appear familiar with documenting incidents in this manner.

## Provision 87

Incident reports will specify if a weapon was used; whether a search of the housing unit occurred after the incident; whether housing changes were initiated; whether a referral for further investigation was made and to whom; whether protective custody was requested; and whether maintenance orders were submitted in connection with the incident.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The FCSO Incident Report Policy (200-25) should be revised to include the requirements of this provision. FCSO staff report their incident reports capture the information noted in this provision.

## Provision 88

FCSO will enter all incident reports into the electronic incident reporting system (currently Odyssey) within 24 hours of the incident.

*Compliance Status:* Partial Compliance

***Additional Discussion/Recommendations:***

FCSO staff report they enter incident reports into the electronic incident reporting system within 24 hours of the incident. The Monitoring Team will work with FCSO on developing proof of practice for this provision.

## **Provision 89**

Jail supervisors will review all incident reports to ensure that the applicable data points, including incident type, time, location, involved parties, staff, witnesses, narrative summary, and the information required in paragraph 87, are reported in the document.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team has reviewed some incident reports that were reviewed by jail supervisors and others that had not been reviewed by a supervisor. The FCSO Incident Report Policy (200-25) should be revised to include the requirements of this provision.

## **Provision 90**

FCSO will use maintenance reports to document all maintenance issues related to the facility including fires and utility failures. Maintenance reports will specify time, location, impacted parties, staff, witnesses, nature and extent of the damage, and whether work orders requesting maintenance were submitted in connection with the issue(s).

***Compliance Status:*** Partial Compliance

*Additional Discussion/Recommendations:*

FCSO relies on a Computerized Maintenance Management System known as "Maximo," which is administered by the County, to document maintenance issues and track pending and completed work orders. Under existing processes, FCSO personnel are to report maintenance issues to the building maintenance contractor, Johnson Controls, Inc. (JCI), which then creates responsive work orders within Maximo. Another contractor, EMSI, also conducts routine inspections of the Rice Street physical plant, and regularly shares a spreadsheet with all observed maintenance issues with JCI for entry into Maximo. While this system regularly results in the creation of necessary work orders, it does not rely on separate maintenance reports generated by FCSO. Moreover, because JCI is solely responsible for entering work orders into Maximo, it creates risks that some observed maintenance issues will not be entered into Maximo and, therefore, not appropriately tracked. Indeed, during both site visits, the Monitoring Team was informed that this has sometimes been a challenge in the past.

## Provision 91

FCSO will enter all maintenance reports and work orders into the electronic incident reporting system within 48 hours of the maintenance issue. The County and FCSO will review all maintenance reports and work orders weekly to address concerns.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

While maintenance issues are sometimes routed through the FCSO's on-site Building Maintenance Manager, which would enable them to be tracked by FCSO, they are also often reported to JCI directly by staff who are dispersed throughout

73

the Rice Street Jail.  This makes the systematic tracking of timeframes between observation of the maintenance issue and entry into Maximo more difficult. Regarding the requirement for weekly meetings between the County and FCSO about maintenance reports and work orders, there continues to be evidence of siloing among the key stakeholders responsible for building maintenance and repair.  Meaningful, collaborative meetings with detailed information sharing between the County, FCSO (including both the Building Maintenance Manager and custody leadership who are responsible for maintaining security during necessary maintenance projects), and JCI would be an important step towards compliance with Provision 91.

## Investigations and Corrective Action Planning

The FCSO has a variety of systems in place to address investigation (post incident, use of force reviews, internal affairs, etc.) and corrective action planning but will require substantial effort and resources to fully comply with the Consent Decree. During this monitoring period, the FCSO demonstrated willingness and effort to improve its investigative and review processes, but the system as a whole continues to face significant structural barriers that prevent sustained progress. While the daily incident briefing process remains a stable and effective component of operations, most of the investigative and corrective action provisions remain in partial or non compliance.  These provisions collectively require well-functioning data systems, consistent investigative practices, and coordinated oversight across multiple divisions, conditions that are not yet present within the agency.

A central theme across the provisions is the absence of a unified, reliable, and accessible data infrastructure.  The FCSO currently relies on a patchwork of systems and processes that do not communicate with one another.  Incident reports, grievances, internal investigations, criminal investigations, anonymous complaints,

and video evidence are all captured in different systems or repositories, many of which lack standardization or basic categorization. This fragmentation makes it extremely difficult to track the status of investigations, identify patterns or trends, or ensure that serious incidents receive appropriate follow-up. It also places a substantial burden on already limited investigative and supervisory staff, who must navigate these disconnected systems while also managing high workloads.

Staffing shortages, particularly in investigative and supervisory positions, further complicate compliance efforts. These shortages limit the agency's ability not only to complete investigations in a timely and thorough manner, but also to participate in necessary training, strengthen documentation practices, and build internal capacity. As the agency continues to manage high levels of violence, contraband, and other critical safety concerns, investigative systems remain reactive rather than preventive.

Despite these challenges, FCSO leadership has shown a consistent willingness to engage in technical assistance and to prioritize foundational improvements. Planned enhancements to the JMS are particularly important, as improved incident categorization and reporting capabilities are necessary for nearly every provision in this section. Early exploration of a centralized investigative file system and the request for leadership development assistance also reflect a commitment to long-term reform. These steps, while incremental, are essential for establishing the organizational stability and infrastructure needed to support more complex improvements in investigative quality, trend analysis, and corrective action planning.

Given the scope of work needed and the systemic nature of the deficiencies identified, substantial compliance with most provisions is not anticipated before 2027. However, the Monitoring Team will continue collaborating with the FCSO

to support incremental progress, strengthen core investigative functions, and build the foundation for sustainable compliance over time.

## Provision 92

FCSO will implement a brief and documented daily Incident Review briefing, Monday through Friday, with the Chief Jailer and other appropriate administrative staff to review all major incidents and maintenance issues that occurred in the Jail on the previous day or days and discuss responsive action.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***

The FCSO consistently conducted daily operations calls that included participation from the executive team, including the Sheriff, prior to the arrival of the Monitoring Team. Those meetings continue, even on weekends and holidays as needed. These meetings are designed to address critical incidents occurring within the jails as well as maintenance issues.

All meetings are documented with meeting notes, with follow up regarding any outstanding or unresolved issues are addressed in subsequent sessions. Meeting notes were reviewed which reflected discussions on jail related incidents, maintenance issues and staffing. The notes also contained discussions regarding corrective actions to address issues raised during previous calls. In addition to the Sheriff's executive management meetings, the Chief Jailer plays an integral role in the daily operations of the jail and maintains ongoing communication with the jail leadership team.

During the monitoring period, the Chief Jailer, Jarrett Gorlin, resigned. Mr. Gorlin had served as the Chief Jailer for slightly over one year. In response to his resignation, the FCSO initiated a nationwide search to identify a suitable

replacement.  In the interim, a dedicated leader has been assigned to serve as the Assistant Chief Jailer, ensuring continuity of operations until the hiring process concludes.

The FCSO and the manager currently responsible for overseeing jail operations requested technical assistance in the area of correctional leadership development. To support this need, a member of the Monitoring Team has taken on the additional role of mentor to the current jail administrator, providing feedback on complex issues and helping to prioritize daily tasks.

As a result of the FCSO's efforts, this provision has reached substantial compliance, and it is anticipated that this status will be maintained during the next monitoring period.

## **Provision 93**

FCSO will examine incident report data for patterns and trends (including violence reported on particular floors, among particular groups, or on particular shifts), and will identify remedial measures to correct any identified issues.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO acknowledges that regular review of incident trends has been limited, largely due to insufficient tracking capabilities within the current JMS.  This lack of robust data categorization has hindered the ability to analyze incident patterns effectively and address emerging issues in a timely manner.

Looking ahead to the next review period, the FCSO anticipates implementing significant improvements to the JMS system.  These enhancements will focus on refining the categorization of incidents that occur within the jail.  By improving the

system's ability to organize incident data, the FCSO aims to facilitate more meaningful trend analysis.  This, in turn, will support the identification of patterns and the development of corrective actions to address any areas of concern.

The Monitoring Team will maintain ongoing collaboration with the FCSO throughout this process, assisting in the establishment of effective management data reporting mechanisms and supporting the jail's commitment to continuous improvement.

## Provision 94

FCSO will implement a Critical Incident Review process, by which Jail leadership, investigatory staff, and other relevant staff review incidents resulting in serious harm or disruption (such as homicides, suicides, injuries requiring outside transport, escapes, and large scale disturbances), within 30 days of the incident's occurrence, to discuss the cause of the incident and any immediate remedial measures, and ensure that all relevant information has been provided for investigation.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently has a critical incident review process in place.  However, FCSO leadership recognizes that there are notable gaps in the system that require further refinement.  In response to these issues, the FCSO has proactively requested technical assistance to enhance the critical incident review process.  This assistance is scheduled to be facilitated during the next review period.

Throughout this report, it is evident that the FCSO is engaged in numerous special projects.  To ensure effective prioritization, the Monitoring Team has chosen to temporarily delay the provision of technical assistance for the critical incident

78

review project.  The focus instead has shifted to other critical initiatives, such as the review of use of force incidents.  These efforts are expected to help build internal capacity for conducting critical incident reviews and will be beneficial for addressing other incidents, including serious suicide attempts and resident deaths.

In the interim, the Monitoring Team will continue to review critical incident review packages and attend critical incident reviews.  The Monitoring Team has completed a review of existing critical incident review packages and supports the FCSO's internal assessment, which indicates that additional processes need to be implemented.  These recommended improvements include the establishment of standardized documentation for critical incident reviews, greater clarity regarding the roles and responsibilities of those involved in the process, and enhanced follow-up on corrective actions.

### **Provision 95**

FCSO will screen all incident reports, third-party reports, anonymous reports, and grievances, and will refer them for investigation as appropriate.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The requirements of this provision affect a range of systems both within the FCSO Custody Division and in external divisions.  Many of these systems operate independently, without being evaluated against one another.  For instance, the Custody Division does not investigate all custody-related incidents; these investigations are conducted by a separate division outside of custody and there is no current mechanism for custody to track the status of all internal investigations associated with custody incident reports.  While some anonymous and third-party complaints are tracked, there is currently no single tracking mechanism in place for

these types of complaints.  Additionally, the resident grievance system does not have a strong connection to other review systems, such as the use of force review system.

Despite these limitations, the FCSO continues to engage in incident reporting and investigations.  However, the overall quality and timeliness of these investigations are significantly hindered by the ongoing staffing shortage at the FCSO, along with insufficient training for staff who conduct the initial screenings.  Staff shortages result in inadequate personnel to carry out monitoring investigations effectively, hinder the ability to conduct timely and thorough inquiries, and pose challenges for allocating staff to receive training on quality investigative practices.  Furthermore, there are numerous tracking systems in place that do not communicate with one another and may not contain accurate or consistently maintained data, largely due to staffing constraints and lack of internal focus.

Before a robust compliance monitoring plan can be developed, the Monitoring Team must first quantify all areas where information related to incidents and allegations is captured within the various FCSO databases.  Given current limitations, it is not anticipated that the FCSO or Monitoring Team resources will be available to focus on this provision during the next monitoring cycle.

In the interim, during the next reporting period, the Monitoring Team will concentrate on capturing and screening all incident reports, as required by Provision 93.

**<u>Provision 96</u>**

FCSO will conduct timely thorough, and objective investigations of all threats of or incidents of violence resulting in serious injury, sexual abuse, drug trafficking, dangerous contraband, extortion, suicides, serious suicide attempts, injuries

80

requiring treatment by an outside hospital, injuries of a suspicious nature
(including black eyes, injuries to the mouth, injuries to the genitals, etc.), fires,
escapes, escape attempts, allegations of staff misconduct, and deaths.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As discussed in Provision 95, the FCSO conducts investigations of incidents.
These investigations are conducted either by custody lieutenants, the Strategic
Enforcement Unit, or the Office of Professional Standards.  There is not currently
an integrated process to track all outstanding investigations as each division
maintains their own tracking mechanism and the quality of documentation in those
tracking systems should be improved.  The Monitoring Team reviewed a small
sample of investigations documented in incident reports.  It was clear from a small
sampling that additional training is necessary, and the goal will be for the FCSO to
generate a monthly report on the number of investigations initiated during that
month and the status of those investigations.  It is not likely that a single report
capturing all of these investigations will be developed since that may require a
technological solution or an employee responsible to synthesize the information in
the various tracking systems for a singular report.  This is a complex provision
impacting numerous divisions within FCSO and will require a division-by-division
analysis and approach.  It is not likely this provision will reach substantial
compliance in 2026, but the Monitoring Team will address incremental
improvements with the FCSO.

## Provision 97

FCSO will develop and implement a process for monitoring the timeliness and
completeness of all investigations.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As discussed in Provision 95, the FCSO currently conducts investigations of incidents through multiple venues, including custody lieutenants, the Strategic Enforcement Unit, and Office of Professional Standards. However, there is no unified or integrated process to track all outstanding investigations. Each division operates its own tracking mechanism, which results in fragmented oversight and makes it difficult to monitor the overall status of investigations across divisions. The steps for compliance with this provision are documented in Provision 96. Achieving substantial compliance will be hampered until a unified tracking system is established.

## Provision 98

All Jail investigations will include creation and maintenance of an investigative file documenting investigative steps taken/to be taken, evidence and statements collected, and findings and referrals made.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Currently, multiple divisions within the FCSO are responsible for maintaining investigative files related to jail investigations. The jail division utilizes incident reports stored in the JMS system; however, the JMS system does not serve as a comprehensive repository for investigative files, as it lacks the capability to store associated video footage or photographs of incidents. In contrast, the Strategic Enforcement Unit and Office of Professional Standards maintain their own investigative files outside of the JMS system. This segregation is considered

appropriate, as the information contained within these investigations should not be accessible to all individuals with JMS system access.

The FCSO does have the capability to retain videos related to incidents in a separate system. Despite this, there is no single file or location that consolidates all investigative materials. Consequently, assessing the quality of investigative files is challenging, as they are dispersed across various locations, managed by different divisions, and maintained in non-standardized formats.

To address these challenges, the County has approved the adoption of a new technology solution. During this monitoring period, the Board of Commissioners approved a countywide force data collection system (Axon) that will not only upgrade Taser equipment but also provide improved force data collection, force reviews and force tracking systems. This proposed system is intended to serve as a comprehensive storage location for all aspects of an investigation, including confidential reports and videos. The County is not able to commit to a timeline for the systems upgrades in the jail as it has not yet finalized the procurement with the vendor or developed a roll-out timeline as the project involves numerous county departments. The Monitoring Team is encouraging the prioritization in the Jails Division.

Access to this system could be restricted based on a need-to-know basis, enhancing both security and confidentiality. While the Monitoring Team has not yet assessed the feasibility of this approach, it appears to be a viable option. Even if the County is able to acquire this new system, the procurement process is expected to extend into the next monitoring period. Subsequently, in late 2026, the FCSO would need to focus on policy development, staff training on information storage, and establishing access rules. If implemented effectively, this provision may achieve substantial compliance by late 2026, contingent on the procurement and

functionality of the technology solution.  Should the solution prove ineffective, alternative approaches will be considered and addressed in the next report.

**Provision 99**

All Jail investigations will be referenced in electronic systems by an investigation number that can be cross-referenced with the incident identification number.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***

The Strategic Enforcement Unit files and Office of Professional Standards files both include references to the corresponding jail incident report numbers. Personnel investigation currently maintain an additional reference number while the Criminal Investigation Unit files currently rely on the jail incident report number.  For custody investigations, documentation is maintained within the JMS system, which relies exclusively on the incident reporting number, commonly referred to as the JA number.

Should the County move forward with procuring a new incident reporting system, as described in Provision 98, it is essential that this new platform also incorporates the incident log number for effective cross-referencing.  The system currently under consideration by the County possesses the capability to include this log number.

It is expected that if a unified tracking system is implemented, it will continue to preserve and reference the JMS incident log number.  As a result, the County is anticipated to maintain substantial compliance with this provision.

## Provision 100

FCSO will complete its internal investigation regardless of whether the victim wishes to pursue criminal or administrative charges, or whether an external agency pursues criminal prosecution.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

Discussions with both internal affairs and custody investigators have confirmed that internal investigations into alleged criminal activities are conducted irrespective of the victim's willingness to participate or the District Attorney's decision to pursue criminal prosecution. This approach ensures that all potential violations are thoroughly examined within the internal processes of the FCSO.

However, at this time, the information available to the Monitoring Team has been insufficient to fully validate compliance with this requirement. To address this gap, the Monitoring Team will collaborate with the FCSO as they proceed with the implementation of Provision 99. The goal is to identify whether compliance with this provision can be effectively tracked using the incident report databases. This would allow the Monitoring Team to verify that internal investigations are consistently initiated and carried out, regardless of external factors or victim preference. Absent that ability to easily identify examples, large samples of investigations may be required to determine compliance.

## Provision 101

FCSO will refer all incidents that appear appropriate for criminal prosecution to the appropriate law enforcement agency for investigation, even when a victim does not wish to cooperate.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

FCSO staff indicate that they adhere to the requirement of referring investigations to the appropriate law enforcement agency for incidents that may warrant criminal prosecution, regardless of the victim's willingness to cooperate.  However, this practice is not explicitly outlined in current policy or training materials. Furthermore, there is presently no established tracking mechanism to document when such referrals are made, making it challenging to support effective compliance monitoring.

The FCSO has not identified a unified system that comprehensively records all referrals for criminal prosecution and their subsequent outcomes.  This lack of a centralized tracking process is notable, as referrals can originate from multiple divisions, including the Custody Division, the Strategic Enforcement Unit, and Office of Professional Standards.  To address this gap, the FCSO will need to develop a single, consolidated tracking mechanism for all referrals to the District Attorney.  This system should be capable of recording whether or not the victim has chosen to cooperate with the investigation.

The Monitoring Team will collaborate with the FCSO in the development and implementation of this tracking mechanism during the next review cycle.  It is anticipated, however, that substantial compliance with this provision is unlikely to be achieved before late 2026.

## Provision 102

The FCSO Jail investigator will issue a written investigative report to the Chief Jailer within 30 days after the date of the incident, unless there is documented good cause for an extension.  The investigative report will indicate whether the

allegation is substantiated, unsubstantiated, or unfounded. The investigative report will include an effort to determine whether staff actions or failures to act contributed to the abuse, a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings, including a determination of why the incident occurred.

**Compliance Status:** Non Compliance

**Additional Discussion/Recommendations:**
The FCSO acknowledges that both the quality and timeliness of written investigative reports have been significantly hindered by a shortage of jail investigative staff and supervisors. This staffing limitation not only impacts the ability to produce comprehensive and prompt reports, but also prevents the reassignment of investigative personnel to participate in essential, high-quality investigative training opportunities. In light of these constraints, staff strive to perform their duties to the best of their abilities with the resources available; however, they recognize that their efforts do not consistently meet internal standards for investigation quality and timeliness.

The Monitoring Team has encountered difficulties in tracking investigations due to deficiencies in the current tracking systems. Specifically, the system provided for review includes incidents that lack completion dates for investigations, even in cases where the investigations may have already occurred. This gap increases the risk that incidents are not being properly documented or followed up on, leading to situations where cases may inadvertently be overlooked or "fall through the cracks."

Looking ahead, the primary focus for the next review period will be the development and implementation of a robust, quality tracking system. Until such a

system is established and provides a reliable baseline for the overall investigative workload, it will remain challenging to accurately assess whether investigations are being completed in a timely manner and to determine the precise staffing needs of the jail.

Additionally, there is a concern regarding responsibility for conducting investigations, as both custody staff and the Strategic Enforcement Unit may be involved. This ambiguity necessitates further discussion and analysis to determine the most efficient structure for ensuring that high-quality investigations are completed in a timely fashion. At present, there appears to be a disconnect between jail leadership and the Strategic Enforcement Unit, as the latter does not report directly to the jail administrator. The Monitoring Team will examine this issue more closely in the next reporting period, with continued emphasis on developing a quality tracking system as a foundation for compliance.

## Provision 103

The departure of the alleged perpetrator or victim from Jail custody or County/FCSO employment will not provide a basis for terminating an investigation.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As previously referenced in Provision 100, the FCSO reports that an investigation does not automatically cease when a victim refuses to participate, expresses a desire not to pursue prosecution, is released from custody, or when an employee is discharged from employment. Although these factors do not necessarily halt the investigative process, there are concerns regarding the validity of this statement due to the absence of an effective internal tracking system.

Without a reliable tracking mechanism, it is currently impossible to accurately assess whether investigations are being completed when victims or employees depart.  While some investigations may proceed due to the severity of the underlying issue, it is equally likely that others are discontinued simply because the involved employee resigns or the resident is released.  This uncertainty highlights a gap in the investigative tracking process.

There is also the consideration that, in some instances, it may be appropriate to discontinue an investigation if a serious criminal prosecution is not anticipated, in order to allocate resources more effectively.  However, this approach requires careful evaluation and further discussion.  Any changes to current practices will need to be addressed as part of a policy update, which will be developed collaboratively with the United States and the Monitoring Team.  It is not anticipated that this policy update will begin until late 2026 as the focus will remain on tracking mechanisms in the next reporting period.

## Provision 104

When outside agencies investigate alleged incidents, the FCSO will request that the outside agency notify a designated point of contact at FCSO when the investigation concludes.  In such cases, FCSO will conduct its own investigation, with the goal of identifying and remedying conditions or misconduct that affects the safety of people incarcerated in the Jail, and will cooperate with and defer to an outside agency's ongoing investigation as appropriate.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***
Outside agencies, such as the Atlanta Police Department (APD), are actively involved in conducting investigations within the jail, including cases involving in-

custody deaths.  In in-custody deaths, the FCSO initiates a critical incident review prior to the completion of the APD's investigation.  Additionally, outside agencies may investigate alleged criminal activities that originate within the jail but have impacts extending into local communities.  In such cases, the FCSO may or may not participate as part of an investigative team alongside these external agencies and maintain awareness of certain incidents.

However, there may also be situations where outside agencies may not inform FCSO of their investigation outcomes, especially when the individual under investigation is no longer in custody.  This lack of notification can hinder the FCSO's ability to address systemic issues or implement corrective actions.

To ensure compliance with this provision, it is essential for FCSO to formalize interagency agreements with APD and other strike team partners.  These agreements should specifically require that the FCSO be notified when investigations are concluded under designated circumstances.  Furthermore, as with other investigative provisions, the FCSO must maintain an independent log to track the status and completion of these investigations, as well as any subsequent follow-up inquiries conducted by the FCSO.

It is not anticipated that formal agreements with outside law enforcement agencies will be finalized in the next reporting period.  Nevertheless, the FCSO should provide updates on efforts to establish such agreements and improve interagency communication moving forward.

## **Provision 105**

Within 60 days of an incarcerated person's death, serious suicide attempt, or other sentinel events resulting in serious security breaches or life-threatening injuries to staff or incarcerated people, the Chief Jailer and other relevant staff will review the

investigative file to identify and recommend any corrective action, including changes to policy, or other systemic remedial measures, to attempt to prevent similar incidents in the future.  These reviews and any recommendations will be memorialized in writing.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As outlined in Provision 94, the FCSO conducts critical incident reviews following in-custody deaths and other sentinel events.  During the current monitoring period, the Monitoring Team evaluated several critical incident reviews.  Based on these evaluations, the team concurs with the FCSO's own internal analysis, which indicates that it would benefit from technical assistance to enhance the overall review process.

The Monitoring Team anticipates providing the FCSO with technical assistance in the next review period.  The focus will be on improving processes, policies, reporting mechanisms, follow-up procedures, and promoting critical thinking within the context of incident reviews.  However, it is important to note that substantial compliance is not anticipated in 2026, as refining the sentinel event review process will require significant training and a broader cultural transformation at all levels within the organization in how to self-evaluate and self-correct.

NaphCare also engages in the review of patient deaths, including those by suicide, which involves a review by a physician (usually the medical director or, for suicides, the primary psychiatrist) to assess the quality of clinical care provided leading up to the death, and identification of any correctable issues.  A Morbidity and Mortality review is also conducted within 30 days.  The Monitoring Team has

evaluated documentation associated with this process but has not yet been invited to participate in a Morbidity and Mortality review.  Once the Monitoring Team can participate in these reviews, we will be able to assess the effectiveness of this process at identifying necessary corrective actions, changes to policy, or other remedial measures.  Pursuant to Provisions 246 and 247, the Monitoring Team will work collaboratively with NaphCare to improve this process in coming Monitoring Periods.

### Provision 106

At least semi-annually, FCSO will assess for patterns and trends in deaths, serious suicide attempts, and other sentinel events, will memorialize these assessments and recommended remedial measures in written reports, and will implement systemic remedial measures to correct any identified issues.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Provision 93 highlights a significant gap in the FCSO's incident report tracking capabilities, specifically the absence of an adequate data tracking system for conducting semi-annual reviews of patterns and trends in sentinel events.  The initial and essential step in addressing this issue is to update the JMS to enable effective categorization of incidents.  It is crucial to ensure that all incidents subject to semi-annual trend analysis are consistently documented within the JMS system.  For instance, all serious suicide attempts should be reported through incident reports and not solely recorded in the unit health records.

Once the JMS system is appropriately configured to generate reports for trend analysis, the Monitoring Team will collaborate with FCSO to enhance the management of incident data.  This collaboration will focus on reviewing reports,

implementing corrective actions, and ensuring proper follow-up procedures. The priority for the upcoming review period will be the update and optimization of the JMS system for comprehensive data capturing, with the goal of facilitating a semi-annual review in late 2026.

In addition, Pursuant to Provisions 293 and 294, one year after the effective date of the Consent Decree, the County and FCSO will establish a Quality Assurance Program to evaluate trends and patterns related to the Consent Decree. As set forth in the discussion of Provisions 293 and 294, this program has begun but needs additional work. Trends in patient deaths and serious suicide attempts are a primary subject for correctional quality assurance, and the Monitoring Team will work collaboratively with the FCSO, the County, and NaphCare to establish process and outcome studies related to any such trends.

## Sexual Abuse Reporting and Investigations

The FCSO has demonstrated its commitment to achieving compliance with the PREA-related provisions of the Consent Decree in two areas this reporting period. First, it has added two PREA Compliance Managers to assist the PREA Coordinator. Second, the FCSO has entered a Memorandum of Understanding with LiveSafe Resources to provide several resources pertaining to sexual abuse, including a no-cost telephone hotline, victim advocacy and support services and coordination of sexual assault examinations conducted by Sexual Assault Forensic Examiners (SAFEs) or Sexual Assault Nurse Examiners. The FCSO PREA Coordinator is a dedicated professional who is working collaboratively with the Monitoring Team and LiveSafe to meet the requirements of the Consent Decree.

## Provision 107

Fulton County and FCSO will make available a no-cost telephone hotline for reporting sexual abuse in the Jail, consistent with PREA regulations (National Standards to Prevent, Detect and Respond to Prison Rape, 28 C.F.R. § 115 et seq.). FCSO will ensure that all Jail staff accept reports of sexual abuse, including third-party reports of sexual abuse, and will make appropriate notifications.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

Through the Memorandum of Understanding with LiveSafe, Fulton County and the FCSO are providing a no-cost telephone hotline for reporting sexual abuse. While there had been some challenges with the hotline initially, those appear to have been resolved. The PREA Coordinator is intermittently testing the hotline to ensure it is operational. The Monitoring Team observed signs containing the new hotline number at the Main Jail during their October visit. The Team did not observe signs with the new hotline number at the South Annex.[9] The Monitoring Team recommends continued training and education for FCSO and LiveSafe staff to ensure expectations and responsibilities are being met.

## Provision 108

FCSO will send notifications regarding all sexual abuse allegations to a centralized PREA Unit in a timely and prompt manner, and the status of each such investigation will be centrally tracked and documented at least monthly.

---

[9] The Monitoring Team advised staff at the South Annex that they needed to post the signs containing the PREA hotline number. During a November Technical Assistance visit, a member of the Monitoring Team observed the appropriate PREA signs posted at the South Annex.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

FCSO staff acknowledge that timely notifications of sexual abuse allegations has been an ongoing issue. The PREA Compliance Manager has met with staff during roll calls to remind them who to notify if they are made aware of a potential PREA incident. With the expansion of the PREA Unit, the process of notification should be revisited as policies are reviewed/revised. The Monitoring Team is assisting with the development of an effective spreadsheet to track and document the status of reported allegations.

## **Provision 109**

FCSO will employ a full time, dedicated PREA Coordinator, and any additional support staff such as investigators as needed to reasonably manage volume, to direct PREA compliance activities, and have responsibility to implement the sexual abuse provisions of this Consent Decree.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The addition of two PREA Compliance Managers will assist the PREA Coordinator with managing the volume of PREA allegations and implementation of the sexual abuse provisions of the Consent Decree. The FCSO reports there are currently two investigators that are trained to conduct sexual abuse investigations. During the next Monitoring Period, the Monitoring Team will assess whether the resources dedicated to PREA investigations and compliance are sufficient to manage the volume of cases.

## Provision 110

FCSO will send all incarcerated people who allege sexual abuse for an examination at a hospital facility when recommended by Jail medical staff.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The PREA Coordinator tracks the residents who have been sent to a hospital facility for a sexual abuse exam. LiveSafe offers sexual abuse exam services at the Jail facilities. Details need to be developed regarding the process and procedures, in collaboration with jail medical staff, including but not limited to, space to conduct exams, response time for LiveSafe staff and notification procedures.

## Provision 111

FCSO will investigate all allegations of sexual abuse in the Jail in a timely, thorough, and complete manner. At a minimum, investigations into sexual abuse in the Jail will include and document interviews of the complainant and the alleged perpetrator, attempts to identify and interview potential witnesses, and reviews of camera footage (including camera footage which may corroborate but not confirm an allegation), relevant documents, and other physical evidence. Where relevant medical records are reviewed by the investigator but not included in the file for privacy reasons or legal restrictions on access to medical information, a summary of relevant information from the records will be included. All investigations will document consideration of all such evidence, and, where any such evidence is unavailable or not considered, include an explanation.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Criminal Investigation Division conducts all of the investigations alleging sexual abuse/assault. Currently, there are only two investigators trained to conduct sexual abuse/assault investigations. The FCSO has taken the proactive step of conducting an internal audit of a couple of sexual abuse investigations. The audit identified issues with documentation and evidence. The Monitoring Team will focus on sexual abuse investigations in the next reporting period.

## Provision 112

Sexual abuse investigations will be conducted by investigators who have received special training in institutional sexual abuse. Specialized training will include techniques for interviewing sexual abuse victims, proper use of Miranda v. Arizona, 384 U.S. 436 (1966), and Garrity v. New Jersey, 385 U.S. 493 (1967), warnings, sexual abuse evidence collection in confinement settings, and the criteria and evidence required to substantiate a case for administrative action or prosecution referral.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As noted above, the Criminal Investigations Division conducts the sexual abuse/assault investigations. Currently, there are only two investigators trained to conduct these investigations.

## Provision 113

Administrative investigations into sexual abuse allegations will be completed regardless of the results of any criminal investigations and regardless of the

subject's continued confinement in the Jail.  Alleged victims will be advised of the outcome of their allegations when possible.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team has been advised that the sexual abuse investigations continue even if the victim has been released from custody.  The Monitoring Team will verify this information in the next monitoring period.

## **Provision 114**

Within 30 days after an allegation of sexual abuse is referred for investigation, FCSO will issue a written investigative report that indicates whether the allegation is substantiated, unsubstantiated, or unfounded.  In making that determination, FCSO will apply a preponderance-of-the-evidence standard, with the sole exception of criminal charges.  The investigative report will include an effort to determine whether staff actions or failures to act contributed to the abuse, a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings.  If warranted, supervisors may grant a time-limited extension for completion of an investigation.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The current PREA Incident Tracking log does not track the timeliness of sexual abuse investigations.  The investigative reports indicate whether the allegation was substantiated, unsubstantiated or unfounded.  The Monitoring Team will further assess this provision in the next monitoring period.

**Provision 115**

FCSO investigations into sexual abuse allegations will examine whether policy violations or violations of PREA regulations have occurred in addition to assessing whether potential criminal conduct has occurred.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team was able to review a small sample of sexual abuse investigations. The investigations determined whether there was a violation of the Fulton County Jail's PREA policy (400-12). The investigators utilized a preponderance of the evidence standard. The Monitoring Team will have the opportunity to examine a larger sample of sexual abuse investigations during the next monitoring period.

**Provision 116**

Jail investigations into sexual abuse allegations will consider potential administrative or other remedies including personnel actions and trainings for staff, and counseling referrals, and housing or classification changes for incarcerated people.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team will conduct a detailed analysis of this provision in the next monitoring period. The FCSO has identified issues with records regarding housing changes after sexual abuse allegations.

**Provision 117**

A multi-disciplinary review team, including upper-level management officials at the Jail, with input from line supervisors, investigators, and medical and mental health practitioners, will conduct monthly incident review meetings for substantiated allegations of sexual abuse and for unsubstantiated allegations of sexual abuse committed by staff.  The review team will: (a) consider whether the allegation or investigation indicates a need to change policy or practice to better prevent, detect, or respond to sexual abuse; (b) examine the area where the incident allegedly occurred to assess whether physical barriers in the area may prevent detection of sexual abuse; (c) assess the adequacy of staffing levels in that area during different shifts; (d) assess whether monitoring technology should be deployed or augmented to supplement supervision by staff; and (e) prepare a report of its findings and any recommendations for improvement and submit such report to the PREA Coordinator.  FCSO will timely consider the review team's recommendations for improvement and will implement them or document their reasons for not doing so.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team acknowledges that with the FCSO's current staffing crisis, convening a multi-disciplinary review team on a monthly basis is challenging.  FCSO staff report that they will begin convening this review team within the next thirty days.  The monthly reviews need to be documented and include the list of those in attendance and their position.

**Provision 118**

Supervisory sexual assault investigators will review and sign off on all investigations and will order additional investigation as needed.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

The FCSO does not currently have a supervisory sexual assault investigator. They are exploring the training needed to ensure they have a trained supervisory sexual assault investigator.

**Provision 119**

FCSO will take appropriate corrective administrative action—including personnel action, trainings and counseling referrals for staff, and housing or classification changes for incarcerated people—based on the findings of sexual abuse investigations.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The FCSO reports that appropriate corrective action is taken for substantiated sexual abuse cases. The Monitoring Team did not have an opportunity to review any substantiated sexual abuse cases but will conduct an analysis of the actions taken during the next monitoring period.

## Information Management Systems and Resiliency Planning

This section of the Consent Decree addresses the FCSO's JMS, emergency power, and resiliency planning. Provision 120 establishes that Fulton County and the FCSO will review and modify the JMS to ensure that those systems provide accurate, reliable, and up-to-date information about people in the Jail, including

101

locations and custody levels. During this review period, Fulton County and the FCSO invested resources in technological support to improve the FCSO's use of the JMS. The FCSO also began exploring options to complement the JMS and integrate JMS data with information stored in other systems. However, it is the Monitoring Team's understanding that the biggest current obstacles to accurate, reliable, and up-to-date information about residents are not limitations of the JMS.

Instead, they are rooted in issues discussed above related to a backlog of unclassified residents and resident movement practices. For example, in July 2025, 23% of residents in the JMS were missing a classification level. In our tours and conversations with FCSO staff, it is also clear that unauthorized bed moves have become common. While housing unit staff document movement at the beginning of each shift through paper change reports and share these reports with the Classification Unit, the process is prone to error. As discussed above, the FCSO is working on these issues through updates to the classification system, staff training on movement and resident count procedures, and draft revisions to the Classification Policy (200-13).

With respect to Provision 121, which addresses the need for reliable back-up power systems, significant, ongoing problems exist, including problems with the uninterruptible power supply (UPS) for the camera systems and new UPSs in the housing towers with old batteries. Fulton County initially sought a quote from its building security system contractor for the security cameras UPS at the Main Jail, but determined that it would upgrade the system on its own. After the update, there is now 48 minutes of support in case of power loss, instead of the 5 minutes available before the upgrade. Also, as of early October 2025, 50% of the UPS devices on the floor towers have been replaced.

Provision 122 requires Fulton County and the FCSO to develop and implement a resiliency plan for major events, such as power outages. Resiliency plans include a framework for how to mitigate, prepare for, respond to and recover from emergencies including but not limited to natural disasters such as tornadoes and fires. An important component of resiliency planning is training and assessing readiness. In response to the request for documents related to these provisions, FCSO provided a Continuity of Operations Plan with an effective date of September 11, 2024, along with emergency evacuation procedures. It is vital that these documents are accurate and up to date; however, the Code Red Procedural Manual for the South Annex and the Code Red Egress and Relocation Procedural Manual state, "At our Facility, we currently use the Self-Contained Breathing Apparatus System (SCBA)" and outline the recommended method for donning and using an SCBA. However, although the facilities report that they are in the process of purchasing and implementing SCBAs, they currently utilize iEvac (brand) Smoke/Fire Hoods, which are smoke respirators and different than an SCBA. It is vitally important that policies and procedures align with the types of equipment in actual use at the facilities and that they are revised and updated when equipment is changed.

## Provision 120

The County and FCSO will, in consultation with the Monitor, review and modify its information management systems to ensure that those systems provide accurate, reliable, and up-to-date information about people in the Jail, including locations and custody levels.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

In addition to efforts described above related to policy and training on movement and resident count procedures, the Monitoring Team recommends that Fulton County and the FCSO explore electronic options to automate the tracking of resident movements. Further, we recommend that the FCSO staff begin conducting monthly audits of its JMS to identify missing, out-of-date, and inaccurate data and producing reports analyzing patterns, trends, and common causes associated with data issues. These reports should allow the FCSO to distinguish between user- and process-related issues that can be addressed through internal policy changes and training and issues with the JMS itself that must be addressed through the vendor. In future reporting periods, the Monitoring Team will then focus its review on the accuracy and reliability of the JMS data and the efficacy of the monthly audit process.

## **Provision 121**

The County and FCSO will upgrade its systems to ensure that, in the event of power outages, emergency power is immediately available and critical services in the Jail continue.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO and Fulton County have numerous ongoing facility projects that impact critical services in the jails, including back up power, UPS devices, fire alarm and suppression systems, doors, and door locks. In order to achieve substantial compliance, the FCSO and Fulton County will need to complete the upgrade of its critical emergency systems.

104

**Provision 122**

By dates set in the Implementation Plan, Section XII, the County and FCSO will develop and implement a resiliency plan for major events like power outages so that these events do not put people incarcerated in the Jail at substantial risk of serious harm.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

It is critical that a jail not just have a written resiliency plan, but that the elements of the plan are functional and training occurs on a regular basis. However, inaccurate information such as a plan that lists equipment that is not in current use creates serious concerns about the plans. In order to obtain substantial compliance, the FCSO should review and update all policies, procedures, and plans related to resiliency along with all training related to them and revise them anytime there are significant changes.

## Data Tracking and Reporting

The provisions in this section require the FCSO to track and report on information related to staffing and recruitment efforts, grievances, incidents, allegations of sexual abuse, and the resident population.

The FCSO provided the Monitoring Team with Quarterly Staffing Updates for the second and third quarters of 2025. The third quarter report included information about its recruitment efforts, describing participation in 37 career fairs and community events that led to invitations to 1,080 individuals to take the FCSO Physical Abilities Test. The third quarter report also addressed hiring and attrition, with information about the FCSO overall and specific to its Jail Operations. For example, in the third quarter of 2025, the FCSO hired 16 deputies, 14 of whom

were hired to work in the jails.  During that same time period, the FCSO lost 29 deputies, 15 of whom were assigned to the jails.  Information about the use of overtime was also included in the third quarter report.  Specifically, in the third quarter of 2025, FCSO staff worked a total of 67,276 overtime hours, 46,283 of which were worked by Jail Operations staff.

The FCSO has also shared with the Monitoring Team reports that list the average daily population for July through November 2025, which fluctuated between 1,958 and 2,079 residents at the Main Jail.  In August 2025, the FCSO provided the Monitoring Team a specific update regarding the size of the resident population, the strain it placed on its resources, and the practices necessary to address the issue:

> As of today, the total population in the Fulton County jail system is 2,972 and the Main Jail population is 2,016.  At the same time, the Main Jail has 515 beds out of service due to various maintenance issues.  Because we are limited in bedspace, we are forced to resort to the use of portable sleeping devices ("boats").  Currently, we have deployed the use of 18 portable sleeping devices.  The number of devices fluctuates depending on arrests, releases, and outsourcing.

As of January 19, 2026, the number of residents using a portable sleeping device was 61.

This staffing and resident population information and the FCSO's current tracking of grievances, incidents, and allegations of sexual abuse begin to address many requirements associated Provisions 123 through 127.  In the sections below, the Monitoring Team addresses specific provisions and recommendations.

**Provision 123**

FCSO will provide the Monitor and United States a Quarterly Staffing Update every January 15, April 15, July 15, and October 15, which will include information on FCSO's recruitment efforts, hiring, attrition, vacant posts, and use of overtime. The Quarterly Staffing Update will report separately on staffing for the FCSO overall and staffing at the Jail specifically. When the 15th day of a month in which the Quarterly Staffing Update is due falls on a weekend or holiday, the report will be due on the following County business day.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

As discussed above, the FCSO provided the Monitoring Team with Quarterly Staffing Updates for the second and third quarters of 2025. The third quarter report included information about its recruitment efforts, hiring and attrition, and the use of overtime. The FCSO's third quarter report addressed vacant posts as well, but did not distinguish between vacancies associated with positions assigned to work in Jail Operations and those assigned to work in other areas, as is required by Provision 123.

In future Quarterly Staffing Updates, the Monitoring Team recommends that the FCSO provide additional details about vacant positions that address both the specific positions that are vacant and the assignment of those positions.

**Provision 124**

FCSO will track all grievances filed and their subject matter, including grievance responses and appeals, analyzing them for patterns and trends so as to prevent violence.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO has two systems for accepting and handling grievances. An electronic, tablet-based system through ICSolutions allows for automatic notifications and electronic responses. The paper system is tracked with a spreadsheet and scans of grievances saved on a shared drive. FCSO staff copy information from the electronic ICSolutions system into the spreadsheet to have a single source to document how grievances are handled. Between January 1 and December 31, 2025, the FCSO recorded 2,575 paper grievances and 2,667 electronic grievances.

The FCSO's grievance tracking spreadsheet includes information about the subject of grievances, but does not include details about the outcome of the grievance or the FCSO response. And while the spreadsheet does have columns for information about appeals, these are largely empty.

The Monitoring Team requested records related to efforts to analyze grievance data for patterns and trends and was told it had access to the database in which those records were maintained, but did not receive any records that appeared responsive to the request.

The Monitoring Team recommends that the FCSO expand its grievance tracking spreadsheet to include details about the outcome of grievances and appeals, as well as the FCSO response provided to residents. To the extent that FCSO staff currently conduct analysis to identify patterns and trends, we recommend that they document this analysis in a manner that can be shared with the Monitoring Team. If this analysis is not currently being conducted, we recommend that the FCSO begin to do so in 2026. In future reporting periods, the Monitoring Team will then

focus its review on the accuracy and reliability of the grievance data being tracked and the efficacy of the analysis conducted.

**Provision 125**

FCSO will track and report the following events occurring in the Jail: (a) homicides, (b) physical assaults between incarcerated people, (c) stabbings, (d) hospital transports following assaults between incarcerated people, and (e) contraband discovered.  FCSO will report these events by Jail facility, will separately identify violence against 17-year-olds, people with Serious Mental Illness, and people who identify as gay or transgender.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Through its jail management system, the FCSO maintains reports about individual incidents within its jails.  These individual reports do not appear to track information about the residents involved that is required by Provision 125, including whether the incidents involved residents with serious mental illness.

The Monitoring Team recommends that the FCSO either revise its individual incident reports to collect information about the age, mental health status, sexual orientation, and gender identity of involved residents or develop internal reporting procedures that link this resident information with existing individual incident reports for the purposes of aggregate reporting.  Further, the FCSO should develop a routine of aggregating these individual incident reports addressing homicides, physical assaults, hospital transports, and contraband discovered on a monthly basis to allow for pattern and trend analysis.  In future reporting periods, the Monitoring Team will then focus its review on the accuracy and reliability of the

incident data being tracked as well as the quality of the routing analysis being conducted.

## **Provision 126**

FCSO will collect and track data regarding sexual abuse allegations and investigations at the Jail, and will analyze the data for trends and patterns.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO maintains monthly PREA incident tracking logs that collect information about the date the allegations were reported, the nature of the allegation, the involved residents, and the outcome of the investigation.  For example, the October 2025 log includes 10 allegations, one of which was substantiated.  The Monitoring Team requested records related to any efforts to analyze these data for trends and patterns, but did not receive any responsive records.  We recommend that the FCSO develop a routine to produce quarterly reports identifying trends and patterns as well as recommendations to address any potential issues with policies, practices, and training revealed by that analysis.  In future reporting periods, the Monitoring Team will then focus its review on the accuracy and reliability of the allegation and investigation data being tracked and the efficacy of the analysis conducted.

## **Provision 127**

FCSO will report data regarding the population in the Jail to the United States and Monitor monthly.  FCSO will notify the United States and the Monitor if the size of the population in the Jail makes compliance with any provision in this Consent Decree unfeasible.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO has shared with the Monitoring Team monthly population information and as noted above, notified the Monitoring Team of a particular compliance-related issue in August 2025.  While this notification was important, it was relatively ad hoc, and we recommend that the FCSO revise the Sheriff's Monthly Report Policy (700-28) to require staff to include assessments of whether population levels make compliance with the Consent Decree unfeasible in monthly reports and share these reports with the Monitoring Team on a routine basis.

# Use of Force

## Policies, Procedures and Training

The FCSO has an established framework of use-of-force policies and training programs that generally align with accepted correctional standards and constitutional principles.  Existing departmental and custody-specific policies provide baseline guidance on authorized force levels, reporting expectations, and staff responsibilities, and current training programs include initial academy instruction and annual refresher training covering force tactics, de-escalation concepts, and reporting requirements.  These foundational elements demonstrate that the FCSO is not operating without policy or training infrastructure.

At the same time, these policies and training programs have not yet been fully updated to incorporate all requirements of the Consent Decree or to function as a coordinated system.  Reform is complicated and will be staff intensive, prompting the County and FCSO to engage correctional use-of-force experts to support a comprehensive reassessment of policy structure, content, and implementation.  The FCSO has demonstrated a commitment to this collaborative process, but the work is time-consuming and ongoing, with current efforts focused on developing an implementation plan to guide future policy updates.

Training compliance remains closely tied to the completion of revised policies and the ability to relief staff from working in the units to attend the updated training.  While staff and supervisors receive use-of-force training under existing programs, expanded and updated training, particularly scenario-based instruction and agency-specific supervisory training, will follow once policy revisions are finalized.  Overall, the FCSO has a solid foundation in place, but achieving full compliance

will require completion of the policy update process and corresponding enhancements to training to ensure consistent application and oversight.

## Provision 128

By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Use of Force as set forth in paragraphs 129–151 below and will submit those policies and procedures to the Monitor and United States for approval pursuant to the process described in Section III above.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

At the beginning of the monitoring period, the FCSO submitted a series of updated force policies to the Monitoring Team in an effort to comply with the Consent Decree. However, many of these policies were aspirational in nature as the FCSO lacked sufficient staff to comply or failed to incorporate aspects of the Consent Decree that should have been incorporated.

In November 2025, two correctional experts were brought in as technical assistance to support the FCSO team in revising force-related policies and practices. The experts' objective is to ensure that all aspects of the Consent Decree are carefully considered and incorporated.

The FCSO has demonstrated a commitment to collaborating with these experts to update all related policies. However, this process is both time-consuming and complex, making it unlikely that the work will be completed by the next review period. The primary focus during this period has been the development of an implementation plan to coordinate an approach to achieve compliance with all use-of-force-related provisions. Policy updates will follow finalization of the

implementation plan, with revised policies expected to be submitted to the United States and the Monitoring Team for feedback, likely beginning in mid-2026.

It is not anticipated that all force-related provisions can be submitted simultaneously, as there are currently more than twenty policies requiring careful review. Alternatively, the FCSO may choose to consolidate these policies into a single custody use of force policy. Though this consolidation would require significant time and effort, it appears to be the preferred approach, and the FCSO has indicated their intent to pursue this direction.

In the interim, the FCSO maintains existing force policies, which already contain many elements characteristic of appropriate force policy frameworks. The correctional experts will continue to work with FCSO to incorporate necessary updates into the policies, regardless of the policy direction FCSO ultimately determines is best for the agency.

### Provision 129

FCSO will ensure that its use-of-force policies provide sufficient guidance on use of force and what constitutes excessive force in compliance with constitutional standards and generally accepted practices and will ensure compliance with all such policies. FCSO's use-of-force policies will describe the level of force authorized for each threat level.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The FCSO maintains two primary policies governing the use of force by staff. The first policy, Use of Force Directive (1.01), is a departmental policy that outlines general principles and procedures for the use of force. The second policy, Custody Use of Force Policy (200-05), specifically addresses custody operations and

provides detailed guidance on the use of force within those settings. There are approximately 20 other FCSO policies that should be evaluated as there are aspect of force reporting, reviewing or code of conduct that may best be located in a single custody use of force policy.

Together, the policies offer standard instructions to staff on appropriate use of force, including clear definitions and boundaries regarding excessive force and compliance with constitutional standards. The Custody Use of Force Policy (200-05) also has a level of force approach, delineating four distinct levels of force. Level I represents a command presence, while Level IV encompasses the use of deadly force.

The FCSO's existing policies provide a solid foundation upon which further requirements of the Consent Decree can be incorporated. It is anticipated that, with ongoing support from technical experts specializing in use of force, FCSO will be able to submit a draft of the updated use of force policy to both the United States and the Monitoring Team during the next review period.

In the meantime, the current use of force policies remain in effect and generally align with basic correctional standards. There is no immediate need for emergency modifications, as the policies do not contain provisions that are considered inappropriate or inconsistent with acceptable correctional use of force practices.

## **Provision 130**

FCSO will require in policy and ensure in practice that Jail staff:

a. Use de-escalation and crisis intervention methods when safe and resort to force only after all other reasonable efforts to resolve a situation have failed;

b. Not use force on a person who is already under officer control and does not pose a threat to the safety or security of the institution, incarcerated people, staff, or visitors;

c. Use only the amount of force needed to gain control of the person and immediately reduce the level of force as the threat diminishes;

d. Not use force as a response to verbal insults, taunts, or swearing, and only in response to verbal threats where there is an immediate threat to the safety or security of the institution, incarcerated people, staff, or visitors;

e. Not use force as punishment or retaliation;

f. Not use force until the following conditions have been met: (i) a warning or command has been given and repeated, if practical; (ii) the incarcerated person has had time to comply with the warning or command; and (iii) it appears that the incarcerated person is going to continue to resist the order or the staff's effort to control the situation;

g. Activate body-worn camera in advance of a force incident, whenever possible;

h. Make timely, documented notifications to medical and mental health staff prior to planned uses of force, if feasible, and after any use of force;

i. Adequately and promptly report all uses of force, including each separate use of force that occurs in an incident, and do so independently and not in consultation with anyone else. Each staff member who used or observed a use of force must prepare a written report by the end of that person's shift or as soon as possible thereafter;

j. In reporting a use of force, provide an accurate and detailed account of events that describes what precipitated the use of force, the level of resistance encountered, and any attempts at de-escalation;

116

k.  Treat any failure to report a use of force as required under these policies as a disciplinary infraction subject to re-training and staff discipline, including possible termination;

l.  Subject any supervisor who fails to comply with their use-of-force review obligations to re-training and discipline for this failure; and

m. Prohibit the use of conclusory statements, boilerplate, or canned language (e.g. "fighting stance") without supporting incident-specific details in reports describing uses of force.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team acknowledges that this provision is closely tied to the ongoing update of the use of force policies.  In the process of reviewing the current use of force policies and related staff training, it has been observed that several of the outlined requirements are already present in existing procedures and training materials.  However, as the official update to the use of force policies is completed, both the Monitoring Team and force experts will carefully verify that these requirements are explicitly included in the revised policies, as well as in the associated training and review processes.  Furthermore, the incorporation of these elements will be confirmed and documented in the six-month trend analysis report, ensuring that all necessary standards are addressed appropriately and consistently.

## Provision 131

Within three months after the date that any policy or procedure related to use of force is finalized or revised (following the period of review for the Monitor and United States), FCSO will train all relevant staff on that policy, through in-service training.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***

The FCSO currently provides use of force training when an employee is newly hired and annually, but this provision is specifically attached to updated training following a policy update, so compliance is contingent on the policy revision required pursuant to Provision 130.

## **Provision 132**

FCSO will ensure that all staff are properly and regularly trained on policies and procedures on uses of force. All staff members who interact with incarcerated people will be required to receive adequate in-service use-of-force training and annual use-of-force refresher training. Training must include scenario-based training where staff can practice applying force techniques in scenarios encountered in the Jail. Topics covered by the training will include: (a) constitutionally permissible and impermissible uses of force, including what constitutes excessive force; (b) appropriate use of chemical agents and Tasers; (c) de-escalation techniques; (d) use of force on incarcerated people with mental health disabilities or in crisis; (e) methods of managing incarcerated people with mental illness to avoid the use of force; (f) defensive tactics; (g) use-of-force reporting requirements; and (h) all Jail use-of-force policies and procedures.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently offers limited use of force training for new employees, covering both policy and tactical instruction. The training curriculum includes essential topics such as court cases relevant to the use of force, de-escalation principles, and reporting protocols. In addition to these foundational areas, staff

receive tactical training focused on less lethal force options, specifically the use of Tasers and chemical agents. Once employees have completed their initial training, the FCSO provides annual retraining to ensure ongoing competency and compliance with established standards.

Despite these efforts, a review of the types, formats, and frequency of training, as well as analysis of real force incidents, indicates a clear need for a far greater investment in training in both the hours spent off-post for training as well as the types of training provided. To address these gaps, several improvements are necessary. These include updating lesson plans to reflect current best practices, increasing the use of scenario-based training, enhancing de-escalation skills practical application, expanding training opportunities for trainers, and increasing off-post training hours. It is also recognized that the FCSO previously utilized a force simulator system to help with decision making under stress. That system is currently not operational and may be obsolete due to more current technologies. The FCSO reports that the new Axon Taser system offers an opportunity for virtual training, which may create the possibility for expansion to non-Taser scenarios. If that is not feasible, the FCSO should explore updating or repairing the previous virtual training system and utilizing realistic custody scenarios that staff may face in their daily work. However, implementing these enhancements is challenging due to the current staffing crisis faced by the FCSO.

The entire force training plan must be revised as force policies are refined, systemic non compliance issues are identified through the use of force review process, and expectations rise concerning de-escalation and improving interactions with residents in crisis. It is not expected that a comprehensive training plan will be developed in the upcoming review period. Nevertheless, as force incidents are reviewed, the Monitoring Team will collaborate with the FCSO to provide

119

individualized and targeted training on systemic issues identified during the review process. This approach will continue until a full training plan and curriculum redesign can be accomplished in collaboration with the technical assistance experts. It is feasible that a training plan can be developed in the next review period with the development of a pilot training program for employees by late 2026.

## Provision 133

FCSO will ensure that supervisors, as part of their initial and annual in-service supervisory training, receive training in conducting use-of-force reviews or investigations appropriate to their rank; strategies for effectively directing staff to minimize uses of force and to intervene effectively to prevent or stop objectively unreasonable force; and supporting staff who report objectively unreasonable or unreported force, or who are retaliated against for attempting to prevent objectively unreasonable force.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Recently, the FCSO began sending supervisors to state-sponsored training sessions focused on use of force investigations and the use of force review process. While these training opportunities are beneficial, not all supervisors have had the chance to participate. The FCSO remains committed to ensuring that all supervisors receive this training, sending staff as classes become available and as supervisors are able to attend off-post training sessions.

A review of the lesson plans for these trainings shows that supervisors are being taught to evaluate use of force incidents based on constitutional standards regarding the authority and limitations of force. However, the post-force reviews

assessed by the Monitoring team were found to be insufficient, indicating that staff may not have received proper training on the lesson plans, lack adequate time to conduct thorough reviews, or oversight does not effectively address deficiencies in review quality. These issues appear to reflect the current situation. The supervisor training plan is a positive step forward; however, the Monitoring Team has identified the need for FCSO to develop its own training curriculum. This internal curriculum should be created once the use of force policies and review systems are updated, ensuring alignment with the unique operational context of the FCSO.

It is recommended that the FCSO policy and training specifically address custody-related scenarios, the duty to intercede, the duty to report, de-escalation attempts, force tactics, and medical and mental health follow-up after a use of force incident. While it is encouraging that the FCSO has initiated structured training for supervisors, the State curriculum does not address certain systemic issues that are specific to the FCSO and cannot focus on systemic issues identified during use of force reviews. It is noted that the FCSO does conduct some level of training in the annual supervisor training plan but not to the degree required under the Consent Decree.

To address these gaps, the use of force technical experts will assist FCSO in supplementing the state-sponsored training with adjunct modules tailored to FCSO supervisors. These additional trainings will focus on the critical areas not presently covered and issues that may be unique to the FCSO. It is anticipated that the development and implementation of this specialized training could occur by the end of 2026, contingent upon the promulgation of revised use of force policies and review requirements. In the interim, the FCSO is encouraged to continue to send supervisors to the state facilitated training as it appears to be in alignment with general force review principles.

## Tasers

The FCSO has established foundational policies and training protocols governing the use of electronic control devices (Tasers) within the Custody Division.  Staff receive structured initial and refresher training, and existing lesson plans reflect core principles related to proportionality, officer safety, and risk awareness.  These efforts provide a solid framework upon which further refinement can occur.

During this monitoring period, the Monitoring Team reviewed available information regarding Taser utilization and individual use-of-force incidents.  While policies are in place and Taser issuance has been limited, the review identified utilization patterns and specific deployments that raise concern and require closer attention.  These findings highlight the need for more consistent analysis of Taser use, clearer guidance on when deployment is appropriate, and stronger mechanisms to address misuse through supervision and accountability.

Several compliance gaps relate not to the absence of policy or training, but to the need for greater clarity and integration across systems.  The current Conducted Energy Weapon Policy (200-09) has not yet been revised in consultation with the Monitoring Team to fully incorporate Consent Decree requirements, including expectations related to warnings, cycle limitations, prohibited uses, and considerations for individuals experiencing mental or behavioral health crises.  While some of these elements are addressed in training materials, they are not yet consistently reinforced through policy language or the use-of-force review process.

The FCSO has begun working with technical assistance experts to develop a broader implementation plan addressing use of force policies, training, and oversight across the Custody Division.  While this work has not yet focused specifically on Taser-related policy, Taser use is expected to be incorporated into this comprehensive framework beginning in the next review period.  Continued

monitoring will focus on whether these efforts result in clearer guidance, improved analysis of utilization trends, and sustained, constitutionally compliant practice.

The County also approved replacement Tasers through a countywide approach that is reported to also improve force tracking, force reviews, and information storage related to force incidents. The procurement is not yet complete, so the actual implementation date for the new program is not yet established.

### **Provision 134**

FCSO will reduce reliance on electronic control devices to gain control of incarcerated people while still ensuring incarcerated person, staff, and visitor safety.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

At this stage in the monitoring process, there is insufficient information regarding the actions the FCSO has taken to systematically evaluate trends related to the use of electronic control devices, specifically Tasers, within the Custody Division. The absence of comprehensive trend analysis concerning use of force incidents, the options employed during these incidents, and subsequent post-incident reviews of specific tactics, prevents the FCSO from providing proof of meaningful efforts to reduce overall Taser usage. The FCSO has provided some information on Taser utilization, but that information did not focus on only custody use of force so it was impossible to evaluate whether there was any change in Taser use in custody in 2025 compared to 2024.

While it has been observed during monitoring that the issuance of Tasers decreased as evidence by custody staff reporting they were no longer in possession of a Taser, potentially resulting in a reduction in their use, the lack of statistical analysis

123

renders this information anecdotal at best. Furthermore, upon reviewing several cases where Tasers were deployed, the Monitoring Team identified at least one incident in which the Taser was used in a manner inconsistent with established correctional norms and, likely, with the FCSO's expectations. The County approved replacement of all Tasers, which will require the update to policies, training and review practices. The Monitoring Team will work with the FCSO to ensure the updates comply with the Consent Decree. The timeframe for replacement of the Tasers has not yet been established but will be discussed in the next reporting period.

It is essential that, as the FCSO updates its use of force policies and training, tactical options and scenario-based decision-making are thoroughly discussed with staff. This process should focus on determining the circumstances under which Taser deployment is considered the best force option compared to alternatives such as physical restraints, holds, or the use of chemical agents like oleoresin capsicum. Currently, the FCSO does not demonstrate in-depth analysis of either individual Taser deployments or systemic reviews of Taser use. It is the intention to make the Taser provision implementation a priority in early 2026 with the goal to be able to quantify use and update policies and training during the next review period.

## **Provision 135**

FCSO will ensure that no Jail staff use the Taser unless they have been adequately trained to do so.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO policy stipulates that Tasers are to be issued only to custody staff who have completed either the required eight-hour initial training or the four-hour

124

annual refresher training.  However, there are notable gaps in the current training tracking system that undermine effective oversight of Taser training and certification.  While FCSO can access the State of Georgia Peace Officer and Standards Training (GA POST) database to obtain the information, currently that is not accessible to the shift supervisors working in the jail.

The Training Bureau currently tracks Taser training using Excel spreadsheets. There is no rapid review database available for custody supervisors to quickly verify whether all assigned staff on duty are current in their Taser training certifications.  This limitation increases the potential that staff whose Taser training has lapsed may still be issued or carry a Taser and potentially use the device after their certification period has expired.  This can be mitigated by staff carrying a certification card that can be reviewed by the supervisor at the beginning of the shift or an up-to-date training record being sent to the Watch Commanders to ensure all staff on duty who are issued a Taser are current in their training.

The existing use of force review system does not include a consistent process to verify whether staff who have utilized a Taser or other less lethal force, such as oleoresin capsicum (OC), were current in their training when they used the tool. This system poses a risk to proper accountability and compliance with established standards.

To address these issues, policy revisions are needed for both the force policies and the review process.  These changes should establish clear mechanisms for verifying and documenting staff training status, require up-to-date certification for all personnel authorized to carry Tasers, and ensure that training compliance is assessed as part of the use of force review.  These improvements will be subject to future monitoring to ensure effectiveness.

## Provision 136

FCSO will require that staff discharge Tasers only in circumstances to be outlined in a Taser policy developed in consultation with the Monitor to comply with constitutional standards.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***

The FCSO has not yet collaborated with the Monitoring Team to update the Conducted Energy Weapon (CEW) Policy (200-09), which was last revised on January 30, 2024. Upon reviewing this policy, it is evident that revisions are necessary to ensure compliance with the Consent Decree, not only with this provision but across several others.

Technical assistance experts are in the process of working with FCSO to develop a plan and timeline to update the CEW Policy, as well as related training and the review process for Taser deployments. Once a draft policy has been developed, it will be submitted to the United States and the Monitor for evaluation. The finalized policy will then be incorporated into Taser training, and the use of force review process will be enhanced to support more thorough analysis of Taser use.

These improvements will ensure that each Taser discharge is assessed for compliance with the revised policy and that any failure to adhere to the policy is appropriately addressed. It is anticipated that a draft of the updated policy can be prepared by the next review period.

## Provision 137

FCSO will ensure that staff warn incarcerated people and other staff prior to discharging a Taser, when feasible.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Currently, FCSO Taser lesson plan direct that staff must issue a warning before deploying a Taser, except in situations deemed life-threatening.  This protocol has been observed in several recent Taser use-of-force incidents reviewed during the monitoring period, where staff consistently warned the resident prior to Taser deployment.

However, the existing CEW Policy does not explicitly mandate a warning before deployment.  This omission needs to be addressed in the upcoming policy revision, as required by Provision 136.

Additionally, the use-of-force review forms do not currently include a specific section to document whether a warning was provided prior to Taser deployment. These forms are presently under review, and incorporating an evaluation item for warnings prior to the use of force will be beneficial.  This addition will enhance the ability to assess and support compliance with the warning requirement.

## Provision 138

Each application (in probe, darts, or drive stun mode) or standard cycle (five seconds) of a Taser is a separate use of force, and FCSO will require that each application or cycle is (i) objectively reasonable, (ii) is the minimum force necessary to protect the staff member or another person, (iii) avoids unnecessary injury or risk of injury to officers and others, and (iv) is proportional to the threat. FCSO will require that staff members give the incarcerated person a reasonable opportunity to comply prior to applying another cycle.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

To comply with Provision 137, it is important to update both the CEW Policy and training materials so they clearly state what is expected. The current lesson plan does require an articulable reason for each use of a Taser, limits applications to five seconds or less, asks staff to consider other force options first, addresses the risk of unintended injury, and requires that the force used be proportionate. However, the existing policy is not clear enough about when staff should actually deploy a Taser. By making both the policy and lesson plan more explicit, employees can reduce their reliance on Tasers and only use them when it is objectively reasonable. Staff should also receive training to stop using a Taser as soon as the threat has diminished.

This objective will require a comprehensive update of the policy, enhancement of training programs, and a more thoughtful approach to analyzing Taser use-of-force incidents. The force technical assistance experts will collaborate with the FCSO to revise the policy, improve training, and refine the review process. The overarching goal of these efforts is to bring the FCSO into compliance with Provision 137.

While substantial compliance with this provision is not expected during the next review period or even likely in 2026, it is considered realistic that a draft of the revised CEW Policy can be submitted to the United States and the Monitoring Team prior to the next review.

## Provision 139

FCSO will require that staff do not deploy more than three cycles or 15 total seconds of a Taser against a person during a single incident unless Lethal Force is justified. FCSO will require that staff report the justification for each application

or cycle in use-of-force force reports.  FCSO will require officers to consider alternatives, including de-escalation, if the Taser is ineffective.

**Compliance Status:** Non Compliance

**Additional Discussion/Recommendations:**

The current CEW Policy does not include the mandatory language requiring staff to limit Taser applications to no more than three cycles, unless lethal force is justified.  Additionally, a review of CEW training materials indicates that, while applications are restricted to five seconds per cycle, there is no explicit mention of the three-cycle limitation.

Similar to other provisions related to Taser use, the existing use-of-force review process lacks a consistent mechanism for evaluating whether Taser deployment protocols are being properly followed.  This gap can be addressed by updating the use-of-force review process to incorporate a specific question regarding compliance with the three-cycle restriction whenever a Taser is deployed.

The Monitoring Team and technical assistance experts believe that the Custody Division has the capacity to brief staff on these policy changes during daily roll call sessions in early 2026.  These briefings will serve to notify staff of the updated policy and, during the transition period as the use-of-force review systems are revised, remind supervisors and managers to evaluate compliance with this provision whenever a Taser is used.

Although substantial compliance with this provision is not expected until late 2026, when the requirement will be fully integrated into formal policy, training, and auditing, the FCSO remains committed to training staff on the three-cycle limitation before the complete implementation of the updated policy.

**Provision 140**

FCSO will require that staff do not discharge or activate Tasers:

a. In drive-stun mode solely for pain compliance.  Officers may discharge Tasers in drive-stun mode only to supplement the probe deployment to complete the incapacitation circuit, or to gain separation between the officer and the person so that officers can consider another force option;

b. To target the face, head, neck, breasts, chest, or groin; instead, staff should target the lower center mass (except in deadly force situations);

c. Intentionally, when doing so would mean more than one Taser is used at a time against a person;

d. When it is reasonably evident that a discharge may cause serious physical injury or death, including if the person may fall from a significant height onto a hard or sharp object, if the person is known or reasonably appears to be pregnant, elderly, infirm, or frail, or if the person has been exposed to a flammable substance, except where Lethal Force is justified;

e. On a person who is known or reasonably appears to be exhibiting signs of a mental or behavioral health crisis and who otherwise does not pose an immediate threat of serious injury.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The current CEW Policy and lesson plan incorporate select elements of Provision 140; however, they do not explicitly address all the required expectations.  For instance, while the lesson plan covers appropriate target zones and highlights risks related to incapacitation and pregnancy, it does not include guidance on deploying Tasers against individuals experiencing mental health crises.

130

Additionally, the CEW Policy offers only limited direction concerning the requirements of Provision 140.  To achieve complete alignment with this provision, it is crucial for the FCSO to revise its policy to incorporate these specific mandates.  This process should also involve enhancing training materials, including the development of relevant simulated scenarios, and updating the use of force review system to reflect these changes.

To facilitate the development and implementation of these updates, use of force technical experts will work collaboratively with the FCSO.  With coordinated efforts, it is feasible to expect that the revised policy will be ready for submission to the United States and the Monitoring Team during the next scheduled review period.  Once approval is obtained, the FCSO will be able to commence staff training.  However, a significant challenge remains: the lack of sufficient staffing to provide backup coverage during off-post training sessions which may impact achieving substantial compliance in 2026.

## Use-of-Force Reviews

The FCSO currently operates a use of force review process, which is partially addressed within the Custody Use of Force Policy (200-05).  In addition to this core policy, there are more than thirty other policies that govern force or force review practices within the Custody Division.  A dedicated group of command staff members assigned to the FCSO is responsible for conducting reviews of known use of force incidents and for documenting the outcomes of these reviews.

Despite this established commitment, the procedures for conducting these reviews are often overly complex.  This complexity has led to delays in completing reviews, insufficient documentation of findings, and inconsistent follow-up actions.  Nonetheless, the FCSO has shown a clear commitment to conducting

thorough reviews and has demonstrated a willingness to update policies, seek external support, and recognize existing structural challenges. This openness provides a solid foundation for future improvements in force practices.

An analysis of approximately twenty randomly selected use of force incidents from 2025 revealed significant concerns regarding staff training and response practices. Staff members were found to be inadequately trained in de-escalation techniques, and their responses frequently did not align with the FCSO policies or accepted principles for the use of force. In many cases, inappropriate responses appeared to stem from insufficient training and limited support, as staff often lacked adequate supervision or backup when managing resident misconduct or refusals to comply with direct orders.

This lack of support frequently resulted in staff acting independently in response to resident noncompliance, leading to unprofessional communication and the use of unauthorized or improper force techniques. None of the incidents reviewed reflected responses that were consistent with industry standards for correctional force. These initial findings highlight recurring systemic issues, including insufficient staffing, uneven supervisory review, inconsistent documentation, unclear separation of roles, lack of follow-up, and the absence of a well-resourced, standardized, and consistent force review structure.

Based on the force incident reviews and discussions with the FCSO staff regarding force-related policies, it became evident early in the analysis that substantial improvements are needed in force training, review procedures, custody force policies, tracking mechanisms, and documentation forms. In response to these findings, the Monitoring Team began providing technical assistance in November 2025 by engaging two experienced correctional executives with expertise in

updating force policies, training, and review practices in large correctional systems.

These experts are collaborating directly with the FCSO to develop an actionable implementation plan that addresses all relevant force provisions and will support every aspect of the implementation process.  This technical assistance is considered critical, as other sections of this report identify persistent gaps in policy consistency, the absence of a formal investigative manual and force tracking systems, inconsistent supervisory practices, and significant staffing shortages that impede timely and effective review of force incidents.  Coordinating these improvements into a unified plan is essential for achieving sustainable compliance. The primary goal for the next review period is to establish a robust implementation plan that will guide the FCSO's strategy for complying with use of force review provisions.

## Provision 141

FCSO will amend its use-of-force policies and procedures to reflect, and ensure compliance in practice with, the following requirements related to use-of-force reviews.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO initiated the process of updating its use of force policies and implemented a force review system prior to the arrival of the Monitoring Team.  At present, these systems are being evaluated by technical assistance experts, who are working in collaboration with the FCSO to ensure that all relevant custody policies are updated during the upcoming review period.

133

As part of this effort, it is anticipated that a significant number of existing policies will need to be consolidated into the Custody Use of Force Policy (200-05). This integration aims to minimize confusion and reduce the likelihood of providing inconsistent or overlapping guidance across multiple policies, thereby contributing to a clearer and more uniform approach to use of force procedures within the Custody Division. Once updated, a robust training strategy will be required to roll out changes to the force policy and force review process.

A positive development in this arena is the Board of Commissioners' approval of the procurement of an integrated technology solution (Axon) that will improve data storage of force evidence/information, improve documentation on force reviews and create a more efficient force tracking system. The timeframe for implementation of that project is pending completion of the procurement process.

## **Provision 142**

FCSO will ensure that all uses of force and allegations of force are promptly reviewed by appropriate supervisors to identify unlawful conduct, policy violations, and tactical needs. This review will consist of the following, all of which will be documented in a report:

a. Names and statements of all staff members, incarcerated people, and other participants or witnesses interviewed by the supervisor;

b. A detailed description and review of the incident, including a discussion and resolution of any material inconsistencies in the evidence;

c. The supervisor's preliminary findings and conclusions regarding the appropriateness of the force, including whether the force used was necessary, proportional, and objectively reasonable, and otherwise within policy;

d. Any recommended corrective action plans, re-training, and discipline if appropriate;

e. A determination of whether anyone was injured and whether necessary medical care was provided;

f. Photos of all visible injuries sustained;

g. A description of whether an individual's mental health condition may have or likely contributed to the force event;

h. A description of injuries observed, including by medical staff;

i. Separate, confidential interviews of all Custody Staff and witnesses who observed or participated in the use of force;

j. Documentation about whether the use of force was recorded on video and if not, why not;

k. All supporting documentation such as incident reports and classification records; and

l. All video and audio recordings of the incident and of interviews conducted.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

The FCSO is actively engaged in the review of known use of force incidents. However, the current approach to these reviews presents several challenges that impact their effectiveness and integrity. One key issue is the need for significant improvements in the timeliness, quality, and follow-up of these reviews. Additionally, not all force events are being identified and forwarded for supervisory review, which restricts the thoroughness of oversight and limits the ability to address problematic incidents systematically.

Moreover, the reviews often lack sufficient explanation of findings, failing to clearly address whether the use of force was necessary or proportional in each

135

case.  There is also inconsistent documentation regarding corrective actions or retraining expectations, which undermines the potential for learning and improvement.  Another gap in the process is the absence of a mechanism for the force review process to effectively inform leadership about recommended changes to policies or training.  Even when the review committee makes findings, these are not consistently followed through with a corrective action plan, leaving important recommendations unaddressed.

Furthermore, there is insufficient clarity about how the use of force review process interfaces with the internal affairs investigative process.  This lack of connection hinders appropriate referrals, accountability, and systemic tracking of force incidents.  Strengthening this interface is necessary to ensure all incidents are properly addressed and documented.  Additionally, it is critical that policies, training, and review processes incorporate information received from resident complaints, as further discussed in Provision 93.  Addressing these challenges is an aspect of the technical assistance support that is currently underway.

## Provision 143

The watch commander and the lieutenant colonel will review the use of force report to ensure that it is complete, that the report was thorough, and corrective action was initiated, if necessary.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The FCSO maintains a policy and practice that requires unit officers and deputies to document all use of force incidents, along with any supplemental reports associated with those incidents.  This documentation is essential for ensuring transparency and accountability within the organization.  Unit supervisors are

tasked with the timely review of these reports. Their responsibilities include verifying the clarity of the documentation and identifying any violations of policy. Prompt and thorough supervisory oversight is critical to maintaining the integrity of the review process.

Despite these established practices, it has been observed that certain force incidents, especially those involving minor uses of physical strength and holds, are not consistently classified or documented as force incidents. This gap in reporting undermines the comprehensive oversight of use of force events. The initial assessments of these incidents, required by the provision to be conducted by the watch commander and the lieutenant colonel, have highlighted the need for additional supervisory staff, more intensive training, improved documentation practices, and clearer expectations regarding consistent follow-up. These shortcomings indicate broader issues related to role clarity and supervisory capacity.

Efforts to strengthen this process are currently underway as part of the technical assistance support being provided. Enhancing these procedures is expected to address the identified gaps and improve the overall effectiveness of supervisory oversight concerning use of force incidents. However, the severe shortage of custody supervisors will inhibit quick reform of the review process. A robust review process is contingent on a sufficient number of well trained supervisors assigned to conduct meaningful reviews, a challenge that will not likely be addressed in the near future.

## **Provision 144**

FCSO will ensure that investigations comply with, and develop a manual on use-of-force investigations setting forth, the following:

a. All investigative findings are based on application of a preponderance-of-the-evidence standard;

b. Investigators obtain and review all supporting evidence, including witness and participant statements, physical evidence, body charts, photographs, and video or audio recordings;

c. Investigators conduct timely, thorough, and documented interviews of all relevant staff and incarcerated people who were involved in and witnessed the incident in question, to the extent practicable;

d. All investigations occur promptly after the incident and include thorough documentation of the basis for the investigator's finding, including discussion of all evidence available and unavailable;

e. All investigations must clearly indicate whether there was compliance with Jail policies and procedures related to uses of force; and

f. All uses of force will be timely reviewed by supervisors who were neither involved in nor approved the use of force.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Although the FCSO currently completes use of force incident packages and employs an executive review process for force incidents, the requirements of this provision call for a more systemic and thoroughly documented approach to incident investigations and use of force reviews, which is not yet fully established. Achieving compliance will depend on clearly distinguishing the responsibilities of the incident supervisor, who is tasked with gathering information to complete the incident package, from those involved in the use of force review process. While these functions are related, they constitute distinct areas that must be defined and supported independently.

The technical assistance project will play a vital role in developing the strategies, policies, forms, training, tracking mechanisms, and internal auditing processes needed to make these systems effective. Progress in these areas will require considerable time, dedicated resources, and a concerted effort to build internal expertise. However, significant staffing shortages pose substantial challenges, limiting supervisors' ability to conduct timely incident investigations and meaningful use of force reviews. These vacancies also hinder participation in training related to new policies and procedures, as the lack of sufficient supervisory coverage restricts availability for professional development.

## **Provision 145**

Higher-level reviewers of appropriate rank will make determinations of whether findings by supervisors regarding the use of force are consistent with policy and supported by a preponderance of the evidence; whether the reviews are thorough and complete; whether there are tactical, equipment, training, or policy considerations that need to be addressed; and whether to initiate an administrative personnel complaint.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently conducts reviews of known use of force incidents through a team comprised of managers and command staff. While this process is in place, it has become apparent that the quality of these reviews, the thoroughness of documentation, and the follow-up procedures all require further improvement. To address these needs, this provision has been incorporated into the technical assistance plan.

Achieving substantial compliance with this provision will necessitate a significant commitment to ongoing training, updates to relevant policies and forms, and the implementation of more robust internal monitoring practices. These efforts aim to ensure greater consistency and effectiveness in the review process.

Additionally, higher-level reviewers must be provided with clearer expectations regarding their roles and responsibilities. The development of stronger documentation tools and the establishment of more consistent standards are essential to enable these reviewers to determine whether supervisory findings are comprehensive, supported by evidence, and in alignment with established policy. Strengthening these aspects will be a primary focus of the technical assistance initiatives in the upcoming review period.

## Provision 146

FCSO will create a use-of-force review committee that will oversee use-of-force events. The use-of-force committee will consist of middle- and upper-level management staff. The committee will conduct systemic reviews of uses of force and investigations into uses of force at least every six months to identify patterns or trends and to determine if there were violations of policy or opportunities to improve training or practices at the organizational and individual level. The committee will also determine if uses of force are being properly classified, investigated, and resolved. FCSO will take appropriate corrective action based on the trends and patterns observed in its systemic reviews. Supervisor-level staff will be re-trained on conducting use-of-force investigations if these reviews or audits demonstrate that FCSO's policies and procedures are not being followed.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

In addition to the recommendations outlined in Provision 145, several steps are necessary to enhance the effectiveness of the use of force review committee. The committee will benefit from a clearer structural framework, which will clarify roles and responsibilities for all members. Establishing consistent and realistic meeting schedules is also essential to ensure that reviews are conducted in a timely and reliable manner.

Furthermore, the development and implementation of stronger documentation practices are critical. These practices will support the committee's ability to systematically evaluate patterns and trends in known use of force incidents. Improved documentation will facilitate comprehensive reviews and support organizational accountability.

It is also recommended that the FCSO collaborate with the Monitoring Team to refine the policy that determines which use of force packages are presented to the committee. Specifically, clarity is needed regarding the distinction between incidents requiring systemic evaluation by the committee and lower-level events, such as minor physical strength applications and holds without injury or complaint of abuse, that may be reviewed and resolved by jail command staff. Defining this distinction will ensure that the committee's focus remains on cases warranting broader organizational oversight, while routine, lower-level incidents are handled at the appropriate level within the jail.

These refinements will be addressed as part of the technical assistance review and are necessary to strengthen overall oversight and consistency in the use of force review process.

**Provision 147**

If staff are found to have engaged in misconduct related to inappropriate or unnecessary force against incarcerated individuals, including use of excessive force or failure to report or inaccurately reporting a use of force, FCSO will initiate appropriate personnel actions and systemic remedies, including reporting to an appropriate law enforcement agency for consideration of criminal prosecution as appropriate.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***
The FCSO currently follows an established employee investigation process for addressing use of force violations, which includes the option to refer cases for criminal prosecution when appropriate.  Despite the existence of this process, its accountability is hindered by the lack of robust tracking mechanisms.  A key limitation is that the current system does not allow for comprehensive monitoring and follow-through on misconduct investigations.

In response to this limitation, the FCSO has reported that the County is in the process of acquiring a new force and internal affairs tracking system.  The implementation of this system is expected to enhance the internal management of misconduct investigations, enabling more effective tracking from the initial referral by custody personnel through the various stages of the personnel investigation, disciplinary process, and, if warranted, criminal prosecution.

An important feature of the new tracking system will be the integration of the Early Warning System.  This addition is intended to facilitate the identification of employee patterns or emerging trends that could suggest the need for intervention, supplemental training, or additional supervisory review.  By proactively

recognizing these indicators, the organization can take timely action to address potential issues before they escalate.

During the upcoming review period, the primary focus will be on quantifying the number of referrals for investigation and closely examining both the investigative process and its outcomes.  This approach will provide greater insight into the effectiveness and thoroughness of the investigative procedures to assist with making further recommendations.

Enhancing the tracking system will also improve the clarity of referral pathways between the use of force review process and internal affairs investigations. Establishing these referral pathways is critical for ensuring accountability and for detecting patterns in known use of force incidents.  Such improvements will ultimately strengthen the organization's ability to maintain oversight and uphold standards of conduct.

## Data Tracking and Reporting

The FCSO currently faces significant challenges in developing a reliable and coordinated system for tracking, reviewing, and analyzing use-of-force incidents. Although some structures are in place, underreporting of lower-level force, fragmented databases, and inconsistent documentation practices limit the FCSO's ability to identify trends, training needs, or supervisory gaps.  These limitations also prevent the FCSO from producing the comprehensive six-month analyses required under the Consent Decree.

Efforts to modernize the system are underway, including exploring replacement databases and refining review processes, but meaningful progress cannot occur until a single, integrated platform is established and supervisors receive consistent training.  Similarly, while an early warning system exists, it is not yet fully

functional because it does not pull information from all necessary sources, including grievances and external complaints.

Overall, the County and FCSO are working toward improvement, but substantial updates to technology, staffing, and review practices will be required before FCSO can accurately track use-of-force activity, evaluate patterns, and respond effectively to emerging risks.

## **Provision 148**

FCSO will develop and implement a system that accurately tracks all uses of force by Jail staff and any complaints or grievances related to the alleged use of excessive force to alert FCSO administration to any potential need for retraining, problematic policies, or supervision lapses.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently has the capability to track use of force incidents by incident number or JA number.  However, both the FCSO and Monitoring Team acknowledge that not all use of force incidents are being properly captured, especially those involving minor physical strength or holds.  This underreporting highlights the need for ongoing training for supervisors to ensure they can accurately identify and report force incidents.  Additionally, updates to the JMS system are necessary to guarantee that all use of force incidents are consistently tracked within the system.

Identifying grievances and complaints related to use of force in a quantifiable tracking system has proven challenging.  At present, there is no direct connection between use of force grievances, the use of force review system, and the employee early warning system.  This disconnect further illustrates the difficulties posed by

144

disparate database tracking systems and the lack of coordination in managing critical information.  Such information should be readily available during incident reviews and when evaluating trends and patterns within the jail system.

As discussed, the overall use of force review process requires standardized reporting systems.  These systems would assist FCSO administration in identifying patterns that signal a need for systemic retraining, enhanced supervision support, or updates to existing policies.  All of these components are currently being addressed through technical assistance provided to improve the use of force system.

In addition, the County has approved the replacement of the existing use of force database tracking system.  This is a countywide solution that will replace the existing Tasers, provide integrated storage of all information relative to a force incident, create a force tracking system and integrate force review forms within the system.  It is reported that once the Axon system is operational, it will establish a singular source to track all use of force incidents and reviews.  However, the FCSO will also need to identify a mechanism to incorporate grievances and complaints related to force into this system to enable comprehensive review and oversight.

**<u>Provision 149</u>**

The tracking system discussed in paragraph 148 above will include the categories of information required for individual use-of-force reviews under paragraph 142 above, as well as the following: (a) name and rank of the supervisor(s) responsible for investigating the force; (b) the length of time between the use of force and the completion of the use-of-force investigation and review; (c) the type of any disciplinary action (including corrective action) taken; and (d) whether the matter was referred to the Office of Professional Standards or another agency for further investigation.

145

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The current databases utilized by the FCSO to track use of force incidents and reviews of and/or investigations on use of force incidents do not capture all of the information required by this provision. As the FCSO and County consider alternative database solutions, it will be essential to ensure that any new system allows for the extraction and tracking of all mandated data elements. Technical assistance experts will continue to support the FCSO throughout the implementation process. However, it should be noted that full compliance with these requirements is not expected to be achieved within the next reporting period.

## Provision 150

Every six months, FCSO will analyze the prior six months' force data, including the data described above, to determine if underreporting is happening, assess any staff member-specific, unit-specific, and Jail-wide trends, and identify and correct deficiencies revealed by this analysis. The analysis will include reviews of all of the following: incident reports regarding force; use-of-force reviews and investigations; investigations into allegations of excessive force; use-of-force determinations and recommendations; force reporting; and incidents in which medical assistance was requested or provided following a use of force. FCSO will submit this data and analysis to the Monitor and United States every six months.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Currently, the FCSO does not conduct meaningful evaluations of use-of-force data trends due to limitations in the existing JMS and other databases, which do not yet capture all necessary information from force incidents, reviews or investigations.

146

Meaningful six-month review reports for internal assessment, as well as for analysis by the United States and the Monitoring Team, remain difficult to produce until all force incidents are captured as a force incident, consistent analysis of force is occurring, and a comprehensive database system is established.

Staff training and the standardization of review processes are ongoing challenges, as the absence of standardized data elements hinders the development of consistent and actionable metrics. Technical assistance experts are actively supporting the FCSO in addressing these challenges by refining structural processes, procedures, forms, and policies to ensure information is standardized and suitable for future data analysis. However, having adequate supervisors and managers to consistently and effectively review force incidents may be a barrier to thoughtful reviews, even with updated policies, forms and training.

The County and FCSO will continue to explore alternative database solutions to capture both force utilization and corresponding force review data, efforts that will be prioritized for the upcoming reporting period. However, it is anticipated that a complete and accurate use-of-force trend analysis report will not be available until early 2027. In the interim, technical assistance experts will work towards quantifying available data in 2026 as part of the ongoing improvement process.

## **Provision 151**

FCSO will develop and implement an effective early warning system that screens incident reports, use-of-force reviews, allegations of excessive force, and grievances to identify staff members who may be using excessive force, regardless of whether individual use-of-force reviews concluded that specific uses of force were within policy. The system will examine and address potential behavior patterns by staff members that may indicate training deficiencies, persistent policy

violations, misconduct, or potential criminal activity related to uses of force. Screening staff will refer to supervisors for investigation any misconduct, criminal activity, or other behaviors that may require corrective action including re-training. FCSO will maintain a list of staff members identified by the early warning system as possibly needing additional training or discipline and will provide an updated list to the United States and the Monitor every six months and upon request.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO currently maintains an early warning system and has established a policy to guide its use. In addition, the Office of Professional Standards (OPS) (internal affairs) monitors force utilization to identify employees who may need further support, training, or who may be exhibiting problematic behavior. Despite the presence of these mechanisms, the early warning system requires significant updates to enhance its effectiveness.

At present, the system does not include several critical components that are necessary to trigger further evaluation of force utilization, training needs, or employee support. Notably, the current early warning system does not incorporate grievance allegations and complaints received from external sources. As a result, such information is not factored into the evaluation of individual employees, limiting the system's ability to provide a comprehensive assessment.

Early warning systems can be powerful tools for identifying employees who need additional support, further training, or who may not be suitable for work in a law enforcement environment. While the FCSO has implemented a version of such a system, substantial improvements are needed to ensure its effectiveness and consistent application. Because early warning systems rely on information from

148

other database systems, such as the use-of-force system, employee sick leave records, and the grievance system, full compliance with this provision will not be possible until these supporting databases are properly enhanced.

In the interim, the use-of-force technical assistance team will collaborate with FCSO leadership to make the most of the existing database systems, with the goal of identifying employees who require additional attention. However, it is anticipated that this effort will not be completed during the next review period and will likely become a focus in late 2026.

# Environmental Health and Nutrition

## Policies, Procedures and Training

The FCSO provided a list of the policies and procedures that have been revised since May 1, 2025, however, there has not yet been a review process for approval. Many of the reported changes were relatively minor such as changing the word "inmate" to "resident." Additionally, most of the environmental health and nutrition related policies including Food Service Procedures; Sanitation Procedures, Inspection, and Housekeeping Program Pest Control; Housekeeping: Janitorial Laundry Supplies Storage; Chemical Control; Facility Inspections Facility Maintenance; Resident Personal Hygiene; and Hair and Nail Care Services were reported to still be in draft format. The policies and procedures must be revised or written before substantial compliance can be met for the related training.

### Provision 152

By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Environmental Health and Nutrition as set forth in paragraphs 153–180 below and will submit those policies and procedures to the United States and the Monitor for approval pursuant to the process described in Section III above.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***

Due to the high number of set fires and the serious risk posed by the lack of a fully functioning fire alarm and suppression system in the Main Jail, the FCSO should prioritize reviewing, updating and implementation of new or revised policies and

150

procedures related to fire safety, including the Safety, Fire Safety Regulations and Inspections Policy (100-08).

**Provision 153**

Within six months of the date that any policy or procedure related to Environmental Health and Nutrition is finalized or revised (following the period of review for the Monitor and the United States), FCSO will train all relevant staff on that policy, through in-service training.

***Compliance Status:*** Not Rated

## Sanitation and Environmental Safety

The jail must be maintained in a clean and sanitary condition to promote personal hygiene and prevent and minimize disease transmission. To achieve substantial compliance, the FCSO and County will need to both have adequate policies and procedures in place governing sanitation and environmental safety, and demonstrate, through appropriate documentation, that those policies are being followed. Moreover, on site observations of the Monitoring Team, and its discussions with staff and the incarcerated population, should verify that those policies are being consistently adhered to. While the Monitoring Team found the general level of cleanliness to be improved in October 2025 (when compared to the observations of the baseline visit in May 2025), the provisions related to sanitation and environmental safety are either in partial compliance or non compliance

An undated document titled, "Housekeeping Plan: Daily Cleaning & Maintenance" (Housekeeping Plan), was provided by the FCSO that addresses the cleaning of areas other than resident housing areas, such as various elevators, staff restrooms, employee offices, visitation booths, court rooms, and the front lobby. The Housekeeping Plan includes refilling the cleaning chemicals in the sanitation

151

closets as well as the hand soap and hand sanitizer dispensers on the resident housing floors.  However, the cleaning of the resident housing units, including the cells, dorms, dayrooms, showers, and toilets, is not included in the Housekeeping Plan.  Therefore, to attain substantial compliance, a housekeeping plan that addresses the resident living areas including cleaning procedures and instructions on which cleaning supplies and chemicals to use, checklists, and measures to ensure accountability must be developed and implemented.

In a positive sign of progress, the Monitoring Team found the South Annex to be cleaner than was observed in May 2025.  Additionally, 5-South in the Main Jail and the Marietta Annex housing units were found to be reasonably clean. However, significant, serious sanitation deficiencies were found, including accumulations of soils, soap film, and mold in numerous showers; a large area of mold on the ceiling in the intake area; dusty air vents; soiled walls and floors; and accumulations of dust, trash, and debris in various cells and pipe chases. Additionally, the weekly Main Jail inspection and the MOLD reports provided by the FCSO document frequent findings of mold and mildew in the showers.

In general, the floor, walls, and cooking equipment in the Main Jail kitchen were found to be cleaner than was observed during the May 2025 baseline inspection. However, one of the walk-in coolers was not functioning properly, leading to unsafe food temperatures.  The ground around the kitchen's trash compactor was soiled with food residue, debris, and trash, attracting numerous flies.  Deficiencies that hinder proper kitchen sanitation were observed, including severely peeling wall paint, missing grout, and missing and broken ceiling tiles.  These issues must be corrected and reliable processes for promptly identifying and correcting other sanitation issues must be developed, for substantial compliance to be achieved.

**<u>Provision 154</u>**

The County and the FCSO will develop and ensure compliance with a comprehensive, written housekeeping plan that assigns responsibility for carrying out the requirements from paragraphs 155–156 below.  The housekeeping plan will describe cleaning procedures and instructions on which chemicals and cleaning supplies to use.  In addition, it will include checklists and other measures to ensure accountability for completion of sanitation tasks.  The County and FCSO will provide the Monitor and the United States a draft of this housekeeping plan for review and comment.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

As set forth above, while the FCSO has a Housekeeping Plan, it is not yet comprehensive, as Provision 154 requires, nor is it being consistently applied and complied with.

**<u>Provision 155</u>**

FCSO will ensure documented cleaning and sanitization on a set schedule, at least weekly, of all Jail areas, including: (a) housing units and individual cells, including floors, walls, sinks, toilets, bunks, and showers; (b) medical areas, including exam and procedure rooms, sinks, toilets, and exam tables; (c) laundry areas, and ensuring that soiled clothes are laundered separately from unsoiled clothes; and (d) food preparation and distribution areas.  Ceilings, air vents, air returns will be cleaned monthly.

***Compliance Status:*** Non Compliance

## Provision 156

The County and FCSO will ensure that sanitation inspections are conducted at least weekly by designated staff, that the inspections and their findings, including deficiencies, are documented, and that all deficiencies identified are promptly addressed through documented corrective action and follow-up.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO regularly prepares several reports that touch on sanitation issues, including the mold inspection reports, which note the date and location of identified mold and mildew, as well as similar notations in the regular reports prepared by EMSI. However, Provision 156 requires weekly sanitation inspections that document other non-mold sanitation problems in the jails, and the FCSO has not produced records indicating that compliant weekly inspections are happening, nor that corrective action to remediate identified issues is being consistently taken.

## Provision 157

The County will repair or replace all broken or damaged equipment in the medical areas, laundry, and kitchens immediately after it discovers or is notified that they are inoperable; will inspect all equipment in these areas at least weekly to ensure that it is in good working condition; and will provide prompt servicing and preventative maintenance of all such equipment. For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Between the May and the October site visits, the FCSO made a number of necessary repairs to kitchen equipment, including repairing broken grills and kettles. However, other equipment, such as kitchen coolers, remained broken. Further, the Monitoring Team observed broken ceiling tiles and peeling paint throughout the kitchen, as well as sink sealant missing in the dishwasher station. Moreover, Provision 157 requires weekly inspections and timely preventive maintenance, which had not been performed for other necessary equipment, including the kitchen Ansul hood, which had an expired inspection tag at the time of the October visit.

## Physical Plant

The poor condition of the physical plant and lack of maintenance create a hazardous environment for residents, officers, support staff, contractors, and visitors in a variety of ways. Given the manifest safety risks, these issues must be addressed as soon as possible.

Locks remain a significant problem in the Main Jail in that residents continue to break and damage the locks, and the slider and swing doors, creating an unsecure, unsafe environment where resident movement is not contained by locking doors. Numerous door hinges and frames were observed to be severely damaged rendering it impossible to close and secure the cell and pipe-chase doors. These findings are supported by the weekly facility inspection reports. For example, the September 24, 2025 "Weekly Inspection Rice Street" report cites approximately 51 cell doors that were unable to be closed and secured due to damaged door hinges in 2-South, Zones 100 through 500.

Properly functioning toilets, sinks, and showers are essential to maintaining personal hygiene and good health.  Plumbing fixtures that do not work, have low water pressure, leak, run constantly, or are clogged or backed up were observed and are consistently noted in the facility's inspection reports.  During the inspection of 4-North, a resident stated that water leaked from the bottom of his toilet and he had "caulked" around it using a combination of toothpaste and toilet tissue.  The Monitoring Team consistently observed resident attempts to address plumbing problems, such as sopping up leaking fixtures with clothing and blankets, in place of actual fixes of the problems themselves.

During the October monitoring visit, exposed live wires were found throughout many of the housing units, creating critical safety and fire concerns.  Residents are removing the light switch plate covers, exposing the wiring in the walls.  They are using those wires to light wicks made of tissue or paper and, in some cases, starting significant fires, which is extremely hazardous for both residents and staff.  The FCSO reported that as of October 2025, the facility had 24 fires in 2025, including a fire that caused significant smoke and extensive damage to a shower stall, which was evident during the monitoring visit.  In addition, a fire was set on December 12, 2025, seriously injuring both residents and staff and triggering a major emergency response.

The FCSO's fire protection and safety practices are not adequate to protect life and prevent injury.  A State Fire Marshall's Safety Fire Inspection Report, dated April 29, 2024, states that the following are noncompliant: means of egress of approved type; exit signs; detection, alarm, communication systems; extinguishment systems; compartmentation requirements; and electrical system.  Further compounding the danger, the fire alarm and suppression systems in the Main Jail are not fully operational.  *See* First Monitoring Report at pp. 32.  A project

156

commenced on September 29, 2025, to replace the systems in two phases and as of October 2025, completion was not expected for at least a full year. To obtain substantial compliance, all facilities must have a fully functional fire alert and suppression system that is inspected and tested at regular intervals to ensure that it is compliant with fire safety codes. While the County is working with a contractor to bring those systems fully back online, the fire danger in the units is self-evident, and the timetable for full restoration of those systems must be escalated.

Additionally, residents are using the long screws removed from the light plate covers to craft weapons, and an officer was attacked with one such instrument during the October 2025 site visit. Residents are also using the metal switch plates to burn holes in the windows to allow for the entry of contraband into the facility. The extent of the problem and the number of exposed, live wires observed during the October 2025 site visit is shocking and must be immediately addressed.

Mold in the Main Jail is not promptly remediated. The facility provided a "MOLD" report for the dates of March 5, 2024, through September 24, 2025, listing approximately 474 instances where mold or mildew was found, also indicating that most of them are repeat findings. During the October 2025 site visit, mold was observed in numerous showers.

Heavy accumulations of dust were found on the ductwork and vents in the Marietta Annex housing units. During the October 2025 site visit, facilities management reported that due to blocked vents in cells and vandalism to the return air ducts in the pipe chases, air is not being satisfactorily exchanged in the facility. The facility provided air temperature reports, which noted that the acceptable range for air temperatures is 68-78°F. While most of the temperatures recorded on the reports and those measured during the onsite inspections fell within this range, documented temperatures in the mid to upper 50s were also noted on the reports.

157

The custody staffing crisis discussed above is also inextricably intertwined with the persistent maintenance problems in the Main Jail. Custody staffing shortages continue to hinder the maintenance contractor (and its subcontractors) from having adequate access to housing units to perform repairs and renovations. JCI, the County's jail maintenance contractor, prepares a Maintenance Access onto Floor Denial Log 2025, which substantiates numerous occasions wherein contractors were unable to gain access to the facility to perform essential repair work due to the lack of available security escorts.

## Provision 158

The County will ensure that all doors and locks in the housing areas of the Jail are kept in good working order, and that the housing areas are free of dangerous features including holes in walls and windows, and accessible metal.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

Provision 158 applies to all doors and locks in the housing areas, which includes the doors and locks to housing zones, individual cells, and pipe chases. Regarding pipe chases, the facility has proactively identified and begun installing a different style of lock on the pipe chase doors and, as of the site visit in October 2025, residents had not been able to break or damage the new locks. However, there are 54 pipe chase doors per floor that all require lock retrofitting, and only a portion had been completed as of the October site visit. Moreover, the zone and cell doors and locks must also be repaired. While locks and doors were repaired in many housing areas that had been blitzed, the Monitoring Team observed many that remained broken as of the October site visit and the EMSI weekly inspection

158

reports cite numerous damaged door frames and open, unsecured pipe chase doors with missing or broken hasps.

Further, the Monitoring Team has observed live electrical wires interspersed throughout many housing areas, which are "dangerous features" that have not yet been addressed. While the County has discussed possible plans for remediating this problem, as well as the accessible metal that is available in many inmate housing areas, they have not yet been implemented.

## Provision 159

The County will ensure that all plumbing fixtures, including sinks, toilets, and showers, operate with adequate running water at appropriate temperatures.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

As noted above, plumbing fixtures that did not work, had low water pressure, leaked, ran constantly, or were clogged or backed up were observed on multiple floors during the October site visit and are consistently noted in the facility's inspection reports. Moreover, broken plumbing fixtures were a primary driver of resident complaints to the Monitoring Team during the site visit, with multiple residents demonstrating broken toilets in cell, showers that never stopped dripping, and leaking pipes and fixtures leaving residents perpetually fighting a war of attrition against leaks within their housing units.

## Provision 160

The County will ensure that lights and light fixtures provide adequate lighting (with light intensity measuring at least 20-foot candles) in all housing units, cells,

159

dayrooms, and personal hygiene areas, and that all lighting and electrical fixtures are free of exposed wiring.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Lighting levels were at least 20-foot candles in most of the observed areas at the Main Jail during the October 2025 inspections, with several exceptions, including 7-North, Zone 600 that had no lighting due to the fire that was set in the shower stall on October 1, 2025, and the lighting in the housing units at the Marietta Annex did not meet the minimum standard, ranging from only 5 to 16-foot candles. On a positive note, some of the serious lighting deficiencies observed at the South Annex during the baseline inspection had been rectified. Specifically, the lights in the dayroom area of the housing units had been repaired. Additionally, residents had been given small dome lights for use in cell. The Monitoring Team will assess whether those individual lights given to residents are still being utilized or whether the in-cell lights have been repaired during our next monitoring visit. In the South Annex, the FCSO has covered certain cell windows with metal obstructions to prevent the introduction of contraband into those cells. The Monitoring Team understands the FCSO's motivations for this, as interruption of the flow of contraband is absolutely necessary. Yet, the Monitoring Team also has significant concerns about the deprivation of natural light in those cells, which is not consistent with correctional best practices, and only makes the core goals of Provision 160, ensuring adequate lighting and light fixtures, all the more essential.

## Provision 161

The County will ensure that mold on ceilings and walls is promptly remediated.

***Compliance Status:*** Non Compliance

## **Provision 162**

The County will ensure that there is adequate air quality and ventilation throughout the facilities, including by: (a) changing all air filters throughout the Jail on a regular schedule; (b) cleaning all air vents and air returns throughout the Jail on a regular schedule; (c) cleaning or replacing all dirty ceiling tiles throughout the Jail; (d) cleaning dust and dirt from overhead pipes throughout the Jail; and (e) ensuring that all air conditioning and heating facilities are in good repair.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

At the time of the October site visit, dirty ceiling tiles, overhead pipes, and other heating, ventilation, and air conditioning (HVAC) ductwork were prevalent throughout the Main Jail. The Monitoring Team was informed that some of the air conditioning units that had been non-functional during the baseline visit were now working. However, the Monitoring Team did observe several housing units with large, industrial fans to circulate air, and residents sleeping in the common dayrooms because air was not being adequately circulated by the HVAC system into their individual cells. In a positive step towards compliance, the Monitoring Team was informed that the County's DREAM department is hiring an HVAC technician to coordinate HVAC work for the jails. A schedule must be developed and adhered to for the inspections and routine preventative maintenance called for by Provision 162.

161

**Provision 163**

The County will ensure that pipe chases are in good working condition free from leaks, flooding, and other damage, and that incarcerated people do not have access to pipe chases at any time.

**Compliance Status:** Partial Compliance

**Additional Comments/Recommendations:**

FCSO staff have made efforts to resecure the pipe chases utilizing a new locking mechanism.  That project is ongoing and is a precursor to fixing the other issues inside the pipe chases.

**Provision 164**

The County will ensure that there are adequate fire suppression and alert systems throughout the Jail and that they are tested at regular intervals to ensure they are kept in working condition.

**Compliance Status:** Non Compliance

**Additional Discussion/Recommendations:**

The repair and replacement of the fire alert and suppression systems is an urgent life/safety matter.  While the County has engaged a contractor to work on this, the timetable for project completion is elongated.  All efforts should be made by the County and FCSO to get these systems back online as soon as possible.  If an insufficient number of security escorts is continuing to slow down this essential and time-sensitive work, the FCSO should assign dedicated officers to this project to facilitate its fast completion.  The County should assess the number of technicians assigned to this by the contractor to ensure that sufficient resources are being devoted.  It is not an overstatement to say that given the number of fires in

162

the jails in 2025, and the damage already caused, lives may depend on the timely completion of this project.

Furthermore, the FCSO and County should ensure compliance with the Safety, Fire Safety Regulations and Inspections Policy (100-08) stating, "The Chief Jailer or designee will ensure facility fire prevention regulations and practices including proper placement and maintenance of adequate fire protection equipment throughout jail facilities." Deficiencies were observed during the onsite inspection including fire extinguishers with inspection tag logs that were not kept up to date and breathing apparatus storage cabinets that were empty.

### Provision 165

For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

A system is in place to provide notification of maintenance issues (both through the reports of FCSO personnel and facility inspections by EMSI), which are routinely reported and entered into the Maximo maintenance database. However, the biggest obstacle to compliance is the persistent custody staffing shortages that hinder the maintenance contractor, JCI, and its subcontractors, from accessing the jail to perform repairs and renovations. The JCI Maintenance Access onto Floor Denial Log 2025 substantiates numerous occasions wherein contractors were unable to gain access to the facility to perform essential repair work due to the lack of

163

available security escorts.  These reports were validated by the Monitoring Team's discussions with maintenance personnel.

**Provision 166**

The County will develop and promptly implement a comprehensive plan to inspect and fix all existing physical plant deficiencies in the Jail in accordance with paragraphs 158–164 above, and to maintain such plant elements in good condition going forward.  The County will provide the United States and Monitor a draft of this plan, and it will consider comments from the United States and Monitor in revising and finalizing the plan.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

The Fulton County Replacement Jail Bridging Plan (update) Aug 2023, predates the Consent Decree and is not a detailed, comprehensive plan that specifically addresses doors and locks, dangerous features, plumbing fixtures, lights, lighting, exposed wiring, mold, adequate air quality and ventilation, cleaning dust and dirt from overhead pipes, air conditioning and heating facilities, pipe chases, and fire suppression and alert systems. The Monitoring Team also reviewed the Fulton County Jail Project Action Plan (From: June 1, 2025 to Sept. 30, 2025 and 3. Objectives G. states, "Develop a Long-Term Jail Maintenance Plan." The Monitoring Team finds that these documents are a positive start, but they do not establish "partial compliance" with Provision 166, which states "The County will develop and promptly implement a comprehensive plan to inspect and fix all existing physical plant deficiencies in the Jail in accordance with paragraphs 158-164 above, and to maintain such plant elements in good condition going forward. The County will provide the United States and Monitor a draft of this plan, and it

164

will consider comments from the United States and Monitor in revising and finalizing the plan."

## Provision 167

The County and FCSO will conduct documented inspections at least weekly to ensure that the items described in paragraphs 158–164 are in good working condition going forward.  For all deficiencies identified in these inspections, the County will ensure that corrective actions are promptly taken, including by inspecting, cleaning, maintaining, and if necessary repairing or replacing the defective items.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

Regular documented inspections are conducted, including JCI's weekly inspections of various units at the Main Jail and monthly inspections at the South Annex, and Summit's (the contracted food service provider) quarterly inspections of the Main Jail kitchen.  The facility also provided reports regarding mold, elevators, power outages, and damaged exterior windows.  In order to obtain substantial compliance, the County and FCSO will need to ensure that documented corrective actions are taken when deficiencies are found.

## Provision 168

Pursuant to the terms of the Staffing Plan, FCSO will provide supervision that is reasonably designed to avoid damage beyond normal wear and tear.

*Compliance Status:* Non Compliance

## Pest Control

While the presence of significant numbers of pests or common signs of infestation, such as numerous droppings, were not observed by the Monitoring Team, the presence of pests was found during the October site visit. Kitchen staff reported seeing no rodents, and very few cockroaches since the one-time treatment of the kitchen with an EPA Registered, botanical cleaning agent last summer. The ground around the kitchen trash compactor was untidy, attracting house flies. Small numbers of drain flies were observed in some of the shower and toilet areas, indicating that improved cleaning practices are needed to eliminate breeding and harborage. No evidence of rodent infestation, including droppings was observed. The interviewed staff and residents reported that they had not recently seen roaches or rodents in the resident housing units; however, random cockroaches were observed in several of the pipe chases.

Service reports were provided indicating weekly visits by the contracted pest control company. The service reports include observations made by the technician and recommended corrective actions, such as loading dock doors left open when not in use and a recommendation to keep the doors closed. The materials or products used during the service, such as insecticides, should be listed on the service report to ensure regulatory compliance and adhere to safety standards; however, they were not listed on the reports that were provided. Rodent bait stations, refillable containers that are strategically placed around buildings and baited with rodenticide for the control of rodents, should be serviced at least monthly and more often if an infestation is present. A review of the contracted pest control company's service reports for the Main Jail state that the rodent bait stations were sometimes "skipped" and the most common stated reason was "not due this visit" for the six-month period of April through September 2025, despite

the fact that bait stations should be serviced on at least a monthly basis, which is an important aspect of a comprehensive integrated pest management system.

Clean laundry is fundamental to maintaining personal hygiene and good health. Resident clothing appeared to be in generally good condition, without obvious rips, tears, and stains. However, most of the interviewed residents in the Main Jail reported that their laundry is not exchanged as scheduled or returned in a timely manner. Many of the residents reported that they prefer to hand wash their own laundry, and evidence of this practice was observed, including laundry soaking in a mop bucket. Residents housed at the Marietta Complex reported that the laundry that they send out is returned the same day.

Haircutting equipment was observed and hair trimmings were found in the storage box on the small brushes used to clean the equipment, and on hair clippers that should have been cleaned after use. Failure to properly clean and disinfect barber tools places residents at risk of skin and scalp diseases.

## Provision 169

The County and FCSO will develop and implement a comprehensive Integrated Pest Management system for all parts of the Jail that uses prevention measures to keep pests from entering the Jail and control measures to reduce and eliminate pests.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

Provision 169 requires the development and implementation of a "comprehensive" Integrated Pest Management system. The County and the FCSO shared an Integrated Pest Management Plan from their contractor, but it is unsigned and undated. While the County and FCSO, through their pest control contractors, have

167

engaged in some efforts to control and mitigate pests, they have not yet implemented the comprehensive system and plan that is required.

## Provision 170

The County and FCSO will ensure that its pest control system is adequately responsive to reports of pest activity by incarcerated people, including by implementing adequate contact tracing, promptly evaluating all reports of pest activity, and promptly taking appropriate corrective actions where reports are confirmed.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The County and FCSO have made efforts to control the spread of pests through regularly scheduled visits from the pest control contractor and, as set forth above, signs of infestation were not present during either of the Monitoring visits. However, Provision 170 also requires evidence that the system is adequately responsive to reports of pest activity by incarcerated people. The Monitoring Team will work with FCSO and the County to develop appropriate tracking mechanisms to document pest reports from incarcerated people and responsive actions in the next Monitoring Period.

## Provision 171

The County and FCSO will ensure that pest control measures employed in the kitchen, such as use of chemical sprays, do not contaminate food or food preparation areas.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***

On July 31, 2025, the Monitoring Team observed a contractor's treatment of the kitchen with botanical cleaning agents and noted that the preparation work for the treatment areas included tenting that was securely in place to protect the food and other areas of the kitchen.

## Provision 172

For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The County and its contractors have access to the Jail to address housekeeping, maintenance, and rehabilitation issues.  However, as set forth in the discussion of Provision 91, there continues to be evidence of siloing among the key stakeholders responsible for building maintenance and repair.  Meaningful, collaborative meetings with detailed information sharing between the County, FCSO (including both the Building Maintenance Manager and custody leadership who are responsible for maintaining security during necessary maintenance projects), and JCI would be necessary to demonstrate the "communication" and "coordination" that are essential to Provision 172.

## Provision 173

FCSO will take adequate steps to reduce the introduction and spread of ectoparasites and lice throughout the Jail, including by:

169

a. Ensuring that every incarcerated person receives a physical skin check conducted by qualified medical staff within a reasonable time after entering the Jail and before transfer to any housing area;

b. Taking prompt action to control any known infestation or infection;

c. Ensuring that incarcerated people receive adequate opportunities to shower and that their clothes are adequately laundered and replaced as needed; and

d. Ensuring that haircutting equipment is adequately cleaned and disinfected between uses to prevent the spread of skin infections or parasites, and that scalps are examined for parasites or infections before haircuts commence.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

A skin check is performed within a reasonable time after residents enter the jail. While the jail continues to see individual cases of ectoparasites, they are being treated timely to reduce contagion risk, and large-scale outbreaks have been minimized.

## Chemical Control

It is essential that cleaning chemicals are properly labeled and stored, and available to the residents at appropriate intervals to maintain clean cells and living areas. To reach substantial compliance with the Chemical Control provisions, the County and FCSO will need to both have adequate policies and procedures in place governing chemical use and storage, and demonstrate, through logs and records, that those policies are being followed. Moreover, on-site observations of the Monitoring Team, and its discussions with staff and the incarcerated population, should verify that those policies are being consistently adhered to.

The FCSO reports that it is in the process of updating its policies and procedures related to Housekeeping, Janitorial Laundry Supplies Storage, and Chemical Control. The Monitoring Team looks forward to reviewing those revised policies once drafts are shared.

Records reviewed by the Monitoring Team reflected that no soap was passed out on several days in June, and the facility was "out of chemicals" on numerous days in August 2025, and was "out of bleach tabs" on numerous days in September 2025. Furthermore, some of the logs have a checkmark next to bleach tabs in the chemicals issued column, despite having "out of bleach tabs" handwritten at the top of the form. The chemical inventory logs at the Marietta Annex were not up to date, the log for the Zep brand DZ-7 disinfectant was blank despite the fact that there was a partial 55-gallon drum of the chemical in the storage area. In response to a request for inspection logs related to chemical use and control, the FCSO reported that no responsive records exist, which must be addressed.

Safety Data Sheets (SDS) are documents developed by chemical manufacturers that provide detailed information about hazardous chemicals, including their composition and properties, safe handling and emergency procedures, and recommendations for personal protective equipment. Up to date SDSs were observed in the Main Jail's 7th floor sanitation room; however, the SDSs were not up to date at the Marietta Annex. For example, the SDS for the Zep brand DZ-7 disinfectant at the Main Jail had a revision date of October 1, 2023, which corresponds with the SDS date found on the company's website. However, the same product at the Marietta Annex had an outdated Material Safety Data Sheet (MSDS) with an issue date of 08/13/08.

Unlabeled chemical spray bottles pose a safety hazard. Numerous unlabeled spray bottles that contained liquid that appeared to be chemicals (based on appearance

and odor) were observed in various areas, including a spray bottle that contained a liquid with a strong bleach odor that was being used by a resident to clean the dayroom tables in a zone on Floor 1-North on October 7, 2025 and numerous unlabeled bottles in the chemical room at the Marietta Annex. The 7th floor sanitation room in the Main Jail was observed to be orderly and clean. However, the FCSO lacks documentation related to cleaning the janitorial closets and storage areas.

During interviews, residents stated that they routinely self-wash their laundry, and evidence of this practice was observed, including a mop bucket containing resident laundry soaking in a milky white liquid that had a strong bleach odor in the medical unit.

The distribution of cleaning supplies and chemicals in the resident housing areas is deficient to achieve and maintain general sanitation in the facilities. With the exception of one interviewed resident who stated that he can obtain the necessary cleaning supplies from the "right" officers, the residents stated that they need access to more cleaning supplies, including chemicals, to maintain a clean environment, and none reported that they had received instruction or training on the use of chemicals. Copies of Inmate Work Detail Equipment Training Forms were provided indicating that residents who assist the sanitation officers receive training related to the use of equipment and chemicals. Forms were also provided indicating that residents assigned to the kitchen received training on topics including hand washing and washing dishes.

## Provision 174

FCSO will ensure that all chemicals are stored, labelled, distributed, and used following OSHA Standards.

*Compliance Status:* Non Compliance

## Provision 175

FCSO will ensure that all chemical containers, including spray bottles, are secured and kept inaccessible to anyone other than authorized staff except under appropriate conditions and with appropriate supervision.

*Compliance Status:* Non Compliance

## Provision 176

FCSO will develop and implement a perpetual chemical inventory system to track receiving, issuing, and current quantity of chemicals on hand in all areas where chemicals are stored.  FCSO will ensure that all receiving and issuing out of chemicals is recorded in this inventory system, and that it is updated daily to always reflect the amount of chemicals on hand in each storage area.

*Compliance Status:* Non Compliance

## Provision 177

FCSO will ensure that all janitorial closets and storage areas are kept clean and organized, and that those cleanings are documented and performed on a regular schedule.

*Compliance Status:* Non Compliance

## Provision 178

FCSO will ensure that all staff and incarcerated people who utilize chemicals receive adequate, documented training in the proper use and storage of chemicals.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Records reviewed by the Monitoring Team indicate that training has been provided to kitchen workers and staff who accompany sanitation personnel. However, resident workers also need to be given proper training, including on the proper use of chemicals vis-a-vis bloodborne pathogens, given that they are sometimes at risk of exposure.

## Food and Nutrition

Maintaining safe food temperatures is critical for preventing foodborne illnesses. The FCSO has ongoing problems with the refrigeration system and has leased a refrigerated trailer unit to supplement the kitchen's refrigeration. During the inspection of the kitchen on October 6, 2025, walk-in cooler C-1 was not properly working and not adequately cold to maintain safe food storage temperatures. The cooler held potentially hazardous foods, including numerous boxes of turkey bologna. Although the food code states that foods such as lunchmeat should be held at a maximum temperature of 41°F, the temperature of the bologna was found to be as high as 44°F. On October 8, 2025, numerous bagged lunches that included lunchmeat and cheese slices were observed sitting on a table at room temperature at the Marietta Annex at approximately 2:45 p.m. The lunchmeat was measured at 74°F, far exceeding the 41°F safe food holding temperature. The bags were reported to not be needed because the intended recipients were out of the facility; however, this is a dangerous practice and could lead to foodborne illness if the food were to be consumed. To achieve substantial compliance with Provision 179, the FCSO needs to ensure that foods are maintained at safe temperatures in accordance with food code regulations at all times.

174

The food service program has a significant influence on the climate and morale of the facility.  Therefore, it is important that the food service department provides nutritious, appetizing meals within budgetary and operational constraints.  During both the May and October 2025 site visits, numerous residents reported that the facility serves the same sliced bologna lunchmeat at breakfast, lunch, and dinner. Observation of the dinner meal on October 8, 2025, was consistent with this reporting and revealed sliced luncheon meat that looked the same as that served in the sandwiches at lunch, even though the dinner entree was listed as turkey ham on the menu.  Likewise, the breakfast served on May 20, 2025, included sliced luncheon meat that was listed on the menu as "baked turkey ham" and looked the same as the meat served for the lunch sandwiches.

While this meat may be calculated in the dietitian's menu plan, it is not a best practice to routinely serve the same food item.  Such an approach quickly leads to menu fatigue and complaints.  The FCSO outsources food service to a vendor that is contractually required to "ensure that all meals will be served in a manner that makes them nutritious, wholesome, palatable and visibly pleasing" and therefore, the FCSO should reevaluate the frequent service of bologna type lunchmeats to ensure that the meals meet their contractual as well as requisite nutrition requirements, including sodium recommendations, because deli meats are a significant source of sodium.  The dietitian's menu analyses reveals that the general diet contains almost 5 grams of sodium and the Cardiac menu contains an average of 3.4 grams of sodium and also includes frequent servings of turkey bologna and salami, which exceeds the United States Department of Agriculture Dietary Guidelines for Americans recommendation of less than 2.3 grams of sodium per day.

Additionally, a review of the diabetic menus reveals that it generally aligns with the regular diet menu except that some menu items, such as grits, are not buttered and a serving of 100% fruit juice or canned fruit is provided instead of cookies or cake. However, the diet is high in carbohydrates and lacks servings of fresh fruits and vegetables.

The dietitian's analysis of the regular diet that was provided by the facility indicates that it meets or exceeds the recommendations for Iron, Vitamin A, Vitamin C, Vitamin D, and Calcium for adults between the ages of 19 to 50; however, the Calcium is below the recommendation for adults over the age of 50. Moreover, it is sufficient, on paper, to meet the caloric requirements of the resident population, including the 17-year-olds.

Both the medical department and interviewed residents report that the provision of medical diets is inconsistent. To obtain substantial compliance, all menus should be reviewed to ensure that the diets promote good health and meet the nutritional needs of all incarcerated persons, and the process for medically therapeutic diets is reviewed and improved to ensure that meals that comply with the medical diet order are consistently provided.

## Provision 179

FCSO will ensure all food items are stored, prepared, and delivered to incarcerated people at the appropriate temperatures for food safety.

***Compliance Status:*** Non Compliance

**<u>Provision 180</u>**

FCSO will ensure that meals for incarcerated people meet requisite nutritional and caloric requirements, including the specific requirements for special and medically necessary diets, such as diabetic diets.

***Compliance Status:*** Partial Compliance

# Medical and Mental Health Care

## Policies, Procedures and Training

During site visits, the Monitoring Team met with and observed a dedicated cadre of medical and mental health staff, and their security partners in the FCSO, who are committed to providing clinically adequate treatment to the jail population. This is encouraging. However, as set forth below, there are significant problems that must be overcome for the FCSO to achieve compliance with the medical and mental health provisions.

Regarding the provisions related to training and policies and procedures, the FCSO's current policies and training infrastructure for medical and mental health services are not yet structured to support compliance with the Consent Decree. Although NaphCare's corporate policies generally address many of the required subject areas, they do not provide the site-specific operational guidance necessary to ensure consistent practice. Without detailed standard operating procedures (SOPs), expectations around communication, documentation, referral pathways, treatment delivery, monitoring, and progression toward stabilization cannot be reliably operationalized. To address these gaps, the Monitoring Team is working collaboratively with NaphCare (including providing recommended SOP content across critical domains). These workflows should be coordinated with security and incorporated into FCSO policies to ensure consistency and compliance with the Consent Decree. Training systems mirror these structural gaps. While orientation and ongoing training for both custody and clinical staff occur, existing FCSO policies do not include all the training required under the Consent Decree, or the competencies expected upon completion.

178

**Provision 181**

By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Medical and Mental Health Care, and will submit those policies and procedures to the United States and the Monitor pursuant to the process described in Section III above.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***

The FCSO has not yet submitted finalized new or revised medical or mental health policies required under the Consent Decree for the Monitoring Team's review. Based on discussions with leadership, several policies are reportedly undergoing revision in collaboration between the FCSO and NaphCare.

**Provision 182**

Within three months of the date that any policy or procedure related to Medical or Mental Health Care is finalized or revised (following the period of review for the Monitor and United States), FCSO will ensure all relevant staff are trained on that policy, through in-service training.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***

The FCSO has not provided final revised medical or mental health-related policies or procedures in response to the requirements of the Consent Decree.  Because these policies have not yet been finalized or approved, the associated requirement—ensuring that all relevant staff receive timely in-service training within three months of policy implementation—cannot yet be operationalized. Once required policies are finalized, the FCSO and NaphCare should implement a

179

structured training program that clearly defines staff training responsibilities, uses standardized documentation and tracking systems, and ensures all new or revised policies prompt mandatory, documented in-service training within three months, consistent with the Consent Decree.

The Monitoring Team recommends the following:

- Once required policies and procedures are drafted and approved, develop a corresponding training curriculum for each policy.
- Clear expectations regarding training responsibilities, including which staff (nursing, mental health professionals, prescribers, and custody staff assigned to mental health units) must receive which modules.
- Implement standardized training documentation systems (e.g., sign-in logs, competency checklists, and annual refresher tracking).
- Ensure that all new or revised policies trigger mandatory, documented in-service training within three months, as required by the Consent Decree.

## Provision 183

The County and FCSO currently contract with a vendor to provide medical and mental health staffing for the Jail and expect to continue to do so.  The County and/or FCSO will ensure that the vendor's policies and conduct conform to the requirements of this Consent Decree.  Where the Consent Decree places an obligation on the County and/or FCSO to provide certain services or undertake certain actions, the Parties recognize that the vendor's satisfaction of the requirements of the provision suffices.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

The FCSO has a dedicated Health Program Manager on staff to help manage the contract with NaphCare, which is very helpful. Yet, there does not yet appear to be a coordinated, robust oversight framework to ensure that the vendor's policies, practices, and clinical operations consistently conform to the requirements of the Consent Decree. Communication and coordination among the County, FCSO, and vendor related to care monitoring, policy development, and implementation must be enhanced, and the Monitoring Team has not yet observed a reliable, formalized system for tracking compliance, identifying deficiencies, or ensuring timely corrective action.

## **Provision 184**

All Custody Staff will receive training that emphasizes the importance of providing medical and mental health services in the Jail, and the role that Custody Staff have in ensuring these services are provided, with the understanding that Custody Staff is not medically trained and is not responsible for making medical decisions and does not get to override medical decisions.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

The Monitoring Team has been assured that this training has been done with all custody staff currently employed at the jails and is included in the curriculum for pre-service training. The Monitoring Team has reviewed certain components of this training, such as "Basic Jail Officer Certification Course—Inmate Medical," which is useful but somewhat general and not specific to conditions at the jails. Attendance rosters should also be provided for review.

Regarding mental health training, while the FCSO Training Requirements and Specialized Training Policy (700-05) and Suicide Prevention and Intervention and Response to Inmate Suicide Attempt or Death Policy (400-16) and NaphCare corporate Health Training for Correctional Officers Policy (C-04) contain some elements relevant to this provision, particularly training on recognizing mental illness, identifying crises, and referring individuals to health services, they do not collectively establish a unified, facility-wide curriculum that clearly emphasizes the importance of ensuring access to medical and mental health services.  The training materials reviewed do not clearly articulate that custody staff play a central role in facilitating clinical care, nor do they explicitly instruct custody staff that they are not medically trained, not responsible for making medical decisions, and not permitted to override clinical judgment.

## Provision 185

All Custody Staff who work in mental health units will be trained in de-escalation and crisis response techniques, and will be trained to recognize signs of decompensation (e.g., significant worsening of symptoms, or significant decline in self-care and/or communication).

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Current custody training requirements address suicide prevention and crisis response but remain fragmented and insufficient to ensure consistent, specialized mental health training for all custody staff assigned to mental health units. Although FCSO Policy 700-05 includes suicide intervention, de-escalation, and Crisis Intervention Team concepts in initial training, it does not explicitly require training on recognition of psychiatric decompensation or establish unit-specific

standards for custody staff working in mental health housing, and while FCSO Policy 400-16 requires initial and annual suicide-prevention training and proposes additional mental health-specific competencies, these requirements have not yet been reconciled across policies.  NaphCare Policy C-04 appropriately calls for enhanced training for custody staff assigned to mental health housing.  Despite the provision of several training slide decks addressing medical and psychiatric emergencies, symptom recognition, and crisis response, it remains unclear which custody staff receive this training, how frequently it is delivered, or whether completion is reliably tracked, as the facility did not provide a structured training schedule, attendance records, or a system for verifying compliance.

## Intake and Records

All new arrivals to the jail flow through its intake area where they are evaluated by NaphCare staff before moving on to their housing assignments.  Intake is an especially important health care process in jails, as two essential healthcare obligations are met at intake: identifying patients with urgent and emergent medical or mental health needs, and ensuring continuity of care for patients receiving medical or mental health care prior to coming to jail.  All of these patients need to be identified at intake, and their medications and treatments need to be continued uninterrupted.  At present, while NaphCare has appropriate policy frameworks in place related to patient intake, the lack of privacy in the intake setting is a significant impediment that must be remedied for the FCSO to achieve substantial compliance.

**Provision 186**

FCSO will conduct medical and mental health intake screenings upon admission to the Jail in a confidential setting that encourages the sharing of accurate and complete information.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Two NaphCare policies and procedures lay the foundation for compliance with Provision 186:

- E-02 Receiving Screening, which does not mention the requirement for privacy.
- A-07 Privacy of Care, which states "All health services, including history taking, will be conducted in an area private enough to ensure the patient will feel free to discuss problems."

Medical and Mental Health Intake screenings are done at the Main Jail in a large room with five assessment areas divided by small visual screens. Four of the assessment areas are staffed by registered nurses (RNs), each of whom does a separate part of the intake assessment. The last area is staffed by medical assistants/licensed vocational nurses (LVNs) who draw blood, collect urine, etc. There is little privacy in this setting. When fully functioning, the room can contain five (or more) medical staff, and five patients, all trying to talk at the same time. Both medical staff and patients told the Medical Monitor that one often has to yell in order to be heard. The cloth visual screens separating the assessment areas provide no privacy for verbal information. Anything a patient says can be heard by the other nine (or more) people in the room. The Medical Monitor did find evidence of patients who withheld sensitive medical information in intake because

184

of the lack of privacy and then reported this information later, when they had privacy.

The Intake Medical and Mental Health Assessment room will have to be significantly remodeled to achieve substantial compliance with Provision 186. Alternatively, Intake Assessment could be moved to a different intake area where privacy could be assured.

## **Provision 187**

FCSO will ensure that the Jail's data management system accurately and timely communicates information to the electronic medical records system, including changes in custody status, location, and medical conditions.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO has no policy and procedure that addresses this provision. Review of patient charts in the TechCare Electronic Medical Record (EMR) shows that "custody status, location, and medical conditions" are easily found in the EMR. However, food services has a separate computer program that is not integrated with TechCare. When practitioners prescribe medical diets to patients, the prescription must be printed off and manually taken to food services, where it then must be entered into the food service computer program. Multiple practitioners and patients told the Medical Monitor about delays of up to weeks between the ordering of a medical diet and when the new diet was first delivered to the patient. This increases the risk that patients will suffer medical harm by being served food that they should not eat.

TechCare should integrate with the food services computer program, if possible. NaphCare leadership has indicated that is working on a solution for this.

## Emergencies

Across both medical and mental health emergencies, FCSO staff demonstrated responsiveness and appeared to take emergent presentations seriously during the October site visit. The goal of an emergency response system is to deliver life-saving emergency care to patients as soon as possible. Life-saving emergency medical interventions include Automated External Defibrillators (AEDs), Cardiopulmonary Resuscitation (CPR), Naloxone, and cut down kits. An effective emergency response system includes relevant policies and procedures, training, properly located equipment, effective communication protocols, regularly scheduled practice drills, appropriate documentation, and routine oversight, including continuous quality improvement.

Similarly, in mental health emergencies, the facility requires an integrated policy or procedure that defines and operationalizes mental health emergency protocols. The lack of a unified document with expectations and operational guidance leaves the system vulnerable to inconsistent practices in high-risk situations. In addition to generating clear guidance, cross-departmental training, and reliable systems for tracking timeliness and compliance are needed.

### **Provision 188**

FCSO will develop and implement protocols identifying potentially life-threatening medical emergencies that require immediate consultation with a physician or immediate transfer to a hospital emergency room. FCSO will ensure that incarcerated people deemed to fall within these protocols are immediately assessed by a medical professional who will document the risk presented and the level of supervision required or immediately transferred to a hospital emergency room. In the event of any delays in assessment or transfer, FCSO will ensure that incarcerated people are under constant unobstructed visual observation.

186

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Provision 188 requires the development of compliant emergency protocols, documentation from each response, and proof of practice that the protocols are being adhered to. The NaphCare Emergency Services and Response Plan Policy (D-07) addresses some of the requirements of Provision 188. However, D-07 requires an "emergency plan" that is "approved by the responsible health authority and facility administrator." The Medical Monitor was informed that the FCSO does not currently have an emergency plan but that this document is being written. D-07 also does not address other parameters of Provision 188, such as defining what constitutes a "potentially life-threatening medical emergency" or the requirements for retrospective review of performance to ensure that the policies and procedures are adhered to. A site-specific SOP for emergency responses must be written incorporating all of the requirements of Provision 188 to be compliant.

## Provision 189

FCSO will develop protocols identifying potentially life-threatening mental health emergencies (e.g., imminent danger to self or others) that require immediate consultation with a QMHP or immediate transfer to a hospital emergency room or psychiatric hospital. FCSO will ensure that incarcerated people deemed to fall within these protocols are immediately assessed by a QMHP who will document the risk presented and the level of supervision required, or, if transfer is warranted, FCSO will take all reasonable steps to immediately transfer to a hospital emergency room or psychiatric hospital. In the event of any delays in assessment, FCSO will ensure that incarcerated people are under constant unobstructed visual observation while awaiting assessment.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Although existing policies direct staff to respond to suicide risk and psychiatric emergencies, current referral processes do not clearly operationalize or enforce the provision's requirements for immediate qualified mental health professional (QMHP) assessment, hospital transfer when warranted, and continuous unobstructed observation pending evaluation.  The FCSO Suicide Prevention and Intervention and Response to Inmate Suicide Attempt or Death Policy (400-16) and NaphCare's Mental Health Referral Guidelines outline emergency response pathways; however, the referral tools reviewed define "emergent" assessments as occurring within 24 hours and lack clear criteria for immediate QMHP evaluation, creating a gap between policy intent and operational practice.  During the October site visit, the Mental Health Monitor observed inconsistent implementation of core safety requirements, including failures to place acutely psychiatrically ill individuals on constant, unobstructed visual observation while awaiting assessment, with some detainees housed in cells with obstructed sightlines and ligature risks.  Although a revised mental health referral SOP and related materials include additional operational details, there does not appear to be a single, unified, cross-departmental psychiatric emergency protocol that clearly delineates when immediate QMHP assessment or hospital transfer is required and how supervision must be maintained pending evaluation.

## Provision 190

FCSO will ensure that life-saving medical aid is promptly delivered during medical emergencies.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

Life-saving medical aid includes CPR, AEDs, Naloxone, cut-down kits, and first aid, such as control of bleeding. To assess compliance, emergency response data must be collected, collated, and analyzed to identify issues with the delivery of life-saving medical aid. Although some of this data is being collected on handwritten forms, the Monitoring Team has not yet received these forms. Nor has the Monitoring Team seen evidence of a systematic process for developing corrective action plans to address identified issues during medical emergencies.

The Monitoring Team has the following recommendations:

- The FCSO must routinely collect and analyze data on emergency response times for custody first responders, medical responders, emergency medical technicians and first use of potentially life-saving procedures.
- These statistics should be presented monthly to the Medical Advisory Committee (MAC) and shared with the Monitoring Team.
- The FCSO must analyze this data and create corrective action plans (CAPs) to address deficiencies in emergency response.
- Share the FCSO's analyses of emergency responses and the resultant CAPs with the Monitoring Team.

## Provision 191

FCSO will ensure that all medical, and mental health staff receive adequate pre-service and annual in-service training on first-responder medical care, mental health care, de-escalation and suicide prevention. FCSO will ensure that all Custody Staff receive adequate pre-service and annual in-service training on first-responder medical care, and the appropriate level of mental health care, de-

189

escalation and suicide prevention training. FCSO will conduct joint man-down drills with medical and custodial staff and address problems identified.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

NaphCare Emergency Services and Response Plan Policy (D-07) appropriately addresses most of the requirements of Provision 191. The Medical Monitor has reviewed the PowerPoint emergency training given to Security and health care staff. This training generally complies with the requirements of Provision 191. The FCSO should provide rosters of attendees so that the Monitoring Team can verify this compliance.

The Monitoring Team has been provided with critiques of man-down drills done in September, October, and November 2025. These are appropriately done. However, in order to certify compliance with Provision 191, the Monitoring Team should have access to all man-down drill critiques, as well as attendee rosters and minutes from any discussion in supervisory committee meetings.

See the Policies, Procedure and Training, as well as Suicide Prevention section for details on mental health-related aspects of this provision.

## Provision 192

FCSO will regularly review medical emergency responses to identify opportunities for improvement and implement any needed changes.

***Compliance Status:*** Non Compliance

*Additional Discussion/Recommendations:*

The Medical Monitor was told that the FCSO is not yet systematically reviewing medical emergency responses.  The Monitoring Team is available to assist with this process.

## Assessments, Sick Calls, and Referrals

This section of the Consent Decree requires all patients to be appropriately assessed for medical and/or mental health problems and to have unimpeded access to health care while incarcerated.  The Monitoring Team's discussions with and observations of medical and mental health staff reflect that they are committed to providing quality patient care, which is encouraging.  Yet, as set forth below, significant obstacles must be overcome to achieve compliance with these provisions.

Health care assessments consist of the receiving screening and the health assessment (called the "Physical Assessment" in TechCare).  If these assessments are not done within accepted time frames, patients with serious health problems can be missed and suffer harm.  Likewise, if patients do not have access to sick call clinics in a timely manner, all will have increased risk, and some will suffer medical harm.

The Monitoring Team identified gaps and areas for improvement in the FCSO's systems for mental health assessments, sick call triage, and referral processes.  While the facility conducts mental health screening at intake and has multiple guidance documents outlining referral pathways, these documents are fragmented and lack unified operational standards.  Mental health and psychiatric evaluations demonstrate variable quality, limiting their reliability for diagnosis, treatment planning, and risk assessment.  Additionally, the absence of a standardized and

consistently implemented Serious Mental Illness (SMI) classification system undermines the facility's ability to ensure appropriate clinical follow-up, housing decisions, diversion from restrictive settings, and population-level risk management.  Together, these vulnerabilities reflect the need for consolidated policies, clearer referral criteria, improved documentation standards, and stronger quality assurance to support a coherent and clinically sound assessment and referral framework.  The Monitoring Team has provided guidance on some of these necessary site-specific policies and will continue to work with NaphCare on implementation.

**Provision 193**

All incarcerated people will receive a comprehensive health assessment following their intake screening, including people who had a comprehensive health assessment in a prior incarceration within the past year.  The timing of the assessment will be based on whether the screening identifies factors necessitating an urgent follow-up due to active, uncontrolled, or otherwise unstable physical health symptoms.  These factors, and the associated timelines, will be described in a policy that FCSO will implement after approval from the United States and the Monitor.  The purpose of the medical assessment is to create a full and comprehensive record of the individual's medical history, diagnoses, symptoms, and current needs.  The information gathered during the medical assessment will be used to create treatment plans and will guide follow-up care.  Diagnoses will be listed clearly and will be updated as needed.

***Compliance Status:*** Partial Compliance

192

***Additional Discussion/Recommendations:***

The FCSO must develop a relevant policy that incorporates the requirements of Provison 193. The NaphCare Policy and Procedure Manual currently has a relevant section: E-04 Initial Health Assessment that addresses some of the requirements of Provision 193. However: a) this document is not site specific and discusses items irrelevant to Fulton County (such as Health Assessment timing in prisons); b) it does not establish separate timing requirements for Urgent or Routine as required by Provision 193; and c) the FCSO uses different terminology. Instead of "Health Assessment," the TechCare EMR refers to "H&P Assessment" or "Physical Assessment." As a result, a site specific SOP for the Main Jail needs to be written to address the requirements of Provision 193.

In practice, intake is staffed with a medical practitioner 24/7. Patients found at intake to have chronic medical conditions are seen by a practitioner before they leave intake. The intake practitioners interviewed by the Monitoring Team reported that they are able to keep up with these assessments without backlog. Patients without chronic or acute medical conditions at intake are appropriately scheduled to receive a health assessment within 14 days.

Compliance with the urgent and 14-day requirements of Provision 193 can be tracked on the TechCare EMR by generating a report of all "Physical Assessments" over any time period. Using this tool, the Medical Monitor checked compliance for the month of October, 2025. 407 patients were listed. 287 patients had an initial Physical Assessment or 71%. Based on rough calculations, 232 of the 287 patients had their physical assessment done within 14 days, or 81%. These numbers will have to improve to achieve compliance with Provision 193.

The FCSO should be monitoring data related to the timeliness and quality of health assessments. The Monitoring Team have been informed that this data is being collected and audited and it should be shared with the Monitoring Team.

## Provision 194

Individuals whose mental health screening instrument indicates a need for a full mental health assessment will receive one on a timely basis. The timing of the assessment will be based on whether the screening identifies factors necessitating an urgent follow-up due to active, uncontrolled or otherwise unstable mental health symptoms. These factors, and the associated timelines, will be described in a policy that FCSO will develop and implement after approval from the United States and the Monitor. The purpose of the mental health assessment is to create a full and comprehensive record of the individual's medical history, diagnoses, symptoms, and current needs. The information gathered during the mental health assessment will be used to create treatment plans and will guide follow-up care. Diagnoses will be listed clearly and will be updated as needed.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Although NaphCare has established policies and guidance governing mental health screening, referral, and evaluation, inconsistent implementation impacts the reliability and clinical effectiveness of the intake and assessment process at Main Jail.

NaphCare Mental Health Screening and Evaluation Policy (E-05) outlines the required elements of the initial mental health screening, including psychiatric history, prior treatment, suicidality, psychotropic medication use, substance use, and emotional response to incarceration. Although corporate policy permits

194

screening to occur within fourteen days of arrival, at the Main Jail this screening is incorporated into the receiving screening completed by nursing shortly after intake. The Monitoring Team agrees with this expedited timeline for screening as it facilitates early detection of mental health needs.  During the October site visit, NaphCare intake staff indicated that individuals who screen positive generate an automatic routine referral, though nursing may change this to priority in TechCare if appropriate.  Staff noted that there does not appear to be an emergent-referral option in the system; instead, they escalate referrals based on clinical concern. Consistent with policy, individuals with a positive screen must receive a full mental health evaluation within 30 days, or sooner when clinically indicated.

NaphCare has developed multiple guidance documents addressing mental health referrals, triage, and evaluations, including referral criteria, escalation pathways, and evaluation templates, as well as clinical guidance for detained individuals whose legal circumstances place them at elevated mental health risk.  While these materials include many elements necessary to support timely identification and intervention for individuals with mental health needs, they are fragmented, internally inconsistent, and not integrated into a single, facility-wide SOP. Variability in referral timeframes, absence of consolidated guidance, outdated diagnostic references, and lack of standardized expectations for psychiatric evaluations could contribute to inconsistent staff understanding and implementation, as reflected in differing interpretations reported by nursing and mental health staff during the October site visit.  Chart reviews further demonstrated variability in the completeness and clinical quality of mental health and psychiatric assessments, limiting their reliability for diagnosis, treatment planning, acuity determination, and safety-related decision-making.

The facility should implement an integrated, standardized mental health referral and evaluation framework; supported by unified SOPs, consistent timelines, enhanced EMR functionality, updated evaluation templates, routine quality assurance, and interdisciplinary training; to ensure timely, comprehensive, and consistently documented mental health and psychiatric care.

## Provision 195

A QMHP will indicate if an incarcerated person has SMI by adding this to the problem code and flags sections of the person's medical record.  They will also add an SMI designation whenever it becomes apparent, at any point in the course of their incarceration, that such a designation is appropriate.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

At the time of the October visit, there was no standardized, facility-wide definition of SMI, nor was there a consistent process for identifying, documenting, or updating SMI status in the electronic medical record.  Although NaphCare's corporate definition of SMI is a "substantial disorder of thought or mood that significantly impairs judgment, behavior, reality testing, or the ability to manage daily demands within the correctional environment," this definition did not seem to be operationalized within local policy or practice.  QMHPs reported varying interpretations of what constitutes SMI, and several clinicians were unfamiliar with any formal definition or classification process.

The lack of a reliable SMI designation system has significant downstream operational implications.  Without consistent identification, the facility cannot ensure appropriate housing placement, minimum clinical visit frequencies, treatment intensity, monitoring expectations, diversion from restrictive housing, or

prioritization for discharge planning.  The absence of a standardized SMI classification framework also limits population-level management.  Without this information, NaphCare and the FCSO cannot easily identify high-risk individuals who require enhanced monitoring, specialized programming, or timely clinical escalation.  This gap also impairs the facility's capacity to track outcomes, plan staffing, or appropriately allocate mental health resources.

The facility should implement a standardized, EMR-integrated Serious Mental Illness designation; supported by clear workflows, staff training, supervisory oversight, and routine quality assurance; to ensure consistent identification, documentation, and clinical use of SMI across care and custody processes.  Prior to submission of this report, the Monitoring Team received a document titled "FCSO Severe Mental Illness Designation Criteria," dated December 11, 2025.  This document outlines a proposed framework for SMI and represents an important initial step toward standardization.  The Monitoring Team looks forward to discussing the process for finalizing this definition and to understanding how it will be operationalized in practice.

## **Provision 196**

FCSO will indicate in the medical record if any incarcerated person has a Substance Use Disorder (SUD).  FCSO will ensure that any incarcerated person who reports at intake or otherwise the use of medications or substances that may trigger withdrawal receive immediate initiation of withdrawal monitoring and obtain treatment consistent with the BJA Guidelines for Managing Substance Withdrawal in Jails: A Tool for Local Government Officials, Jail Administrators, Correctional Officers, and Health Care Professionals (June 2023), including, where appropriate, medication for opioid use disorder.  In the event that BJA publishes new guidelines or updates the guidelines, FCSO will provide treatment consistent

with the new guidelines or updates, or will meet and confer with the United States and the Monitor about the appropriate treatment.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Provision 196 has the following components:

- The TechCare medical record must document those patients with a SUD. The FCSO is compliant with this component. All current patients being treated for withdrawal and for SUD can easily be accessed in TechCare.

- Withdrawal monitoring must begin immediately when withdrawal is reported or suspected. Current practices appear compliant with this component.

- Withdrawal must be monitored and treated consistent with the BJA guidelines. The FCSO is compliant with this component.

- The FCSO must provide treatment for Opioid Use Disorder (OUD) consistent with the BJA guidelines. The FCSO continues treatment for OUD if patients were receiving treatment for OUD prior to incarceration in a community methadone clinic or buprenorphine clinic. This complies with Provision 196. However, the FCSO does not initiate long term buprenorphine or morphine as treatment for OUD as recommended by the BJA guidelines. This is not compliant with Provision 196. The Medical Monitor discussed the need to initiate long-term treatment for OUD with the Jail Medical Director. This would require a significant increase in medical and security staffing.

- The FCSO should "meet and confer with the United States and the Monitor about the appropriate treatment" to discuss initiating long term treatment for

198

patients with SUD.  The Monitoring Team recognizes that due to FCSO's staffing crisis, the implementation of this provision and program will likely be delayed for at least twelve months.

## **Provision 197**

FCSO will ensure that the sick call process provides incarcerated people with adequate access to medical and mental health care.  FCSO will implement a system for sick calls that includes: (a) ready availability of sick call requests and daily collection in a confidential manner; (b) sick call requests will be triaged appropriately and in a timely manner; (c) sick calls will be logged and tracked through a tracking system that notes the date of the sick call and the date of the examination and any treatment; and (d) FCSO will implement a sick call oversight system that will allow audits to assess timeliness and appropriateness of responses.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The NaphCare Nonemergency Health Care Requests and Services Policy (E-07) includes the requirements of Provision 197, including:

- Sick call request form availability: interviews with providers and incarcerated persons suggest that many, though not all, incarcerated persons understand how, and are able to, make sick call requests (either to staff, through a tablet, if available, or a paper sick call request form). However, patients who are segregated do not have access to tablets and must ask Security staff for sick call request forms.  Because of the staffing shortage, this can be difficult.  Segregated patients told the Medical Monitor that they have difficulty submitting sick call request forms, which should be addressed.

199

- Collection of sick call request forms:  Sick call request forms are collected by LVNs twice a day.  This is compliant with Provision 197.  Triage of sick call request forms.  E-07 requires that sick call requests be triaged within 24 hours.  Continuous Quality Improvement ("CQI") studies showed 77% compliance with this requirement in January 2025 and 55% compliance in March 2025.  This must improve to achieve Substantial Compliance with Provision 197.

- Tracking of sick call requests:  Sick call requests are appropriately tracked in TechCare.  Reports on "Completed Sick Calls," "Cancelled Sick Calls," "No Show Sick Calls," etc.  are easily available in TechCare.  This is compliant with Provision 197.  Sick call request oversight and monitoring.  The Medical Monitor has been told that FCSO monitors this data and its analysis and conclusions should be shared with the Monitoring Team.

The Monitoring Team has the following recommendations:

- The FCSO must track and audit the sick call process to show "timeliness and appropriateness of responses."
- The Monitoring Team needs access to data showing compliance with Provision 197.

## **Provision 198**

Individuals whose sick call request reveals an emergency will be treated on an emergency basis.  Individuals whose sick call request reveals factors necessitating an urgent follow-up due to uncontrolled or otherwise unstable symptoms will receive a medical assessment or mental health assessment, as appropriate, within an urgent timeframe.  These factors and timelines will be described in a policy that FCSO will develop and implement after approval from the United States and the

Monitor.  All other individuals whose sick call requests require a medical assessment or behavioral health assessment will receive that assessment within 72 hours.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Provision 198 requires the following:

- A policy containing all of the requirements of Provision 198.  The current NaphCare Nonemergency Health Care Requests and Services Policy (E-07) does not satisfy all of the requirements of Provision 198.  A SOP specific to the Main Jail must be written to satisfy Provision 198.

- Provision 198 requires patients with routine sick call requests to be assessed by an RN or a practitioner (depending on the request) within 72 hours.  The Medical Monitor has been told that the FCSO monitors this data.  However, the Monitoring Team has not been given access to this data and so cannot certify compliance with this parameter.  The Medical Monitor has interviewed multiple practitioners and patients, who report that this time frame is routinely not met.

- Multiple medical staff members told the Monitoring Team that the most significant reason for delays in evaluating sick call requests is the lack of available security escorts, as described elsewhere in this report.

The Monitoring Team recommends the following:

- FCSO must write an SOP specific to the jails that addresses the requirements of Provision 198.

- The FCSO should routinely track and audit the average time between the submission of a sick call request and when the patient is seen by an RN or a practitioner.
- The Monitoring Team needs access to the data showing compliance with the timeliness requirements of Provision 198.

## Medical Care

The overall goal for the provision of health care to patients incarcerated at the FCSO jails is that all necessary medical tasks, including intake screening, tuberculosis screening, health assessments, chronic care clinics and sick call, will be completed, in a clinically appropriate fashion, every day without carry-over to the next day. Thereafter, the emphasis will be on ensuring the quality of health care administered, which is CQI.

Currently, not all medical and mental health tasks are completed every day. Estimates from medical practitioners interviewed by the Medical Monitor in October ranged from being able to complete half to two thirds of each day's tasks. This indicates an unacceptable degree of systemic health care dysfunction at the jail. Some of the root causes of this dysfunction are readily apparent in that security staffing remains insufficient to handle the flow of patients to clinic appointments and providers into the housing units to see patients. NaphCare and its FCSO and County partners should work with the Monitoring Team to identify, and rectify, other root causes of this dysfunction. Moreover, records within the medical records database indicate a persistent backlog of between 280-400 appointments for residents with chronic medical conditions. This, too, must be corrected.

**Provision 199**

FCSO will provide appropriate security to ensure that healthcare services are available to the incarcerated population.  In the event that healthcare services are significantly delayed or denied due to a lack of staffing, FCSO will document the disruption, escalate the issue to supervisory staff at the Jail, and implement corrective actions.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

The Monitoring Team spoke with and observed numerous members of the FCSO, at the line and leadership levels, who expressed a sincere willingness to participate in the medical and mental health missions of the jail.  That is encouraging.  Yet, Provision 199 has two components: adequate security and disruption reports.  Currently, security is inadequate to ensure that health care services are available to the incarcerated population.  Medical personnel at all levels interviewed by the Medical Monitor identified this as the single biggest problem with the delivery of health care.

Security for health care operations is provided by off-duty custody officers hired by NaphCare (sometimes colloquially known as "NaphCare Officers," though they are, in fact, FCSO employees).  The problem is that there are too few NaphCare Officers on duty to provide security for all medical operations at once.  This leads to medical operations being suspended at various locations until an officer becomes available.  The nonproductive time results in the inability of medical personnel to complete all scheduled tasks in a given day, with some indicating that they are only able to complete half or two thirds of their daily medical tasks (an exception is the South Annex, where assigned security appears to be sufficient for medical staff to complete all medical tasks on most days.)

203

Regarding disruption reports, current practice is for medical personnel who suspend medical operations waiting for a security escort to submit a written disruption report. Interviews with both medical and security personnel indicate that this system simply does not work as medical personnel perceive the reports to be futile and so do not routinely submit them.

The FCSO must increase the number of security escorts at the Main Jail, whether using on-duty personnel assigned to medical service or increasing the number of off-duty personnel hired for this task. The Monitoring Team suggests a formal meeting attended by the FCSO, NaphCare, and the Monitoring Team to discuss a solution to this problem.

**Provision 200**

FCSO will hire sufficient staff with appropriate credentials to offer all necessary medical care.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Provision 200 has two components: sufficient staffing and appropriate credentials. Review of the staffing matrix, interviews with NaphCare leadership, and interviews with medical personnel show overall satisfaction with the number of health care staff. However, it is not possible to know for certain that medical staffing is adequate given the large impediment to the delivery of medical services caused by the shortage of security staff. The Monitoring Team will be able to more accurately evaluate medical staffing once the security staffing issue is resolved, and additional polices and procedures are developed, as set forth above.

NaphCare maintains a centralized process to track credentials for full-time and as-needed health care staff, including verification at hire and ongoing monitoring of

licensure and certifications to meet contractual requirements. The Monitoring Team was provided with a staff list reflecting compliance with select credentialing elements; however, the list reportedly did not include verification of all required credentials, limiting the ability to assess substantial compliance.

## Provision 201

FCSO will ensure that incarcerated people can adequately communicate with medical and mental health staff, and will use available interpretation services to ensure language access.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO uses on-call language line interpreters as needed for patients who do not speak English. Sign language interpreters are reportedly available as needed. The Medical Monitor spoke to two hearing-impaired patients in the Medical Observation Unit (MOU) who reported no significant problems communicating with staff. Residents who need language support in non-medical housing will also be consulted about this issue in future site visits by the Monitoring Team.

## Provision 202

FCSO will ensure that incarcerated people with chronic conditions, including, but not limited to, HIV, other autoimmune diseases or conditions, hypertension, diabetes, congestive heart failure, asthma, and elevated blood lipids, hepatitis C, or cancer, receive ongoing care for their conditions as needed. FCSO will ensure that a Medical Provider develops and implements a chronic care plan for each individual with a chronic condition.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Provision 202 has two main components:

- All patients with a chronic medical condition will receive an appropriate chronic care plan.  Based on reviews of a sample of medical charts and interviews with medical providers, there is evidence that these plans are being consistently created, which is encouraging.

- Patients with chronic medical conditions will receive medical care for their condition consistent with the medical standard of care.  This requires consistent scheduled check-ups in the chronic care clinic.  However, review of "Overdue Chronic Care Appointments" in TechCare has shown a persistent backlog of between 280-400 appointments.  This represents an unacceptable level of dysfunction of the chronic care program that must be corrected to achieve substantial compliance with Provision 202.  Further, the FCSO has published disease management guidelines for the following chronic conditions: asthma, diabetes, dyslipidemia, Hepatitis C, HIV, hypertension and tuberculosis.  Two of these, diabetes and Hepatitis C, are incongruent with the medical standard of care.

## Provision 203

FCSO will maintain a chronic care registry that identifies all incarcerated people receiving chronic care, the diagnosis, the date of their last visit with a Medical Provider, and the date of their next visit.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***

The FCSO maintains a chronic care registry that satisfies all of the requirements of Provision 203. It can be easily accessed through TechCare "Chronic Disease Management," and Reports "Active Chronic Care Counts," "Chronic Care Visits Performed," and "Overdue Chronic Care Appointments."

## Provision 204

FCSO will take all reasonable steps to ensure that incarcerated people are able to receive timely medical specialist appointments, including those scheduled outside of the Jail.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Grady Memorial Hospital provides all specialty medical care and services for patients of the FCSO. Interviews with medical staff, patients, and review of patient charts showed few impediments to jail patient access to offsite medical care. The coordinator of medical care for incarcerated patients at Grady reported having an excellent working relationship with jail medical and security staff. The main impediment to offsite medical care at Grady is reported to be the frequent unavailability of security escorts, which results in many patients not showing up for their scheduled appointments.

Also, in order to certify substantial compliance with Provision 204, the Monitoring Team will need to review compiled statistics relating to offsite visits, such as how many appointments were missed or rescheduled due to a lack of security escorts, the average wait for appointments for various specialties, and MAC discussion of any problems or deficiencies with offsite care. The FCSO should schedule regular meetings with care coordinators at Grady to discuss issues related to transport and

coordination of care for Jail patients.  The FCSO should also track and audit statistics relating to the provision of offsite medical care to Jail patients.

## Provision 205

FCSO will maintain a specialty appointment registry that identifies all incarcerated people recommended for a specialist, the specialty to which they are being referred, the date of referral, whether the referral was approved or denied by the medical contractor, the date the appointment is scheduled to occur, and the date the appointment was completed.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***

FCSO maintains a specialty appointment registry that satisfies all of the requirements of Provision 205.  This registry can easily be found on the TechCare Dashboard under "Offsites," "Queues-Offsites," and Reports "Completed Offsites by Site."

## Provision 206

FCSO will ensure that incarcerated people who receive specialty, emergency room, or hospital care are examined and evaluated by a Registered Nurse upon their return to the Jail, and that the Registered Nurse reviews all accompanying documentation available from the visit before the incarcerated person is returned to his/her housing unit.  This review and the outside provider's documentation will be recorded in the medical record, and appropriate follow-up, including referrals to a Medical Provider, will be scheduled.  FCSO will ensure compliance with hospital discharge plans as appropriate.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

All patients returning from offsite medical care are seen by a medical practitioner in the Medical Unit before returning to their housing unit. This clinic is staffed by a medical practitioner 24/7. Review of several patient charts showed generally appropriate documentation, orders, and follow-up appointments. Additional information related to whether hospital discharge plans are being consistently followed, including CQI studies or evaluations of discharge plan compliance for the backlog of chronic care patients (See Provision 202), will be necessary to verify compliance.

## **Provision 207**

FCSO will ensure that incarcerated people receive adequate testing and treatment that addresses their serious medical needs in a timely and appropriate manner.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Review of patient medical records and interviews with patients and medical staff to date have shown no significant problems with the ability of patients to have appropriate testing completed in a timely manner. Timeliness of lab and x-ray studies can be easily accessed in TechCare for any date range under "Lab Compliance reports" and "Radiology Compliance Reports."

However, review of "Overdue Chronic Care Appointments" in TechCare has shown a persistent backlog of between 280-400 chronic care appointments. When chronic care appointments are delayed, access to adequate testing and treatment that are ordered at these appointments are delayed and not "timely." This backlog

must be addressed before substantial compliance with Provision 207 can be achieved.

## Provision 208

FCSO will ensure that individuals needing rehabilitative therapy services receive them in a timely manner.  FCSO will examine the feasibility of having physical and occupational therapists provide services in the Jail to facilitate these services.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

Rehabilitative therapy services, such as Physical Therapy (PT) and Occupational Therapy (OT), are available to incarcerated patients at Grady Memorial Hospital. These require offsite transfer of patients to Grady for PT/OT appointments.  This is inconvenient for patients and their security escorts.  Also, interviews with patients and review of charts show that some prescribed rehabilitative therapy is not being performed.

The FCSO currently does not offer PT/OT on site.  The Medical Monitor notes that most jails the size of the FCSO do have an onsite PT/OT clinic.  The Medical Monitor sees no significant obstacle that would prevent the FCSO from setting up an onsite PT/OT clinic other than the scarcity of security escorts that such a clinic would require.  Both the FCSO and NaphCare leadership expressed openness to providing onsite PT/OT, but the problem of security escorts will have to be addressed.

## Provision 209

FCSO will develop and implement a policy or protocol to provide supports and accommodations to meet the physical health needs of individuals in their housing

units.  The policy will include a minimum timeframe within which FCSO must deliver accommodations for disability, mobility, and physical impairment needs. FCSO will ensure that individuals needing equipment, assistive care devices or support items receive them in a timely manner.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

FCSO currently has no policy that would satisfy Provision 209.  Interviews with patients and review of records show that most patients needing accommodations for impairment, receive them.  Some patients interviewed, especially in the MOU and Female Observation Unit (FOU), did complain about time delays in receiving impairment devices.

## Supportive Environments for People with Medical and Mental Health Needs

Incarcerated patients have a wide range of medical needs.  Some only need their medications.  Others, with more serious medical disabilities, need help ambulating, communicating, or even need assistance with their activities of daily living (ADLs), such as bathing, dressing and eating.  Such patients must be housed in an environment where needed assistance is available.

A key obstacle to the FCSO's compliance with the Consent Decree requirements for supportive environments is the Main Jail facility itself.  The MOU/FOU is too small for a facility the size of the FCSO.  There are problems related to the age of the physical plant.  While some specialized mental health units, such as 5-South, were recently renovated, other units remain characterized by inconsistent access to essential clinical spaces, limited therapeutic environments, inadequate suicide-resistant infrastructure, and insufficient accommodations for individuals with

serious medical or psychiatric impairments.  Several observation areas contain ligature points, obstructed sightlines, or non-functional safety features, and available suicide-resistant cells are insufficient to meet demand.  The County is attempting to upgrade the physical spaces devoted to patients with special needs by, for example, installing Americans with Disabilities Act (ADA) compliant grab bars.  However, much work still needs to be done.

Although some units benefit from dedicated staff and structured workflows, physical plant limitations, inconsistent access to equipped clinical spaces, and gaps in staffing and supervision undermine the facility's ability to reliably provide supportive environments for individuals with significant medical and mental health needs.  Many of these deficits require coordinated action between the County, which maintains the buildings, the FCSO, and NaphCare, highlighting the need for clearer shared processes and sustained collaboration across agencies.

## **Provision 210**

The County and FCSO will maintain a Medical Observation Unit (MOU) and Female Observation Unit (FOU) that is safe for incarcerated people with medical conditions, disabilities, or other serious medical injuries to reside.  FCSO will provide adequate supportive staffing to the MOU and FOU to assist patients with mobility needs and who need assistance with activities of daily living.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

Provision 210 requires that the MOU/FOU be safe.  The Monitoring Team has found several issues indicating the MOU/FOU is not compliant with the safety requirement, including a patient who was recently severely beaten in the FOU, a sewage backlog into the FOU, a perpetually dripping shower, which causes a slick

212

floor that has resulted in slips and falls, and a broken call bell system. This means patients have no reliable way to notify staff of their urgent or emergent medical problems.

Provision 210 also requires that patients in the MOU/FOU have adequate support and assistance with their mobility needs and ADL. During our visit, several patients housed in the MOU/FOU complained that they were not being given appropriate assistance with their mobility and ADL issues. Moreover, a significant issue is the insufficient number of hospital beds for those who need them. While the Main Jail has more hospital beds, most of the cells in the MOU/FOU are too small to accommodate a hospital bed and still have enough room for a cellmate (see Provision 211). In addition, ADA compliant grab bars in cells and bathrooms have been installed in the MOU but have not yet been installed in the FOU (See Provision 213).

The Monitoring Team recommends the following:

- The County and FCSO need to complete installation of ADA complaint grab bars in the MOU/FOU.
- The County and FCSO needs to install call bells in each MOU/FOU cell to allow patients to notify staff of urgent/emergent situations.
- The County and FCSO must fix the plumbing issues in the MOU/FOU that contribute to unsafe conditions, such as dripping showers, slick floors, and sewage backups.
- The FCSO must ensure sufficient security and monitoring to protect patients from harm.

**Provision 211**

The County and FCSO will make every effort to have an adequate number of hospital beds for people in the MOU.  FCSO will make every effort ensure that no person residing in the MOU due to a medical condition, disability, or other serious medical injury is provided with a temporary bed or floor bed.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

Provision 211 has two components: adequate hospital beds and no temporary/floor beds.  Regarding hospital beds, the FCSO has 12 hospital beds but is not able to use them all in the MOU/FOU because most of the MOU/FOU rooms are too small to accommodate a hospital bed and still have enough space for a second patient.  In other words, every hospital bed used decreases the overall patient capacity of the MOU/FOU by one.  As a result, some patients who should be using a hospital bed are not given one and some patients who should be housed in the MOU/FOU are not.

Further, most cells in the MOU/FOU have only one built in bed.  In order to have two patients per cell, the FCSO has been stacking mattresses to create a second bed.  Although these are not "floor" beds, in the opinion of the Medical Monitor, they are "temporary" beds and so not compliant with Provision 211.

The Monitoring Team recommends the following:

- The hospital beds that the FCSO has are typical 36-inch-wide hospital beds.  However, significantly narrower 30-inch wide (and even 24-inch wide) hospital beds are available, which may allow a second person to be housed in cells with a hospital bed.  The FCSO should evaluate the feasibility of using these narrower hospital beds.

- Stacking mattresses is not compliant with Provision 211. The FCSO needs to find a way to use non-temporary beds in the MOU/FOU.

## Provision 212

The County and the FCSO will maintain a working call bell system in the MOU and FOU that rings to a staffed area across all shifts.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Although the FCSO plans to eventually install a working call bell system in the MOU/FOU, at the time of the October site visit, work on this project had not yet begun. The FCSO must complete this project to achieve substantial compliance with Provision 212.

## Provision 213

The County and FCSO will add grab bars to cells and bathrooms in the MOU and FOU. All such features will be suicide resistant.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Grab bars have been installed in most of the MOU cells and bathrooms. Installation is ongoing in the FOU. The FCSO must complete this project to achieve substantial compliance with Provision 213.

## Provision 214

The County and the FCSO will rehabilitate and maintain adequate suicide-resistant cells in all buildings where incarcerated people are held and ensure that they are always usable.

215

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Across multiple days of observation, the Main Jail did not have enough suicide-resistant cells to meet the needs of the number of individuals placed on suicide watch.  As a result, multiple detainees, including those on Suicide Observation Status (SOS) 1 precautions (the highest level of observation for acutely suicidal individuals) and those in acute psychiatric crisis, were housed in non-suicide-resistant cells, including cells within the Psychiatric Observation Unit (POU) and FOU that contain ligature points and obstructed sightlines.  One suicide-resistant cell in the Main Jail was non-operational due to needed repairs, further limiting capacity.  While South Annex leadership reported that its two suicide-resistant cells were generally sufficient, one was observed to be in disrepair with padding removed at the time of the visit.  A NaphCare SOP directs staff to report suicide cell safety or operational concerns to FCSO for escalation and documentation. However, it remains unclear how such issues are systematically tracked or resolved, indicating that the County and FCSO have not yet ensured adequate maintenance, availability, and continuous usability of suicide-resistant cells as required by this provision.

The Monitoring Team recommends the following:

- Complete a full audit of all cells used for suicide-watch or acute mental health observation across the Main Jail and South Annex, documenting ligature risks, obstructed sightlines, and structural deficiencies.
- Establish a phased remediation plan with clear timelines for repairing, replacing, or decommissioning unsafe cells, prioritizing those currently housing suicidal individuals.

- Develop contingency housing procedures for situations in which demand exceeds available suicide-resistant cells, including requirements for constant observation and immediate escalation.
- Create a preventive maintenance schedule for suicide-resistant cells to ensure rapid repair of damaged padding, fixtures, and monitoring equipment.
- Incorporate environmental risk monitoring into quality-improvement processes, including weekly reviews of cell functionality and the status of suicide-watch capacity.

## Provision 215

The County and FCSO will repair and rehabilitate housing units to remove physical risks for suicide and self-harm, to include but not be limited to removing objects and fixtures that could be used for self-harm or as a tie-off point for a ligature.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team has not yet been presented with a systematic process for identifying, prioritizing, tracking, and repairing environmental risks that create exposures to self-harm hazards throughout jail housing units. These issues are compounded by limited custody staffing, uneven maintenance response, and unclear communication pathways between FCSO and County facilities teams. Collectively, these deficits illustrate a systemic failure to rehabilitate and maintain the housing environment in a manner that reduces suicide and self-harm risk, as required by the provision. The facility should implement a coordinated environmental suicide-risk management system to identify, mitigate, and monitor

217

self-harm hazards across all housing units.  The Monitoring Team remains available to provide technical assistance as needed to support these efforts.

**Provision 216**

For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

***Compliance Status:*** Partial Compliance

## Mental Health Care

Mental health services at FCSO are operational across multiple housing settings and acuity levels, including general population clinics, specialty mental health units (5 South), the POU, restrictive housing and youthful offender units.  The mental health clinical staff we encountered were consistently thoughtful and committed to providing care to residents with psychiatric needs, and during unannounced observations, they were respectful and attentive in their interactions with patients.  Our interactions with NaphCare mental health leadership were transparent and constructive, and they seemed open, reflective, and expressed a clear interest in identifying opportunities to improve care for individuals incarcerated in the FCSO jails.

Despite the dedication observed among staff, the overall mental health care delivery system appears dictated by jail operational challenges and consequently more focused on identifying and responding to acute crises rather than on providing a fully developed, integrated, and individualized continuum of care. Across settings, limited security staffing and insufficient private clinical space restrict the ability to consistently provide confidential assessments and treatment.

218

As a result, core therapeutic activities are frequently delivered through brief cell-side encounters, often prioritizing efficiency and brief access over thorough clinical assessment or engagement.  The above likely impacts diagnostic accuracy, treatment planning quality, risk monitoring, and integration of behavioral therapies. It also leads to an underestimate of the staff required to provide high-intensity and integrated mental health care.

Documentation practices vary in quality and consistency, particularly regarding initial evaluations and follow-up notes.  Mechanisms to ensure systematic supervisory review would help ensure consistent delivery of quality of care.

Regarding discharge planning, there does not seem to be a systemwide discharge-planning program for individuals with mental illness, and workflows remain informal, inconsistently applied, and heavily dependent on court-driven coordination and a single discharge planner.  The creation of a dedicated mental health discharge planner line is a positive step in addressing this.

### Provision 217
FCSO will hire sufficient staff with appropriate credentials to offer all necessary mental health care.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***
Although mental health staffing efforts are ongoing, the current staffing model appears insufficient to support the timely, intensive, and therapeutically appropriate care required by the Consent Decree.  During the October visit, acutely psychiatrically ill detainees, including individuals pending psychiatric hospitalization, were scheduled for follow-up visits up to eight weeks later, and a single psychiatrist was responsible for system-wide prescribing while also

providing direct care to the most clinically unstable patients, likely limiting visit frequency and intensity.  In general, the mental health staffing configuration appears calibrated to a low-intensity, high-volume care model, with operational constraints, particularly limited escort staffing, driving reliance on brief, cell-side encounters rather than structured, out-of-cell therapeutic visits, which likely understates true staffing needs.  Additionally, concerns have been raised by both custody and clinical staff regarding after-hours mental health and psychiatric coverage; while a recently provided "After-Hours On-Call Process" outlines procedures for overnight provider contact, it is unclear whether this process has been fully implemented.

## **Provision 218**

FCSO will ensure that appropriate, detailed, individualized treatment plans are developed and implemented for incarcerated people with mental health needs.  If Custody Staff deny any recommendations by medical or mental health staff regarding housing, privileges, transfers to outside specialists, emergency room visits or hospitalizations, FCSO will document consultation between custody and mental health leadership discussing the decision and the reasons behind it.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Although NaphCare Patients with Chronic Disease and Other Special Needs Policy (F-01) requires individualized treatment planning for individuals with significant mental health needs, these expectations are not consistently reflected in documentation or operational practice.  During chart reviews, discrete treatment plans were not identified for males receiving mental health care, and progress notes showed variability in the clarity and completeness of treatment goals,

interventions, and coordination.  In addition, the process for documenting instances in which custody decisions conflicted with clinical recommendations was not clear. NaphCare should standardize and enforce comprehensive mental health treatment planning through EMR templates, clear SOPs, documented custody–clinical consultation processes, and ongoing quality assurance.

## Provision 219

FCSO will develop and implement a policy regarding mental health and SUD treatment planning.  Individualized mental health and SUD treatment plans will be developed for each incarcerated person on the mental health caseload in a timely manner.  Each plan will include treatment goals and objectives.  FCSO is responsible for implementing each mental health and SUD treatment plan.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Although the components of Provision 219 are addressed in the NaphCare Mental Health Services—Treatment Plans Policy (F-03), including sections 11, 12, and 13 on SUD Treatment Plans, these expectations are not consistently reflected in documentation or operational practice for mental health (see Provision 218) and the FCSO does not initiate SUD treatment (see Provisions 196, 221) for its incarcerated patients, including patients on the mental health caseload.

## Provision 220

FCSO will ensure that incarcerated people with SMI receive treatment that adequately addresses their mental health needs in a timely and appropriate manner, in a clinically appropriate setting, with clinically appropriate personnel and with clinically appropriate medications, therapy, and programming.  FCSO will ensure that all incarcerated people with SMI receive regular, consistent therapy,

counseling, skill-building, and rehabilitation services, including group therapy, as clinically appropriate.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The absence of a standardized SMI definition and consistent medical record flagging undermines the system's ability to ensure that individuals with SMI are reliably identified and prioritized for enhanced treatment intensity, monitoring, and diversion from restrictive housing. While some individuals receive pharmacologic treatment and periodic provider follow-up, observed variability in visit duration and frequency, and lack of clear guidelines and standardization regarding the use of mental health housing limit the jail's ability to demonstrate that individuals with SMI are receiving clinically adequate, consistent, and rehabilitative mental health services as required.

Data provided by NaphCare indicate that 268 individuals were designated as being SMI in November 2025. Because this figure reflects a rolling monthly count rather than a point-in-time census, it likely exceeds the number of individuals designated as SMI on any given day during that period. Even if interpreted conservatively as a snapshot, this would represent approximately 9% of the jail population, assuming an average daily population (ADP) of 2,960 (taken from averaging ADP on 11/1/25, 11/15/25, and 11/30/25). This proportion is substantially lower than the up to 15–20% SMI prevalence commonly reported in large urban jail systems. Although it is unclear what definition of SMI was used to pull this data, per data provided by NaphCare, 230 individuals were diagnosed with a depressive-, bipolar-, or psychotic-spectrum disorder in November 2025.

The Monitoring Team recommends the following:

222

- Implement the proposed SMI SOP to standardize identification, documentation, and service expectations for SMI patients.
- Establish minimum frequency standards for counseling and psychiatric visits for SMI patients across housing settings.
- Utilize quality-assurance tracking to monitor diagnostic quality and accuracy, adherence to visit frequency and treatment engagement standards.

## **Provision 221**

FCSO will provide adequate SUD treatment, including monitoring and appropriate medications, to all individuals who need it.  This includes, where appropriate, medication for opioid use disorder.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Treatment of SUD includes treatment of patients with OUD: long term therapy with methadone or Suboxone plus appropriate monitoring and counselling.  The FCSO continues OUD treatment if patients were already receiving treatment for OUD prior to incarceration in a community methadone clinic or buprenorphine clinic, which is compliant.  However, the FCSO does not initiate long-term OUD treatment in patients who were not already receiving it in the community.  Such patients are only treated for withdrawal.  This is not compliant with Provision 221 (see also Provisions 75 and 196).  The Medical Monitor and the Jail Medical Director have discussed the need for the FCSO to develop an OUD program that would initiate OUD treatment for appropriate patients.  Such a program would require a significant increase in medical and security staffing as well as developing a housing area for OUD patients and so will take a great deal of planning.

**Provision 222**

FCSO will ensure an inpatient level of care is available to all incarcerated people who need it, including regular, consistent therapy and counseling, as clinically appropriate.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Psychiatric hospital bed shortages have contributed to consistent delays in transferring incarcerated individuals who require inpatient-level mental health care. This was a challenge described by NaphCare leadership and staff, and observed by the Monitoring Team during the site visit, with limited capacity at Georgia Regional Hospital being a significant contributing factor. NaphCare leadership indicated that wait times for transfer to Georgia Regional Hospital for patients who are referred for acute decompensation was typically two to three weeks. While the FCSO is not responsible for community inpatient bed availability, it retains responsibility for ensuring that individuals who meet criteria for inpatient care receive timely and adequate interim treatment while awaiting placement. During the October visit, individuals awaiting psychiatric hospitalization were observed across multiple housing settings, including the POU, 5-South mental health units, and restrictive housing, without a standardized approach to monitoring intensity, treatment frequency, or escalation of care. Although NaphCare Policy D-08 recognizes the need for inpatient psychiatric care, it does not specify management requirements for individuals awaiting hospitalization, underscoring the benefit of a unified SOP that defines referral criteria, interim housing, monitoring, and minimum clinical contact standards to ensure consistent inpatient-level care pending transfer.

Data provided by NaphCare indicate that seven individuals were hospitalized in November 2025, including five for forensic admission related to competency restoration and two for acute psychiatric treatment. In the context of the number of individuals observed during the October visit who appeared acutely psychotic or clinically unstable, these figures further underscore the limited availability of inpatient psychiatric beds relative to clinical need.

## Provision 223

FCSO will ensure that clinical conversations between QMHPs and incarcerated people are conducted in a confidential setting to allow for effective information sharing and treatment.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

During the October site visit, confidential clinical space for mental health encounters was not available for mental health staff to utilize across nearly all settings, with the exception of the South Annex. The prevailing practice observed was the delivery of mental health services cell-side, through closed or partially open cell doors, within housing units, or at open clinic desks that did not provide auditory or visual privacy. As a result, clinical conversations frequently occurred in environments where other bystanders could overhear sensitive personal information. This lack of privacy can limit a patient's willingness to disclose symptoms or safety concerns and can interfere with a clinician's ability to provide therapeutic interventions, as well as the quality and completeness of assessments and treatment planning.

While there are circumstances in which meeting outside of a fully confidential setting may be operationally necessary or clinically appropriate due to acute safety

or security considerations, such encounters should represent the exception rather than the standard of care.  Given the operational, environmental, and staffing constraints observed, privacy does not function as the default standard (in policy or practice).

**Provision 224**

FCSO will ensure that incarcerated people who are a danger to themselves or others due to symptoms of mental illness receive timely and adequate treatment.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

See Provisions 189 and 222.

**Provision 225**

FCSO will develop and implement an incentive-based behavior management program or mental health achievement award program.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

During both the October and May site visits, there was no evidence of, and the Monitoring Team was not informed of, an existing incentive-based behavior management or mental health achievement program operating in any housing area, including general population units, mental-health housing units on 5-South, or the POU.  The FCSO Restrictive and Special Management Housing Units Policy (200-04) indicates that individuals in extended restrictive housing must have programs to support removal of restrictions, presumably based on improved behavior. Neither custody staff nor mental health leadership identified any structured program that provides positive reinforcement for treatment participation,

behavioral stabilization, self-care activities, or progression through levels of mental health care.  Residents interviewed across multiple settings did not report exposure to any incentive system tied to mental-health engagement or behavioral improvement.

The FCSO and NaphCare should develop and implement a formal, clinically driven incentive-based behavior management program, beginning with deployment on specialized mental health housing units and the POU, where the clinical need for structured behavioral reinforcement is greatest.  An SOP guidance document previously provided by the Mental Health Monitor to NaphCare includes recommendations for embedding an incentive framework into mental health housing operations and level-of-care progression systems.

## Provision 226

FCSO will provide documented release planning and related services for incarcerated people with a mental illness diagnosis or who receive and continue to require psychotropic medications, including the following:

a. Arranging an appointment with community mental health providers for all incarcerated people with mental health needs and ensuring, to the extent possible, that incarcerated people meet with that community mental health provider prior to or at the time of discharge to facilitate a warm hand off;

b. Providing referrals for incarcerated people with mental health needs that require ongoing treatment post-release;

c. Providing sufficient supply of critical medications on discharge to carry over until the medication can be obtained in the community;

d. Arranging with local pharmacies to have incarcerated people's prescriptions renewed to ensure that they have an adequate supply to last through their next scheduled appointment;

e. Assisting people with serious mental health needs with transportation from the Jail; and

f. Ensuring that, where appropriate, family members are aware of an impending release so that they can assist with transportation and safety.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Overall, while some discharge planning components are being implemented for select individuals, the lack of a formal SOP, standardized eligibility criteria, documentation requirements, workforce capacity, and quality tracking mechanisms prevents full compliance with Provision 226. As noted earlier, the creation of a dedicated mental health discharge planner is a promising step in compliance with this provision.

There are elements of discharge planning that are occurring in practice at the FCSO, particularly related to medication continuity and linkage to community mental health providers for some individuals with known release dates or court-ordered program transfers. During both site visits, staff described processes through which follow-up psychiatric appointments can be scheduled (primarily with Grady), limited medication supplies are provided at release, and Assertive Community Treatment (ACT) referrals are pursued for select individuals with higher needs. These practices indicate that some components of discharge planning are being utilized. The discharge planning provisions go beyond what is explicitly required by NaphCare as per their corporate Discharge Planning Policy (E-10 ). The Fulton County-specific addendum indicates that nursing staff receive

228

a daily list of detainees who may be released from court soon, that the discharge planner schedules appointments for follow up care as needed, that handouts with community resources are provided to each detainee, and that NaphCare will provide medication for "chronic medications and/or antibiotics for up to 14 days."

It is unclear how the processes above have been operationalized. There does not appear to be a standardized, systemwide discharge planning program for individuals with mental illness, and workflows appeared to be informal, inconsistent, and highly dependent on a single discharge planner and court-driven coordination. Referral criteria for discharge planning do not seem to be clearly defined and it remains unclear whether all eligible individuals, particularly those in general population or experiencing unplanned releases, are consistently identified and engaged prior to discharge.

Observed medication continuity practices also reflect partial compliance. While medication supplies are sometimes provided (four days for most releases, longer for court-ordered programs), there does not appear to be a uniform standard ensuring that all individuals discharged on psychotropic medications receive sufficient medication coverage and community prescriptions to bridge care until outpatient follow-up. Similarly, while staff reported some ability to schedule appointments within a short timeframe for certain discharges, there is no clear clinically driven standard requiring appointments be arranged prior to release, nor consistent documentation confirming that warm handoffs were completed.

Transportation assistance and family notification are described anecdotally but were not observed to be implemented in a systematic or consistently documented manner. These supports appear to be used selectively rather than as part of a routine, protocol-driven process focused on individuals with SMI who are at heightened risk of post-release decompensation.

229

The FSCO and NaphCare should implement a comprehensive mental health discharge planning SOP and update relevant policies to adhere to the requirements of this provision.

## Provision 227

FCSO will ensure that incarcerated people with mental illness are placed in housing that is the most integrated setting possible based on their required level of care and will not unnecessarily segregate incarcerated people based on their mental health needs.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

While the FCSO has residential mental health housing to support individuals with increased mental health needs, there does not appear to be a consistently applied framework for admission and discharge into these settings. This limits the facility's ability to ensure placement in the least restrictive, clinically appropriate setting.

There is evidence that NaphCare makes efforts to house individuals with mental illness in settings intended to provide higher levels of support, including specialized mental health units on 5-South and the POU. Staff described processes for transferring individuals experiencing acute psychiatric decompensation to these settings, and that these units were all generally at capacity, indicating that attempts are being made to maximize this important resource. Competency restoration programming also reflects specialized treatment provision to a defined subgroup of individuals with significant mental illness in a specialized environment designed to provide targeted services.

230

However, observations during the October visit showed that these processes are not governed by a standardized, consistently applied protocol that ensures people with mental illness are housed in the most integrated, least restrictive setting appropriate to their clinical needs.

Data provided by NaphCare indicate that 116 individuals were housed in the 5-South mental health unit in November 2025.  Even setting aside previously noted concerns regarding potential under-identification of individuals with SMI, this would indicate that approximately 43% of SMI individuals were housed in specialized mental health housing.  This suggests that there may be insufficient residential mental health bed capacity and underscores the need for a clear process to ensure that available mental health housing is prioritized and maximized for individuals with the greatest clinical need.

Of note, a draft update of the FCSO Mental Health Program Services Policy (400-13) references a "Behavioral Health Transition Program" for individuals moving from intensive behavioral health treatment (presumably 5-South or POU) to general population.  It is unclear if this is a new initiative as it has not yet been discussed with the Monitoring Team.

The FSCO and NaphCare should develop and implement a Mental Health Housing SOP establishing clear admission and discharge criteria for all mental health housing settings, including POU and 5-South units.  The Mental Health Monitor has previously provided NaphCare with draft guidance on what should be considered for inclusion in this SOP.

## Provision 228

FCSO will develop and implement policies that will establish the criteria for admission into the mental health unit (3 North or any successor unit) and the POU

and the levels of care provided to incarcerated people in those units. The policies and procedures will require that FCSO house incarcerated people with mental illness in the most integrated and least restrictive setting possible, provide individuals with the most out-of-cell time appropriate to their needs, and will not assign them a classification that requires segregating them from the rest of the Jail population unless a QMHP has determined this is appropriate. The policies will further create a system whereby individuals will be released gradually from more restrictive levels of supervision to less restrictive levels over an appropriate period of time. The policies will specify the minimum amount of out-of-cell time per week for each level of care. FCSO will submit policies developed pursuant to this paragraph to the United States and the Monitor for review, comment, and approval, consistent with the procedures in Section III, and will implement these policies in phases taking into consideration physical space constraints according to a timeline that will be determined as part of the Parties' Implementation Plan, Section XII.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***
As detailed under Provision 227, while some functional mental health housing units currently operate (including 5-South units and the POU), the facility has not implemented the required written policies that govern admission criteria, discharge criteria, levels of care, minimum out-of-cell time, or step-down processes across these units. The Monitoring Team has been provided with access to an SOP for POU, although it is unclear what version draft it is. Treatment and housing decisions regarding mentally ill individuals in restrictive housing will be discussed in subsequent sections.

**Provision 229**

Individuals housed on 3 North (or any successor unit) and the POU will have adequate access to large-muscle exercise, programming, therapeutic services, educational services, and recreation.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO demonstrates partial compliance with this provision. While some therapeutic group programming is occurring on certain mental health housing units (one group a week on each zone of 5-South and several a day on the restoration unit), access to structured services, recreation, and large-muscle exercise for many individuals housed in high-acuity mental health units, especially POU, seemed not consistent or present. During the October site visit, detainees in POU and higher-acuity units were frequently confined to cells for extended periods with no meaningful access to recreation or structured out-of-cell therapeutic activity. Most, if not all, clinical encounters in these settings occurred cell-side rather than in program spaces, and there was limited evidence of routine, scheduled therapeutic programming beyond brief counseling check-ins. As a result, patients in the highest-acuity settings, who often have the greatest clinical need for regulated activity, therapeutic engagement, and rehabilitative services, remain subject to prolonged isolation with limited access to these mandated supports.

The FCSO and NaphCare should ensure that minimum service expectations for recreation, large-muscle exercise, therapeutic groups, and programming are explicitly defined within all relevant mental health housing including 5-South and POU through an SOP. This SOP should specify required frequencies, duration of out-of-cell therapeutic activity, staffing responsibilities, and required documentation of participation, as well as escalation processes when services are

233

cancelled or not delivered due to staffing or security obstacles.  Clear standards and tracking mechanisms will be necessary to achieve consistent compliance and ensure that therapeutic engagement is not supplanted by prolonged containment.

## Suicide Prevention

Suicide prevention at the FCSO reflects a system in which frontline recognition of risk often occurs but formalized procedures and accountability mechanisms are underdeveloped.  Custody and clinical staff seem to generally demonstrate awareness of suicide risk and frequently initiate referrals to mental health services when detainees express suicidal ideation or display concerning behavior.  However, the practice appears vulnerable to variation by housing unit, shift, and facility location, with inconsistent adherence to required monitoring and safety standards.  As noted in the Supportive Environments section of this report, at the Main Jail, the number of individuals placed on suicide watch frequently exceeded the availability of suicide-resistant cells, leading to the placement of detainees in cells not designed for suicide prevention, including cells with ligature risks and obstructed sightlines.  These capacity constraints combined environmental hazards, create an ongoing risk that individuals identified as suicidal are not housed in safe conditions.

Supervision and monitoring practices for at-risk individuals were also inconsistent.  While observation log sheets were present in many areas, the completion of monitoring documentation varied, and staff acknowledged existing gaps.  Despite being informed that individuals at the highest level of suicide observation (SOS Level-1) were being monitored at fifteen-minute intervals (Q15), these checks were not reliably completed or documented for these individuals.  This is especially concerning as FSCO and NaphCare policy both indicate that individuals who are at acute risk of suicide be monitored through constant observation, which

234

was not implemented.  Additionally, suicide risk assessments by QMHPs were not consistently conducted in private settings, and treatment interventions for suicidal individuals were frequently limited to brief cell-side contacts rather than structured therapeutic encounters.  These operational inconsistencies limit the jail's ability to ensure continuous protection, timely clinical reassessment, and effective therapeutic engagement for detainees during periods of elevated suicide risk.

## Provision 230

FCSO will ensure that it identifies suicidal incarcerated people and intervenes appropriately.  Jail staff will immediately interrupt, and provide appropriate aid to, any incarcerated person who threatens or exhibits suicidal or self-injurious behavior.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

Please see 189 for related information.  Custody staff are motivated to identify and interrupt suicidal behavior, which is encouraging.  However, although the policies related to the above (FSCO Policy 400-16, NaphCare Policy B-05) appear generally appropriate and cover the requirements of the provision, tracking and quality assurance regarding following of these policies and procedures is unclear.

## Provision 231

Custody staff will immediately notify medical/ mental health staff of all suicide attempts, gestures, and threats.  Upon request from medical/ mental health staff, FCSO will transport people from annex facilities to the Main Jail for suicide observation.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

See Provisions 189 and 230.

## Provision 232

FCSO will provide thorough, quality suicide risk assessments by a QMHP of incarcerated people who are at risk of suicide. Absent documented clinical contraindications or documented individualized assessment of security needs, these suicide risk assessments will be conducted in a confidential setting. In addition, FCSO will ensure that incarcerated people identified as being at risk of suicide are immediately searched and monitored with constant direct supervision until a QMHP conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

QMHPs are conducting suicide risk assessments when referrals are made; however, the quality, setting, and operational consistency of these assessments vary significantly, and required immediate safety procedures are not reliably implemented or documented.

The FCSO Policy 400-16 and NaphCare Policy B-05 both indicate that recently identified individuals who are suicidal will be searched and monitored continuously until a QMHP conducts a risk assessment, and that suicide screens must occur in a confidential setting. The Monitoring Team has not yet been provided with data or information regarding quality, tracking and auditing processes related to this.

236

Review of NaphCare's suicide risk assessment practices identified opportunities to further standardize and strengthen evaluation processes. Greater alignment of assessment tools and clearer expectations for structured suicide risk evaluation would improve consistency, clinical clarity, and reliability of suicide risk identification across settings.

During the October site visit, many suicide risk assessments were observed to be conducted cell-side or in other non-confidential environments, including on the POU and on restrictive housing and mental health units where individuals remained locked in their cells. These settings frequently lacked auditory and visual privacy, limiting the ability to obtain accurate histories of suicidal ideation, intent, and protective factors.

## **Provision 233**

FCSO will provide direct staff supervision of actively suicidal incarcerated people when necessary and close supervision of incarcerated people with lower levels of risk. Officers will document their checks. Actively suicidal people will be monitored at all times, and individuals under close supervision will be monitored no less frequently than every 15 minutes.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO is not compliant with this provision. Although both the revised draft of FCSO Policy 400-16 and NaphCare Policy B-05 require that individuals assessed as being at high risk of self-harm (i.e., "SOS Level-1") are monitored on a continuous basis by a staff member, individuals at this level of risk were assigned to being monitoring at Q15 minute intervals. It is unclear why there is a gap between policy and practice. Even more concerning is that staff acknowledged

237

that the Q15 checks for these high-risk patients were not being completed consistently across housing areas.  Safety check logs were observed posted on cell doors and were reportedly completed by both custody and NaphCare staff; however, documentation timeliness and accuracy seemed variable.

The FCSO must standardize and strictly enforce continuous-observation protocols for actively suicidal individuals, including clear documentation requirements and supervisory verification of completion.  If the FCSO is not able to meet observation needs with their own staff, they should consider expanding existing agreements with Allied Universal or NaphCare to provide dedicated contracted staff for constant and 15-minute observation coverage.  There should be routine audits of individuals on suicide watch as well as observation logs to verify real-time compliance.  The Monitoring Team is available to provide assistance in developing these protocols.

## Provision 234

FCSO will ensure that incarcerated people expressing suicidality are placed in suicide resistant housing with sight lines that permit the appropriate level of staff supervision.  If no suicide resistant cell is available, a suicidal incarcerated person will be placed on constant observation until such housing is available.  Incarcerated people expressing suicidality will not be placed in other forms of Restrictive Housing.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

In the Main Jail, it appears that on an ongoing basis the number of detainees on suicide watch exceeded the number of available suicide-resistant cells, resulting in placement in settings not designed for suicide safety.  During site visits, suicidal

detainees were observed across the third-floor units, including the POU and FOU, in cells that were not ligature-resistant and had obstructed sightlines, directly conflicting with the requirements of this provision.  Individuals placed in these alternative cells were not monitored constantly.

The FSCO should ensure sufficient, well-maintained suicide-resistant housing and enforce constant observation and appropriate placement standards for suicidal individuals, with clear prohibitions on unsafe housing and systems to track capacity and maintenance in real time.


## Provision 235

The County and FCSO will maintain the padded cells in the Jail in a clean, sanitary, and operational condition, and will use them solely for documented mental health purposes.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

During site visits, some padded suicide-resistant cells were either non-operational or not appropriate for use.  In October, one of the padded cells in the Main Jail was reported to be damaged and out of service, which was reported to be a common occurrence.  At the South Annex, two padded suicide-watch cells were present; however, their operational status remained questionable at the time of observation. One cell had padding removed and appeared to require repair.  The limited number of available padded cells, combined with inconsistent maintenance workflows and delayed repair timelines, results in systemic inability to ensure that suicide-resistant housing is consistently usable across the jail system.  The FCSO has reported that a single contractor is responsible for repairing damage to the padded

239

cells and that its repair timelines are elongated.  The FCSO should explore other options for achieving more timely repair of the padded cells.

As noted, earlier the Monitoring Team was provided with a document titled, "Observation Unit/Suicide Resistant Cells," which outlines NaphCare's process for reporting operational and safety concerns with suicide cells.  The FSCO should formalize maintenance, tracking, and use standards for padded suicide-resistant cells to ensure safe and functional capacity to use for suicide prevention.

## Provision 236

For any obligation of the County requiring physical access to the Jail—including but not limited to housekeeping, maintenance, or rehabilitation—FCSO will provide prompt notification of issues, communication, coordination, and access to secured areas of the Jail to facilitate the County's ability to perform its obligations.

***Compliance Status:*** Partial Compliance

## Provision 237

FCSO will ensure that suicidal incarcerated people receive adequate mental health treatment and follow-up care, including out-of-cell counseling.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Clinicians provided ongoing evaluation and psychiatric follow-up for residents on suicide watch.  However, most observed interactions occurred cell-side through doors rather than in private spaces, and out-of-cell counseling was not observed. As a result, treatment often defaulted to brief safety checks rather than comprehensive therapeutic intervention.  See response to Provision 223 for more details.

240

## Medication Administration

Policy and training materials addressing medication administration are largely in place and reflect many elements of accepted correctional health care standards. However, the Monitoring Team identified variability in how these policies are implemented in practice, particularly with respect to follow-up after missed or refused medications, documentation and tracking of non-adherence, and systematic monitoring of laboratory testing for individuals receiving psychotropic medications.

Moreover, medication is sometimes administered in the middle of the night on certain housing units in the Main Jail, resulting in a substantial number of medication refusals that result from residents simply refusing to wake up.  Further, in most housing units, medication rounds were limited to a single general announcement, with no documented or observed effort by custody or health care staff to personally locate individuals who did not present for pill call.  In some instances, follow-up was reportedly performed informally by other residents rather than by staff.  These issues must be addressed for the FCSO to work towards compliance with these provisions.

### Provision 238

FCSO will ensure that incarcerated people receive appropriate medications in a timely manner and that incarcerated people have proper diagnoses and/or indications documented for each medication they receive.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Provision 238 has two main components.  Medications must be provided in a "timely manner" and indications for prescriptions must be documented.  Regarding

timeliness, the Medical Monitor interviewed multiple jail patients about their experience with jail medication procedures.  The most common patient complaint was that meds, including insulin, are passed to patients in some housing units at unreasonable hours, e.g., 1:00 AM in the MOU/FOU and 2:00 AM on 5-North. This results in many "refusals" which are nothing more than patients not waking up or being tired and not wanting to get up.  This practice does not meet the requirement of Provision 238 for "timely" medication administration.  Other metrics showing timeliness of medication administration are:

- The average time from intake until patients receive the Chronic Care medications they were taking prior to incarceration.
- The average time from the prescription of medications by jail practitioners until those medications are first administered.

This data is available in TechCare in various report formats.  The Monitoring Team has been told that this data is being collected and audited in MAC meetings. However, the Monitoring Team has not yet been granted access to any analyses of medication administration data and so cannot certify compliance with Provision 238.

Regarding proper diagnoses and appropriate indications, the Medical Monitor reviewed five medical records chosen at random.  All showed appropriate documentation of diagnoses and indications for prescribed medications.

The Monitoring Tem has the following recommendations:

- The Monitoring Team must have access to analyses of data relating to the timeliness of medication prescriptions.
- The medication pass schedule should be changed so that all patients receive their medications when they are scheduled to be awake.

**Provision 239**

FCSO will ensure that prescribed medications are administered in a clinically appropriate manner as to prevent deviation from the medication regimen, including misuse, hoarding, overdose, theft, or violence related to the medication.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

NaphCare Medication Services - Medication Misuse and Diversion Policy and Controlled Substances Policy meet the requirements of Provision 239.  The FCSO should routinely audit and report confirmed instances of medication misuse and diversion.  If such audits and reports are being done, the Monitoring Team has not been given access to this data.  The Medical Monitor was able to observe med pass in several housing units.  The nurses conducting medication pass generally followed the policy guidelines.

The Monitoring Team has the following recommendations:

- The FCSO should monitor the incidence of medication diversion and misuse and report trends at the MAC meeting.
- The FCSO should routinely monitor medication administration to ensure that the nurses passing meds are adhering to policy.
- The Monitoring Team must have access to all data collected relating to Provision 239.

**Provision 240**

FCSO will ensure that incarcerated people receive psychotropic medications in a timely manner, that incarcerated people have proper diagnoses and/or indications for each psychotropic medication they receive, and that medications are

243

administered to incarcerated people in clinically appropriate dosages and without errors.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

The FCSO Medication Rounds (Pharmaceuticals) Policy (400-05) outlines procedures intended to ensure that patients receive prescribed medications in a timely manner, including requirements for individualized follow-up with detainees who do not respond to a general medication call. While the policy framework itself appears clinically appropriate, the Monitoring Team's observations, supported by staff and detainee interviews during both site visits, indicate that these procedures are inconsistently implemented in practice. In most housing units, medication rounds were limited to a single general announcement, with no documented or observed effort by custody or health care staff to personally locate individuals who did not present for pill call. In some instances, follow-up was reportedly performed informally by other residents rather than by staff. This pattern was observed in both general population and designated mental health housing units, raising concerns about missed doses, interruptions in treatment continuity, and medication safety throughout the system.

Data provided by NaphCare indicate that 742 individuals received antipsychotic medication in November 2025. Antipsychotics use is most clearly indicated and efficacious in individuals with psychotic or bipolar disorders, although can be also used off-label for a variety of conditions. Per data provided by NaphCare, in November 2025, 105 individuals were diagnosed with some type of psychotic disorder, and 125 individuals were diagnosed with either depression or bipolar disorder. Even if all 125 individuals in the depression/bipolar category suffered from bipolar disorder, that means approximately 230 of the 742 (roughly 30%) of

244

individuals receiving antipsychotics in November were diagnosed with a psychotic or bipolar spectrum disorder. These numbers suggest that in the FSCO there is a significant proportion (70%) of antipsychotic prescribing for non-psychotic/bipolar patients or off-label indications, or incomplete or inconsistent documentation of appropriate psychiatric diagnoses in the medical record. This implies that there is room to optimize and improve prescribing practices at the FCSO as it relates to psychiatric diagnosis.

The FCSO and NaphCare should implement a structured quality-tracking process to routinely monitor medication administration timeliness, missed doses, and follow-up after non-presentation for pill call, with findings reviewed through the facility's quality assurance program and used to identify and correct systemic gaps in practice. The FCSO and NaphCare, should implement a standardized, facility-wide process to ensure that antipsychotic prescribing is consistently supported by clearly documented, clinically appropriate psychiatric diagnoses.

## Provision 241

FCSO will ensure that psychotropic medication administration records are audited by appropriate health care staff every 90 days for completeness and accuracy.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

NaphCare Medication Services Policy (D-02) outlines documentation standards and variance reporting, they do not appear to require routine audits of psychotropic medication administration records for completeness and accuracy. The FSCO and NaphCare should develop and implement a formal quality-assurance process requiring audits of psychotropic medication administration records at least every

90 days.  The audit process should include defined review criteria and linkage to corrective actions and staff education as part of the facility's CQI program.

## Provision 242

FCSO will develop and implement a policy requiring accurate documentation of psychotropic medication refusals and psychiatric follow-up after repeat refusals.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

NaphCare Medication Services Policy (D-02) provides an appropriate framework regarding psychotropic refusals that is consistent with the requirements of this provision.  This includes instructing providers to continue psychotropic medications in SMI patients, even if they are refusing, as well as increased monitoring and referral guidelines for any patients who are refusing psychotropic medications.  However, the FCSO has not provided evidence supporting consistent implementation of these requirements, although chart reviews demonstrated documentation of repeated psychotropic medication refusals, especially given the unclear operationalization of the SMI framework.

The FCSO and NaphCare should implement a standardized process to ensure that all psychotropic medication refusals are accurately documented in the EMR and that repeated refusals reliably trigger timely psychiatric review and follow-up, consistent with D-02 policy requirements.

## Provision 243

FCSO will ensure that a qualified individual is available to administer emergency medications at all times.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

NaphCare Medication Services Policy (D-02), including provisions addressing emergency and STAT medications, require that qualified clinical personnel be available at all times to administer emergency medications and that such medications be administered immediately when clinically indicated. These policies reference adequate nursing coverage across housing units, on-call provider availability, and established emergency response procedures to ensure timely assessment and medication administration during psychiatric or medical emergencies.

During the site visits, interviews with mental health, nursing, and medical personnel indicated that appropriately trained clinical staff were available on all shifts to administer emergency medications, including injectable psychotropic medications when indicated. Record review further supported that emergency medication orders were carried out by qualified personnel for acutely decompensated psychiatric patients. While the Monitoring Team was not provided with aggregate staffing or response-time data to independently verify the regularity of these practices, the available interview and record-based evidence suggest a potential finding of substantial compliance with this provision should this information be provided.

## Provision 244

FCSO will ensure that laboratory studies are ordered per the standard of care as clinically appropriate for incarcerated people who receive psychotropic medications to screen for potentially adverse side effects or otherwise as needed to

monitor the incarcerated person's health status and the effectiveness of the medication and treatment.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

During site observations and clinical record reviews, the Monitoring Team identified evidence that laboratory testing was ordered for some individuals receiving psychotropic medications.  Provider training materials reference reviewing and signing off on psychiatric laboratory results and ordering laboratory studies at baseline, with medication-specific guidance for antipsychotics, mood stabilizers, and antidepressants.  These materials indicate an expectation for baseline testing, follow-up at six months, and annual monitoring thereafter, with earlier reassessment when results are abnormal (e.g., borderline hemoglobin A1c values).  A Psychiatric Provider Training Checklist, provided by NaphCare, also includes laboratory ordering and review, suggesting that laboratory monitoring expectations are incorporated into provider orientation.

However, it remains unclear whether these expectations are consistently operationalized across the facility or systematically monitored for adherence to existing policies and procedures.  The Monitoring Team is not aware of a standardized, facility-wide process to ensure that required baseline and interval laboratory studies are reliably ordered, completed, reviewed by providers, and documented for all individuals prescribed psychotropic medications.

## Oversight and Mortality Reviews

Mortality investigations are an essential component of all medical systems, including jails.  Some jail deaths are expected, such as terminal cancer patients on hospice.  However, most jail deaths are unexpected and the health care provided to

248

patients who died unexpectedly must be closely evaluated to determine whether the death was, in any way, preventable. The goal of the mortality reviews is to improve health care overall by identifying any weaknesses in the healthcare system and creating a plan to fix them.

## Provision 245

FCSO is responsible for overseeing all medical and mental health care provided by vendors or contractors and ensuring that adequate care is provided. When oversight efforts reveal areas for improvement, FCSO is responsible for working with vendors and contractors to institute improvements.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

Many areas of necessary health care improvement are identified in this report. Provision 245 emphasizes the FCSO's responsibility to make the necessary improvements needed to adhere fully to the Consent Decree. In addition, coordination between the FCSO and NaphCare appears fragmented, as reflected in misaligned or inconsistently implemented policies, unclear delineation of roles and responsibilities, and variable communication and workflows. The FCSO must also improve the security staffing picture for health care to achieve compliance with this provision.

## Provision 246

Medical and mental health staff will participate in all mortality and serious suicide attempts reviews pursuant to paragraph 105, alongside FCSO, to ensure comprehensive and well-documented evaluation of quality of care related to all deaths and serious suicide attempts. This includes detailed psychological autopsies to assess gaps in mental health treatment that may have been relevant to the death.

All reviews should be documented and contain analysis of care, conclusions regarding any gaps or areas for improvement, corrective action plans to make needed improvements, and a plan to assess the effectiveness of any corrective actions after they are implemented.

**Compliance Status:** Partial Compliance

**Additional Discussion/Recommendations:**

NaphCare Procedure in the Event of a Patient Death Policy (A-09) and FCSO Suicide Prevention and Intervention and Response to Resident Suicide Attempt or Death Policy (400-16) substantially align, at the policy level, with the requirements of this provision. Both policies require multidisciplinary participation by medical and mental health leadership in mortality and serious suicide attempt reviews, including involvement of the Medical Director, Mental Health Director, primary psychiatric providers, and the Health Services Administrator, with coordination alongside custody leadership. The policies establish standardized review processes, including clinical and administrative mortality reviews, completion of Health Services Administrator and physician death summaries, timely Morbidity and Mortality (M&M) meetings within defined timeframes, Suicide and Self-Harm Behavior Case Reports for suicide attempts, and Psychological Autopsy Reports for deaths by suicide. These processes are explicitly intended to evaluate the quality of care provided, identify contributing clinical, operational, or system-level factors, and support corrective actions and continuous quality improvement.

However, documentation provided to the Monitoring Team regarding recent detainee deaths does not demonstrate that these policy-mandated review processes are being implemented in a consistent, comprehensive, or well-documented manner in practice. The materials reviewed were inconsistently structured, limited

250

in clinical depth, and did not reflect a clearly coordinated multidisciplinary review involving both health care and custody leadership.

## Provision 247

Medical and mental health staff will work with Custody Staff to implement appropriately detailed and specific corrective action plans in response to any deficiencies in care found through the mortality review process.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

NaphCare Policy A-09 and FCSO Policy 400-16 require the development and implementation of CAPs in response to deficiencies identified through mortality and serious suicide attempt reviews. Under these policies, CAPs are to be developed based on review findings, submitted for corporate approval, implemented at the facility level, and monitored through the facility's CQI program, with progress documented in CQI or M&M meeting minutes and relevant findings shared with treating and supervisory staff. These requirements align with this provision's expectation that identified deficiencies result in structured, accountable remediation and ongoing performance monitoring.

The Monitoring Team has not received documentation demonstrating that corrective action plans have been consistently developed, implemented, or tracked in response to mortality or serious suicide attempt reviews. While existing NaphCare and FSCO policies satisfy the requirements of this provision at the policy level, compliance cannot be substantiated in practice due to the absence of evidence demonstrating that quality CAP processes are operationalized and sustained following mortality and serious suicide attempt reviews.

251

# Restrictive Housing

## Policies, Procedures and Training

The FCSO has several policies that address restrictive housing.  The Restricted and Special Management Housing Unit Policy (200-04) was updated in February 2025 and the Disciplinary Segregation Policy (200-15) was updated in May 2025.  These policies and related training programs have not been fully updated to incorporate all of the requirements of the Consent Decree.  During the Monitoring Team's October visit, staff at the South Annex showed members of the team the forms they were developing to track the residents in restrictive housing.  During both the May and October 2025 visits, residents in restrictive housing reported they had not received any written notice explaining the reason for their placement and were not aware how long they would remain there.  Residents who were serving disciplinary sanctions were generally aware as to why they were in restrictive housing.  Revising and implementing restrictive housing unit policies and training staff is labor intensive.  Having a multi-disciplinary team/committee regularly meet to review and track the residents in restrictive housing is a correctional best practice and aligns with the Consent Decree.  The FCSO's staffing crisis makes implementing this practice challenging.  The Monitoring Team will continue to work with the FCSO on prioritizing the policies and trainings to be revised and implemented.

### Provision 248

By dates set in the Implementation Plan, Section XII, FCSO will draft new or revised policies and procedures to comply with the provisions related to Restrictive Housing as set forth in paragraphs 249–282 below and will submit those policies

and procedures to the United States and the Monitor for approval pursuant to the process described in Section III above.

***Compliance Status:*** Not Rated

***Additional Discussion/Recommendations:***
The FCSO has not yet had the opportunity to formally submit revised policies related to restrictive housing the United States and the Monitoring Team.

## **Provision 249**

Within six months of the date that any policy or procedure related to Restrictive Housing is finalized or revised (following the period of review for the Monitor and the United States), FCSO will train all relevant staff on that policy, through in-service training.

***Compliance Status:*** Not Rated

## **Provision 250**

FCSO will ensure that all staff working in restrictive housing units are trained about the risks associated with long terms in restrictive housing, the particular risks associated with confining people with serious mental illness and young people in restrictive housing, and to recognize signs of decompensation in restrictive housing.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***
The FCSO will include the risks associated with long terms in restrictive housing in their revised training.

## Mental Health Contraindication to Restrictive Housing

The restrictive housing provisions are intended to ensure that individuals with SMI or acute psychiatric vulnerability are protected from placement in conditions that pose a heightened risk of psychological deterioration, self-harm, or suicide, and that housing decisions are consistently informed by timely, clinically grounded mental health input.  Collectively, these provisions establish an integrated decision-making framework in which QMHPs assess contraindications to restrictive housing, recommend less restrictive alternatives, provide ongoing clinical monitoring and treatment, and collaborate with custody leadership to minimize both the use and duration of restrictive housing for individuals with mental health needs.

Current practice at the FCSO reflects inconsistent implementation of this framework.  There does not seem to be a standardized, facility-wide process to ensure that mental health consultation reliably occurs prior to restrictive housing placement, is consistently documented, or results in timely diversion to less restrictive housing when clinically indicated.  As noted elsewhere in this report, the historical absence of a standardized SMI designation within the medical record makes it more difficult for NaphCare and the FSCO to systematically identify individuals who should be presumptively contraindicated for restrictive housing or subject to heightened clinical review prior to placement.  In practice, this has resulted in reliance on ad hoc communication rather than a structured, enforceable clinical-custody workflow.

In addition, the lack of clearly defined care pathways for individuals with SMI or acute mental illness who remain in restrictive housing leaves the system and patient vulnerable to variable monitoring and clinical follow-up.  The Monitoring Team was not provided with evidence of a uniform process for weekly QMHP

reviews or multidisciplinary review of extended restrictive housing placements when continued restrictive housing was clinically questionable. This indicates that several core safeguards envisioned by the Consent Decree, including real-time clinical oversight, progressive reduction of restrictions, and routine provision of treatment outside the cell, have not yet been operationalized.

Data provided by NaphCare indicate that, in November 2025, five SMI individuals were housed in restrictive housing in the Main Jail and none in the South Annex. However, NaphCare also reported that seven individuals in the restrictive housing areas in the Main Jail, and four in the South Annex, were diagnosed with a schizophrenia-spectrum disorder, a diagnostic category that should be considered SMI. During the October site visit, the Monitoring Team observed at least four individuals exhibiting acute psychotic symptoms in the 7-North Zones 100 and 600 (administrative and disciplinary segregation, respectively), as well as three individuals with apparent psychotic symptoms across the B and C pods in the South Annex (punitive and administrative segregation, respectively). These observations, as well as the discrepancy between SMI and schizophrenia diagnostic reporting above, raises concerns about potential under-identification of individuals with serious mental illness in restrictive housing, particularly in the context of inconsistencies in SMI definition and identification.

Although existing FCSO and NaphCare policies reference periodic medical and mental health rounds in restrictive or segregated settings, they do not establish explicit workflows for consultation, clinical exclusion criteria, alternative housing placement when restrictive housing is contraindicated, or associated observation and treatment requirements. Implementation of the SOP guidance previously provided regarding SMI identification, specialty mental health housing admissions, and treatment planning would provide essential infrastructure to advance

compliance with these provisions. A standardized classification process, defined consultation and documentation requirements, clear escalation pathways, and multidisciplinary oversight mechanisms are necessary to ensure that restrictive housing decisions consistently include clinical input when appropriate.

## **Provision 251**

Restrictive housing will be contraindicated when it leads to decompensation, mental health deterioration, self-harm, or suicidality. Restrictive housing is also contraindicated if it causes new signs or symptoms of SMI where such signs or symptoms had not previously been identified or if there is a significant medical contraindication to restrictive housing.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO Restrictive and Special Management Housing Policy (200-04) and Disciplinary Segregation Policy (200-15) do not explicitly prohibit the use of restrictive housing when it results in mental health decompensation, deterioration, self-harm, suicidality, or the emergence of new signs or symptoms of serious mental illness. While 200-04 states that individuals with serious mental illness may not be placed in Extended Restrictive Housing, this limitation does not address contraindications applicable at the point of placement or during shorter-term restrictive housing. As noted above, during the October visit, the Monitoring Team encountered individuals with acute psychotic symptoms in restrictive housing settings.

The FCSO should revise its restrictive housing policies and procedures to incorporate clear, affirmative mental health contraindications consistent with this

provision, including explicit guidance regarding deterioration, self-harm risk, and new-onset psychiatric symptoms.

**Provision 252**

Custody Staff will notify and consult mental health staff before placing incarcerated people in restrictive housing to determine whether it is contraindicated based on the incarcerated person's mental health.  Both Custody Staff and mental health staff will document this consultation.  If it is not feasible to consult with mental health staff before the placement, then the consultation will occur within 24 hours of placement, or within 48 hours if on a weekend or holiday, to determine the appropriateness of the placement.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

There is no formal, standardized system to operationalize required mental health consultation and documentation related to placement in restrictive housing.  FCSO Policies 200-04 and 200-15 require notification of health care staff after transfer to segregation but do not mandate pre-placement mental health consultation or define timeframes or documentation standards for assessing contraindications, and NaphCare Policy G-02 similarly emphasizes post-placement notification without requiring in-person assessment or structured mental health consultation.  During site visits, staff described reliance on informal, inconsistent communication, with no standardized workflow or documentation mechanism to ensure timely consultation either prior to placement or shortly thereafter, limiting the reliability of mental health input into restrictive housing decisions.

As a result, although consultation occurs intermittently in practice, the absence of formal protocols, defined timelines, required documentation, and oversight

257

mechanisms prevents the facility from demonstrating consistent compliance with this provision. These protocols should be developed in accordance with this provision.

## Provision 253

Mental health staff will make a determination as to whether restrictive housing is contraindicated due to SMI or other acute mental health condition based on a review of pertinent records, and mental health staff will notify Custody Staff of the determination. If mental health staff determines that restrictive housing is contraindicated, they will recommend alternative, less restrictive housing.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*

As noted above, there do not appear to be clearly defined, agreed-upon mental health contraindications to restrictive housing embedded within the FCSO custody policies or the NaphCare policies provided to the Monitoring Team. This gap limits the ability of mental health staff to consistently make, document, and communicate determinations regarding whether restrictive housing is contraindicated due to serious mental illness or other acute psychiatric conditions, as required by this provision. The absence of clearly articulated SMI definition (until recently) also affects how alternative, less restrictive housing options are identified, recommended, and operationalized. This may also explain the number of acutely psychotic patients encountered by the Monitoring Team during visits to restrictive housing settings in October.

While existing policies reference medical and mental health input into housing decisions, they do not specify the criteria, documentation requirements, or

communication pathways by which mental health staff must notify custody of contraindication determinations or housing recommendations.

FCSO should ensure that restrictive housing policies and procedures explicitly incorporate the requirements of this provision, including:

- A standardized documentation mechanism within the electronic health record to capture placement reviews, contraindication determinations, and recommended alternative housing.
- Clear documentation standards within the medical record, coupled with a defined, parallel notification process to custody leadership to ensure that mental health determinations are timely, visible, and acted upon.

## Provision 254

In addition, all incarcerated people placed in restrictive housing will be screened by a Qualified Mental Health Professional in a face-to-face clinical encounter within the first week of placement. The purpose of this screening is to determine whether restrictive housing is contraindicated. If mental health staff determines that restrictive housing is contraindicated, they will notify Custody Staff of the determination and recommend alternative, less restrictive housing.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO and NaphCare restrictive housing policies and procedures indicate that mental health staff will conduct rounds at least weekly for individuals in extreme isolation (medical daily), and that medical or mental health staff will make rounds three times per week for segregated patients with limited contact with staff or other individuals.

259

However, although these policies require ongoing mental health contact for individuals housed in restrictive settings, the Monitoring Team was not provided with evidence demonstrating that such face-to-face clinical contacts by a QMHP occur consistently or are reliably documented. In addition, the policies and procedures provided do not require a timely, face-to-face QMHP screening within the first week of placement in restrictive housing for the specific purpose of evaluating whether restrictive housing is contraindicated, as required by this provision.

The FCSO should revise restrictive housing policies and procedures to explicitly require and operationalize timely, face-to-face QMHP screening for all individuals placed in restrictive housing, including defined timelines, documentation standards, and tracking mechanisms to ensure completion and accountability.

**Provision 255**

If an incarcerated person in restrictive housing shows signs of decompensation, suffers a deterioration in his or her mental health, engages in self-harm, or develops a heightened risk of suicide, or if an incarcerated person in restrictive housing develops signs or symptoms of SMI where such signs or symptoms had not previously been identified, Custody Staff will immediately refer the incarcerated person for assessment and treatment by a QMHP. The QMHP will determine if restrictive housing is contraindicated and, if so, recommend less restrictive housing.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

During the October site visit, staff indicated that referrals from restrictive housing do occur, and custody staff identified multiple individuals exhibiting overt

psychiatric decompensation who were known to the mental health service.  It was not clear that a written, facility-wide workflow exists to define clinical triggers for reassessment, referral, or removal from restrictive housing when mental health deterioration, self-harm risk, or decompensation is observed.

The FCSO should ensure that existing mental health referral guidelines for custody staff, including criteria related to suicide risk, psychotic decompensation, and behavioral deterioration, are explicitly applied to restrictive housing settings.  In addition, the facility should implement tracking and oversight mechanisms to monitor referral acuity, timeliness of QMHP assessment, and outcomes of housing reviews for individuals in restrictive housing, in order to demonstrate consistent compliance with this provision.

## **Provision 256**

FCSO will not place or retain a person in restrictive housing if they have SMI, unless:

a.  The incarcerated person presents such an immediate and serious danger that there is no reasonable alternative, or

b.  a QMHP determines (i) that restrictive housing is not contraindicated; (ii) that the incarcerated person is not a suicide risk; (iii) that the incarcerated person does not have active psychotic symptoms; and (iv) in disciplinary circumstances, that lack of responsibility for the misconduct due to mental illness or mitigating factors related to the mental illness do not contraindicate disciplinary segregation.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

There are no clearly defined workflows to operationalize this provision, including how determinations regarding immediate and serious danger are made, how required clinical findings are documented, or how mitigating factors related to mental illness are considered in disciplinary contexts. The FCSO and NaphCare should update restrictive housing policies and procedures to explicitly incorporate the requirements of this provision.

## Provision 257

If a QMHP determines that restrictive housing is contraindicated, FCSO will not place a person in restrictive housing unless the incarcerated person presents such an immediate and serious danger that there is no reasonable alternative.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

As discussed above, there does not seem to be a defined process by which individuals are formally evaluated and determined to be contraindicated for restrictive housing by mental health staff, nor is there a structured mechanism to ensure that such determinations are honored in housing decisions. The FCSO should revise restrictive housing policies and procedures to explicitly incorporate the requirements of this provision.

## Provision 258

Whenever an incarcerated person is placed or kept in restrictive housing despite SMI or contraindication, this decision must be approved with documented reasons

by the Chief Jailer or designee, and will be reviewed weekly with the goal of moving the person into less restrictive housing as soon as feasible.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The restrictive housing policies and procedures reviewed do not require documented approval by the Chief Jailer or designee when an individual is placed or retained in restrictive housing despite serious mental illness or a mental health contraindication. Nor do they establish a structured process for weekly review of such placements with the explicit goal of transitioning individuals to less restrictive housing as soon as feasible. The FCSO should revise restrictive housing policies and procedures to explicitly incorporate the requirements of this provision.

## Provision 259

Incarcerated people with SMI in restrictive housing will receive clinically appropriate mental health treatment for the entirety of the placement in restrictive housing. These treatment sessions will occur outside the cell in a confidential clinical setting, unless there are overriding, particularized security concerns.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

Existing policies do not clearly define expectations regarding treatment modality, setting, visit frequency, or documentation for individuals with SMI housed in restrictive housing. In addition, there does not appear to be a coordinated, multidisciplinary framework to oversee mental health treatment delivery in restrictive housing or to ensure adherence to required clinical standards. The absence of clear requirements for out-of-cell treatment, defined roles and responsibilities, or escalation procedures when security barriers arise limits the

263

facility's ability to ensure that individuals with SMI receive adequate care while in restrictive housing.

During the October site visit, the individualized requirements governing ongoing mental health treatment for the seriously mentally ill individuals encountered in restrictive housing were not clearly articulated or consistently operationalized. From a clinical standpoint they seemed eligible for mental health housing, but did not appear to be receiving enhanced care. One individual was referred for psychiatric hospitalization. Although mental health patients housed in restrictive housing were receiving treatment, this did not seem to be routinely delivered outside the cell in a confidential clinical setting. FCSO should revise mental health treatment and restrictive housing policies and procedures to adhere with the requirements of this provision.

## **Provision 260**

At least once per week, a QMHP assigned to supervise mental health treatment in the restrictive housing unit will conduct face-to-face clinical contact with all people with SMI in restrictive housing, to monitor their mental health status and identify signs of deterioration.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Both NaphCare corporate policy and the FCSO's policies reference periodic mental health contact for individuals housed in restrictive settings, including weekly mental health rounds in certain segregation contexts. However, the policies reviewed do not establish a standardized process to ensure that all individuals with serious mental illness housed in restrictive housing receive the required weekly, face-to-face clinical contact by a QMHP for the purpose of monitoring mental

health status and identifying signs of deterioration.  The Monitoring Team was also not provided with information to confirm that these required visits are occurring.

**Provision 261**

After 30 days, incarcerated people with SMI or contraindications to restrictive housing will be removed from restrictive housing, unless the Chief Jailer certifies that transferring them to less restrictive housing is clearly inappropriate. Incarcerated people with SMI or other contraindication to restrictive housing who are housed in restrictive housing for more than 30 days will have their cases reviewed by the Chief Jailer, the director of mental health services, and a psychiatrist or psychiatric nurse practitioner.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO and NaphCare policies reviewed by the Monitoring Team do not incorporate the requirements of this provision.  Specifically, existing policies do not require automatic removal of individuals with serious mental illness or other contraindications from restrictive housing after 30 days, nor do they establish a structured process for senior-level clinical and custody review when continued placement beyond 30 days is contemplated.  The FCSO and NaphCare should revise restrictive housing policies and procedures to explicitly incorporate the requirements of this provision

## Conditions in Restrictive Housing

The FCSO's staffing crisis is an impediment for the FCSO reaching substantial compliance with many of the Consent Decree provisions related to restrictive housing.  As noted in the Executive Summary, the sanitation at the South Annex had greatly improved since our visit in May.  The hallway floors had been painted

265

and lighting in the housing areas had improved.  At both the South Annex and Main Jail, residents reported they ordinarily were not given the opportunity to get out of their cells on weekends and they were not always afforded the opportunity for outdoor recreation on a weekly basis.  They also noted they did not have access to books and reading material.  The FCSO needs sufficient staff in the housing units to be able to escort residents to recreation.  Finally, the staffing shortages also make it a challenge to keep appropriate records of each resident's daily activities.

## Provision 262

Incarcerated people in restrictive housing will have daily access to out-of-cell time, absent exceptional circumstances.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***
The FCSO Restrictive and Special Management Units Policy (200-04) provides that residents in Restrictive Housing or Special Management Units will be offered a minimum of one hour of exercise five days a week outside of their cells, unless security or safety considerations dictate otherwise.  The Monitoring Team recommends revising the policy to address the requirement of daily out-of-cell time.

## Provision 263

Incarcerated people in restrictive housing will have opportunities to exercise in areas of the Jail allowing for large muscle movement twice weekly.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

Some of the residents at South Annex reported they had not been to the outdoor recreation area for several weeks.  FCSO staff confirmed that due to staffing challenges, they are not always able to escort the residents to the outdoor recreation area.  The Monitoring Team suggests the FCSO revise its policy to include the requirement noted in this provision.

## Provision 264

Incarcerated people in restrictive housing will retain the ability to submit grievances, contact the PREA hotline and PREA Coordinator, and access the Jail handbook.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

During the Monitoring Team's October visit, they did not observe any residents in restrictive housing who had access to a tablet where they could submit a grievance.  They would need to submit a paper grievance.  They had not been issued a resident handbook and without a tablet, would not be able to access the handbook that way.  Many of the kiosks in the restrictive housing units were broken.  During the next monitoring period, the Monitoring Team will verify whether residents in restrictive housing have contacted, or have the ability to contact, the PREA hotline.

## Provision 265

Incarcerated people in restrictive housing for non-disciplinary purposes will have generally the same ability to retain personal property, including reading/writing materials, as people in general population, and to make phone and video calls during out-of-cell time.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

During the Monitoring Team's October visit, residents in restrictive housing indicated they did not have access to books or reading materials. Many residents noted that they were able to make phone calls during out-of-cell time. Many of the kiosks were broken so they were not able to make video calls.

## Provision 266

Incarcerated people in disciplinary restrictive housing will retain at minimum some reading/writing materials and religious articles. These items may not be removed except upon a particularized security concern.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO Disciplinary Segregation Policy (200-15) permits residents to possess a Bible/Religious book, two soft covered books, and religious article(s)/apparel approved by the Chaplin. During the next Monitoring Team visit, we will fully assess whether residents in disciplinary segregation have these materials in their cells.

# Discipline

The FCSO now has three staff dedicated to the resident discipline process: a captain, a lieutenant, and a hearing officer. The captain is experienced and is providing guidance and oversight to the team. The team is reviewing the entire disciplinary process and identifying gaps and solutions. The Monitoring Team acknowledges the disciplinary team is committed to ensuring residents are held accountable for misconduct while ensuring their due process rights are met. Due

to the ongoing staffing crisis, the disciplinary team often handles duties adjacent to the process such as conducting the investigation of the incident. The staffing crisis has been an impediment to conducting a disciplinary hearing within 14 days of the incident report. The disciplinary team reports that cases have been dismissed as a result of it not being able to hold the hearing within the requisite time frame. An objective mental health consultation and review process needs to be established to achieve compliance with the Consent Decree. The Monitoring Team anticipates that with focused effort, the FCSO will be able to make good progress with this area during the next monitoring period.

## Provision 267

All discipline of incarcerated people will be imposed consistent with Jail policies and this Consent Decree.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The disciplinary team is able to follow much of the FCSO's policy related to resident discipline. The focus of the next monitoring period will be to address the portions of the policy and Consent Decree that have not been followed (i.e., providing residents written notification of findings, consultation with a Qualified Mental Health Provider, etc.).

## Provision 268

In consultation with the Monitor, FCSO will review its schedule of disciplinary sanctions and ensure they are proportional to misconduct, progressive in severity, and purposeful in encouraging compliance with Jail rules.

269

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team anticipates reviewing the scheduling of disciplinary sanctions with the FCSO during the next monitoring period.

## **Provision 269**

All disciplinary investigations will be completed, and all disciplinary hearings will occur, within 14 days. A supervisor may approve a request for an extension of a disciplinary investigation with documented good cause.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

FCSO staff reported they are not always able to hold a disciplinary hearing within 14 days. As a result, they have had to dismiss charges. Moreover, the disciplinary team reported that cases are sent to them that have not yet been investigated.

## **Provision 270**

All people accused of any disciplinary offense with a potential restrictive housing sanction will have an opportunity to participate in a live disciplinary hearing. No one will be denied a live hearing except for particularized safety concerns, which will be documented and detailed, and in which case they will be provided an alternative means to make a statement (e.g., in writing) for consideration at the hearing.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO disciplinary team holds a live disciplinary hearing, with the resident present, if there is a potential for a restrictive housing sanction. Procedures for

ensuring non-English speaking residents or those who require an accommodation should be addressed.

## Provision 271

Any findings of guilt will be explained in writing, will explain the factual basis for the finding and the specific violations found, and will be provided to the incarcerated person being disciplined.

*Compliance Status:* Non Compliance

*Additional Discussion/Recommendations:*
The FCSO does not currently provide residents with a copy of their findings.

## Provision 272

Disciplinary officers will issue restrictive housing sanctions only as necessary, and only after concluding that other reasonable sanctions (e.g., commissary restriction, loss of phone privileges) are insufficient to serve the purposes of punishment.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*
FCSO staff report they consider sanctions other than restrictive housing, such as loss of phone privileges or commissary. The Monitoring Team will further assess the documentation for the sanctions during the next monitoring period.

## Provision 273

Disciplinary sentences for offenses that arise out of the same episode will be served concurrently.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The FCSO should revise its Resident Rules and Discipline Policy (600-01) to include this requirement.  FCSO staff report that sanctions arising out of the same incident are served concurrently.

## Provision 274

Incarcerated people who demonstrate good behavior during disciplinary restrictive housing should be given consideration for early release from restrictive housing, as appropriate.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO does not currently have a multi-disciplinary review team that is regularly reviewing the population in administrative and restrictive housing.  This is a staff intensive process but once it is established, it will be beneficial in managing the beds in restrictive housing.  Processes established for the review team should include consideration of early release for residents who demonstrate good behavior.

## Provision 275

Custody Staff will consult with mental health staff to determine whether initiating disciplinary procedures is appropriate for incarcerated people with mental health disabilities, in accordance with the following:

   a.  The disciplinary review panel or individual will consult with a QMHP prior to the hearing;

b. If, following a review of the incarcerated person's medical and mental health record, a QMHP determines the incarcerated person's actions were the result of mental illness (i.e. unable to appreciate the nature and quality or the wrongfulness of their acts), the incarcerated person will not be disciplined because of mental illness;

c. Even when an incarcerated person with mental illness is determined to be culpable for a disciplinary violation, Custody Staff will consult with a QMHP to determine whether the proposed sanction is likely to cause psychological harm or interfere with mental health treatment. In such cases, custody and mental health staff will confer to consider alternative sanctions that do not pose such harm and document such consultation; and

d. If Custody Staff decide not to follow those recommendations, Custody Staff will document a reasonable rationale why they decided not to follow the alternative sanction recommendations, how the harm identified by the QMHP will be safely addressed, and what sanctions if any they decided to put in place.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO has not yet established a formal, objective process regarding consultation with a QMHP as required by this provision.

## 17-Year-Olds in Restrictive Housing

The FCSO must develop a policy regarding 17-year-olds in restrictive housing that incorporates the requirements in the Consent Decree. During the Monitoring Team's October visit, 17-year-olds in restrictive housing had minimal complaints, except for the food. Several of the residents reported not knowing why they were

in the restrictive housing unit.  The lighting in a number of the cells was not working, but the residents had a small dome light.

## Provision 276

Until completion of the process described in Paragraph 277 below, and subject to the limitations set above in paragraphs 251-275 and below in paragraphs 278-280, FSCO will approach restrictive housing for 17-year-olds as follows: FCSO will not use restrictive housing for 17-year-olds in response to minor offenses or major offenses, as defined in the schedule of disciplinary sanctions described in section D above, that do not involve violence, significant property damage, or serious security risks.  FCSO may use restrictive housing for 17-year-olds in response to major offenses involving violence, significant property damage, or serious security risks, or in response to serious and extreme offenses, as defined in the schedule of disciplinary sanctions, but will consider youth as a mitigating factor when selecting a reasonable and proportionate sanction.  FCSO may also use restrictive housing for 17-year-olds in response to an ongoing safety threat, and FCSO will review the ongoing need for such placement as appropriate.

*Compliance Status:* Non Compliance

## Provision 277

By a date to be set in the Implementation Plan, Section XII, FCSO will have a multi-disciplinary committee, which will include appropriate FCSO leadership and the FCSO Medical Director, and will review restrictive housing practices for 17-year-olds in the Jail and make recommendations with the goal of minimizing to the extent possible FCSO's use of restrictive housing for this population.  The committee will consult with the Monitor and will review and consider national standards on the use of restrictive housing for this population.  The committee will

communicate its findings to the Monitor, who, by a date set in the Implementation Plan, Section XII, will produce a written report documenting the work and any recommendations. By a date to be determined, the FCSO will revise its policies and practices to implement these recommendations. The Parties will meet and confer about any recommendations FCSO has not implemented.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***
The FCSO has not yet engaged in the process described in this provision.

## Provision 278

FCSO will provide 17-year-olds placed in restrictive housing with continuing and adequate access to: medical, mental health, and education services; hygiene supplies; opportunity for large muscle exercise and telephone calls to their attorney; writing and reading materials; religious materials; and access to the grievance system.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***
The residents reported they had access to medical and mental health care and hygiene supplies. They noted they had not been out to the outdoor recreation area for some time. The Monitoring Team will further assess the 17-year-olds' access to the grievance system and telephone calls to their attorney during the next monitoring visit.

**Provision 279**

FCSO will provide sight and sound separation of 17-year-olds and adults in restrictive housing, and it will not house 17-year-olds in adult restrictive housing units.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The Monitoring Team recommends adding the prohibition of housing 17-year-olds in adult restrictive housing units in the new policy.

**Provision 280**

All 17-year-olds in the Jail will have adequate access to out-of-cell time, opportunities for large muscle exercise, programming (except that programming may be limited for the time a 17-year-old is serving a disciplinary sanction in restrictive housing or as otherwise needed for safety reasons), medical and mental health treatment, and educational services, as appropriate, and will not be subject to restrictive housing conditions solely because of their age.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

Several 17-year-olds in general population reported they had access to educational services and medical and mental health treatment. They also noted they had not been to the outdoor recreation area for "awhile" and thought it was due to staffing shortages.

## Data Tracking and Analysis

The provisions in this section require the FCSO to track and report on information related to the use of restrictive housing. While the FCSO does track some

information related to its use of restrictive housing, current efforts do not address all of the tracking, analysis, and reporting required by Provisions 281 and 282.

## Provision 281

FCSO will document using an incident report or by some other agreed-upon means the placement, reasoning for placement, and removal of all incarcerated people to and from restrictive housing by the end of the shift in which such placement or removal occurs.  FCSO will have a centralized tracker for restrictive housing that records the date and time of placement; reason for placement; status of any disciplinary charges; projected restrictive housing release date; actual restrictive housing release date; and consultations with mental health staff regarding the use of restrictive housing.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The FCSO provided the Monitoring Team a special management log from September 2025 that included information about residents held in Disciplinary Confinement, Administrative Segregation, and Protective Custody.  The tracker listed, among other items, the entry date and basis for placement.  This special management log did not include other required items, however, such as information about consultations with mental health staff.  The Monitoring Team recommends that the FCSO focus on revisions to the special management log to ensure that it includes all information required by Provision 281.  In future reporting periods, the Monitoring Team will then focus its review on the accuracy and reliability of the information included.

**Provision 282**

FCSO will collect and report system-wide data on its use of restrictive housing. This data will describe the incidence and prevalence of restrictive housing, including the total number of incarcerated people in each restrictive housing, restrictive housing recidivism rates, and the average length of stay. This data will include demographic information, including race, gender, gender identity, sexual orientation, disability status, and age.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team requested internal reports and other documentation regarding the use of restrictive housing required by Provision 282, including the total number of incarcerated people in restrictive housing, restrictive housing recidivism rates, and the average length of stay. While we received records from the FCSO Classifcation High Risk Segregation Review Committee and weekly restrictive housing status reviews, the Monitoring Team did not find the type of aggregate reports required by Provision 282. The Monitoring Team recommends that the FCSO begin to address this provision by revising its Restrictive and Special Management Housing Units (200-04) and Disciplinary Segregation (200-15) Policies to require staff to produce quarterly reports summarizing the information required by Provision 282, identifying emergent issues, and making recommendations to address them. In future reporting periods, the Monitoring Team will then focus its review on the content of those reports.

# Special Education and Related Services

In assessing their implementation priorities for the Consent Decree, the County and FCSO have determined they will focus on the Special Education and Related Services provisions in 2027. While FCSO staff will continue working on providing appropriate special education services before 2027, they are prioritizing the implementation of the life safety provisions contained in the Consent Decree. FCSO staff expressed a commitment to identifying and addressing the educational needs of the 17- to 21-year-olds. FCSO staff described the process for their facilitation of the educational service as follows:

> FCSO staff sends a referral list to their contact at the Atlanta Public Schools (APS). Residents between the ages of 17 – 21 are placed on the referral list. APS staff reviews the list and identifies individuals with an active Individualized Education Program (IEP) and initiates contact with the resident and/or their parent(s). The APS team evaluates each resident to determine the most appropriate educational support. A meeting is held with the resident and their parent. Once a plan is in place, instructors begin delivering educational services to the resident.

During the Monitoring Team's October visit, a Monitoring Team member spoke with five 17-year-olds who reported "going to school," which was described as one to two times per week for one to two hours at a time, usually with one resident present with the instructor. There were a few other 17-year-olds who indicated they were not receiving educational services but would be interested in participating in some type of "school." The Monitoring Team will continue to speak with 17-year-olds regarding educational services and will work with the

FCSO to ensure that adequate education services are implemented for these residents.

## Provision 283

FCSO will comply with the requirements of the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. §§ 1400–1482; 34 C.F.R. Part 300.

***Compliance Status:*** Non Compliance

## Provision 284

FCSO will employ a dedicated IDEA Coordinator, and any additional support staff as needed to reasonably manage volume, to direct IDEA compliance activities, and have responsibility to implement provisions of this Consent Decree related to special education and related services.

***Compliance Status:*** Non Compliance

## Provision 285

By dates set in the Implementation Plan, Section XII, the County and FCSO will create special education and related services policies and procedures to be consistent with the principles set forth herein and in accordance with the IDEA.

***Compliance Status:*** Not Rated

## Provision 286

Within six months of the date that any policy or procedure related to Special Education and Related Services is finalized or revised (following the period of review for the Monitor and United States), FCSO will train all relevant staff on that policy, through in-service training.

*Compliance Status:* Not Rated

## Provision 287

FCSO will create a comprehensive intake process to include assessments, interviews/questionnaires, and records review to help identify students who may currently receive special education services, previously received special education services, or may require special education services and will ensure the Atlanta Public School (APS) and/or the Fulton County Schools (FCS) has access to this information on a timely basis. FCSO will ensure that APS and/or FCS has access to any incarcerated people who are identified so that it can conduct evaluations as appropriate.

*Compliance Status:* Non Compliance

## Provision 288

FCSO will facilitate APS's and/or FCS's provision of specially designed instruction and related services to students with disabilities based on their individualized academic, social, emotional, and behavioral needs.

*Compliance Status:* Non Compliance

## Provision 289

FCSO will, under the leadership of APS and/or FCS, facilitate the development and implementation of Individualized Education Programs ("IEPs"). FCSO will facilitate the meaningful participation in the IEP decision-making process of students and their parents or guardians where appropriate.

*Compliance Status:* Partial Compliance

***Additional Discussion/Recommendations:***

FCSO staff facilitate APS's implementation of resident's Individual Education Programs (IEPs).

## Provision 290

FCSO will ensure that APS and/or FCS has necessary access to Jail Facilities so that it can provide services in an educational setting as appropriate.

***Compliance Status:*** Non Compliance

## Provision 291

FCSO will facilitate APS's and/or FCS's tracking and sharing of all removals from the educational setting based on behavior to determine when a manifestation determination review must be held, and will facilitate APS's and/or FCS's conducting of all required manifestation determinations as required by the IDEA.

***Compliance Status:*** Non Compliance

## Provision 292

FCSO will coordinate with APS and/or FCS and take all reasonable steps within its control to ensure that there are a sufficient number of education professionals to offer educational services consistent with this Consent Decree.

***Compliance Status:*** Non Compliance

# Quality Assurance

Quality Assurance, also known as Continuous Quality Improvement (CQI), is the process of ensuring that all health care processes are happening as they should and that patients are receiving appropriate medical care. CQI review of processes are "process studies," whereas CQI review of the quality of patient care are "outcome studies." The CQI process should include routine and ad-hoc process studies and outcome studies to ensure that all health care processes are reviewed over a period of time and appropriate outcomes are achieved; review of all such studies by a formal CQI committee, which typically meets monthly; and corrective action plans generated and tracked by the CQI committee in response to identified deficiencies.

NaphCare policies establish a comprehensive quality assessment/CQI framework that aligns with the requirements related to corrective action planning and performance oversight. The policy mandates formation of an institutional CQI committee with participation from medical leadership, mental health staff, nursing, custody/security representatives, and administrative leadership. The committee is responsible for identifying quality issues, establishing performance thresholds, conducting monitoring activities, analyzing findings, developing and implementing corrective action plans, and determining follow-up timeframes to assess the effectiveness of interventions. Policies further require routine chart reviews conducted at least quarterly, documentation of CQI meeting minutes, and preparation of monthly CQI reports summarizing identified issues and actions taken or planned. Mortality reviews are explicitly included as a core component of the CQI program, ensuring linkage between death reviews and systematic quality improvement efforts.

The policy also requires that all health staff participate in CQI activities, that the Medical Director remain actively involved, and that quality improvement initiatives be tracked through process and outcome studies, with at least one formal study completed annually. Annual effectiveness reviews are required to assess CQI performance, including focused review of deaths and serious incidents involving individuals with mental illness or substance use disorders.

Despite the presence of this policy framework, the Monitoring Team has not received sufficient evidence demonstrating that an operational, sustainable Quality Assurance Program has been implemented. FCSO will need to bolster its compliance team capacity to move towards substantial compliance with the quality assurance provisions. The Medical and Mental Health Monitors will provide technical assistance on what is expected from the CQI process.

## Provision 293

Beginning one year after the effective date, for the metrics required by this Consent Decree, the County and FCSO will, with input from the Monitor, establish an adequate Quality Assurance Program with the expectation that this Program will continue after the termination of this Consent Decree to ensure the durability of these improvements. The County and FCSO will ensure that the Quality Assurance Program is sufficiently maintained and identifies and corrects deficiencies relevant to the areas covered in this Consent Decree in the Jail.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

The Monitoring Team was provided with seven medical and mental health CQI studies conducted between December 2024 and March 2025. These included both process and outcome studies. However, the Monitoring Team has not been given

284

access to any CQI studies conducted after March of 2025 nor to any minutes or attendance logs of CQI committee meetings.  The Monitoring Team needs access to all CQI studies and CQI Committee minutes to be able to fully evaluate compliance with Provision 293.  Further, Provision 293 also requires quality assurance efforts related to other non-medical or mental health subjects covered by the Consent Decree.  FCSO will need to build additional capacity in its Compliance Unit in order to be able to achieve this objective.

## Provision 294

On an ongoing basis, the Quality Assurance Program will collect and analyze reliable data for patterns and trends relevant to the Consent Decree, and will develop and implement adequate corrective action plans when data analysis or program reviews indicate the need to address a system deficiency and ensure compliance with the terms of this Consent Decree.  The corrective action plans will include the time frame for implementation of corrective action, the person or persons responsible for implementing the action, and how the outcomes will be objectively measured.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team recognizes that it will take time to develop a comprehensive Quality Assurance Program as described by Provision 294 that will include all aspects of the Consent Decree, and to build sufficient staffing and expertise in order to administer the program.

# Implementation and Reporting

Provisions 295 through 298 outline requirements concerning initial and subsequent implementation plans to describe the steps Fulton County and the FCSO will take to fulfill their obligations under the Consent Decree. The initial implementation plan should include a specific schedule and deadlines to address required policy and procedure changes, analyses and plans, such as those related to staffing and housing, and training about the Consent Decree. Subsequent implementation plans, updated every six months, are required to set specific schedules and deadlines for the next year, provide details about implementation activities, and address areas of noncompliance and recommendations from the Monitoring Team.

Fulton County and the FCSO submitted the initial implementation plan within the requisite time frame required by the Consent Decree and received comments from the United States. Once the Monitoring Team began its work, it collaborated with FCSO regarding the implementation plan. During this review period, the Monitoring Team provided Fulton County and the FSCO technical assistance as it developed detailed implementation plans for certain provisions, including those identified by the Monitoring Team as having a particularly high priority. In June 2025 and December 2025, Fulton County and the FCSO submitted subsequent implementation plans within the requisite time frame required by the Consent Decree. In December 2025, the Parties agreed to an initial implementation plan that identifies high-level due dates, prioritizing each subsection of the Consent Decree containing substantive provisions. A draft of that initial implementation plan is currently under review, and the Monitoring Team expects that it should be finalized soon.

As required by Provision 301, Fulton County established a Compliance Coordinator position and filled it during this review period. The FCSO and NaphCare also identified staff to coordinate their compliance efforts. These personnel are critical in drafting and updating implementation plans and other work to coordinate and document efforts to achieve compliance with individual provisions. The Monitoring Team does not think this is a sufficient number of staff to fulfill the compliance functions of the Consent Decree.

Provisions 304 and 305 require the FCSO to, among other things, notify the Monitoring Team and the United States of in-custody deaths withing 24 hours and to provide a monthly notification of deaths, overdoses requiring medical intervention, serious injuries, and substantiated findings of certain types of staff misconduct. During this review period, the Monitoring Team was notified of several in-custody deaths and the process for notification has evolved. We also received memoranda documenting that the FCSO Internal Affairs Unit had investigated no in-custody deaths classified as a homicides during the months of August, September, and October.

## Provision 295

The County and FCSO will create an Implementation Plan, supplemented semi-annually, that describes the actions they will take to fulfill their obligations under this Consent Decree. Implementation of this Consent Decree will be completed in phases as outlined in the Consent Decree and the Implementation Plan.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

After the initial implementation plan that sets general due dates for each section of the Consent Decree is finalized, the Monitoring Team recommends that Fulton

287

County and the FCSO prioritize detailed plans for the provisions within sections that have due dates in the first half of 2026.  The detailed plans should include specific details about the individual work steps necessary to gain and document compliance with each provision, the staff responsible for completing each work step, and deadlines for each work step that set a reasonable pace for meeting overall due dates.

## Provision 296

Within 30 days of the Effective Date, and every six months thereafter, the County and FCSO will create and implement an Implementation Plan.  In each Implementation Plan, the County and FCSO will develop a specific schedule and deadlines for each action step required to implement the Consent Decree over the course of the next year, with a general schedule for successive years.

*Compliance Status:* Partial Compliance

## Provision 297

In the first Implementation Plan (Implementation Plan #1), the County and FCSO will develop a specific schedule and deadlines for the first twelve months, to include when the County and FCSO will: (a) draft or revise policies and procedures; (b) complete a staffing analysis and all plans required by this Consent Decree; and (c) develop and deliver training to Jail custody, medical, and mental health staff and providers concerning the provisions of this Consent Decree and the County's and FCSO's commitment to fulfilling their obligations under the Constitution and federal law.

*Compliance Status:* Partial Compliance

## Provision 298

Implementation Plans after Implementation Plan #1 will focus on and provide additional detail regarding implementation activities.  The County and FCSO will address in their further Implementation Plans any areas of non compliance or other recommendations identified by the Monitor in its reports.

*Compliance Status:* Not Rated

## Provision 299

The United States and the Monitor will provide comments regarding all Implementation Plans within 30 days of receipt. The County and FCSO will timely revise their Implementation Plans to address comments from the United States and the Monitor; the Parties and the Monitor will meet and consult as necessary. The United States and Monitor must approve the final Implementation Plans.

*Compliance Status:* Partial Compliance

*Additional Discussion/Recommendations:*

As discussed above, the County and FCSO have submitted several iterations of the implementation plan.  While each iteration has addressed feedback from the Monitoring Team and United States, none have been approved as a final version.

## Provision 300

FCSO will maintain and submit upon request records or other documents to verify that it has taken actions described in its reporting to the Monitor and United States (e.g., policies, procedures, protocols, training materials, investigations, and

incident reports), and will provide all documents reasonably requested by the Monitor or United States.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***
The FCSO and County have generally shared records requested by the Monitoring Team through a SharePoint site, though the Monitoring Team and United States experienced issues accessing the SharePoint site during the reporting period. The Monitoring Team's access was restored relatively quickly, but the issues encountered by the United States took longer to address.

### Provision 301

Within 30 days of the Effective Date, the County and FCSO will develop a job description and initiate recruitment of a full-time Compliance Coordinator. This person will have the requisite skills, knowledge, abilities, and time to perform the job functions that are substantially related to coordinating the successful implementation of every requirement of this Consent Decree. Two years after the Effective Date of this Consent Decree, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***
While Fulton County, the FCSO, and NaphCare have all identified staff members to coordinate compliance, the Monitoring Team reiterates the recommendation included in its First Monitoring Report that this effort will require a team of additional full-time staff, including those capable of data management and legal analysis. The Monitoring Team believes that the FCSO should begin with at least

five full-time staff and engage in a meaningful workload assessment, as the true need may be much higher.

## Provision 302

The Compliance Coordinator will report to the Attorneys for the County and the FCSO who will serve as a primary point of contact for the Monitor and United States. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out its duties.

***Compliance Status:*** Substantial Compliance

***Additional Discussion/Recommendations:***

The County Compliance Coordinator position reports to the attorneys for the County and has taken the lead in responding to records requests from the Monitoring Team.

## Provision 303

At a minimum, the Compliance Coordinator will: (a) coordinate compliance and implementation activities; (b) facilitate the provision of data, documents, materials, and access to County and FCSO personnel to the Monitor, United States, and the public, as needed; (c) ensure that all documents and records are maintained as provided in this Consent Decree; and (d) assist in assigning compliance tasks to County or FCSO personnel.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

While the compliance coordinators for the County, FCSO, and NaphCare have generally fulfilled the responsibilities addressed in this provision, as indicated elsewhere, substantial compliance will require a larger team of full-time staff.

## Provision 304

FCSO will notify the United States and the Monitor upon the death of any incarcerated person, within 24 hours.  FCSO will forward to the Monitor and United States incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of incarcerated people, as well as all final investigative reports that involve deaths and mortality reviews within seven days of completion.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team recommends that the FCSO formalize its notification procedures by documenting in policy the staff responsible for notifying the Monitoring Team, the deadlines for initial notification and for forwarding relevant reports, and the process by which relevant reports and documentation will be identified and shared.

## Provision 305

Monthly, FCSO will notify the Monitor and United States of any of the following occurring at the Jail during the preceding month:

    a.  deaths and cause of deaths if known;

    b.  overdoses requiring medical intervention;

    c.  serious injuries to incarcerated people or staff requiring hospitalization or emergency hospital transfer;

    d.  substantiated findings of violence, extortion, or sexual abuse; and

    e.  substantiated findings of staff misconduct related to drug trafficking, other contraband, or retaliation against an incarcerated person or staff member for reporting misconduct.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team recommends that the FCSO revise its Sheriff's Monthly Report Policy (700-28) or another relevant policy to require staff to generate and share a report notifying the Monitoring Team and the United States of incidents described in this provision that occurred in the prior month. We further recommend that the FCSO develop a process to audit these reports to identify missing or inaccurate information, correct inaccuracies, and update policies and procedures to address commonly occurring issues.

## **Provision 306**

Upon request, FCSO will forward to the United States any related incident reports, and medical and/or mental health reports, and investigation reports as they become available, for the events reported monthly.

***Compliance Status:*** Partial Compliance

***Additional Discussion/Recommendations:***

The County and FCSO have been responsive to requests from the Monitoring Team, but as noted in the discussion of Provision 300, the provision of certain records have been hampered by access issues encountered by the United States.

# Accountability and Transparency

Provisions 348 through 352 in this section of the Consent Decree establish requirements related to resident and community access to FCSO policies and procedures adopted under the Consent Decree. The FCSO has not yet made these documents available on its website, included them on the tablets provided to residents, or revised its resident handbook to notify residents that they can review them upon request.

Provision 353 in this section requires that the FCSO provide residents with a way to report information related to the Consent Decree directly to the Monitoring Team at no cost. This has not yet been established, but the Monitoring Team plans to work with the FCSO to develop a process in the next reporting period.

## Provision 348

FCSO will make all new policies and procedures adopted under this Consent Decree readily available to the public and the incarcerated population, unless a specific policy or procedure creates a legitimate security risk, as described below.

*Compliance Status:* Not Rated

## Provision 349

FCSO will notify all incarcerated people that they can review available policies and procedures upon request.

*Compliance Status:* Not Rated

## **Provision 350**

Electronic copies of policies and procedures adopted under this Consent Decree will be available in the multipurpose area of the Main Jail and in the Annex Facilities.

*Compliance Status:* Not Rated

## **Provision 351**

Policies and procedures will also be posted on the FCSO website and accessible on electronic platforms (e.g., tablets and kiosks) accessible to incarcerated people.

*Compliance Status:* Not Rated

## **Provision 352**

If FCSO determines that allowing the public to access a policy or procedure creates a legitimate security risk, it will notify the Monitor and United States of this determination. FCSO will provide a written explanation of the security risk upon request.

*Compliance Status:* Not Rated

## **Provision 353**

FCSO will provide ways for incarcerated people to report information related to the Consent Decree directly to the Monitor at no cost to the incarcerated person, including via the Jail kiosks and in writing.

***Compliance Status:*** Non Compliance

***Additional Discussion/Recommendations:***

The Monitoring Team will work with FCSO during the next reporting period to establish these procedures.

## Compliance Status of Substantive Provisions

| Section | Provision | Compliance Status |
|---|---|---|
| Policies, Procedures, and Training | 31 | Not Rated |
| | 32 | Not Rated |
| | 33 | Not Rated |
| | 34 | Not Rated |
| | 35 | Partial Compliance |
| | 36 | Partial Compliance |
| | 37 | Partial Compliance |
| | 38 | Partial Compliance |
| | 39 | Partial Compliance |
| | 40 | Not Rated |
| Notification of Rights and Protections | 41 | Partial Compliance |
| | 42 | Partial Compliance |
| | 43 | Partial Compliance |
| | 44 | Non Compliance |
| | 45 | Partial Compliance |
| Protection from Harm – Policies, Procedures, and Training | 46 | Not Rated |
| | 47 | Not Rated |
| | 48 | Partial Compliance |
| | 49 | Non Compliance |
| | 50 | Partial Compliance |

| | | |
|---|---|---|
| Protection from Harm – Classification and Housing | 51 | Partial Compliance |
| | 52 | Partial Compliance |
| | 53 | Partial Compliance |
| | 54 | Partial Compliance |
| | 55 | Partial Compliance |
| | 56 | Partial Compliance |
| | 57 | Not Rated |
| | 58 | Partial Compliance |
| | 59 | Partial Compliance |
| | 60 | Partial Compliance |
| Protection from Harm – Staffing and Supervision | 61 | Partial Compliance |
| | 62 | Partial Compliance |
| | 63 | Partial Compliance |
| | 64 | Partial Compliance |
| | 65 | Non Compliance |
| | 66 | Non Compliance |
| | 67 | Non Compliance |
| | 68 | Partial Compliance |
| | 69 | Partial Compliance |
| | 70 | Partial Compliance |
| | 71 | Partial Compliance |
| | 72 | Substantial Compliance |
| Protection from Harm – Contraband Prevention | 73 | Partial Compliance |
| | 74 | Partial Compliance |
| | 75 | Partial Compliance |
| Protection from Harm – Gang Violence | 76 | Non Compliance |
| | 77 | Partial Compliance |

298

| | | |
|---|---|---|
| | 78 | Non Compliance |
| | 79 | Partial Compliance |
| | 80 | Partial Compliance |
| | 81 | Non Compliance |
| | 82 | Partial Compliance |
| | 83 | Partial Compliance |
| Protection from Harm – Grievance, Incident, and Maintenance Reporting | 84 | Partial Compliance |
| | 85 | Partial Compliance |
| | 86 | Partial Compliance |
| | 87 | Partial Compliance |
| | 88 | Partial Compliance |
| | 89 | Partial Compliance |
| | 90 | Partial Compliance |
| | 91 | Partial Compliance |
| | 92 | Substantial Compliance |
| | 93 | Non Compliance |
| | 94 | Partial Compliance |
| | 95 | Partial Compliance |
| | 96 | Partial Compliance |
| | 97 | Partial Compliance |
| | 98 | Partial Compliance |
| Protection from Harm – Investigations and Corrective Action Planning | 99 | Substantial Compliance |
| | 100 | Partial Compliance |
| | 101 | Partial Compliance |
| | 102 | Non Compliance |
| | 103 | Partial Compliance |
| | 104 | Partial Compliance |
| | 105 | Partial Compliance |
| | 106 | Non Compliance |

| | | |
|---|---|---|
| | 107 | Partial Compliance |
| | 108 | Partial Compliance |
| | 109 | Partial Compliance |
| | 110 | Partial Compliance |
| | 111 | Partial Compliance |
| | 112 | Partial Compliance |
| Protection from Harm – Sexual Abuse Reporting and Investigations | 113 | Partial Compliance |
| | 114 | Partial Compliance |
| | 115 | Partial Compliance |
| | 116 | Partial Compliance |
| | 117 | Non Compliance |
| | 118 | Non Compliance |
| | 119 | Partial Compliance |
| Protection from Harm – Information Management Systems and Resiliency Planning | 120 | Partial Compliance |
| | 121 | Non Compliance |
| | 122 | Partial Compliance |
| | 123 | Partial Compliance |
| | 124 | Partial Compliance |
| Protection from Harm – Data Tracking and Reporting | 125 | Non Compliance |
| | 126 | Partial Compliance |
| | 127 | Partial Compliance |
| | 128 | Partial Compliance |
| | 129 | Partial Compliance |
| Use of Force – Policies, Procedures and Training | 130 | Partial Compliance |
| | 131 | Not Rated |
| | 132 | Partial Compliance |
| | 133 | Partial Compliance |

| | | |
|---|---|---|
| Use of Force – Tasers | 134 | Non Compliance |
| | 135 | Partial Compliance |
| | 136 | Not Rated |
| | 137 | Partial Compliance |
| | 138 | Partial Compliance |
| | 139 | Non Compliance |
| | 140 | Partial Compliance |
| Use of Force – Use-of-Force Reviews | 141 | Partial Compliance |
| | 142 | Partial Compliance |
| | 143 | Partial Compliance |
| | 144 | Non Compliance |
| | 145 | Partial Compliance |
| | 146 | Partial Compliance |
| | 147 | Partial Compliance |
| Use of Force – Data Tracking and Reporting | 148 | Partial Compliance |
| | 149 | Non Compliance |
| | 150 | Non Compliance |
| | 151 | Partial Compliance |
| Environmental Health and Nutrition – Policies, Procedures and Training | 152 | Not Rated |
| | 153 | Not Rated |
| Environmental Health and Nutrition – Sanitation and Environmental Safety | 154 | Non Compliance |
| | 155 | Non Compliance |
| | 156 | Partial Compliance |
| | 157 | Partial Compliance |

301

| | | |
|---|---|---|
| Environmental Health and Nutrition – Physical Plant | 158 | Non Compliance |
| | 159 | Non Compliance |
| | 160 | Partial Compliance |
| | 161 | Non Compliance |
| | 162 | Non Compliance |
| | 163 | Partial Compliance |
| | 164 | Non Compliance |
| | 165 | Partial Compliance |
| | 166 | Non Compliance |
| | 167 | Partial Compliance |
| | 168 | Non Compliance |
| Environmental Health and Nutrition – Pest Control | 169 | Partial Compliance |
| | 170 | Partial Compliance |
| | 171 | Substantial Compliance |
| | 172 | Partial Compliance |
| | 173 | Partial Compliance |
| Environmental Health and Nutrition – Chemical Control | 174 | Non Compliance |
| | 175 | Non Compliance |
| | 176 | Non Compliance |
| | 177 | Non Compliance |
| | 178 | Partial Compliance |
| Environmental Health and Nutrition – Food and Nutrition | 179 | Non Compliance |
| | 180 | Partial Compliance |
| Medical and Mental Health Care – Policies, Procedures and Training | 181 | Not Rated |
| | 182 | Not Rated |
| | 183 | Partial Compliance |
| | 184 | Partial Compliance |
| | 185 | Partial Compliance |
| Medical and Mental Health Care – Intake and Records | 186 | Partial Compliance |
| | 187 | Partial Compliance |

| | | |
|---|---|---|
| Medical and Mental Health Care – Emergencies | 188 | Partial Compliance |
| | 189 | Partial Compliance |
| | 190 | Partial Compliance |
| | 191 | Partial Compliance |
| | 192 | Non Compliance |
| Medical and Mental Health Care – Assessments, Sick Calls, and Referrals | 193 | Partial Compliance |
| | 194 | Partial Compliance |
| | 195 | Non Compliance |
| | 196 | Partial Compliance |
| | 197 | Partial Compliance |
| | 198 | Partial Compliance |
| Medical and Mental Health Care – Medical Care | 199 | Partial Compliance |
| | 200 | Partial Compliance |
| | 201 | Partial Compliance |
| | 202 | Partial Compliance |
| | 203 | Substantial Compliance |
| | 204 | Partial Compliance |
| | 205 | Substantial Compliance |
| | 206 | Partial Compliance |
| | 207 | Partial Compliance |
| | 208 | Partial Compliance |
| | 209 | Partial Compliance |
| Medical and Mental Health Care – Supportive Environments | 210 | Partial Compliance |
| | 211 | Partial Compliance |
| | 212 | Non Compliance |
| | 213 | Partial Compliance |
| | 214 | Non Compliance |
| | 215 | Non Compliance |
| | 216 | Partial Compliance |

| | | |
|---|---|---|
| Medical and Mental Health Care – Mental Health Care | 217 | Partial Compliance |
| | 218 | Non Compliance |
| | 219 | Non Compliance |
| | 220 | Non Compliance |
| | 221 | Partial Compliance |
| | 222 | Partial Compliance |
| | 223 | Non Compliance |
| | 224 | Partial Compliance |
| | 225 | Non Compliance |
| | 226 | Partial Compliance |
| | 227 | Partial Compliance |
| | 228 | Non Compliance |
| | 229 | Partial Compliance |
| Medical and Mental Health Care – Suicide Prevention | 230 | Partial Compliance |
| | 231 | Partial Compliance |
| | 232 | Partial Compliance |
| | 233 | Non Compliance |
| | 234 | Non Compliance |
| | 235 | Non Compliance |
| | 236 | Partial Compliance |
| | 237 | Partial Compliance |
| Medical and Mental Health Care – Medication Administration | 238 | Partial Compliance |
| | 239 | Partial Compliance |
| | 240 | Partial Compliance |
| | 241 | Non Compliance |
| | 242 | Partial Compliance |
| | 243 | Partial Compliance |
| | 244 | Partial Compliance |

304

| | | |
|---|---|---|
| Medical and Mental Health Care – Oversight and Mortality Reviews | 245 | Non Compliance |
| | 246 | Partial Compliance |
| | 247 | Partial Compliance |
| Restrictive Housing – Policies, Procedures and Training | 248 | Not Rated |
| | 249 | Not Rated |
| | 250 | Non Compliance |
| Restrictive Housing – Mental Health Contraindication to Restrictive Housing | 251 | Non Compliance |
| | 252 | Non Compliance |
| | 253 | Non Compliance |
| | 254 | Partial Compliance |
| | 255 | Partial Compliance |
| | 256 | Non Compliance |
| | 257 | Non Compliance |
| | 258 | Non Compliance |
| | 259 | Non Compliance |
| | 260 | Partial Compliance |
| | 261 | Non Compliance |
| Restrictive Housing – Conditions in Restrictive Housing | 262 | Partial Compliance |
| | 263 | Partial Compliance |
| | 264 | Non Compliance |
| | 265 | Partial Compliance |
| | 266 | Partial Compliance |
| Restrictive Housing – Discipline | 267 | Partial Compliance |
| | 268 | Non Compliance |
| | 269 | Non Compliance |
| | 270 | Partial Compliance |
| | 271 | Non Compliance |
| | 272 | Partial Compliance |
| | 273 | Partial Compliance |
| | 274 | Non Compliance |
| | 275 | Non Compliance |

| | | |
|---|---|---|
| Restrictive Housing – 17-Year-Olds in Restrictive Housing | 276 | Non Compliance |
| | 277 | Non Compliance |
| | 278 | Partial Compliance |
| | 279 | Partial Compliance |
| | 280 | Partial Compliance |
| Restrictive Housing – Data Tracking and Analysis | 281 | Non Compliance |
| | 282 | Non Compliance |
| Special Education and Related Services | 283 | Non Compliance |
| | 284 | Non Compliance |
| | 285 | Not Rated |
| | 286 | Not Rated |
| | 287 | Non Compliance |
| | 288 | Non Compliance |
| | 289 | Partial Compliance |
| | 290 | Non Compliance |
| | 291 | Non Compliance |
| | 292 | Non Compliance |
| Quality Assurance | 293 | Partial Compliance |
| | 294 | Non Compliance |
| Implementation and Reporting | 295 | Partial Compliance |
| | 296 | Partial Compliance |
| | 297 | Partial Compliance |
| | 298 | Not Rated |
| | 299 | Partial Compliance |
| | 300 | Partial Compliance |
| | 301 | Substantial Compliance |
| | 302 | Substantial Compliance |
| | 303 | Partial Compliance |
| | 304 | Partial Compliance |
| | 305 | Non Compliance |
| | 306 | Partial Compliance |

| | 348 | Not Rated |
|---|---|---|
| | 349 | Not Rated |
| Accountability and Transparency | 350 | Not Rated |
| | 351 | Not Rated |
| | 352 | Not Rated |
| | 353 | Non Compliance |